IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PACIFIC ENERGY RESOURCES LTD, *et al.*,[1] | ) | Case No. 09-10785 (KJC) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

**Objection Deadline: May 27, 2009 at 4:00 p.m.**
**Hearing Date: June 3, 2009 at 1:00 p.m.**

## DEBTORS' MOTION FOR AN ORDER APPROVING A KEY EMPLOYEE INCENTIVE PLAN AND AUTHORIZING PAYMENTS THEREUNDER

By this motion (the "Motion"), the above-captioned debtors and debtors in possession (the "Debtors") seek the entry of an order approving a performance-based key employee incentive plan (the "Incentive Plan"), and authorizing the Debtors to make payments thereunder.

### Preliminary Statement

1.      The Incentive Plan is for a select group of executives, managers, supervisors, and key hourly employees that can significantly influence the various initiatives ongoing within the chapter 11 proceedings. This is a new program that is being put in place as a result of the challenges and uncertainties presented by a chapter 11 reorganization process. The Incentive Plan participants will play an integral role in maximizing value for all constituents and

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Pacific Energy Resources Ltd. (3442); Petrocal Acquisition Corp. (6249); Pacific Energy Alaska Holdings LLC (tax I.D. # not available); Carneros Acquisition Corp. (5866); Pacific Energy Alaska Operating LLC (7021); San Pedro Bay Pipeline Company (1234); Carneros Energy, Inc. (9487); and Gotland Oil, Inc. (5463). The address for all of the Debtors is 111 W. Ocean Boulevard, Suite 1240, Long Beach, CA.

providing for a smooth transition of the assets to the new buyers and a wind-down of the estate. The Incentive Plan is based on several metrics, each of which will enhance the value of the estate. The metrics are as follows: (1) Beta Sale Value and Royalty Relief; (2) Alaska Sale Value; (3) Beta Daily Production; (4) Beta Spending to Budget; and (5) Alaska Spending to Budget. The total bonus to be paid under this plan will be between zero and approximately $1.4 million based on the performance against various metrics that have been established. The Low payout is expected to be approximately $380,000 with a mid or likely payout being approximately $740,000. The Incentive Plan will create value for, and provide incentives to, key employees during the chapter 11 process driving the entire team toward positive, value maximizing results for all constituents.

## Jurisdiction

2.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (M) and (O). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief sought herein are sections 105(a), 363(b) and 503(c)(3) of the title 11 of the United States Code (the "Bankruptcy Code").

## Background

4.      On March 9, 2009 (the "Petition Date"), the Debtors commenced these cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors have continued in the possession of their property and have continued to operate and manage their businesses as debtors and debtors in possession pursuant to sections 1107(a) and

2

1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Debtors' chapter 11 cases. The Office of the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee") on March 19, 2009.

5. The Debtors are a group of independent energy companies engaged in the acquisition, development and exploitation of oil and gas properties in the western United States. The Debtors' revenue for 2008 was approximately $226.2 million.

## Relief Requested

6. By this Motion, the Debtor requests that the Court enter an order, pursuant to sections 105(a), 363(b) and 503(c)(3) of the Bankruptcy Code, approving the proposed Incentive Plan and authorizing the Debtors, in their sole discretion, to implement all or any part of the Incentive Plan for the Participating Employees and to make the payments contemplated thereunder.

7. The Incentive Plan is a performance bonus plan that is designed to incentivize a select list of 25 employees ("Participating Employees") who are expected to have an integral role in maximizing value for the Debtors' chapter 11 estates and their creditors by using their skills, knowledge and experience. Bonuses are designed to motivate and are paid for performance only. The total bonuses to be paid under the Incentive would be zero if none of the minimum performance targets are met. Total bonuses, however, would be $380,467 if all the lowest performance targets are met, $740,612 if all of the mid-range performance targets are met and $1,424,75 if all of the highest performance targets are met. The targets are goals that would garner the highest expected value for the estates. To participate, Participating Employees must

3

commit to the Incentive plan and must release all claims that may have against the Debtors, other than unpaid claims for ordinary wages and accrued but unused vacation pay.

