IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: <br><br> PACIFIC ENERGY RESOURCES LTD., et al., <br><br> Debtors. | Chapter 11 <br><br> Case No.: 09-10785 (KJC) <br> (Jointly Administered) <br><br> Hearing Date: June 3, 2009 at 1:00 p.m. ET <br> Objection Deadline: May 27, 2009 at 4:00 p.m. ET[1] <br><br> Re: Docket No. 291 |

**OBJECTION OF MARATHON OIL COMPANY TO MOTION OF THE DEBTORS FOR AN ORDER AUTHORIZING ABANDONMENT OF INTERESTS IN THE SPURR FACILITIES LOCATED IN ALASKA AND REJECTION OF EXECUTORY CONTRACTS RELATING THERETO**

Marathon Oil Company ("Marathon"), by and through undersigned counsel, hereby objects (the "Objection") to the *Motion of the Debtors for an Order Authorizing Abandonment of Interests in the Spurr Platform Located in Alaska and Rejection of Executory Contracts Relating Thereto* (the "Motion")[2] [D.I. 291]. In support of the Objection, Marathon states as follows:

**PRELIMINARY STATEMENT**

1. The above-captioned debtors (the "Debtors" or "Pacific") seek relief in their Motion that (i) is beyond the scope of 11 U.S.C. § 554 and (ii) improperly contravenes applicable non-bankruptcy law. Marathon does not object to the Debtors' seeking the Court's approval, to the extent necessary, to complete and cooperate in the process of disassembling an oil and gas drilling and processing offshore platform (known as the Spurr Platform) and any related onshore facilities, plugging and abandoning any associated oil and gas wells, restoring the surface, and

---

[1] The Debtors extended the deadline to object until June 1, 2009, at 10:00 a.m. (ET) for Marathon Oil Company.

[2] Terms used herein but not defined herein will be accorded the meanings ascribed in the Motion.

1

removing all equipment, pipelines or wells associated with the Spurr Platform (collectively, the "Spurr Facilities") in a manner consistent with applicable non-bankruptcy law and certain contractual obligations (collectively, "Decommissioning" or "Decommission"); however, the Debtors have sought to abandon the Spurr Facilities and to reject associated executory contracts. The Debtors should not be relieved of their responsibility and corresponding liability to Decommission the Spurr Facilities pursuant to applicable non-bankruptcy law. Moreover, issues raised by the Motion are subject to an adversary proceeding filed by Marathon concurrently with this Objection. Indeed, Debtors' Motion is deficient for a number of reasons, not the least of which is because it seeks to affect the rights and obligations of parties other than Marathon and Debtors under the various agreements and regulatory requirements implicated in Decommissioning the Spurr Facilities. These issues should not be decided in the context of this Motion but rather in the accompanying adversary proceeding.

## BACKGROUND

2. As explained more fully in the complaint (the "Complaint") filed contemporaneously with this Objection (the "Adversary Proceeding"), a copy of which is attached hereto as <u>Exhibit A</u>, the Spurr Facilities has been the subject of several transfers and apportionment over the past forty (40) years. The relevant portions of this history are described herein.

**A. Lease ADL 17597: the Spurr Facilities, the Unit Agreement and Unit Operating Agreement**

3. Superior Oil Company ("Superior") was the original lessee for State of Alaska Oil and Gas Lease ADL 17597 executed on or about March 1, 1962 ("Lease ADL 17597"). On April 17, 1962, Superior assigned to Texaco, Inc. ("Texaco") a fifty percent (50%) interest in Lease ADL 17597. This assignment was approved by the Alaska Department of Natural

Resources ("ADNR"). The platform now known as the Spurr Platform was built on Lease ADL 17597 by Texaco and Superior in or around 1966. In 1971, Lease ADL 17597 was joined with other leases to form the North Trading Bay Unit ("NTBU") as documented by the Unit Agreement, for the Development and Operation of the Hemlock and G Formation, North Trading Bay Unit, State of Alaska, dated June 1, 1971 ("Unit Agreement") and the Unit Operating Agreement, Hemlock and G Formation, North Trading Bay, Cook Inlet, Alaska, dated June 1, 1971 ("Unit Operating Agreement").

