IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PACIFIC ENERGY RESOURCES LTD., *et al.*, [1] | ) | Case No. 09-10785(KJC) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |

**Deadline for Objections:   July 21, 2009 at 4:00 p.m. prevailing Eastern time**
**Hearing Date:   August 4, 2009 at 10:00 a.m. prevailing Eastern time**

### *ALTERNATIVE* MOTION OF THE DEBTORS FOR AN ORDER AUTHORIZING ABANDONMENT OF CERTAIN INTERESTS IN OIL AND GAS PROPERTIES IN ALASKA (EXCLUDING TRADING BAY) AND REJECTION OF EXECUTORY CONTRACTS RELATING THERETO

The above-captioned debtors and debtors in possession (the "Debtors") hereby

move (the "Motion") the Court, solely in the absence of a sale, for entry of an order:  (a)

pursuant to section 554 of title 11 of the United States Code (the "Bankruptcy Code"),

authorizing the Debtors to abandon *nunc pro tunc* to the Petition Date (as defined below) certain

of their interests in oil and gas properties located in Alaska (outside of an area commonly

referred to as "Trading Bay"); and (b) pursuant to section 365 of the Bankruptcy Code,

authorizing the Debtors to reject certain identified executory contracts relating thereto (together,

the "Rejected Contracts").[2]  A detailed description of the Debtors' interests in Alaska outside

Trading Bay that the Debtors seek to abandon (to the extent not sold), including the Rejected

---

[1]   The Debtors in these cases, along with the last four digits of each of the Debtors' federal tax identification number, are:  Pacific Energy Resources Ltd. (3442); Petrocal Acquisition Corp. (6249); Pacific Energy Alaska Holdings, LLC (tax I.D. # not available); Carneros Acquisition Corp. (5866); Pacific Energy Alaska Operating LLC (7021); San Pedro Bay Pipeline Company (1234); Carneros Energy, Inc. (9487); and Gotland Oil, Inc. (5463).  The mailing address for all of the Debtors is 111 W. Ocean Boulevard, Suite 1240, Long Beach, CA 90802.

[2]   Concurrently herewith, the Debtors are filing a separate alternative motion to abandon their interests in Trading Bay, Alaska.

Contracts (to the extent not assumed), are set forth in **Exhibit A** hereto (together, the "Abandoned Assets").[3]

This Motion is filed in the alternative and solely to the extent that the Debtors are unable to effectuate a sale of some or all of the Abandoned Assets.[4]  In support of this Motion, the Debtors respectfully state as follows:

### Preliminary Statement

1.    The Abandoned Assets consist of 100% working interests in certain oil and gas leases, several producing oil wells and associated equipment, production facilities, and owned real property, and various oil and gas prospects in and around Cook Inlet, Alaska (excluding the Debtors' interests in Trading Bay).  Pacific Energy Resources Ltd. ("PERL") is the designated operator with respect to the producing properties included within the Abandoned Assets.

2.    The Abandoned Assets have incurred, and continue to incur, significant losses and are unable to generate sufficient positive cash flow to sustain ongoing operations. During the first four months of 2009, the average monthly cash loss, inclusive of required capital maintenance projects and mandatory provisions for future abandonment obligations, was approximately $500,000.  The cash losses have been exacerbated in recent months as a result of volcanic and seismic activity that has caused the closure of the Cook Inlet pipeline, the region's sole outlet for bringing crude oil to market.  Although it is expected over the next couple of

---

[3]   Technically, the Abandoned Assets belong to Pacific Energy Alaska Operating LLC.  Out of an abundance of caution and in order to ensure that all interests in the Abandoned Assets are addressed by this Motion, the Debtors file this Motion jointly and hereby seek to abandon any and all of their respective interests in the Abandoned Assets.

[4]   Concurrently herewith, the Debtors are filing a motion to establish procedures for the sale of the Debtors' interests in Alaska (including the Abandoned Assets).

months that an alternative, albeit more costly, outlet to market will be employed, in the interim, the Abandoned Assets are incurring approximately $1.3 million of cash shortfalls per month. Once the Debtors are able to resume sales of crude oil, it is expected that the Abandoned Assets will require approximately $700,000 of funding each month (at current oil prices). The Debtors cannot satisfy such cash shortfalls without adequate funding under their postpetition lending facility, which will expire for purposes of the Abandoned Assets on August 4, 2009.

