IN THE UNITED STATED BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

IN RE:

PACIFIC ENERGY RESOURCES LTD., *et al.*, )  Chapter 11
                                                          )
                                                          )  Chase No. 9-10785(KJC)
                                  Debtors.      )  (Jointly Administered)
_____ )

## OBJECTION TO ALTERNATIVE MOTION OF THE DEBTORS FOR AN ORDER AUTHORIZING ABANDONMENT OF CERTAIN INTERESTS IN OIL AND GAS PROPERTIES IN ALASKA (EXCLUDING TRADING BAY) AND REJECTION OF EXECUTORY CONTRACTS RELATING THERETO

The United States, on behalf of the Department of Interior ("Interior"), through the Bureau of Land Management ("BLM"), hereby objects to the Alternative Motion of the Debtors for an Order Authorizing Abandonment of Certain Interests in Oil and Gas Properties in Alaska (Excluding Trading Bay) and Rejection of Executory Contracts Relating Thereto ("Alternative Motion") Dkt. #456.  In support of our objection, we show as follows:

### BACKGROUND

1.  The Alaska Native Claims Settlement Act ("ANCSA"), 43 U.S.C. 1601 *et seq*., as amended, created two types of native corporations in Alaska:  regional corporations and village corporations.  Under the settlement, each type of corporation had the right to select certain lands in Alaska.  43 U.S.C. § 1611.  Village corporations received the surface rights to the lands they selected; the subsurface rights under village selections were conveyed to the regional corporations within whose area the village corporation was located.  43 U.S.C. § 1613(e).  The United States transferred ownership of the surface rights to the leased property to the Salamatof Native Association (the village corporation); the subsurface rights were conveyed to the Cook

-1-

Inlet Region Corporation ("CIRI").  The two wells, West Foreland # 1 and #2, sit on Salamatof

Native Association land, the subsurface of which is owned by CIRI.

2.   Under the Native Allotment Act of 1906, as amended, 43 U.S.C. §§ 270-1 to 270-3

(1970), repealed with a savings clause, 43 U.S.C. § 1617 (1976), the United States conveyed two

small parcels within the leased area to individual native Alaskans and retained oil and gas rights,

and a right to royalties, from those allotments.  These allotments were excluded from the

Salamatof and CIRI conveyances.

3.   At the time of transfer of the leased area to Salamatof, the United States, through

BLM, administered Lease #BLM-A-035017 ("BLM/CIRI Lease").  Under Section 14(g) of

ANCSA, 43 U.S.C. § 1613(g), the BLM could have waived administration of the BLM/CIRI

Lease at the time of conveyance of interests to Salamatof and CIRI, but did not to do so.

Therefore, the BLM administers Lease #BLM-A-035017, even though portions of the leased

land are not Federal property.  CIRI, through BLM, leased the oil and gas right to Debtor.

## DISCUSSION

4.   If the Debtors are unable to sell the Abandoned Assets, they seek to abandon those

interests[1] and the associated decommissioning obligations to the lessors or landowners of the

properties.  These decommissioning obligations include, *inter alia*, disassembling the oil and gas

drilling and processing platforms and plugging and abandoning all oil and gas wells, at a cost of

millions of dollars.  Alternative Motion ¶ 3.  Under section 2(j) of the BLM/CIRI Lease, the

Debtors must " plug properly and effectively all wells drilled in accordance with the provisions

---

[1] The "Abandoned Assets" as defined by the Debtors on Exhibit A to the Alternative
Motion" include the BLM/CIRI Lease.

of this lease . . . before abandoning the same. . . ."  See Declaration of Gregory J. Noble, attached

as Exhibit I, hereto ("Noble Declaration").   This requirement is consistent with the regulatory

mandate that the Debtors, having acquired operating rights to the BLM/CIRI Lease, " . . . must

plug and abandon all unplugged wells, reclaim the lease site, and remedy all environmental

problems in existence . . . ."  43 C.F.R. § 3106.7-6(b).

5.  Debtors assert that they will take appropriate and reasonable precautionary measures

to avoid any likelihood of imminent harm to the public health and safety caused by the

abandonment, including investigating the impact of abandonment, notifying the applicable

authorities and providing such parties with the Debtors' analysis of potential impacts and

associated costs.  Alternative Motion ¶ 23.  On information and belief, Debtors have not yet

taken these precautionary steps, nor notified the affected parties of the impacts and costs.  In the

alternative, Debtors propose to temporarily shut-in the properties where operations cannot be

sustained, which will take approximately two weeks and not begin until the date a final decision

to abandon the properties is made.  *Id.*

6.  Specifically, Debtors propose to abandon, *inter alia*, the BLM/CIRI Lease.  The

primary environmental concern upon abandonment of this lease is protection of the freshwater

aquifers.  Noble Declaration p. 1.  By letter dated July 14, 2009, BLM notified the Debtors as to

the minimum action required to shut in the BLM/CIRI lease so the wells will pose no immediate

threat to human safety and health or the environment.[2]  The estimated cost to temporarily shut in

---

[2] This does not include the Debtors' obligation to "plug properly and effectively all wells
. . . before abandoning the same."  *Id*. at p. 2.  BLM estimates the cost to permanently plug the
two wells on the lease, remove the equipment and reclaim the site to be approximately
$4,048,000.  *Id.*

the two wells on the BLM/CIRI Lease is approximately $20,000.  *Id*. p. 1.  Subsequently, on July

16, 2009, BLM conducted a visual inspection of the well site.  Although no contamination was

obvious, a Phase I preliminary surface and shallow subsurface investigation is required to

determine if site contamination poses imminent and identifiable harm to the public.  BLM

estimates that a Phase I investigation would cost approximately $25,000.  *Id*. at p. 2.

