## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

|  |  |
|---|---|
| IN RE: | Chapter 11 |
| PACIFIC ENERGY RESOURCES, LTD., *et al.*, | Case No. 09-10785 (KJC) <br> Jointly Administered |
| Debtors. | Hrg Date: July 27, 2009 at 1:30 p.m. (ET) <br> Obj. Due: July 22, 2009 at 4:00 p.m. (ET) (on consent) <br> Related to Docket No. 545 |

### OBJECTION OF THE STATE OF ALASKA
### TO THE DEBTORS' SALE MOTION

The State of Alaska (the "State"), by its co-counsel, Morrison & Foerster LLP and Stevens & Lee P.C., submits this Objection (the "Objection") to the Debtors' *Motion for an Order: (I) Approving Sale of Debtors' Alaska Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests Pursuant to Sections 363(b), (f) and (m) of the Bankruptcy Code; (II) Assuming and Assigning Certain Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* [Docket # 545] (the "Sale Motion"). In support of the Objection, the State respectfully represents and alleges the following:[1]

### PRELIMINARY STATEMENT

1.       Pursuant to the Sale Motion, the Debtors seek to sell the Group 1 Assets to Ammadon Ltd. and Catherwood Ltd ("A&C"). As set forth in more detail below, A&C has not yet been qualified under Alaska's statutes and regulations to serve as lessee and operator of the Group 1 Assets. Approval of the proposed sale should be conditioned on the State's approval of A&C as successor lessee and operator. To the extent (a) A&C is not ultimately approved by the

---

[1] Capitalized terms not otherwise defined in this Objection shall retain the meanings ascribed to them in the Sale Motion.

State as successor lessee and operator of these assets, or (b) A&C cannot provide adequate assurance of future performance, sections 365(b)(1)(C) and (c)(1) prevent the assignment of the lease to A&C. In addition, the Debtors must cure their defaults under the leases and the Escrow Agreement (defined below) before assuming and assigning the leases for the Group 1 Assets.

2.    The State and the Debtors have been engaged in good faith and productive discussions regarding the State's objections and the State is hopeful that all of its concerns can be resolved before the hearing on the Sale Motion.

### **BACKGROUND**

3.    On March 9, 2009, the Debtors filed voluntary petitions for reorganization under Chapter 11 of the United States Bankruptcy Code. The Debtors' cases are being jointly administered. The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Debtors' cases.

4.    On June 16, 2009, the Debtors filed a *Motion for an Order (A) Approving Procedures for Sale of the Debtors' Alaska Assets; (B) Scheduling Auction and Hearing to Consider Approval of Sale; (C) Approving Notice of Respective Dates, Times, and Places for Auction and For Hearing on Approval of (I) Sale and (II) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (D) Approving Forms of Notice; and (E) Granting Related Relief* [Docket # 129] (the "Sale Procedures Motion"), seeking approval of procedures for a sale (or sales) of the Alaska Assets, which are located in and near (onshore and offshore) Cook Inlet, Alaska and include interests in the Trading Bay Unit, the Trading Bay Field, the West MacArthur River field, the Redoubt Shoal field, and various other locations.

5.    On June 16, 2009, the Debtors also filed two alternative abandonment motions: (a) *Alternative Motion of Pacific Energy Alaska Operating LLC For an Order Authorizing Abandonment of Interests in Oil and Gas Properties at Trading Bay, Alaska and Rejection of Executory Contracts Relating Thereto* [Docket # 455] (the "Trading Bay Abandonment Motion"); and (b) *Alternative Motion of the Debtors For an Order Authorizing Abandonment of Certain Interests in Oil and Gas Properties in Alaska (Excluding Trading Bay) and Rejection of Executory Contracts Relating Thereto* [Docket # 456] (the "Non-Trading Bay Abandonment Motion," and collectively, the "Abandonment Motions"). By these Abandonment Motions, the Debtors seek to abandon their interests in oil and gas properties located in Alaska and reject certain related and identified executory contracts, solely to the extent that the Debtors are unable to effectuate a sale of any or all of their interests in those assets.[2]

6.    Following a hearing on July 1, 2009, the Court entered an Order approving the Sale Procedures Motion, setting the Bid Deadline for July 13, 2009, the Auction for July 20, 2009, and the Sale Hearing for July 27, 2009.

7.    On July 2, 2009, the Debtors filed the Sale Motion seeking entry of an order approving the sale of the Alaska Assets free and clear of all liens, claims and encumbrances, and assuming and assigning certain executory contracts and unexpired leases [Docket # 545].

8.    On July 11, 2009, the Debtors filed the *Amended Notice to Counterparties to Executory Contracts and Unexpired Leases that May Be Assumed and Assigned Regarding Alaska Assets* [Docket # 585] (the "Amended Notice"), setting forth Cure Amounts as of July 7, 2009.