## Proposed Incentive Plan[2]

8.      A copy of the Incentive Plan is attached to this Motion as Exhibit A.[3] The Incentive Plan consists of four groups (the "Groups") that collectively include 25 Participating Employees.[4] Each Group has one or two performance metrics, which are discussed below. Each Participating Employee in a Group that meets its initial target metric would receive a performance bonus equal to a percentage (for all but one type of bonus, on a sliding scale up to a maximum percentage)[5] of his or her base salary as set forth in the Incentive Plan.

9.      **Group 1 – Metric 1a – Maximize Beta Assets Sale Price**. The first group ("Group 1") consists of six Participating Employees (the "Group 1 Participating Employees"), four of whom are officers and two of whom are supervisors. Each of the Group 1 Participating Employees would receive performance bonuses (each, a "Metric 1a Bonus") if Pacific Energy Resources Ltd. ("PERL") receives a *bona fide* third party offer for the Beta

---

[2] This summary of material terms of the Incentive Plan has been included for the convenience of the parties receiving this Motion. It in no way alters, changes or amends the actual terms set forth in the Incentive Plan itself. In the event that there are any inconsistencies between this summary and the Incentive Plan, the language set forth in the Incentive Plan controls.

[3] The copy of the Incentive Plan attached as Exhibit A to this Motion is redacted for confidential information consisting of the salary information for the Participating Employees. The Debtors have concurrently with the filing of this Motion field their *Debtors' Motion to File Under Seal Exhibit A to the Motion for an Order Approving a Key Employee Incentive Plan and Authorizing Payments Thereunder*. Unredacted versions of the Incentive Plan have been provided to counsel for the Secured Creditors Committee and the United States Trustee.

[4] Some Participating Employees are in more than one Group and may receive a bonus in each Group in which they participate that meets or exceeds their respective targets.

[5] Other than for the Metric 1b Bonuses (defined below), once the initial target metric is reached for each Group, Participating Employees in the Group would receive bonuses for that Group on a sliding scale, so that if the relevant metric is in between two of the target amounts for the Group shown in the Incentive Plan, the bonus would be increased proportionately from the prior target to the next target or until the Participating Employee's maximum percentage (in that Group) is reached. An example is provided in the Incentive Plan.

Assets[6] that exceeds one or more of the target prices set forth in the Incentive Plan ("Metric 1a").[7] If the initial Metric 1a target is met, Group 1 Participating Employees would receive between $166,595 to $499,785 in the aggregate on a sliding scale. The Group 1 bonuses would be paid in the first payroll after this Court's entry of an order approving the sale, which is currently expected to be the August 28, 2009 payroll.

10. **Group 1 – Metric 1b – Maximize Beta Royalty Relief.** Three Group 1 Participating Employees (all of whom are officers) would receive a performance bonus (the "Metric 1b Bonus"), in addition to any Metric 1a Bonus, if (a) the MMS reduces PERLs royalty rates for the Beta Assets; (b) the total Beta sales value is greater than $200,000,000 and (c) the portion of sales value attributed to royalty relief (in good faith by a compensation committee)[8] exceeds $324,000 ("Metric 1b"). If the initial Metric 1b target is met, the three Group 1 Participating Employees who are eligible for Metric 1b Bonuses would receive a total of $324,000. All Group 1 Bonuses would be paid as set forth above.

11. **Group 2 – Maximize Alaska Assets Sale Price.** The second group ("Group 2") consists of seven Participating Employees (the "Group 2 Participating Employees"), five of whom are officers and two of whom are supervisors. Each of the Group 2 Participating Employees would receive performance bonuses if Pacific Energy Alaska Operating LLC

---

[6] The "Beta Assets" are working interests in oil and gas leases, which PERL leases principally from the Minerals Management Service ("MMS") of the United States Department of Interior, and related assets, which are located in federal waters approximately nine miles off the coast of Long Beach, California.