4.  The NTBU is composed of three state leases, comprising 1,600 acres in Cook Inlet, Alaska. The original parties were Atlantic Richfield Company ("ARCO"), Texaco and Superior. Texaco and Superior jointly held the interests in Lease ADL 17597, while, on information and belief, ARCO held other leases that became unitized as part of the NTBU. At the time of formation of the NTBU, ARCO had already built and developed an oil and gas drilling and production platform known as the Spark Platform (with accompanying wells) and the ARCO Granite Point Production Facility, and Texaco and Superior had already built the Spurr Platform with accompanying wells and the Texaco-Superior Granite Point Production Facility. All such facilities were contributed to the NTBU. The Unit Operating Agreement designated ARCO as the original Unit Operator of the NTBU. ARCO was designated as the Sub-Operator of Spark Platform, pipelines common to Spark and Spurr, and the ARCO Granite Point Production Facility, and Texaco was designated as the Sub-Operator of Spurr Platform and the Texaco-Superior Granite Point Production facility. However, by an amendment executed contemporaneously with the Unit Operating Agreement, the Sub-Operatorship of Spurr was assigned from Texaco to ARCO. Texaco, Superior and ARCO retained control over their respective contributed platforms to use for non-unitized pools.

**B. 1977 ARCO Assignment**

5.   In or around 1977, ARCO assigned its interest as Sub-Operator of the Spurr Platform back to Texaco and Superior. Although ARCO resigned as Sub-Operator of the Spurr Platform, it retained its Unit Operatorship of the NTBU.

**C. 1984 Property Exchange**

6.   In the Agreement, by and between ARCO and Marathon, dated May 3, 1984 (the "1984 Agreement"), as part of a property exchange with ARCO, Marathon acquired all of ARCO's leasehold interest, working interest, reserves, hydrocarbon production, obligations, right and title in the NTBU, the Unit Agreement and the Unit Operating Agreement. This included the other leases held by ARCO that had become part of the NTBU, Spark Platform and the ARCO Granite Point Production facility. Also, as part of the 1984 Agreement, Marathon became the Unit Operator of the NTBU.

**D. 1988 Letter Agreement**

7.   Upon information and belief, in July 1988, Texaco and Mobil Exploration and Producing North America, Inc. ("Mobil"), as successor in interest to Superior, assigned their full interest in Lease ADL 17597, the Spurr Platform, other relevant leases and the Texaco-Superior Granite Point Production Facilities to Union Oil Company of California ("Union"). In the Letter Agreement, Texaco and Mobil Cook Inlet Producing Properties dated July 26, 1988 (the "1988 Letter Agreement"), Union assigned a fifty percent (50%) interest in the Spurr Platform to Marathon, a fifty percent (50%) interest in gas reserves, and one hundred percent (100%) of the interest in oil reserves and production. The lease assignment that was approved by ADNR transferred fifty percent (50%) of the interest in the lease to Marathon without distinguishing between oil or gas reserves or the Spurr Platform. In September 1988, Union resigned as the

4

Spurr Platform Sub-Operator and elected Marathon to the Spurr Platform Sub-Operatorship. Upon information and belief, Union retained its interest in the Texaco-Superior Granite Point Production Facilities and related leases.

### E. Operation of the NTBU and Spurr Platform

8.      Since 1988, Marathon has been the Operator of the NTBU and the Sub-Operator of the Spurr Platform. Marathon manages all of the properties that compose the NTBU. From 1988 to 1992 the Spurr Facilities were active as an oil and gas production facility operated by Marathon. The Spurr Platform ceased production in 1992. Decommissioning work related to Spurr Facilities has begun, but further work is required in order to finalize Decommissioning of the Spurr Facilities in accordance with the plans submitted to the ADNR, relevant Alaska statutes and regulations, and contractual obligations.