3.    In addition, there are substantial decommissioning obligations associated with the certain of the Abandoned Assets that will be incurred as such properties are retired in the future.[5]  A portion of decommissioning obligations also must be funded out of ongoing production. The projected cost of decommissioning the various Abandoned Assets is ultimately expected to range between $30 million to $60 million and to take three to four years to complete. Although the Debtors have pledged nearly $8.0 million in cash in favor of the State of Alaska (the "State") and the federal government to secure the Debtors' decommissioning and other payment obligations associated with the Abandoned Assets, that is not nearly enough to satisfy total anticipated decommissioning costs. The Debtors also lack sufficient unencumbered funds to decommission the Abandoned Assets.

4.    Since early April 2009, the Debtors have been actively soliciting bids on the Abandoned Assets, along with the Debtors' other assets in Alaska and California. To date, the Debtors have no "stalking horse" bidder or binding sale agreement with respect to the

---

[5]  For purposes herein, the term "decommissioning" refers to the process of disassembling an oil and gas drilling and processing platform, plugging and abandoning any oil and gas wells, restoring the surface, and removing all equipment or pipelines associated with such platform or wells in a manner consistent with applicable non-bankruptcy law.

3

Abandoned Assets.  Although the Debtors have been funding (with lender consent and financing) the operational expenses associated with the Abandoned Assets on a postpetition basis, the Debtors will not have access to continued funding from and after August 4, 2009.  Hence, assuming that no bidder materializes in the immediate future and the Debtors are unable to consummate a sale of any or all of the Abandoned Assets, the Debtors seek to abandon those Abandoned Assets that are not sold (and to reject those Rejected Contracts that are not assumed) as part of the sale process.

5.    Upon abandonment, the Debtors propose that title to the Abandoned Assets pass to the lessors or landowners of the properties at issue, which in most instances will be the State.  The Debtors will coordinate and cooperate with the State and other appropriate parties to transition the Debtors' interests in the Abandoned Assets in an orderly fashion.  The Debtors will also take appropriate and reasonable precautionary measures to avoid any likelihood of imminent harm to public health or safety that arguably could be caused by virtue of the abandonment contemplated hereby.  The Debtors' abandonment of the Abandoned Assets would not affect, and would be without prejudice to, any rights or claims of the estates or any other party in interest in any segregated or reserve accounts created by prior order of this Court.

### Jurisdiction

6.    This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) (A) and (L).  Venue of this proceeding and this Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

4

7.      The statutory predicates for the relief requested herein are sections 365 and 554 of the Bankruptcy Code and Rules 6006 and 6007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## Background

8.      On March 9, 2009 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

9.      The Debtors are continuing in possession of their property and are operating and managing their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

10.      No request has been made for the appointment of a trustee or an examiner in this case. The Office of the United States Trustee appointed an Official Committee of Unsecured Creditors on March 19, 2009.

11.      The Debtors are a group of independent energy companies engaged in the acquisition, development and exploitation of oil and gas properties in the western United States. The Debtors' current oil and gas assets are located offshore near California and principally offshore in Alaska. The Debtors acquired their current oil and gas assets in transactions occurring in the fourth quarter of 2006 and during 2007, and their existing secured debt is related to these acquisitions. The Debtors' revenue is largely dependent on the market price for the underlying crude oil produced, in addition to the level of production. Their revenue for 2008 was approximately $226.2 million.

### The Abandoned Assets

12.     The Abandoned Assets include various fields located in the Cook Inlet area (excluding Trading Bay) and associated wells, equipment, production facilities, and owned real property. A detailed description of the Abandoned Assets is set forth in **Exhibit A** hereto. The major producing fields consist of the West McArthur River field and the Redoubt Shoal field. PERL is the designated operator of each property.

13.     The West McArthur River field encompasses a 100% working interest in approximately 640 acres of developed area and approximately 5,690 acres of undeveloped area. There are three producing wells currently on the property, in addition to two shut-in wells, one water disposal well, eight suspended wells, and an onshore production facility. Although the lease acreage is located offshore in the Cook Inlet, all wells are drilled from onshore locations.