7  Accordingly, the minimum required for the Debtors to assure that no imminent danger

to the public health and safety is threatene from the abandonment of the BLM/CIRI Lease is a

temporary shut-in and a Phase I investigation at a cost of approximately $45,000.

8.  As Debtors acknowledge, the Supreme Court has limited a Debtor's ability to abandon

property in contravention of environmental laws.  *Midlantic Nat'l Bank. v. New Jersey Dept. of

Environmental Protection*, 474 U.S. 494, 507 (1986).  The courts, in interpreting *Midlantic*, have

provided guidelines as to when and under what circumstances a court can authorize a debtor to

abandon such property.  First, a court is required to make a finding as to whether conditions on

the property pose an immediate and identifiable threat to the public health or safety.  *Leavell v.

Karnes*, 143 B.R. 212, 218 (S.D. Ill. 1990).  A court must also consider the financial condition of

the debtor, and where the debtor has assets, the court should require stricter compliance with

environmental laws before abandonment is permitted.  *In re Smith-Douglas, Inc.*, 856 F.2d 12,

17 (4th Cir. 1998).   Further, a debtor must take "adequate precautionary measures to ensure that

there is not imminent danger to the public as a result of the abandonment."  *In re Franklin Signal

Corp.*, 65 B.R. 268, 272 (Bankr. D. Minn. 1986).

9.  Debtors have asserted that they have or will take certain precautionary steps to ensure

that its abandonment of the leases poses no imminent and identifiable harm to the public health

and safety.  Alternative Motion ¶ 23.  However, until such time that the Debtors actually take those steps and provide the Court with the results, this Court cannot find that the conditions on the property to be abandoned does not constitute a hazard to the public health and safety. Further, Debtors assert that they have pledged nearly $8.0 million in cash ("Pledged Cash") in favor of the State of Alaska and the federal government to secure the Debtors' decommissioning obligations although $6.6 million of this is escrowed for a specific property and not available for obligations on other leases.  Alternative Motion ¶ 19.  Thus, according to Debtors, at least $1.4 million is available for the Debtors' interim protective steps.

10.  Debtors recognize their obligations with respect to protecting the public welfare, and until such time as they have completed those actions, authorizing the Debtors to abandon the Abandoned Assets is premature.

Accordingly, the United States objects to the Debtors' request to abandon the BLM/CIRI Lease unless and until, at a minimum, the Debtors have provided the Court with sufficient information to determine whether the abandoned property constitutes a hazard to the public health and safety.  Further, although the Alternative Motion identifies funds available for Debtors' decommissioning obligations, the proposed order does not require that the Pledged Cash be so expended.  Wherefore, the United States requests that at lease $45,000 be made available for the temporary shut-in and Phase I investigation on the BLM/CICR Lease.

Dated: July 21, 2009

Respectfully submitted,

TONY WEST
Assistant Attorney General

DAVID WEISS
Acting United States Attorney

ELLEN W. SLIGHTS (DE Bar No. 2782)
Assistant United States Attorney
1007 Orange Street, Suite 700
P.O. Box 2046
Wilmington, Delaware 19899-2046

_____/s/ E. Kathleen Shahan_____

J. CHRISTOPHER KOHN
TRACY WHITAKER
E. KATHLEEN SHAHAN
Civil Division
U.S. Department of Justice
P.O. Box 875
Ben Franklin Station
Washington, D.C. 20044-0875
(202) 307-0249

ATTORNEYS FOR THE UNITED STATES

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 21, 2009, I caused the foregoing Objection to Alternative

Motion of the Debtors for an Order Authorizing Abandonment of Certain Interests in

Oil and Gas Properties in Alaska (Excluding Trading Bay) and Rejection of Executory Contracts

relating thereto to be served on all parties registered with the CM/ECF System for the United

States Bankruptcy Court for the District of Delaware in this case and by telefax prior to 4:00

p.m. prevailing Eastern time on:

James E. O'Neill, Esq.
302 652-4400

Ira D. Kharasch, Esq.
310 201-0760

Jeffrey Sabin, Esq.
212 752-5378

Amy Kyle,
617 345-5001

Seth Jacobson, Esq.
312 407-8511

J. Caleb Boggs
302 573-6492

Katherine C. Piper, Esq.
310 734-3173

James C. Carignan, Esq
302 421-8390

                /s/ E. Kathleen Shahan
             E. Kathleen Shahan