---

[2] Given that the Debtors are not proceeding with the Non-Trading Bay Abandonment Motion at this time, the State reserves its right to file any objections or responses as the facts are further developed.

9.    At the Auction on July 20, 2009, the Debtors selected A&C as the Successful

Bidder (also referred to as the "Successful Bidder") for the Group 1 Assets.  There was no

Qualified Bid for the Group 2 Assets.

## ARGUMENT

### The Sale Should Not Be Consummated Until the State
### Approves the Successful Bidder as a Qualified Lessee and Operator

10.    The State of Alaska has a complex and comprehensive regulatory framework to

promote Alaska's oil and gas production and to protect Alaska's precious natural resources and

the health and safety of its citizens.  The Alaska Department of Natural Resources, Division of

Oil and Gas ("DNR DOG"), leases Alaska state land for oil and gas exploration.  Each lease,

which is subject to a rigorous analysis to ensure that Alaska's interests are met, is assigned a

unique Alaska Division of Land ("ADL") number and provides for certain decommissioning

obligations.  Any assignment of an interest in an ADL lease must also be approved by the DNR

DOG to ensure that the assignment is consistent with, and promotes, Alaska's interests.

11.    Under Alaska regulations, each operator and lessee involved in the oil and gas

industry in the State of Alaska must meet certain requirements, the nature of which varies

depending on the type of asset and the interest involved.  These requirements are designed to

ensure that the public health and safety of the environment and the general public are

safeguarded and also to ensure that Alaska's lands are being utilized in a manner that maximizes

its oil and gas production potential.

12.    The ADL leases generally require the lessee to submit a plan of development and

a plan of operations, and include requirements with respect to unitization.  See e.g., ADL 17598,

¶ 9, 10 and 15.  In addition, the leases generally require that the assignments of interests under

the lease must be approved by the State.  See e.g., ADL 17598, ¶ 18 ("No assignment, sublease, or other transfer of an interest in this lease, including assignments of working or royalty interests and operating agreements and subleases, will be binding upon the state unless approved by the state.").  That is, in part, because a lessee under a lease is given the ability to explore, develop and operate the pool and field.  See ADL 17598, ¶ 15.  By seeking to assign the lease to the Successful Bidder, the Debtor is seeking to transfer these various interests under the lease.

13.    The Successful Bidder for any assets where the Debtors currently serve as the operator must be qualified as an operator under Alaska law.  The State must approve any new operator, and the newly designated operator is required to, among other things, furnish a bond and, in some instances, additional security.  See 20 AAC 25.020.  The Alaska Administrative Code further provides that State approval is required for any transfer of an interest in a lease, oil and gas exploration license, or permit, including assignments of working or royalty interest, operating agreements, and subleases.  See e.g., 11 AAC 82.605.

14.    The state will evaluate the successor operator of oil and gas facilities based on certain criteria, including, without limitation: (a) the financial qualifications of the buyer; (b) the potential buyer's experience in operating these types of assets; (c) whether the buyer is fully informed about the current state of the facilities; (d) whether the buyer will be able to fulfill the duties and obligations prescribed in the unit agreement; (e) whether the buyer will be able to provide the requisite levels of insurance specified in the unit operating agreements, fund the abandonment liability for each asset, and provide adequate bonding to the State; and (f) whether the buyer has a plan in place to secure adequate funds to pay for decommissioning and abandoning the assets at the appropriate time, including those assets located on private or non-state land.

15.    To determine whether a potential assignee is qualified to serve as an operator, the State's DNR DOG requires the potential assignee to first complete a Business Questionnaire, which includes, *inter alia*, information regarding the potential assignee's identity, business activities and sources of capital for operating the oil and gas units, information regarding the entity's previous projects similar in nature and scope to the proposed operations, a copy of the entity's most recent annual financial reports, and proof of the entity's current Alaska business license. This information is critical for the State to evaluate the qualifications of any potential assignee. Representatives of the State next meet with the potential operator to evaluate whether the proposed operator is fully aware of their responsibilities under Alaska law and the unit agreements, and whether the proposed operator is capable of performing those responsibilities.

16.    A&C, the Successful Bidder, has not yet met with the State to discuss its qualifications to serve as operator of the Group 1 Assets or submitted a Business Questionnaire to the State. As a result, the State has been unable to evaluate adequately A&C's capabilities as a potential operator, and until A&C can demonstrate otherwise, the State considers A&C unqualified to operate these facilities.

17.    The Debtors' existing leases with the State are unlike ordinary real estate leases. As discussed above, the Debtor is seeking to transfer its various interests under the lease to the Successful Bidder, including the ability to explore, develop and operate the assets. See ADL 17598, ¶ 15. The consequences of operating the leased territory improperly would create a risk of substantial danger to health and human safety.