[7] The purchase and sale agreement with a potential buyer of the Beta Assets might have adjustments to the purchase price. The value used to calculate Group 1 performance bonuses will be the same value used to calculate the fee for Albrecht & Associates, Inc. ("Albrecht"), as sale agent, using same adjustments to purchase price for both purposes.

[8] As stated above, the value used to calculate Group 1 performance bonuses will be the same value used to calculate the fee for Albrecht. The sales value attributable to royalty reduction would be based on all available data, including feedback from the buyers on the value they are attributing to the reduction in royalty rates.

("PEAO") receives a *bona fide* third party offer for the Alaska Assets[9] that exceeds one or more of the target prices set forth in the Incentive Plan ("Metric 2").[10] If the initial Metric 2 target is met, Group 2 Participating Employees would receive between $83,082 to $249,246 in the aggregate on a sliding scale. The Group 2 bonuses would be paid in the first payroll after this Court's entry of an order approving the sale, which is currently expected to be the August 28, 2009 payroll.

12.     **Group 3 – Maintain Oil Production and Control Lease Operating Expenses for Beta Assets**. The third group ("Group 3") consists of 14 Participating Employees (the "Group 3 Participating Employees"), two of whom are officers, six of whom are supervisors and six of who are rank and file employees with critical skills and experience. The Group 3 Participating Employees would receive performance bonuses if (a) daily oil production from the Beta Assets meets or exceeds one or more targets during the 17-week period beginning May 3, 2009 and ending August 29, 2009 ("Metric 3a") and/or (b) a ratio that measures lease operating expenses (LOE) [11] for the Beta Assets and the San Pedro Bay Pipeline meets or exceeds one or more target amounts during the 17-week period described above ("Metric 3b"). If the initial Metric 3a target is met, Group 3 Participating Employees would receive between $43,026 to $108,756 in the aggregate on a sliding scale (as applicable to Metric 3b). If the initial Metric 3b target is also met, Group 3 Participating Employees would receive an additional amount of

---

[9] The "Alaska Assets" are working interests in oil and gas leases, which PEAO leases principally from the State of Alaska, and related assets, which are located in or near Cook Inlet, Alaska (the "Alaska Assets").

[10] The purchase and sale agreement with a potential buyer of the Alaska Assets might have adjustments to the purchase price. The value used to calculate Group 2 performance bonuses will be the same value used to calculate the fee for the Debtors' investment banker Lazard Freres & Co. LLC, using same adjustments to purchase price for both purposes.

[11] The ratio is Beta Performance to Budget, as such terms are used in the Incentive Plan.

DOCS_LA:201686.11

between $43,026 to $108,756 in the aggregate on a sliding scale (as separately applicable to

Metric 3b). The Group 3 bonuses would be paid in the first payroll after final reconciliation and

verification of performance, which is currently expected to be the September 11, 2009 payroll.

13. **Group 4 –Control Lease Operating Expenses for Alaska Assets.** The

fourth group ("Group 4") consists of 10 Participating Employees (the "Group 4 Participating

Employees"), two of whom are officers, six of whom are supervisors and six of who are rank and

file employees with critical skills and experience. The Group 4 Participating Employees would

receive performance bonuses if a ratio that measures lease operating expenses (LOE) [12] for the

Alaska Assets meets or exceeds one or more target amounts during the 17-week period described

above ("Metric 4"). If the initial Metric 4 target is met, Group 3 Participating Employees would

receive between $44,738 to $134,214 in the aggregate on a sliding scale. The Group 4 bonuses

would be paid in the first payroll after final reconciliation and verification of performance, which

is currently expected to be the September 11, 2009 payroll.