### F. 1998 Forcenergy Assignment

9.      In 1998, Union notified Marathon that pursuant to the Assignment and Bill of Sale, by and between Forcenergy, Inc. ("Forcenergy") and Union, dated December 22, 1998 (the "1998 Forcenergy Assignment"), it had conveyed its interest in certain "Property" (including the Spurr Facilities) and one million dollars ($1,000,000) to Forcenergy. The Property was defined by referencing Exhibit A of the 1998 Forcenergy Assignment. Pursuant to the 1998 Forcenergy Assignment, Forcenergy agreed to:

> [P]erform and be bound by all provisions, contractual duties and obligations of [Union] as owner of the Property to the extent that the same are valid and subsisting on the Effective Date.
>
> [C]omply with all [laws] of any governmental authority claiming jurisdiction over the Property, including, . . . those laws pertaining to the *abandonment of wells, the plugging of inactive wells and the restoration of the surface.* (emphasis added)
>
> [I]indemnify and defend Assignor, Assignor's subsidiary and affiliated companies . . .from and against all claims, demands, causes of action, or liability

of any nature or kind, including (without limitation) civil fines, penalties, costs of *cleanup, or plugging liabilities*, brought by any and all persons, entities or governmental agencies . . resulting from or arising out of any liability caused by or connected with the use of the Property, and any *environmental compliance or abandonment activities* associated with the Property.[3] (emphasis added)

Assignee hereby assumes sole and complete responsibility for the Property and *timely removal of said equipment and property from the leasehold property in accordance with any applicable oil and gas lease and governmental regulations* pertaining thereto and, from and after the Effective Date, for any and all damages or liability arising out of or in any way connected with said equipment and its removal, use and maintenance. (emphasis added)

10. On December 28, 1998, Union notified Marathon of the assignment to Forcenergy. In such notice Unocal stated that it "has retained its working interest ownership in the NTBU and associated Lease ADL 17597." On information and belief, Union did assign its interest in the Texaco-Superior Granite Point Production Facility to Forcenergy.

### G. Transfer from Forcenergy to Forest Oil and from Forest Oil to Pacific

11. On information and belief, Forcenergy filed for bankruptcy protection on March 21, 1999. As part of its reorganization, Forcenergy was merged with a subsidiary of Forest Oil Company (collectively, "Forest"). On information and belief, by virtue of the merger, Forest acquired all of Forcenergy's interest in the 1998 Forcenergy Assignment. After six years of Forest ownership, on October 16, 2007, Pacific notified Marathon that it had acquired all of Forest's interest in Alaska oil and gas properties as well as the Membership Interest in Forest Alaska Holding, LLC on August 27, 2007. On information and belief, by virtue of the acquisition of Forest Alaska Holding, LLC Pacific also acquired all of Forest's interest in the 1998 Forcenergy Assignment.

---

[3] 1998 Forcenergy Assignment at §§ 1 and 2.

## H. Spurr Decommissioning

12. Marathon, as Operator of the NTBU and Sub-Operator of the Spurr Platform, undertook several activities related to the Spurr Facilities after the transfer of the Spurr Facilities from Forcenergy to Forest. In connection therewith, Marathon submitted several authority for financial expenditures ("AFEs") to Forest and later Pacific for costs associated with the Spurr Facilities. Several AFEs submitted to Forest were approved and returned to Marathon. On information and belief, Forest submitted payments for its share of expenditures associated with such AFEs. A list of AFEs executed by Forest were sent to Jim Arlington, Vice President of Land and Government Affairs for Pacific, after Pacific purportedly succeeded to Forest's interest in the Spurr Facilities. On information and belief, Mr. Arlington previously had been an employee and officer of Forest or one of its subsidiaries.

13. Marathon submitted to the ADNR the North Trading Bay Unit, Final Thirty-Fifth Plan of Development (and First Plan of Abandonment), dated May 30, 2008 (the "2008 POD"). The 2008 POD was copied to Mr. Arlington.

14. On March 20, 2009, Marathon submitted a revised Decommissioning plan to the ADNR titled the Final Thirty-Sixth Plan of Development, North Trading Bay Unit, Cook Inlet, Alaska ("2009 POD") deferring some but not all Spurr Facilities Decommissioning work due in part to Pacific's bankruptcy.