14.     The Redoubt Shoal field was discovered in 1967, but development did not begin until late 2000. The Debtors have a 100% working interest in this field, which includes one offshore platform and an onshore production facility. The field covers approximately 6,723 acres of developed area with two operating wells, three shut-in wells, and one injector.

15.     In addition to the foregoing producing properties, the Abandoned Assets include 100% working interests in approximately 591,126 acres covering multiple exploration prospects. The major exploration prospects are Raptor, Middle Lake, Susitna Basin and potentially Corsair (the latter is subject to a pending appeal with the State). Each of these four prospects is a gas prospect. The Susitna Basin prospect is also an oil prospect.

6

16.    All of the production from the Abandoned Assets is typically shipped via the Cook Inlet pipeline to the Drift River terminal and sold to a single customer on a monthly basis, Tesoro Alaska Company or an affiliate ("Tesoro"). As a result of recent volcanic and seismic activity in the area, the Cook Inlet pipeline has been shut-in, thereby preventing the Debtors from selling oil production generated from the Abandoned Assets.

17.    Even prior to the closure of the Cook Inlet pipeline, the Debtors lost money on the Abandoned Assets at the rate of approximately $500,000 per month. The Debtors estimate that the cash burn for these properties, assuming regular oil deliveries resume, will be approximately $700,000 per month at current oil prices. That cash shortfall increases to approximately $1.3 million per month so long as oil sales remain suspended. From and after August 4, 2009, when the Debtors' postpetition financing expires with respect to the Abandoned Assets, the Debtors will have no access to capital to fund these ongoing losses and administrative expenses. The Debtors also do not have any readily available unencumbered assets to continue to operate and maintain the Abandoned Assets.

18.    In addition, there are significant future decommissioning obligations associated with the Abandoned Assets, which the Debtors do not have the wherewithal to satisfy. The Debtors estimate that such liabilities will range between $30 million to $60 million over a three to four-year period. Any potential buyer of the Debtors' interests in Abandoned Assets effectively would be assuming these substantial future decommissioning costs.

19.    The Debtors have pledged nearly $8.0 million in cash (the "Pledged Cash") in favor of the State and the federal government to secure the Debtors' decommissioning

and other payment obligations associated with the Abandoned Assets. Although approximately

$6.6 million of the Pledged Cash is escrowed specifically with respect to decommissioning

obligations on a single property, the Pledged Cash could be made available to help defray certain

of the costs associated with the abandonment requested hereby.

        20.     To date, perhaps as a result of recent low oil prices and poor capital

market conditions, the Debtors have been unsuccessful in obtaining any binding offers to

purchase the Abandoned Assets, despite a concerted marketing effort. The Debtors retained

Lazard Frères & Co., LLC ("Lazard") as investment bankers in these cases for the express

purpose of marketing the Debtors' assets in Alaska. Over the last two months, Lazard has

communicated the opportunity to numerous prospective buyers, sent out marketing materials,

and coordinated the creation of a data-room for buyers to conduct due diligence on the Debtors'

assets. No prospective buyer has yet been willing to commit to purchase the Abandoned Assets.

        21.     Although the Debtors are continuing their sales efforts and concurrently

herewith are filing a motion to establish bid procedures for the sale of the Debtors' interests in

Alaska, the Debtors have no "stalking horse" bidder in place and no binding sale agreement with

respect to the Abandoned Assets. Hence, in the event no bidder comes forward in the immediate

future and no sale transaction can be consummated as to some or all of the Abandoned Assets,

the Debtors seek to abandon any unsold Abandoned Assets *nunc pro tunc* to the Petition Date.

The Debtors also seek authority to reject the Rejected Contracts that are interrelated with the

Debtors' interests in the Abandoned Assets and are not assumed as part of a sale.

8

22.     Finally, the Debtors propose to abandon the Abandoned Assets to the State or other applicable lessors or landowners. The Debtors will coordinate with such parties in advance of the hearing on this Motion and intend to take appropriate remedial steps to effectuate a smooth transition.