18.    Moreover, even if this Court were to deem the Debtors' interests freely assignable, which the State disputes, the Successful Bidder would still be required to demonstrate to the State's satisfaction that it is a suitable and capable long-term operator

6

(retaining the Debtors' personnel for a limited period of time does not satisfy the State's long-term concerns). If the Successful Bidder is unable to satisfy those conditions, the sale is pointless.

19.     The State hereby reserves its right to withhold approval of any sale of the Alaska Assets that does not comply with Alaska law. The proposed sale should not be consummated until the State has approved A&C as a qualified lessee and operator.[3] At a minimum, the order approving the sale (the "Sale Order") must include a provision that consummation of the sale is conditioned on the State's approval of A&C as successor operator.

### Applicable Law Excuses the State from Accepting Performance

20.     While the trustee or debtor-in-possession may generally assume or reject any executory contract or unexpired lease of the debtor, the executory contract or unexpired lease may not be assumed and assigned if:

> (A) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and
> (B) such party does not consent to such assumption or assignment.

11 U.S.C. § 365(c)(1).

21.     In this case, Alaska law is the applicable law pursuant to which the State may refuse to accept performance from the Successful Bidder. Alaska law provides that "[n]o transfer of an interest in a lease, oil and gas exploration license, or permit, including assignments

---

[3] To the extent there is a disagreement regarding the Successful Bidder's qualifications to lease and operate the Group 1 Assets, any appeals should be in accordance with Alaska's rules and regulations.

of working or royalty interest, operating agreements, and subleases, is binding upon the state unless approved by the commissioner." 11 AAC 82.605. The State will only approve of the assignment if the assignee is qualified pursuant to Alaska law.

22.    Under Alaska's regulations, each operator and lessee involved in the oil and gas industry in the State of Alaska must meet certain requirements, the nature of which varies depending on the type of asset and the interest involved. See e.g., 11 AAC 83.331 (qualifications of unit operators); 11 AAC 83.100 (indicating that Chapter 82 sets forth leasing requirements); 11 AAC 82.200 (qualifications of lessees and licensees); 11 AAC 82.460 (right of the State to request additional information); 11 AAC 82.605 (requirements for assignment); 11 AAC 82.615 (application for approval of assignment); 11 AAC 82.909 (proposals for oil and gas exploration licenses).

23.    Under section 365(c)(1) of the Bankruptcy Code, a debtor cannot assume and assign a contract where applicable law excuses a party from accepting performance from the assignee under the contract. As discussed above, section 82.605 of title 11 of the Alaska Administrative Code gives the State the right to consent to the assignment of the lease and operating responsibilities to the Successful Bidder. As the ADL leases are not ordinary leases of real property, state law requires that the State take various considerations into account before approving any assignment to ensure that the public health and safety of the environment and the general public are safeguarded.

24.    Courts have held that statutes giving the government the right to consent to the assignment are "applicable law" within the scope of section 365(c)(1). See Matter of West Electronics Inc., 852 F.2d 79 (3rd Cir. 1988) (holding that a contract between West and the

federal government could not be assumed by the debtor-in-possession because a federal law provided the government with the right to consent to an assignment).

25.    If the Successful Bidder is not qualified to serve as lessee and operator pursuant to Alaska law, the State will refuse to consent to the assignment, and the Debtor will be unable to assume and assign the leases.  Accordingly, these ADL leases cannot simply be assumed and assigned by the Debtors unless the Successful Bidder is qualified and approved by the State to serve as a lessee and operator under Alaska law.

### The Successful Bidder Has Not Provided Adequate Assurance of Future Performance

26.    Section 365(b)(1)(C) provides that the trustee or debtor-in-possession may not assume an executory contract or unexpired lease unless, at the time of assumption, it "provides adequate assurance of future performance under such contract or lease."  As discussed above, A&C has not yet submitted a Business Questionnaire or met with the State to discuss its qualifications.  As a result, A&C has not demonstrated that it will be able to operate the Group 1 Assets in a manner that (a) is safe with respect to the environment and public health and safety and (b) will maximize the oil and gas production potential of the land.

27.    In addition, lessees and operators are required to submit various reports to the State pursuant to Alaska law. See e.g., 20 AAC 25.070 (operator must keep a detailed accurate daily record of the actual drilling, completion, workover, repair, and plugging operations, and of the required tests); 20 AAC 25.071 (geologic reports whereby operator must log the portion of the well below the conductor pipe); 11 AAC 83.245 (annual report required by lessee when not in commercial production; monthly reports required by lessee during commercial production); 11 AAC 83.343 (unit plan of development); AS 31.05.035 (engineering, geological, and other reports).

9

28.     Specifically, A&C must expressly agree to submit the required reports (the "Reports") to the State before the State will approve the assignment.  Naturally, A&C must also demonstrate that it is capable of producing the required Reports.