14. In further support of this Motion, the Debtors respectfully represent as

follows:

### Basis for the Relief Requested

**B.** **Implementation of the Incentive Plan is a Valid Exercise of the Debtors'
Business Judgment Pursuant to Section 363(b) of the Bankruptcy Code**

15. The Court may authorize the Debtors to implement the Incentive Plan

under section 363(b)(1) of the Bankruptcy Code. Section 363(b)(1) provides that "[t]he trustee,

after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business,

---

[12] The ratio is Alaska Performance to Budget, as such terms are used in the Incentive Plan.

property of the estate." 11 U.S.C. § 363(b)(1). The use, sale, or lease of property of the estate, other than in the ordinary course of business, is authorized when a "sound business purpose" justifies such action. See, e.g., Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996) (noting that under normal circumstances, courts defer to a trustee's judgment concerning use of property under §363(b) when there us a legitimate business justification); In re Delaware & Hudson R.R. Co., 124 B.R. 169, 176 (D. Del. 1991) (explaining that the Third Circuit has adopted the "sound business purpose" test to evaluate motions brought pursuant to section 363(b)).

16.    Historically, courts have approved employee compensation programs that are outside of the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code. See, e.g., Dai-Ichi Kangyo Bank Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1999) (affirming bankruptcy court approval of key employee retention program; stating that "in determining whether to authorize the use, sale, or lease of property of the estate under [section 363(b)], courts require the debtors to show that a sound business purpose justifies such actions"); In re Global Home Products, LLC, 369 B.R. 778, 784 (Bankr. D. Del. 2007) ("The reasonable use of incentives and performance bonuses are considered the proper exercise of a debtor's business judgment."); In re Nobex Corp., 2006 Bankr. LEXIS 417, 2006 WL 4063024, at *2 (Bankr. D. Del. Jan. 19, 2006) (approving incentive pay outside of ordinary course where it was "an appropriate exercise of the Debtor's business judgment."); In re America West Airlines, Inc., 171 B.R. 674, 678 (Bankr. D. Ariz 1994) (it is the proper use of a debtors' business judgment to propose bonuses for employees who helped

8

propel the debtor successfully through the bankruptcy process); In re Interco Inc., 128 B.R. 229, 234 (Bankr. E.D. Mo 1991) ("debtors' business judgment" was controlling in the approval of a "performance/retention program"). See also, In re Riverstone Networks, Inc., Case No. 06-10110 (CSS) (Bankr. D. Del. March 28, 2006); In re Pliant Corp., Case No. 06-10001 (Bankr. D. Del. March 14, 2004).

17.     The Debtors submit that the implementation of the Incentive Plan is a proper exercise of their business judgment. As noted above, the Debtors must accomplish a significant amount of work in a short period of time, while minimizing costs, in order to maximize creditor outcomes.

18.     To help ensure that this happens, the Debtors formulated the Incentive Plan in conjunction with their retained financial advisor Zolfo Cooper LLC ("Zolfo Cooper"). The Debtors believe that the Incentive Plan provides a mechanism by which the Participating Employees will be motivated to work very hard to complete the requisite work necessary to expeditiously liquidate the Debtors' remaining assets on a controlled basis, at minimal cost and expense to the Debtors' estates while maintaining asset value pending sale. Moreover, the Participating Employees will only be paid a performance bonus if they meet the objective benchmarks set forth in the Incentive Plan.

19.     The Compensation Committee of the Debtors' Board of Directors reviewed, considered and recommended that the entire Board of Directors approve the Incentive Plan. The Board of Directors then considered and approved the Incentive Plan.

20.     The Debtors submit that implementation of the Incentive Plan is an appropriate exercise of their business judgment under section 363(b)(1) of the Bankruptcy Code, and should therefore be approved by the Court.