15. As a result of the Unit Agreement, the Unit Operating Agreement, Lease ADL 17597, the 1988 Letter Agreement, the 1998 Forcenergy Assignment any other applicable agreement identified in discovery and applicable Alaska law, Debtors, Union, Chevron Corporation, Forest (and any of such entities' respective affiliates) and/or Marathon may have proportionate responsibility to the State of Alaska for certain Decommissioning activities related

7

to the Spurr Facilities. As a result of the various agreements by and between them, these same parties may also have third party liability to the State of Alaska for certain Decommissioning activities related to the Spurr Facilities.

## I. **Pacific's Bankruptcy**

16. On March 9, 2009 (the "Petition Date"), the Debtors each filed a petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code").

17. The Debtors continue in possession of their property and are operating and managing their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

18. No request has been made for the appointment of a trustee or an examiner in the above-referenced cases. The Office of the United States Trustee appointed an Official Committee of Unsecured Creditors on March 19, 2009.

19. On April 2, 2009, Marathon sent Pacific a letter requesting that the Debtors obtain the Court's approval to continue Decommissioning activities related to some of the Spurr Facilities and for authority to pay Marathon for the Debtors' portion of the costs for the first phase of such Decommissioning activities.

20. Pacific responded by filing the Motion. The exhibits to the Motion include a description of the property that Pacific seeks to abandon which is virtually identical to the list of "Property" scheduled as part of the 1998 Forcenergy Assignment, but also includes a specific listing for the Unit Agreement, Unit Operating Agreement, the 1988 Letter Agreement and the 1998 Forcenergy Assignment as rejected contracts.[4] This indicates that the Debtors

---

[4] *See* Exhibit A to the Motion.

acknowledge that they may have obligations under all those agreements. The Motion seeks an order that authorizes (1) abandonment of the Spurr Platform and other interests described in Exhibit A to the Motion (the "Abandoned Assets") to Marathon effective as of the Petition Date; (2) rejection of any executory contracts relating to the Spurr Facilities; (3) title to the Abandoned Assets be transferred to Marathon; and (4) the Debtors to cooperate with Marathon to transition the Debtors' interests in the Abandoned Assets without funding any portion of the Decommissioning liability associated with the Abandoned Assets on an administrative basis.

## OBJECTIONS

### A. Marathon Does Not Object to Decommissioning the Spurr Facilities

20. Marathon does not object to the entry of an order requiring that the Debtors complete and cooperate in the process of Decommissioning to the extent the Debtors are required to do so contractually and/or by operation of law. However, the Decommissioning activity is arguably not part of the Debtors' ordinary course of business. Thus, Marathon contacted the Debtors and requested that they obtain the Court's permission to continue Decommissioning activities related to the Spurr Facilities.

21. Rather than requesting the Court's permission to continue Decommissioning, the Debtors' filed the Motion which, in part, seeks to abandon all Decommissioning liability to Marathon. Marathon objects to entry of an order identifying Marathon as the party solely responsible for Decommissioning costs.

22. Marathon believes that the proper forum for determining liability is not in this contested matter. Rather, relative liability of the parties other than the Debtors and Marathon, i.e. the defendants named in the Complaint, may only be determined in state court, federal court or by an adversary proceeding in bankruptcy court. Thus, Marathon has filed the Adversary

Proceeding seeking a declaratory judgment from this Court as to relative rights and obligations of Marathon, the Debtors and the other defendants named in the Complaint with regard to the Spurr Facilities. Moreover, the State of Alaska also may have interest in the determination of the parties' obligations pursuant to state law in the Adversary Proceeding.