### Anticipated Precautionary Measures

23.     As noted above, the Debtors will have no access to capital for purposes of the Abandoned Assets after August 4, 2009. Therefore, there is no incremental harm or threat to public health and safety associated with abandonment because, in any event, the Debtors will have no further ability to fund the operation (or decommissioning) of the Abandoned Assets, with or without abandonment. However, in an abundance of caution, and in order to ensure that there will be no imminent and identifiable harm to public health and safety associated with the Debtors' abandonment of the Abandoned Assets, PERL, in its capacity as operator of the producing properties, will reasonably and within its financial constraints, cooperate with the State and other applicable parties in interest to ensure a safe and orderly transition. Indeed, PERL intends to take (or has already taken) the following precautionary steps with respect to the Abandoned Assets prior to the hearing on this Motion:

(a) Conducting an investigation of the potential impacts associated with abandonment and the costs necessary to minimize any adverse consequences;

(b) Notifying applicable authorities and lessors of the Debtors' intent to abandon and providing such parties with the Debtors' analyses of potential impacts and associated costs;

(c) Coordinating with applicable authorities and lessors to transition operations and appoint replacement operators, to the extent feasible; and

(d) Alternatively, temporarily shutting-in properties where operations cannot be sustained and collaborating with applicable authorities and lessors to transfer possession and control of such assets in an orderly fashion.[6]

24.     Taken together, by the time of the hearing on this Motion and in concert with the Debtors' ongoing efforts to effectuate a sale of the Abandoned Assets, the Debtors anticipate that they will have taken sufficient steps to eliminate any threat to the public's welfare that could result from the Debtors' abandonment of the Abandoned Assets.

## Relief Requested

25.     By this Motion and solely in the event that the Debtors are unable to consummate a sale of their interests in any or all of the Abandoned Assets, the Debtors seek to abandon the unsold Abandoned Assets effective as of the Petition Date because they are burdensome to the Debtors' estates and are of no value or other benefit to the estates. For the same reason and under the same circumstances, the Debtors seek to reject the Rejected Contracts that are associated with the Abandoned Assets and are not assumed as part of a sale. This Motion does not affect any rights that the Debtors may have in oil and gas leases or any other assets that relate to areas within Trading Bay. The Debtors' abandonment of the Abandoned Assets also would not affect, and would be without prejudice to, any rights or claims of the

---

[6]  For purposes herein, the term "temporary shut-in" refers to the process of temporarily plugging wells (without the use of cement), weatherizing pipelines and offshore platforms, providing electricity to offshore platforms, and clearing oil production from storage tanks. The Debtors expect the process of temporary shut-in to require approximately two weeks' time from the point that a final decision is made to abandon these assets.

10

estates or any other party in interest in any segregated or reserve accounts created by prior order

of this Court.

### Basis for Relief

**A.    In the Absence of a Sale, the Debtors Have Properly Exercised Their Business
Judgment to Abandon Their Interests in the Abandoned Assets**

26.    Section 554(a) of the Bankruptcy Code provides that "[a]fter notice and a

hearing, the trustee [or debtor-in-possession] may abandon any property of the estate that is

burdensome to the estate or that is of inconsequential value and benefit to the estate." 11 U.S.C.

§ 554(a); *see also* FED. R. BANKR. P. 6007. "The trustee's power to abandon property is

discretionary." *In re Slack*, 290 B.R. 282, 284 (Bankr. D.N.J. 2003) (citations omitted). "Courts

defer to the trustee's judgment and place the burden on the party opposing the abandonment to

prove a benefit to the estate and an abuse of the trustee's discretion." *Id.* "The party opposing

the abandonment must show some likely benefit to the estate, not mere speculation about

possible scenarios in which there might be a benefit to the estate." *Id.* The court only needs to

find the trustee made: 1) a business judgment; 2) in good faith; 3) upon some reasonable basis;

and 4) within the trustee's scope of authority." *Id.*

27.    Upon abandonment, abandoned property is no longer part of the

bankruptcy estate and is treated as if administration of the asset never occurred. 4 NORTON

BANKRUPTCY LAW AND PRACTICE at § 74:2 (3d ed. 2008). Hence, abandonment is retroactive to

the petition date and constitutes a divestiture of the estates' interests in the property to the party

with a possessory interest in it. *See In re Guterl Special Steel Corp.*, 316 B.R. 843, 861 (Bankr.