### The State's Approval is Conditioned on Satisfaction of Cure Obligations

29.     Before this Court or the State can approve of any proposed sale, the Successful Bidder must satisfy any cure obligations outstanding under the agreements to which the State is a party.

30.     These cure obligations include cure amounts under the *Escrow Agreement for Abandonment Liabilities For Redoubt Unit*, dated February 2008 (the "Escrow Agreement"). The Debtors listed the Escrow Agreement on the Amended Notice, indicating that the Cure Amount was $600,000 as of July 7, 2009.  By the date of the sale closing, however, the Cure Amount may be $800,000 as the Debtors are obligated to submit to the State additional payments of $200,000 each month.[4]

31.     In addition, the Debtors must submit a letter to the State resigning as unit operator and agreeing to termination of the North Alexander Unit (the "Resignation Letter").

32.     Section 365(b)(1)(A) of the Bankruptcy Code requires the Debtor to cure defaults "other than a default ... arising from any failure to perform nonmonetary obligations under an unexpired lease of real property, if it is impossible for the trustee to cure such default by performing nonmonetary acts at and after the time of assumption..."

33.     As the submission of the Resignation Letter can be cured at and after the time of assumption, the Debtors are obligated to cure it.  While the obligation to submit the Resignation

---

[4] The State believes that these obligations for post-petition contribution are administrative obligations of the Debtors' estates.  All rights are reserved with respect to such obligations.

Letter to the State is undoubtedly a non-monetary obligation, the exception relating to non-monetary obligations is limited to those obligations that are <u>impossible</u> to cure by subsequent performance. See 3-365 <u>Collier on Bankruptcy</u>-15th Edition Rev. P 365.05 ("it is suggested … that the provision relates to continuous operation provisions and other provisions that are similar in that they involve nonmonetary obligations and cannot be retroactively cured."). Because the obligation to submit the Resignation Letter can be retroactively cured in the same manner in which a monetary default can be cured (i.e., subsequently paying the monetary obligation or subsequently submitting the Resignation Letter), the Debtors must submit the Resignation Letter as a condition to assuming and assigning the leases.

### <u>Reservation of Rights</u>

34.     Under Alaska law, the State can assert a lien against all real property owned by the Debtors based on expenses incurred by the State during remediation. <u>See</u> AS 46.08.075. Accordingly, the State hereby reserves all rights to assert liens against property of the Debtors for costs incurred in abandoning or decommissioning assets or remediating any environmental liabilities. Any such lien rights should continue to exist on the proceeds of the sale. Nothing in the Sale Order should affect Alaska's liens against the proceeds from the sale of its real estate interests.

35.     In addition, Alaska law specifies that the landowner is entitled to its royalty share of the unit production, free and clear of all unit expense and any lien for it. <u>See</u> AS 38.05.180(z). Accordingly, the State's lien for its royalty share is senior to all other secured claims, including the secured claims of the DIP Lenders. <u>See</u> *Final Order (1) Approving Senior Secured Superpriority Postpetition Financing;(2) Authorizing Use of Cash Collateral; (3) Granting Liens and Providing Superpriority Administrative Expense Status; (4) Granting Adequate Protection;*

11

*and (5) Modifying Automatic Stay* [Docket # 415], ¶ 7. Nothing in the Sale Order should serve to cut off the State's statutory lien rights for unpaid royalty interests.

**CONCLUSION**

36.    The Successful Bidder has not been approved as an operator for the Group 1 Assets because it has not provided the State with sufficient evidence of its qualifications. Approval of the sale should be conditioned upon the State's approval of the Successful Bidder because the Successful Bidder will be unable to operate the Group 1 Assets without such approval.    Further, the Debtors must cure all defaults under the leases, including without limitation payment of the amounts owed under the Escrow Agreement and submission of the Resignation Letter to the State, as a condition to the assumption and assignment of the leases to the Successful Bidder.    In addition, the State reserves its right to assert a lien against all of the Debtors' property for expenses incurred by the State in remediating or decommissioning the Debtors' assets, and any such lien rights should continue to exist on the proceeds of the sale.

**WHEREFORE,** the State requests that the Court condition approval of the sale on the State's determination that A&C is a qualified operator under Alaska law, or grant such other and further relief as the Court deems appropriate.

Dated: July 22, 2009

Respectfully submitted,

/s/ *Joseph H. Huston, Jr.*

Joseph H. Huston, Jr. (No. 4035)
Maria Aprile Sawczuk (No. 3320)
1105 North Market Street, Suite 700
Wilmington, DE  19801
Telephone:  (302) 425-3310; -3306
Telecopier:  (610) 371-7972; -988-0838
E-mail:   jhh/masa@stevenslee.com

12

-and-

Lorenzo Marinuzzi, Esq.
Samantha Martin, Esq.
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, NY 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

*Counsel to the State of Alaska*