## C.     The Incentive Plan Complies With Section 503(c) of the Bankruptcy Code

21.     Section 503(c) of the Bankruptcy Code is applicable to all bankruptcy cases filed after October, 2005.  It provides criteria for courts to use in approving certain types of payments to insiders and "other transfers of obligations that are outside of the ordinary course of business."  Section 503(c) contains:  (1) a general prohibition of retention plans for insiders of a debtor; (2) limitations on severance payments to insiders of a debtor; and (3) standards governing other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the Petition. 11 U.S.C. § 503(c).  For the reasons set forth herein, neither section 503(c)(1) nor 503(c)(2) are applicable to the Incentive Plan.  Moreover, as set forth below, the Incentive Plan complies with section 503(c)(3) of the Bankruptcy Code and should therefore be approved.

### Sections 503(c)(1) and (2) are Not Applicable to the Incentive Plan

22.     Pursuant to the statute's plain language, section 503(c)(1) of the Bankruptcy Code pertains solely to retention plans,[13] and section 503(c)(2) only addresses the

---

[13] 11 U.S.C. § 503(c)(1) ("Notwithstanding subsection (b), there shall neither be allowed, nor paid – a transfer made to, or an obligation incurred for the benefit of, an insider of the debtor for the purpose of inducing such person to remain with the debtor's business, absent a finding by the court based on evidence in the record that – (A) the transfer or obligation is essential to retention of the person because the individual has a bona fide job offer from another business at the same or greater rate of compensation; (B) the services provided by the person are essential to the survival of the business; and (C) either – (i) the amount of the transfer made to, or obligation incurred for the benefit of, the person is not greater than an amount equal to 10 times the amount of the mean transfer or obligation of a similar kind given to nonmanagement employees for any purpose during the calendar year in which the transfer

10

requirements for severance plans.[14] Neither section applies to performance-based incentive

plans. See, e.g., Global Home Products, 369 B.R. at 783 ("If [the proposed plans] are plans to

incentivize management, the analysis utilizes the more liberal business judgment review under

§ 363."); In re Nobex Corp., Case No. 05-20050, 01/12/06 Hearing Tr. at 67 (Bankr. D. Del.

2006) (MFW); In re Calpine Corp., Case No. 05-60200, 04/26/2006 Hearing Tr. at 87 (Bankr.

S.D.N.Y. 2006(BRL); Nellson Nutraceutical, 369 B.R. at 802 ("Under the facts of this case,

although the modification of the 2006 bonus program has some retentive effect, it is for the

primary purpose of motivating employees and, thus, the limitations of section 503(c)(1) are not

applicable."). Indeed, Judge Lifland has held that:

> If sections 503(c)(1) and (c)(2) are not operative, a court may consider
> whether the payments are permissible under section 503(c)(3), which
> limits payments made to management and employees, among other things,
> outside of the ordinary course, unless such payments are shown to be
> justified under the facts and circumstances of the chapter 11 case. As one
> treatise points out, the test appears to be no more stringent a test than the
> one courts must apply in approving any administrative expense under
> section 503(b)(1)(A).

In re Dana Corporation, 358 B.R. 567, 576-77 (Bankr. S.D.N.Y. 2006).

23.     Sections 502(c)(1) and (2) apply only to "insiders," which include officers

and persons in control of a corporate debtor. 11 U.S.C. § 101(31)(B). Of the 25 Participating

Employees, all but three of them are line supervisors or rank and file employees, none of whom

---

is made or the obligation is incurred; or (ii) if no such similar transfers were made to, or obligations were incurred
for the benefit of, such nonmanagement employees during such calendar year, the amount of the transfer or
obligation is not greater than an amount equal to 25 percent of the amount of any similar transfer or obligation made
to or incurred for the benefit of such insider for any purpose during the calendar year before the year in which such
transfer is made or obligation is incurred;....").