B. **Pacific May Not Abandon Assets In Contravention of Non-Bankruptcy Law**

23. The Motion contemplates that the Debtors will abandon the Spurr Facilities pursuant to 11 U.S.C. § 554 ("Section 554") without completing the Decommissioning required under state law. Section 554(a) provides that the debtor "may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate." *See* 11 U.S.C. 554(a). However, in *Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Protection*, 474 U.S. 494, 507 (1986), the Supreme Court of the United States held that a bankruptcy trustee may not abandon property in contravention of a state law reasonably designed to protect public health or safety. Although the Supreme Court primarily relied on prior judicial interpretations of the trustee's abandonment power and 28 U.S.C. §959(b) to restrict the abandonment power under Section 554, the Supreme Court found additional support in Congress' repeated emphasis on environmental protection. *Id.* at 505 ("we find additional support for restricting [abandonment] power in repeated congressional emphasis on its 'goal of protecting the environment against toxic pollution.'") (quoting *Chemical Manufacturers Assn., Inc. v. Natural Resources Defense Council, Inc.*, 470 U.S. 116, 143 (1985)).

24. Should it be determined that the Debtors are a party to Lease ADL 17597, the Unit Agreement, the Unit Operating Agreement, the 1988 Letter Agreement, the 1998 Forcenergy Assignment or any other applicable agreement identified in discovery, various Alaska statutes and regulations may define the Debtors' Decommissioning obligations.

25.  The Alaska Oil and Gas Conservation Commission (the "AOGCC") has the statutory authority to regulate certain Decommissioning activities pursuant to ALASKA STAT. §31.05.030, which states that the AOGCC "may regulate … the drilling, producing or plugging of wells." ALASKA STAT. §31.05.030 (2009). ALASKA STAT. §31.05.030 also allows the AOGCC to mandate the "…plugging of wells in a manner that will prevent the escape of oil and gas out of one stratum into another, the intrusion of water into an oil or gas stratum, the pollution of fresh water supplies by oil, gas, water, or salt water, and the prevention of blowouts, cavings, seepages, and fires. *Id.* The AOGCC has provided detailed regulations governing procedures for Decommissioning located at ALASKA ADMIN. CODE tit. 20, §25.105 - ALASKA ADMIN. CODE tit. 20, §25.115 and ALASKA ADMIN. CODE tit. 20, §25.170 - ALASKA ADMIN. CODE tit. 20, §25.172 (collectively, the "Alaska Regulations"). The Alaska Regulations provide for the timing and requirements for when and how Decommissioning must occur. Section 25.105 of title 20 provides that all wells "must be abandoned before expiration of the owner's rights in that property or if, after notice and hearing, the commission orders abandonment for safety reasons or because the operator has effectively abandoned operations prior to the expiration of the lease." ALASKA ADMIN. CODE tit. 20, §25.105 (2009). Further, "[p]lugging of the uncased portion of a wellbore must be performed in a manner that ensures that all hydrocarbons and freshwater are confined to their respective indigenous strata and are prevented from migrating into other strata or to the surface." ALASKA ADMIN. CODE tit. 20, §25.112 (2009). For offshore facilities, the AOGCC regulations provide that "[n]o later than the time that all wells drilled from a fixed offshore platform are abandoned and the platform is removed or dismantled, the operator shall remove all well casing to a depth at least one foot below the mudline." ALASKA ADMIN. CODE

tit. 20, §25.172 (2009). The Alaska Regulations are aimed at promoting public health and safety and thus, cannot be preempted by Section 554.

26.     These and other relevant statutes and regulations impose Decommissioning obligations upon lessees, operators, working interest owners and other oil and gas interest owners. Moreover, Lease ADL 17597, under which the State of Alaska is the lessor, imposes certain Decommissioning obligations. Additionally, the Debtors may be contractually bound under the Unit Agreement, the Unit Operating Agreement, the 1988 Letter Agreement, the 1998 Forcenergy Assignment, other documents signed by the Debtors, and/or common law with respect to Decommissioning liability. Thus, the Debtors may be obligated to the State of Alaska, Union, Chevron, Forest and Marathon to Decommission the Spurr Facilities as co-lessee, working interest owner, or other oil and gas interest owner and/or to the extent the Debtors assumed such obligations under theories of privity of contract, privity of estate, as a third party beneficiary or under common law. These liability theories are more specifically set forth in the Adversary Proceeding.