W.D. Pa. 2004) (abandoned property reverts *nunc pro tunc* to the debtor or the party with

11

possessory right to the property as of the petition date); *Wallace v. Lawrence Warehouse Co.*,

338 F.2d 392, 394 n.1 (9th Cir. 1964) ("The ordinary rule is that, when a trustee abandons

property of the bankrupt, title reverts to the bankrupt, *nunc pro tunc*, so that he is treated as

having owned it continuously.") (citations omitted); *see also Midlantic Nat'l Bank v. New Jersey*

*Dept. of Environmental Protection*, 474 U.S. 494, 507 (1986) ("Although § 544 does not specify

to whom the property is to be abandoned, the legislative history suggests that it is to the person

having a possessory interest in the property …. Such abandonment is to the person having the

possessory interest in the property."); *Ohio v. Kovacs*, 469 U.S. 274, 284 n. 12 (1985)

("[A]bandonment is to the person having the possessory interest in the property.").

28.     As noted above, once the trustee or debtor-in-possession makes a

reasonable business judgment to abandon property of the estate, the threshold for approval of the

abandonment is low. Here, assuming that the Debtors are unable to consummate a sale of some

or all of their interests in the Abandoned Assets, the Debtors have determined in their sound

business judgment and in good faith to abandon the estates' interests in such Abandoned Assets.

29.     Ongoing operations associated with the Abandoned Assets are a material

liability of these bankruptcy estates that the Debtors will no longer have any means to sustain

once funding for these assets under the Debtors' postpetition financing facility expires on August

4, 2009. Given recent volcanic and seismic activity that has prevented the Debtors from bringing

oil production to market, the Debtors are incurring a cash burn associated with the Abandoned

Assets of approximately $1.3 million per month. Even if oil deliveries resume at prepetition

levels, the Debtors would continue to sustain monthly cash shortfalls of approximately $700,000

12

(at current oil prices). When anticipated future decommissioning costs are added to the equation, the Debtors face additional liabilities in the tens of millions of dollars in connection with the Abandoned Assets.

30. Therefore, in the absence of a sale transaction and given the Debtors' inability to continue to fund operations associated with the Abandoned Assets, the Debtors request authority to abandon those Abandoned Assets that are not sold.

31. The Debtors further request that the State or other applicable lessors or landowners be designated as the recipients of the Abandoned Assets. Prior to the hearing on this matter, the Debtors will coordinate with such parties to ensure a smooth transition of the Abandoned Assets.

**B.      Given the Precautionary Steps to be Taken by the Estates, the *Midlantic* Exception to the Debtors' Abandonment Power Does Not Apply**

32. The Debtors are aware of the limited exception to the estates' ability to abandon property with environmental restrictions based upon the U.S. Supreme Court's decision in *Midlantic Nat'l Bank v. New Jersey Dept. of Environmental Protection*, 474 U.S. 494, 507 (1986). As stated by this Court in *In re Insilco Technologies, Inc.*, *Midlantic* and its progeny stand for the proposition that "property of the estate may not be abandoned if the abandonment will act to contravene laws designed to protect public health and safety and will pose an imminent threat to the public's welfare." 309 B.R. 111, 114 (Bankr. D. Del. 2004).

33. In *Midlantic*, the factual circumstances were extreme. The chapter 7 trustee sought to abandon over 470,000 gallons of toxic and contaminated oil that was stored in deteriorating and leaking containers. 474 U.S. at 497. The bankruptcy court permitted the

13

abandonment, despite allegations that the estate had sufficient funds to protect the public from

imminent danger posed by the hazardous waste and was not required to take even relatively

minor steps to reduce such danger, such as securing the facility and removing explosive agents.

*Id.* at 498.

34.    The Supreme Court held that a trustee (or debtor in possession) could not

"abandon property in contravention of a state statute or regulation that is reasonably designed to

protect the public health or safety from identified hazards." *Id.* However, the Court noted that:

> This exception to the abandonment power vested in the trustee by
> § 554 is a narrow one. It does not encompass a speculative or
> indeterminate future violation of such laws that may stem from
> abandonment. The abandonment power is not to be fettered by
> laws or regulations not reasonably calculated to protect the public
> health or safety from imminent and identifiable harm.

*Id.* at 507 n. 9. The Court also expressly reserved the question "whether certain state laws

imposing conditions on abandonment may be so onerous as to interfere with the bankruptcy

adjudication itself[.]" *Id.* at 507.

35.    In the Third Circuit, courts have narrowly construed the *Midlantic*

exception to situations where the danger from abandonment is clearly imminent and identifiable.