[14] 11 U.S.C. § 503(c)(2) ("Notwithstanding subsection (b), there shall neither be allowed, nor paid – (2) a severance
payment to an insider of the debtor, unless – (A) the payment is part of a program that is generally applicable to all
full-time employees; and (B) the amount of the payment is not greater than 10 times the amount of the mean
severance pay given to nonmanagement employees during the calendar year in which the payment is made;....")

should be considered an "officer of the debtor" or a "person in control" of the Debtors even if a few of them have the nominal title of Vice President. See id. Only three Participating Employee have the title of an officer (Treasurer, Senior Vice President and Chief Financial Officer and Executive Vice President and Chief Operating Officer) but even these Participating Employees are not in control of the Debtors for the transactions for which they could be receiving performance bonuses under the Incentive Plan, as they do not have the power on their own (for instance) to dispose of assets. See In re CEP Holdings, LLC, 2006 WL 3422665, at *2 (Bankr. N.D. Ohio Nov. 28, 2006) (appropriate test for insider whether employee has the degree of control with respect to the transaction at issue); Shubert v. Lucent (In re Winstar Communications, Inc.), 348 B.R. 234, 279 (Bankr. D. Del. 2005) (power or influence to have debt owed repaid for preferential transfer purposes); Yoppolo v. Lindecamp (In re Fox), 277 B.R. 740, 745 (N.D. Ohio 2002) (power to pressure debtor to have its debt paid at expense of other creditors). Cf. Nellson Nutraceutical, 369 B.R. at 801 and n.15 ("Only the Level I employees [Management level officers, including the Chief Executive Officer, Chief Financial Officer and various vice presidents of the Debtors] ... are "insiders".... Thus, section 503(c)(1) does not preclude or restrict any payments ... to Level II [Operational directors of the Debtors, including Director of Purchasing, Director of Manufacturing and Director of Finance] or Level III [Managers, including R & D Managers, Materials Managers and Maintenance Manager] employees. Neither does section 503(c)(1) restrict any payments to the Sales Directors, Sales Managers, Office Staff or Line Managers.").

12

24.     The Incentive Plan is neither a retention plan nor a severance plan.

Instead, the Incentive Plan is a performance-based plan that provides for targeted payments to

Participating Employees if they meet the objective performance criteria set forth in the Incentive

Plan.  The purpose of the Incentive Plan is to motivate the Participating Employees to work very

hard in order to obtain the performance bonuses.  Neither the performance goals nor the

payments provided under the Incentive Plan have an impermissible retention or severance

component.  Therefore, sections 503(c)(1) and (c)(2) are not applicable to the Incentive Plan.

### The Incentive Plan Complies With Section 503(c)(3)

25.     The Incentive Plan, and the payments contemplated thereunder, comply

with section 503(c)(3) of the Bankruptcy Code.  The statute states that:

> Notwithstanding subsection (b), there shall neither be allowed, nor paid—
>
> (3) other transfers or obligations that are outside of the ordinary course of
> business and not justified by the facts and circumstances of the case,
> including transfers made to, or obligations incurred for the benefit of,
> officers, managers, or consultants hired after the date of the filing of the
> petition.

11 U.S.C. § 503(c)(3).  Since courts have begun to analyze various payments under section

503(c)(3), they have been unanimous in holding that they must use the "business judgment"

standard as the proper standard for determining whether incentive programs and payments

thereunder are justified.  See e.g., Global Home Products, 369 B.R at 783; In re Werner Holding

Co., Inc., Case No. 06-10578 (KJC) (Bankr. D. Del. July 20, 2006, Aug. 22, 2006, and Dec. 20,

2006); In re Riverstone Networks, Inc., Case No. 06-10110 (CSS) (Bankr. D. Del. March 28,

2006); In re Pliant Corp., Case No. 06-10001 (MFW) (Bankr. D. Del. March 14, 2006).