27.     The Debtors attempt to minimize public health and safety concerns by stating that there is no risk to public health or safety because of Marathon's ongoing efforts to Decommission the Spurr Facilities. *See* Motion at ¶ 18. However, the standard for determining whether Section 554 preempts state law is not whether some third party is available to assume responsibility. If that were the standard, abandonment would always be permitted because the state would ultimately assume responsibility in the interest of protecting its citizens. Instead, the issue is whether Debtors attempt to utilize abandonment under Section 554 impermissibly seeks to preempt state law that is reasonably designed to protect public health or safety.

C. <u>The Court Cannot Order Abandonment to Marathon Under Section 554</u>

28. The Debtors improperly seek an order from the Court that abandons the Abandoned Assets to Marathon and transfers title to the Abandoned Assets to Marathon. The Debtors correctly stated in their Motion that "[u]pon abandonment, abandoned property is no longer part of the bankruptcy estate and is treated as if administration of the asset never occurred. *See* Motion at ¶ 15 (citing 4 NORTON BANKRUPTCY LAW AND PRACTICE at 74:2 (3d ed. 2008)). However, the only determination to be made by the bankruptcy court in an abandonment motion is that the property is (1) burdensome to the estate or (2) of inconsequential value. This Court should not determine who has title to the property, or the validity of liens or interests in the property, nor may the court specify to whom the property is to be abandoned other than to the debtor. *See Chemco, Inc. v. Howard Nat'l Corp. (In re Howard Nat'l Corp.)*, 70 B.R. 278, 282 (N.D. Ill. 1987). That determination should be made in the Adversary Proceeding, a federal proceeding or state court proceeding. Thus, Marathon has filed the Adversary Proceeding to properly resolve these issues.

29. Section 554 does not state to whom property is abandoned. Due to this ambiguity, several courts, citing the legislative history of Section 554, have held that property is abandoned to whomever had a possessory interest prior to the petition date. *Dewsnup v. Timm (In re Dewsnup)*, 908 F.2d 588, 590 (10th Cir. 1990); *In re High Voltage Eng'g Corp.*, 397 B.R. 579, 604 (Bankr. D. Mass. 2008); *See also*, H.R. Rep. No. 595. 95th Cong., 1st Sess. 377 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 92 (1978). Upon abandonment, the property reverts to the debtor as if no bankruptcy petition was filed. *Dewsnup*, 908 F.2d at 590. The effect of abandonment is that it reverts to the party holding a possessory interest in it prior to the petition date. *Id.* (following abandonment, "whoever had the possessory right to the property at the filing

13

of the bankruptcy again reacquires that right"). Consequently, the Spurr Facilities would revert to the Debtors, Marathon, Union, Forest, the State of Alaska and/or any other party holding a possessory interest[5] as if no bankruptcy petition had ever been filed.

30.  The abandonment of the Spurr Facilities does not revert title or responsibility over the property solely to Marathon. *See In re Renaissance Stone Works, LLC*, 373 B.R. 817, 820-21 (E.D. Mich. 2007) (Abandonment cannot convey to a third party any legal or equitable interests in property. The debtor's interests in the abandoned property may be subject to another's possessory interests in the same, but that does not mean that the property can be abandoned to the third party.); *In re High Voltage Engineering Corp.*, 397 B.R. 579, 604 (Bankr. D. Mass. 2008) (Attempted abandonment of the debtor's interest in funds in remediation trust to a nondebtor party, the state environmental protection agency, was inconsistent with concept of abandonment under the Bankruptcy Code. The Bankruptcy Code's intention was to simplify the case administration process and was not intended as a process to determine and resolve conflicts regarding who has title to the abandoned property or the validity of competing liens or other interests of third parties in the property.); *In re Manchester Heights Assoc.*, 165 B.R. 42, 44-45 (Bankr. W.D. Mo. 1994) (The Court quoted Judge Norton, "Section 554 abandonment procedure is not intended to determine issues of ownership and possession of property. Thus, the procedure of section 554 and Rule 6007 cannot be used to effect turnover, recovery or legal title or possession to any particular creditor."). Determining title to the property and relative responsibility for Decommissioning may only be done via litigation in state court, federal court or an adversary proceeding under Fed. R. Bankr. P. Rule 7001. Consequently, Marathon has filed the Adversary Proceeding to properly resolve these issues.