*See, e.g., In re Unidigital, Inc.*, 262 B.R. 283, 286-87 (Bankr. D. Del. 2001) (allowing

abandonment of various chemicals because there was no evidence that such chemicals posed an

imminent and identifiable harm to the public); *In re Guterl Special Steel Corp.*, 316 B.R. 843,

859 (Bankr. W.D. Pa. 2004) (permitting abandonment of a partially remediated site

notwithstanding the presence of radioactive contamination given no imminent threat to public

health and safety); *White v. Coon (In re Purco, Inc.)*, 76 B.R. 523, 533 (Bankr. W.D. Pa. 1987)

14

(finding no evidence of imminent harm to preclude abandonment of 200 drums of cutback

asphalt containing various chemicals, even if construed as hazardous waste and despite evidence

of leakage); *see also New Mexico Environment Dept. v. Foulston (In re L.F. Jennings Oil Co.)*, 4

F.3d 887, 890 (10th Cir. 1993) (permitting abandonment of allegedly contaminated sites where

there was no immediate threat to public health and safety at the time of abandonment), *cert.*

*denied*, 511 U.S. 1005 (1994).

36.     In *Unidigital*, Judge Walrath allowed the debtors to abandon a twenty-five

foot printer weighing over 30,000 pounds that contained chemicals used in the printing process.

262 B.R. at 285. The debtors' landlord objected to the proposed abandonment on the basis that it

fell within the *Midlantic* exception. *Id.* at 286. The court concluded that there was no evidence

that the chemicals were hazardous as currently stored (despite evidence of possible seepage) or

that there was any danger associated with removing the printer if professional contractors were

employed for the job. *Id.* at 287.

37.     In *Guterl*, the court approved the trustee's request to abandon a 9.1 acre

contaminated site that previously had been used to process highly radioactive chemicals for the

federal government. 316 B.R. at 847. As part of the bankruptcy, a substantial portion of the site

had been remediated and toxic chemicals removed, but regulators still objected to the proposed

abandonment on the basis that further remediation work was required. *Id.* at 857-858. The

court, however, found "no persuasive reason for concluding that the threat to public health and

safety posed by the radioactive contamination is imminent." *Id.* at 859. The fact that the site

contained radioactive contamination was not sufficient by itself to convince the court that it

15

posed an imminent threat to public health and safety. *Id.* The court also refused to create a

situation where the trustee would be prohibited from abandoning the site and instead was

required to persist in the task of persuading a federal agency to pay to clean it up. *Id.* at 860.

"Requiring strict compliance with state environmental laws in situations as we have here would

derogate the spirit and purpose of the Bankruptcy Code – i.e., the prompt and expeditious

administration of estate assets within a *reasonable* period of time." *Id.*

      38.    The foregoing authorities support a narrow reading of the *Midlantic*

exception that is limited to situations involving truly imminent and specific harm to the public's

welfare. Indeed, at least one court in the Third Circuit has placed the burden of proof as to the

applicability of the *Midlantic* exception on the party opposing abandonment. *In re St. Lawrence*

*Corp.*, 248 B.R. 734, 739 (D.N.J. 2000). Specifically, the court outlined four conditions that

need to be proven by the objecting party for the exception to apply: (1) an identified hazard

exists that poses a risk of imminent and identifiable harm to the public health and safety; (2)

abandonment of the property will violate a state statute or regulation; (3) the statute or regulation

being violated is reasonably designed to protect the public health and safety from imminent and

identifiable harm caused by an identified hazard; and (4) compliance with the statute or

regulation would not be so onerous as to interfere with the bankruptcy administration itself. *Id.*

As to the latter point, examples cited by the court include: (1) when the estate lacks

unencumbered funds with which to comply with state law; (2) when compliance would take too

long for the proceeding to be expeditious; or (3) when compliance would allow environmental

authorities to completely usurp administration of the case. *Id.* at 739 n.6.