DOCS_LA:201686.11

26.     Indeed, Judge Walrath, in the <u>Nobex</u> case, stated that:

> [Section] (c)(3) was meant to provide a standard, albeit not as
> clear, for any other transfers or obligations outside of the ordinary
> course of business ... I read (c)(3) to be the catch-all and the
> standard under (c)(3) for any transfers or obligations made outside
> of the ordinary course of business are those that are justified by the
> facts and circumstances of the case... I find it quite frankly nothing
> more than a reiteration of the standard under 363... under which
> courts had previously authorized transfers outside of the ordinary
> course of business and that [are], based on the business judgment
> of the debtor...

Transcript of January 12, 2006, Hearing at 86-87, <u>In re Nobex Corp.</u>, Case No. 05-20050 (MFW)

(Bankr. D. Del.) (an order approving the management incentive plan was entered January 20,

2006).  See <u>Nellson Nutraceutical</u>, 369 B.R. at 804 ("[S]ection 503(c)(3) only limits "transfers or

obligations that are outside the <u>ordinary</u> course of business."... Thus, under the plain meaning of

the statute, section 503(c)(3) is simply inapplicable here....   Indeed, such a reading is wholly

consistent with section 363 of the Bankruptcy Code....") (emphasis in original; citations and

footnote omitted).

27.     More recently, in <u>Dana</u>, Judge Lifland agreed with Judge Walrath, stating

that management incentive programs should be evaluated under the business judgment standard,

which requires a debtor to satisfy the Court's inquiry into factors such as:

(1)     Is there a reasonable relationship between the plan proposed and
        the results to be obtained, <u>i.e.</u> will the key employee stay for as
        long as it takes for the debtor to reorganize or market its assets, or
        in the case of a performance incentive, <u>is the plan calculated to
        achieve the desired performance</u> (emphasis added)?

14

(2)     Is the cost of the plan reasonable in the context of the debtors' assets, liabilities and earning potential?

(3)     Is the scope of the plan fair and reasonable; does it apply to employees; does it discriminate unfairly?

(4)     Is the plan or proposal consistent with industry standards?

(5)     What were the due diligence efforts of the debtor in investigating the need for a plan; analyzing which key employees need to be incentivized; what is available; what is generally applicable in a particular industry?

(6)     Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?

Dana Corp., 358 B.R. at 576-77 (citations omitted). Moreover, Judge Lifland noted that courts generally take a "holistic" view of and measure of compensation packages. Id. at 571.

28.     As noted above, the Debtors have a sound business purpose for establishing the Incentive Plan, and the Incentive Plan satisfies the factors articulated by Judge Lifland in Dana.

29.     First, the Incentive Plan is a performance-based plan that has been calibrated by the Debtors to motivate the Participating Employees to "achieve the desired performance" under the Incentive Plan.

30.     Second, the Debtors believe that the cost of the Incentive Plan is reasonable in the context of the Debtors' chapter 11 cases, and in light of the amount of work

15

that must be completed by the Participating Employees, in a compressed amount of time, to obtain their performance bonuses.

31. Moreover, the amount of the performance bonuses are correlated to the additional value that will be created by the Participating Employees. Aggregate bonuses for all four Groups range from $380,467 to 1,100,757 if all targets are met at the minimum target amount for each Group. Metric 1, the minimum sales price target for the Beta Assets, is $150,000,000 and Metric 2, the minimum sales price target for the Alaska Assets, is $5,000,000. The total minimum aggregate bonus for all four Groups of $380,467 is only 0.245% of the gross sale proceeds ($155,000,000) that the Debtors' estates would receive if the minimum sales price targets are met, and the Debtors would have received benefits from the Groups' meeting their production and cost targets, which would have maintained the value of the Beta Assets and Alaska Asset pending sale. The bonuses, if earned, are de minimis in comparison to the potential benefits here.

32. Third, the Incentive Plan is "fair and reasonable" in its scope and does not "discriminate unfairly," because the Debtors designed the Incentive Plan to only include those employees whose services, in the Debtors' opinion, are truly necessary to achieving the goals of the Incentive Plan.