---

[5] Title and other interests in the Spurr Facilities are among the claims to be addressed by the Adversary Proceeding.

## D. Decommissioning Costs Entitled to Administrative Priority

31. To the extent Debtors are liable for the Decommissioning costs, which include costs already incurred and to be incurred through conclusion of the Decommissioning, such costs are entitled to administrative priority because such obligations cannot be avoided through abandonment. *See Comm. Of Pennsylvania, Dept. of Env. Resources v. Conroy*, 24 F.3d 568, 569-70 (3d Cir. 1994) (state's clean-up costs entitled to administrative priority because the estate could not avoid such costs through abandonment and therefore, the expenses to remove the threat posed by such substances are necessary to preserve the estate). In *Conroy*, the Commonwealth of Pennsylvania Department of Environmental Resources (the "DER") ordered the Conroys to dispose of drums and canisters of hazardous waste left at their printing company after it had ceased doing business. Rather than remove the hazardous waste, the Conroys filed a chapter 11 bankruptcy petition. The DER cleaned up the facility and filed an administrative expense claim for the cleanup costs. The Third Circuit Court of Appeals stated that had the Conroys undertaken the cleanup, the cleanup costs would have been classified as administrative expenses. Therefore, these costs could not be avoided through abandonment. *Id.* at 569-70; *see also, LTV Corp. v. LTV Steel Co., Inc. (In re Chateaugay Corp.)*, 944 F.2d 997, 1009-10 (2d Cir. 1991); *Lancaster v. State of Tennessee (In re Wall Tube & Metal Prod., Co.)*, 831 F.2d 118, 123-24 (6th Cir. 1987).

32. Moreover, in a case involving oil wells, the Fifth Circuit Court of Appeals classified the costs of plugging unproductive oil wells as an administrative expense. *See Texas v. Lowe (In re H.L.S. Energy Co., Inc.)*, 151 F.3d 434, 439 (5th Cir. 1998). In *H.L.S. Energy*, Texas law required the owner of an operating interest to plug wells that remained unproductive for a year. *Id.* at 438. The court held that because there was an inescapable obligation to plug

unproductive wells and such obligation arose post-petition, the costs of plugging the wells were administrative expenses. *Id.* at 438-39 (the court did not need to reach the decision of whether post-petition expenses for the remediation of pre-petition environmental liabilities would also be considered an administrative expense).

33. If Marathon completes the Decommissioning, then it is entitled to reimbursement from the Debtors for any increased liability for breach of fair dealing and/or because of indemnification and contribution liability that may result under Alaska law.

34. The Adversary Proceeding in part seeks the Court's declaration regarding relative liability for the Decommissioning costs. However, any costs allocated to the Debtors would be entitled to administrative priority. In short, section 503(b)(1)(A) provides that "the actual, necessary costs and expenses of preserving the estate" are entitled to administrative priority. *See* 11 U.S.C. §503(b)(1)(A). A creditor is entitled to receive administrative expenses if a two-part test is satisfied. *In re Pinnacle Brands, Inc.*, 259 B.R. 46, 51 (Bankr. D. Del. 2001); *see also In re Harnischfeger Indus., Inc.*, 293 B.R. 650, 659 (Bankr. D. Del. 2003). First, the creditor must show that the claim arose from a post-petition transaction between the creditor and the estate. *In re Women First Healthcare, Inc.*, 332 B.R. 115, 120 (Bankr. D. Del. 2005). Second, the creditor must demonstrate that the transaction benefited the estate. *Id.* The Decommissioning is a post-petition transaction in that it would occur post-petition and benefits the estate because they are expenses that the Debtors cannot avoid under Alaska law. Moreover, failure to Decommission the Spurr Facilities according to applicable Alaska statutes and regulations governing Decommissioning could result in substantial fines. *See* ALASKA STAT. §31.05.150 (2009) (The AOGCC may assess a civil penalty of not more than $100,000 for the initial violation and $10,000 for each day thereafter that the violation continues. Additionally, if the violation was a