16

39.     Courts also consider whether the debtor has taken reasonable steps to ensure that there is no adverse impact to the public's welfare. *See, e.g., In re Oklahoma Refining Co.*, 63 B.R. 562, 564 (Bankr. W.D. Okla. 1986) (outlining remedial measures taken by trustee to minimize hazards associated with abandonment); *Franklin Signal Corp*, 65 B.R. 268, 271-273 (Bankr. D. Minn. 1986) (allowing abandonment provided that certain conditions are met to adequately protect the public health and safety, consisting of conducting an investigation to determine environmental impacts and informing state and federal agencies about the situation); *Purco*, 76 B.R. at 533 (concluding that "abandonment will be permitted when the conditions are such that abandonment will not render the public health and safety inadequately protected."); *Borden, Inc. v. Wells-Fargo Business Credit (In re Smith-Douglass, Inc.)*, 856 F.2d 12, 16 (4th Cir. 1988) (same).

40.     The decision in *Oklahoma Refining* is particularly instructive. In that case, the trustee sought to abandon a sixty-five year old oil refinery situated on a heavily-contaminated 160-acre site. 63 B.R. at 563. The trustee ceased operations at the site and moved to have it abandoned. *Id*. With secured creditor consent, the trustee took substantial steps to minimize hazards from the property and cooperated with applicable state agencies. *Id*. at 564. The trustee drilled monitoring wells on the property and removed 2,000 barrels of pitch and asphalt disposal pits and 150 tons of scrap metal. *Id*. The trustee also drained tanks, cleaned out tank bottom sludge, and maintained adequate fencing around the property. *Id*. Last, the trustee commissioned an expert consultant to prepare an environmental investigation of the site in cooperation with state agencies. *Id*. at 563-564. A complete remediation of the site would have

17

required an additional investment of $2.5 million and up to 30 years of monitoring and additional clean up operations. *Id.* at 564. When the trustee sought to abandon the property, various state agencies argued that abandonment would violate laws and regulations designed to protect the public health and safety given the continued pollution at the site. *Id.* The court rejected these arguments and permitted abandonment in light of the actions taken by the trustee and the lack of unencumbered funds to pay for additional remediation work. *Id.* at 565. The court concluded that the "refinery does not present immediate and menacing harm to public health and safety" and will not aggravate the existing situation. *Id.* The court also refused to interpret the *Midlantic* decision as placing the trustee into the impossible predicament of strictly complying with environmental regulations without having access to adequate funds to do so. *Id.*

41.    In the instant case, much like *Oklahoma Refining* and in stark contrast to *Midlantic*, there are no unencumbered assets of the Debtors with which to fund the continued operation of the Abandoned Assets. Thus, there is no incremental harm to the public health or safety associated with the proposed abandonment. Even if the Court did not grant the Motion, the Debtors would have no ability to maintain the Abandoned Assets.

42.    Moreover, the Abandoned Assets do not present a situation of imminent harm to the public welfare. The Abandoned Assets consist of both exploratory and producing properties. The Debtors' working interests in exploratory properties have no ongoing operations and remain in their natural state. There should be no environmental impact whatsoever in terms of the Debtors' abandonment of interests in exploratory properties.

18

43.    As to those Abandoned Assets that are producing properties, PERL, as operator, will reasonably and within its financial constraints, cooperate with the State and other applicable parties in interest to ensure a safe and orderly transition.  Among other things, PERL will, prior to the date of the hearing on this Motion:  (a) conduct an investigation of the potential impacts associated with abandonment and the costs necessary to minimize any adverse consequences; (b) notify applicable authorities and lessors of the Debtors' intent to abandon and providing such parties with the Debtors' analyses of potential impacts and associated costs; (c) coordinate with applicable authorities and lessors to transition operations and appoint replacement operators, to the extent feasible; and (d) alternatively, temporarily shut-in properties where operations cannot be sustained and collaborate with applicable authorities and lessors to transfer possession and control of such assets in an orderly fashion (temporary shut-in is expected to require approximately two weeks' time from the point that a final decision is made to abandon these assets).  In addition, the State and the federal government will have access to the Pledged Cash to defray certain of the costs associated with abandonment.

44.    The Debtors' proposed course of action with respect to the producing properties fairly and reasonably balances the interests of the public welfare against those of the estates, and takes into account that there is no imminent danger associated with these properties. The producing properties continue to operate, and ideally, will be immediately transitioned to a replacement operator.  To the extent that is not feasible, the producing properties can be temporarily shut-in pending the selection of a new working interest owner and replacement operator.