33. The Debtors submit that the fourth factor noted by Judge Lifland – i.e., is the plan or proposal consistent with industry standards – is not applicable to the facts and circumstances of the Debtors' cases. To the best of the Debtors' knowledge, there is no

16

"industry standard" for compensation programs for the employees of failed companies in the Debtors' business.

34.     Fifth, the Debtors and Zolfo Cooper engaged in appropriate due diligence in formulating the Incentive Plan under the facts and circumstances of their chapter 11 cases. Moreover, as set forth above, the Compensation Committee of the Debtors' Board of Directors reviewed, considered and recommended that the Board of Directors approve the Incentive Plan, which the Board of Directors did approve.

35.     Finally, the Debtors note that Zolfo Cooper provided "independent" advice for the purpose of formulating the Incentive Plan. Neither Zolfo Cooper nor any employee of Zolfo Cooper is a participant in the Plan.

36.     As noted above, the application of the Dana "factors" is a holistic endeavor. Id. at 571. Moreover, in In re American Home Mortgage Holdings, Judge Sontchi articulated the holistic application of the Dana factors while considering the interim approval of a retention plan. In approving that plan, in part on an interim basis, Judge Sontchi stated that:

> I think the Debtors have satisfied certainly the most important criteria in connection with the non-insiders. There's a reasonable relationship between the plan and the results to be obtained, the cost of the plan is reasonable, the context of the debtors' assets, liabilities, and the scope of the plan is fair and reasonable... Some of the other criteria may not have been met such as what were the due diligence efforts, you know, did you shop around and see what other plans were out there? Did the debtor receive independent counsel from some sort of expert? Frankly, I don't consider those overtly significant, and certainly understandable that they weren't done in the context of what was an extremely quick meltdown of the debtors' business. (emphasis added)

Transcript of August 7, 2007, Hearing at 110, In re American Home Mortgage Holdings, et al., Case No. 07-11047 (CSS) (Bankr. D. Del.)

DOCS_LA:201686.11

37.     Based upon the foregoing, the Debtors submit that they have established a "sound business purpose" for the formulation and implementation of the Incentive Plan, and therefore satisfied the requirements of section 363(b) and 503(c)(3) of the Bankruptcy Code. As set forth in detail above, the Incentive Plan is a "true" incentive plan that has been designed to motivate the Participating Employees to produce results. The Incentive Plan is not "pay to stay," as none of the Participating Employees will receive any payments, or partial payments, under the Incentive Plan if they fail to meet their respective performance goals. Accordingly, the Debtors submit that the Incentive Plan should be approved and, if the Participating Employees meet their respective performance goals, they should be paid their respective performance bonuses. See Order Approving Incentive Plan and Authorizing Payment Thereunder, In re DHP Holdings II Corp., Chapter 11 Case No. 08-13422 (MFW) (Bankr. D. Del. Apr. 16, 2009) (Judge Walrath approving incentive plan, including, in a handwritten addition to the order, "bonuses, if any, payable to the three Tier 1 Senior Employees upon the basis of the Debtors' Net Operating Recoveries shall not exceed a total amount of $300,000." ).

### Notice

38.     Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (i) the Office of the United States Trustee; (ii) the Debtors' postpetition and prepetition lenders; (iii) counsel for the Official Committee of Unsecured Creditors; and (iv) those persons who have requested notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure. The Debtors submits that, in light of the nature of the relief requested, no other or further notice need be given.

DOCS_LA:201686.11

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form annexed hereto, granting the Motion, and grant such other and further relief as is just and proper.

Dated: May 11, 2009

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (Bar No. 2436)
Ira D. Kharasch (CA Bar No. 109084)
Alan J. Kornfeld (CA Bar No. 130063)
James E. O'Neill (Bar No. 4042)
Robert M. Saunders (CA Bar No. 226172)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: ljones@pszjlaw.com
    ikharasch@pszjlaw.com
    akornfeld@pszjlaw.com
    rsaunders@pszjlaw.com

Counsel for the Debtors and
Debtors in Possession

19