knowing violation, then the AOGCC may assess an additional $10,000 per day.) Imposition of these daily fines would only harm the Debtors' creditors by diminishing the overall pool of assets. Thus, Decommissioning costs are necessary and benefit the estate and Marathon would be entitled to reimbursement on an administrative priority basis. *See H.L.S. Energy Co., Inc.*, 151 F.3d at 438 ("The unplugged unproductive wells operated as a legal liability on the estate, a liability capable of generating losses in the nature of substantial fines every day the wells remained unplugged" and the fulfillment of the estate's obligation can only be seen as a benefit to the estate.).

### E. The Debtors May Not Reject Contracts In Contravention of Non-bankruptcy Law

35.    The Debtors seek to reject executory contracts associated with the Abandoned Assets (the "Rejected Contracts") without identifying which contracts are executory and thus, may be rejected. As the proponent of the Motion, the Debtors bear the burden of establishing the elements required to reject the Rejected Contracts. To be eligible for rejection, a contract must be executory. *See* 11 U.S.C. §365(a). Rather than identify the executory contracts, the Debtors have expressly reserved the right to argue the Rejected Contracts are not executory. *See* Motion at n.2. Thus, the practical effect of such reservation is that parties-in-interest are uncertain which contracts the Debtors are seeking to reject. The Debtors must prove that the contracts sought to be rejected are executory, and must identify with particularity the contracts sought to be rejected in order to provide adequate notice of rejection.

36.    The specific issue of whether the Rejected Contracts may be rejected in contravention of non-bankruptcy law is intertwined with the abandonment issue discussed herein. The Rejected Contracts contain agreements between the parties, including the procedure for Decommissioning and allocating costs associated with such Decommissioning. If the

Debtors were permitted to reject the Rejected Contracts, the agreements that provide the framework for the Debtors to abide by Alaska statutes and regulations would be breached. Thus, to the extent the Debtors are obligated to Decommission and pay for their share of related costs, rejection would effectively cause the Debtors to violate statutes and regulations designed to protect public health and safety because they would have discarded their means to abide by those laws. In sum, for the same reasons the Debtors cannot abandon the Abandoned Assets, the Debtors should not be able to reject the Rejected Contracts.

37. Moreover, deciding the issue of rejection of the Rejected Contracts is premature given the Adversary Proceeding that, in part, seeks the Court's determination of the relative liability of all parties to the Rejected Contracts. The Court should not order rejection of the Rejected Contracts prior to determining the impact of such rejection, if allowed, including liability of parties such as the Debtors, Forest, Union and the other defendants named in the Complaint.

[Remainder of page intentionally left blank]

WHEREFORE, Marathon respectfully requests that this Court enter an Order (i) denying the Motion; (ii) denying the Debtors' request to abandon the Abandoned Assets; (iii) denying transfer of title to the Abandoned Assets to Marathon; (iv) denying the Debtors' request to reject the Rejected Contracts; and (v) granting such other and further relief as may be just and proper.

Dated: June 1, 2009  
Wilmington, Delaware

WOMBLE CARLYLE SANDRIDGE & RICE

*/s/ Kevin J. Mangan*  
Francis A. Monaco, Jr. (DE Bar No. 2078)  
Kevin J. Mangan (DE Bar No. 3810)  
Ericka F. Johnson (DE Bar No. 5024)  
222 Delaware Avenue, Suite 1501  
Wilmington, Delaware 19801  
Telephone: (302) 252-4320  
Facsimile: (302) 252-4330  
E-mail: fmonaco@wcsr.com  
E-mail: kmangan@wcsr.com  
E-mail: erjohnson@wcsr.com

*Counsel for Marathon Oil Company*

WCSR 4138211v1