19

45.      It bears emphasis that the producing properties do not need to be

permanently shut-in or decommissioned at this time.  Indeed, the Debtors estimate that a

complete decommissioning effort would cost $30 million to $60 million and would require three

to four years to complete.  These estates do not have sufficient unencumbered funds, and would

be rendered administratively insolvent, if the Debtors were required to assume that obligation as

an administrative expense.  Accordingly, the Debtors have outlined the precautionary steps that

they will take to ensure that there will be no likelihood of imminent harm to the public welfare

associated with abandonment of the producing properties, while also recognizing the financial

constraints facing these estates.

46.      Because this Motion is filed in the alternative, the Debtors will continue

their efforts to consummate a sale of the Abandoned Assets to a solvent buyer who will assume

the liabilities associated therewith on a going forward basis and eliminate the need for outright

abandonment.

## C.      The Debtors Have Exercised Sound Business Judgment in Rejecting the Rejected Contracts

47.      In addition, the Debtors seek authority to reject the Rejected Contracts.

Section 365(a) of the Bankruptcy Code provides that a debtor in possession, "subject to the

court's approval, may … reject any executory contract or unexpired lease of the debtor."  11

U.S.C. § 365(a); *see also* FED. R. BANKR. P. 6006.  Rejection of an executory contract or

unexpired lease is appropriate where rejection would benefit the Debtors' estates.  *See Sharon*

*Steel Corp. v. National Fuel Gas Distribution Corp. (In re Sharon Steel Corp.),* 872 F.2d 36, 40

(3d Cir. 1989).  Whether the assumption or rejection of an executory contract or unexpired lease

would benefit the estate is a matter reserved for the Debtors' business judgment. *See NLRB v. Bildisco (In re Bildisco)*, 682 F.2d 72, 79 (3d Cir. 1982) ("The usual test for rejection of an executory contract is simply whether rejection would benefit the estate, the 'business judgment' test."). If the debtors' business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract. *In re Federal Mogul Global, Inc.*, 293 B.R. 124, 126 (D. Del. 2003).

48.     Here, for the same reasons that the Debtors seek to abandon the Abandoned Assets and subject to the same reservations, the Debtors seek to reject the Rejected Contracts that are associated with the Abandoned Assets and are not assumed as part of a sale.

### Request for Waiver

49.     Among other things, Bankruptcy Rule 6007(a) requires that the Debtors serve a copy of this Motion and their intent to abandon the Abandoned Assets on "all creditors." The Debtors' consolidated matrix contains over 1,100 creditors. The Debtors submit that service of this Motion on all of these individuals is overly burdensome. The Debtors will serve a copy of this Motion and supporting documents on the constituents set forth below and, therefore, request a limited waiver of the service requirement set forth in Rule 6007. The Debtors submit that the requested waiver is appropriate and will properly and timely effectuate notice.

50.     The Debtors also request that the Court waive the 10-day stay associated with rejection of the Rejected Contracts under Bankruptcy Rule 6007(d) so that the Court's order may go effective immediately.

21

## Notice

51.     Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known:  (a) the Office of the United States Trustee, (b) the Official Committee of Unsecured Creditors; (c) the Debtors' pre-petition and post-petition lenders; (d) all parties who have an interest in the Abandoned Assets (including the Rejected Contracts); and (e) all parties who have requested notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

52.     No previous motion for the relief sought herein has been made to this or any other Court.

22

WHEREFORE, solely to the extent the Debtors are unable to consummate a sale of any or all of the Abandoned Assets, the Debtors respectfully request that the Court enter an order (a) granting this Motion; (b) authorizing the abandonment of the unsold Abandoned Assets *nunc pro tunc* to the Petition Date pursuant to section 554 of the Bankruptcy Code; (c) authorizing the rejection of the unassumed Rejected Contracts pursuant to section 365 of the Bankruptcy Code; and (d) granting such other and further relief as the Court deems just and proper.

Dated: June 16, 2009

PACHULSKI STANG ZIEHL & JONES LLP


Ira D. Kharasch (CA Bar No. 109084)
James E. O'Neill (DE Bar No. 4042)
Maxim B. Litvak (CA Bar No. 215852)
919 North Market Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 652-4100
Facsimile:  (302) 652-4400
E-mail:       ikharasch@pszjlaw.com
                 joneill@pszjlaw.com
                 mlitvak@pszjlaw.com

Counsel for Debtors and Debtors in Possession

23