# PURCHASE AND SALE AGREEMENT

PURCHASE AND SALE AGREEMENT

BY AND BETWEEN

OCAR ENERGY LLC

AND

PACIFIC ENERGY ALASKA OPERATING LLC

AND

PACIFIC ENERGY ALASKA HOLDINGS, LLC

Dated as of August 7, 2009

# TABLE OF CONTENTS

| ARTICLE 1 | DEFINITIONS | 1 |
|---|---|---|
| 1.1 | Abandonment Obligations | 1 |
| 1.2 | Affiliates | 2 |
| 1.3 | Agreement | 2 |
| 1.4 | Alaska Interest or Alaska Interests | 2 |
| 1.5 | Allocated Value | 3 |
| 1.6 | Applicable Laws | 3 |
| 1.7 | Assignment and Bill of Sale | 3 |
| 1.8 | Associated Parties | 3 |
| 1.9 | Assumed Liabilities | 3 |
| 1.10 | Bankruptcy Case | 4 |
| 1.11 | Bankruptcy Claim | 4 |
| 1.12 | Bankruptcy Code | 4 |
| 1.13 | Bankruptcy Costs | 4 |
| 1.14 | Bankruptcy Court | 4 |
| 1.15 | Business Day | 4 |
| 1.16 | Buyer | 4 |
| 1.17 | CERCLA | 4 |
| 1.18 | Claim or Claims | 4 |
| 1.19 | Closing | 4 |
| 1.20 | Closing Date | 5 |
| 1.21 | Confidentiality Agreement | 5 |
| 1.22 | Consents | 5 |
| 1.23 | Contracts | 5 |
| 1.24 | Credit Agreements | 5 |
| 1.25 | Cure Amounts | 5 |
| 1.26 | Defect Value | 5 |
| 1.27 | Deposit | 5 |
| 1.28 | DNR | 5 |
| 1.29 | Easements | 5 |
| 1.30 | Effective Time | 5 |
| 1.31 | Environmental Laws | 5 |
| 1.32 | Environmental Liabilities | 6 |
| 1.33 | Excluded Items | 6 |
| 1.34 | Excluded Liabilities | 7 |
| 1.35 | Execution Date | 7 |
| 1.36 | Fee Interests | 7 |
| 1.37 | Final Purchase Price | 7 |
| 1.38 | Final Settlement Statement | 7 |
| 1.39 | Forest Indemnities | 7 |
| 1.40 | GAAP | 7 |
| 1.41 | Gas | 8 |
| 1.42 | Governmental Bonds | 8 |

| | | |
|---|---|---|
| 1.43 | Governmental Entity | 8 |
| 1.44 | J. Aron | 8 |
| 1.45 | Lands | 8 |
| 1.46 | Leases | 8 |
| 1.47 | Liability or Liabilities | 8 |
| 1.48 | Material Amount | 8 |
| 1.49 | Minimal Defect | 8 |
| 1.50 | Net Revenue Interest | 8 |
| 1.51 | NORM | 8 |
| 1.52 | Oil | 8 |
| 1.53 | Organizational Documents | 9 |
| 1.54 | Party or Parties | 9 |
| 1.55 | PEAH | 9 |
| 1.56 | PEAO | 9 |
| 1.57 | PERL | 9 |
| 1.58 | Permits | 9 |
| 1.59 | Permitted Encumbrances | 9 |
| 1.60 | Person | 9 |
| 1.61 | Preliminary Purchase Price | 9 |
| 1.62 | Preliminary Settlement Statement | 9 |
| 1.63 | Production Taxes | 9 |
| 1.64 | Property or Properties | 9 |
| 1.65 | Property Conditions | 9 |
| 1.66 | Property Taxes | 10 |
| 1.67 | Purchase Price | 10 |
| 1.68 | PV-NRI | 10 |
| 1.69 | Redoubt Interruption Claim | 10 |
| 1.70 | Records | 10 |
| 1.71 | Royalty Interests | 11 |
| 1.72 | Sale Order | 11 |
| 1.73 | Sale Procedures Order | 11 |
| 1.74 | Securities Act | 11 |
| 1.75 | Seller or Sellers | 11 |
| 1.76 | Silver Point | 11 |
| 1.77 | Strict Liability | 11 |
| 1.78 | Tangible Assets | 11 |
| 1.79 | Third Party | 11 |
| 1.80 | Title Defect | 11 |
| 1.81 | Title Defect Notice | 11 |
| 1.82 | Transaction Documents | 11 |
| 1.83 | Units | 11 |
| 1.84 | Well or Wells | 12 |
| | | |
| ARTICLE 2 | PURCHASE AND SALE | 12 |
| 2.1 | Sale of Interests | 12 |
| 2.2 | Assumption | 12 |

ARTICLE 3    PURCHASE PRICE ........................................................................ 12
     3.1    Purchase Price .......................................................................... 12
     3.2    Increases in Purchase Price ...................................................... 12
     3.3    Decreases in Purchase Price ..................................................... 13

ARTICLE 4    BUYER'S REVIEW ...................................................................... 13
     4.1    Buyer's Review Before the Execution Date. .............................. 13
     4.2    No Representation or Warranty of Accuracy; Disclaimer. .......... 14
     4.3    Acknowledgments of Buyer ..................................................... 14
     4.4    Independent Evaluation ............................................................ 17
     4.5    Buyer's Confidentiality Obligations; Press Releases. ................. 17

ARTICLE 5    TITLE AND TITLE DEFECTS ..................................................... 18
     5.1    Title Defect .............................................................................. 18
     5.2    Title Defect Notice ................................................................... 18
     5.3    Determination of Title Defects and Defect Values. ................... 18
     5.4    Calculation of Defect Value ...................................................... 19
     5.5    Consequences of Title Defect ................................................... 20
     5.6    Description and Other Errors .................................................... 20

ARTICLE 6    CERTAIN COVENANTS BETWEEN EXECUTION DATE AND
              CLOSING .................................................................................. 20
     6.1    Assumption of Contracts and Leases; Payment of Cure Amounts. .... 20
     6.2    Third Party Notifications and Regulatory Approvals for the Alaska
              Interests. ................................................................................... 21
     6.3    Termination of Sellers' Insurance ............................................. 22
     6.4    Conduct of Business Pending the Closing. ................................ 22
     6.5    Preferential Rights to Purchase. ................................................ 23
     6.6    Sale Procedures ........................................................................ 24
     6.7    Payment of Deposit .................................................................. 24
     6.8    Financial Ability ...................................................................... 24

ARTICLE 7    CLOSING ................................................................................... 24
     7.1    Closing Date ............................................................................. 24
     7.2    Closing Obligations; Deliveries ................................................ 24
     7.3    Sellers' Conditions ................................................................... 26
     7.4    Buyer's Conditions .................................................................. 27
     7.5    Non-Waivable Conditions to Closing. ...................................... 28

ARTICLE 8    TERMINATION ........................................................................... 28
     8.1    Events of Termination .............................................................. 28
     8.2    Effect of Termination ............................................................... 29

ARTICLE 9    CERTAIN OBLIGATIONS AFTER CLOSING ............................. 29
     9.1    Filing and Recording ............................................................... 29
     9.2    Copies ...................................................................................... 29

| | | | |
|---|---|---|---|
| 9.3 | Further Assurances | 30 |
| 9.4 | Post-Closing Consents. | 30 |
| 9.5 | Buyer's Compliance. | 30 |
| 9.6 | Allocation of Proceeds, Costs and Expenses. | 30 |
| 9.7 | Plugging and Abandoning Wells and Platforms; Remediation; Security for Buyer's Obligations. | 31 |
| 9.8 | Preliminary Settlement Statement | 31 |
| 9.9 | Final Settlement Statement. | 32 |
| 9.10 | Post-Closing Revenues | 32 |
| 9.11 | Post-Closing Expenses | 33 |
| 9.12 | Audits | 33 |
| 9.13 | Reservation of Claims | 33 |

ARTICLE 10  TAXES, COSTS, AND FEES .........................................................................34
| 10.1 | Property Taxes | 34 |
| 10.2 | Production Taxes | 34 |
| 10.3 | Other Taxes | 34 |

ARTICLE 11  BUYER'S RELEASE, DISCHARGE, AND COVENANT NOT TO SUE; BUYER'S OBLIGATIONS TO INDEMNIFY, DEFEND, AND HOLD HARMLESS; DISPUTE RESOLUTION; RISK OF LOSS .................34
| 11.1 | Buyer's Release and Discharge of Sellers and their Associated Parties | 34 |
| 11.2 | Buyer's Covenant Not to Sue Sellers or their Associated Parties | 35 |
| 11.3 | Buyer's Obligations to Indemnify, Defend, and Hold Sellers and their Associated Parties Harmless | 35 |
| 11.4 | Buyer's Obligations. | 36 |
| 11.5 | Buyer's Duty to Defend | 37 |
| 11.6 | Dispute Resolution | 37 |
| 11.7 | Retroactive Effect | 38 |
| 11.8 | Inducement to Sellers | 38 |
| 11.9 | Risk of Loss | 38 |

ARTICLE 12  ENVIRONMENTAL MATTERS .................................................................38
| 12.1 | Buyer's Acknowledgment Concerning Possible Contamination of the Alaska Interests | 38 |
| 12.2 | Disposal of Materials, Substances, and Wastes; Compliance with Law | 39 |

ARTICLE 13  REPRESENTATIONS AND WARRANTIES.................................................39
| 13.1 | Representations by Sellers | 39 |
| 13.2 | Representations by Buyer | 39 |

ARTICLE 14  COMMUNICATIONS .................................................................................42

ARTICLE 15  MISCELLANEOUS .....................................................................................43
| 15.1 | Entire Agreement | 43 |
| 15.2 | Successors and Assigns; Amendment; Survival | 43 |

| | | |
|---|---|---|
| 15.3 | Exclusive Remedy | 44 |
| 15.4 | Choice of Law | 44 |
| 15.5 | Binding Effect; Assignment | 44 |
| 15.6 | No Admissions | 44 |
| 15.7 | No Third Party Beneficiaries | 44 |
| 15.8 | Public Communications | 44 |
| 15.9 | Headings and Titles | 45 |
| 15.10 | Bulk Transfer Law | 45 |
| 15.11 | Severability | 45 |
| 15.12 | Counterparts | 45 |
| 15.13 | Not to Be Construed Against the Drafter | 45 |
| 15.14 | No Waiver | 45 |
| 15.15 | Expenses | 45 |
| 15.16 | Time of Essence | 45 |
| 15.17 | No Partnership | 45 |
| 15.18 | Foreign Trade Law Compliance | 45 |
| 15.19 | Rules of Construction | 46 |

Exhibits and Schedules

Exhibit A  -  Leases Comprising the Alaska Interests
Exhibit B  -  Certain Contracts Comprising the Alaska Interests
Exhibit C  -  Form of Assignment and Bill of Sale
Exhibit D  -  Form of Non-Foreign Affidavit

Schedule 1  -  Certain Consents
Schedule 2  -  Permitted Encumbrances
Schedule 3  -  Allocated Value
Schedule 4  -  Cure Amounts to be Paid by Buyer at Closing

# PURCHASE AND SALE AGREEMENT

This Purchase and Sale Agreement (this "Agreement"), dated as of August 7, 2009 (the "Execution Date"), is by and between OCAR ENERGY LLC, a Delaware limited liability company with an address of 3000-79 Wellington Street West, Toronto, Ontario M5K 1N2 and collectively with any entity that subsequently becomes a party to this Agreement pursuant to an assignment by Ocar Energy LLC in accordance with Section 15.5, referred to herein as ("Buyer"), PACIFIC ENERGY ALASKA OPERATING LLC, a Delaware limited liability company with an address of 111 W. Ocean Boulevard, Suite 1240, Long Beach, California 90802 ("PEAO"), and PACIFIC ENERGY ALASKA HOLDINGS, LLC, a Delaware limited liability company with an address of 111 W. Ocean Boulevard, Suite 1240, Long Beach, California 90802 ("PEAH"). PEAO and PEAH may each be referred to herein as a "Seller" and collectively as the "Sellers." Sellers and Buyer may each be referred to herein as a "Party" and collectively as the "Parties."

## R E C I T A L S:

A.      Pursuant to an Asset Sales Agreement by and between Forest Oil Corporation and PERL (as defined below) and a Membership Interest Purchase Agreement by and among Forest Oil Corporation, Forest Alaska Holdings LLC, Forest Alaska Operating LLC and PERL, each dated May 24, 2007, as amended, Sellers acquired the Alaska Interests (as defined below), and PEAH acquired 100% of the membership interests in PEAO.

B.      Buyer desires to purchase the Alaska Interests from Sellers, and Sellers desire to sell the Alaska Interests to Buyer, in each case effective as of the Effective Time (as defined below), and subject to the terms and conditions of this Agreement.

C.      Sellers are debtors in possession under the protection of Chapter 11 of the United States Bankruptcy Code pursuant to jointly administered cases under Case Number 09-10785 (the "Bankruptcy Case") filed with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The transactions contemplated by this Agreement, including the purchase and sale of the Alaska Interests hereunder, are subject to approval by the Bankruptcy Court pursuant to Sections 105, 363 and 365 of the Bankruptcy Code (as defined below).

## A G R E E M E N T S:

In consideration of their mutual promises under this Agreement, the benefits to be derived by each Party, and other good and valuable consideration, the Parties agree as follows:

## ARTICLE 1
## DEFINITIONS

The following terms, when used in this Agreement, have the following definitions:

1.1      **Abandonment Obligations**. Defined in Section 9.7(a).

1.2 **Affiliates**. A Person's "Parent Companies" and "Affiliated Companies." "Parent Companies," "Affiliated Companies," and "Controlling Interest" shall have the following meanings:

(a) A Person's "Parent Companies" means any and all entities having a "Controlling Interest" in such Person;

(b) A Person's "Affiliated Companies" means any and all entities in which the Person or the Parent Companies of such Person have a direct or indirect "Controlling Interest"; and

(c) "Controlling Interest" means a legal or beneficial ownership of more than 50% of the voting stock or other voting rights in an entity.

1.3 **Agreement**. Defined in the preamble of this Agreement, as more particularly described in Section 15.19(c).

1.4 **Alaska Interest** or **Alaska Interests**. All of Sellers' right, title and interest in and to, except for the Excluded Items and subject to the limitations and terms expressly set forth herein and in Exhibit A and Exhibit B:

(a) All Fee Interests, Leases and Lands, together with corresponding surface and subsurface interests in and to all the property and rights incident thereto; all tenements and hereditaments belonging to the Leases; and all reversionary interests, carried interests, options, convertible interests, net profits interests, together with all rights that arise by operation of Applicable Laws or otherwise in all properties and land unitized, communitized or pooled with the Leases;

(b) All Easements;

(c) All Wells;

(d) All Tangible Assets;

(e) All Contracts;

(f) All Records;

(g) All unitization, communitization and pooling declarations, orders and agreements (including all units formed by voluntary agreement and those formed under the rules, regulations, orders or other official acts of Governmental Authorities) to the extent they relate to the Properties or the production of oil and Gas therefrom;

(h) All permits;

(i) All Royalty Interests; all partnership and joint venture interests (tax, state law or otherwise) affecting any Properties, Easements, Wells or Tangible Assets;

(j)     To the extent assignable, all rights to indemnities (including the Forest Indemnities) and releases from any Third Party relating to the Leases, in each case only to the extent such indemnities and releases relate to (i) activities occurring on or after the Effective Time or (ii) any Claim or Liability assumed by Buyer under this Agreement, provided that Sellers shall retain their interest in such representations, warranties, indemnities and releases to the extent Sellers may potentially remain liable for any such Claim or Liability;

(k)     All intangibles, including operating revenues and accounts receivable relating to the period after the Effective Time, in each case associated with the Properties or the production of Oil and Gas thereto;

(l)     All leases or subleases of Tangible Assets as to which Sellers are (i) lessor or sublessor or (ii) lessee or sublessee together with any options to purchase the underlying property; and

(m)     Right to seek a refund or enjoy credits from the State of Alaska for any overpaid royalties relating to the Leases.

The Alaska Interests shall explicitly exclude the Excluded Items, which are not being transferred hereunder.

1.5     **Allocated Value**.  The values allocated to specific portions of the Alaska Interests as set forth on Schedule 3.

1.6     **Applicable Laws**.  Any and all federal, state, Native American, county, municipal or other federal, state or local laws, ordinances, regulations, rules, permits, or other regulatory requirements and any administrative, executive or judicial or court orders or judgments, as well as the common law, in each case which are applicable to any of the Parties or the Alaska Interests.

1.7     **Assignment and Bill of Sale**.  An instrument substantially in the form of Exhibit C.

1.8     **Associated Parties**.  As to each Party, its successors, assigns, members, shareholders, directors, officers, employees, agents, representatives, contractors, subcontractors and Affiliates.

1.9     **Assumed Liabilities**.  The following Liabilities of Sellers:

(a)     All Liabilities associated with, related to or arising from the ownership of the Alaska Interests;

(b)     All Environmental Liabilities;

(c)     All accounts payable that accrue on or after the Effective Time with respect to the Alaska Interests;

(d)     All joint interest billings due to Union Oil Company of California or its affiliates in connection with the Alaska Interests, whether associated with, related to or arising from the periods prior to, on or after the Effective Time;

(e)     All royalty obligations associated with, relating to or arising from the Alaska Interests that accrue on or after the Effective Time;

(f)     All Claims arising out of the ownership or operation of the Alaska Interests on or after the Effective Time;

(g)     All plugging, abandonment, decommissioning, removal and/or restoration Liabilities associated with, related to or arising from the Alaska Interests with respect to the periods prior to, on or after the Effective Time;

(h)     All Liabilities under litigation involving the Alaska Interests to which either or both Sellers is currently a party or is joined as a party after the Execution Date; and

(i)     Permitted Encumbrances.

For purposes of clarity, Assumed Liabilities excludes any and all Liabilities not specifically referenced in this Section 1.9.

1.10   **Bankruptcy Case**. Defined in the Recitals of this Agreement.

1.11   **Bankruptcy Claim**. As defined in Section 101(5) of the Bankruptcy Code.

1.12   **Bankruptcy Code**. Title 11 of the United States Code, as amended.

1.13   **Bankruptcy Costs**.   All costs and claims related to the Bankruptcy Case, including all administrative expenses and claims for administrative expenses pursuant to Section 503 of the Bankruptcy Code.

1.14   **Bankruptcy Court**. Defined in the Recitals of this Agreement.

1.15   **Business Day**. Any day on which the Bankruptcy Court is physically open to the public.

1.16   **Buyer**. Defined in the preamble of this Agreement.

1.17   **CERCLA**.   The Comprehensive Environmental Response, Compensation and Liability Act, as amended.

1.18   **Claim or Claims**.   Collectively, any and all written or oral claims, demands, suits, causes of action, losses, damages, liabilities, fines, penalties and costs (including attorneys' fees and costs of litigation) asserted or, as applicable, filed by any Person.

1.19   **Closing**. Defined in Section 7.1.

1.20 **Closing Date**. The date on which the Closing occurs, subject to the modification of the term "Closing Date" as set forth in Section 6.5(d).

1.21 **Confidentiality Agreement**. The Confidentiality Agreement, dated June 1, 2009, between PERL and Buyer.

1.22 **Consents**. Any approval, consent, ratification, waiver or other authorization from any Person (including any of the foregoing issued, granted, granted, given or otherwise made available by or under the authority of any Governmental Entity or pursuant to any Applicable Laws), including those set forth on Schedule 1.

1.23 **Contracts**. All farmout and farmin agreements, operating agreements, production sales and purchase contracts, processing contracts, gathering contracts, transportation contracts, saltwater disposal agreements, surface leases, subsurface leases, division and transfer orders, areas of mutual interest, balancing contracts, and all other written contracts, contractual rights, interests and other written agreements (including proposed written agreements) and instruments covering or affecting any or all of the Alaska Interests or the production, handling or transportation of Oil and Gas attributable thereto or the use or ownership or operation of any of the Alaska Interests or the Oil, Gas, water or other substances produced therefrom, to be assigned to or assumed by Buyer under this Agreement, as specified on Exhibit B.

1.24 **Credit Agreements**. (i) The Senior Secured Super Priority Priming Debtor in Possession Credit and Guaranty Agreement, dated as of March 11, 2009, among PERL, Sellers, J. Aron & Company, Silver Point Finance, LLC and certain other lenders, guarantors and others party thereto, as amended, supplemented and modified from time to time, and (ii) the Second Lien Credit Agreement, dated August 24, 2007, among Sellers, J. Aron & Company, Silver Point Finance, LLC and certain other lenders, guarantors and others party thereto, as amended, supplemented and modified from time to time.

1.25 **Cure Amounts**. Defined in Section 6.1(a).

1.26 **Defect Value**. With respect to each Title Defect, the reduction of the value of the affected Lease as a result of such Title Defect, calculated in accordance with the guidelines set forth in Section 5.4.

1.27 **Deposit**. Defined in Section 6.7.

1.28 **DNR**. Alaska Department of Natural Resources.

1.29 **Easements**. All easements, rights-of-way, rights-of-use, servitudes, licenses, authorizations, permits, and similar surface and other rights and interests applicable to, or used or useful in connection with, any or all of the Alaska Interests, as described on Exhibit A.

1.30 **Effective Time**. 7:00 a.m. Pacific Time on August 1, 2009.

1.31 **Environmental Laws**. Any and all Applicable Laws of any Governmental Entity whose purpose is to conserve or protect human health, the environment, wildlife or natural resources, including those Applicable Laws relating to storage, handling and use of chemicals

and other hazardous materials; those relating to the generation, processing, treatment, storage, transport, disposal, cleanup, remediation or other management of waste materials or hazardous substances of any kind; and those relating to the protection of environmentally sensitive or protected areas. Without limiting the foregoing, Environmental Laws expressly includes the Clean Air Act, as amended; the Federal Water Pollution Control Act, as amended; the Rivers and Harbors Act of 1899, as amended; the Safe Drinking Water Act, as amended; CERCLA; the Superfund Amendments and Reauthorization Act of 1986, as amended; the Resource Conservation and Recovery Act of 1976, as amended; the Hazardous and Solid Waste Amendments Act of 1984, as amended; the Toxic Substances Control Act, as amended; the Hazardous Materials Transportation Act, as amended; Title 46 of the Alaska Statutes; and Title 18 of the Alaska Administrative Code.

1.32   **Environmental Liabilities**. All Liabilities under Environmental Laws relating to, arising out of, in connection with, or attributable to ownership or operation of the Alaska Interests, whether associated with, related to or arising from the periods prior to, on or after the Effective Time.

1.33   **Excluded Items**. The reservations, exceptions and exclusions, if any, listed on Exhibit A and Exhibit B, and (ii) the following:

   (a)   pipelines, fixtures, equipment, interests in land or any other property owned by any Third Party such as lessors, contractors, purchasers or transporters of Oil or Gas, including any of Sellers' Affiliates;

   (b)   Sellers' geological or geophysical data containing information not related to the Alaska Interests;

   (c)   (i) cash, (ii) deposits with Government Entities, contractors and vendors, and (iii) other cash equivalents;

   (d)   all rights to representations, warranties, indemnities (including the Forest Indemnities) and releases from any Third Party, except indemnities and releases that are specifically included in the Alaska Interests pursuant to Section 1.4(d).

   (e)   all surety bonds, plugging bonds, abandonment bonds, standby trust agreements, escrow accounts for plugging, abandonment, decommissioning, removal and restoration obligations, and other bonds posted by or at the request of Sellers, and security deposits and other security furnished by Sellers or their predecessors in interest;

   (f)   all rights under insurance policies held by Sellers or any of their Affiliates covering any of the Alaska Interests;

   (g)   Records that are subject to attorney-client privilege, work product immunity or other privileges against disclosure enjoyed by Sellers or any of their Associated Parties, including all privileged information and work product of Sellers from the period up to and including the Closing;

   (h)   any interests, properties or assets owned by any Person other than Sellers;

(i)     any and all Claims against operators or other third parties arising out of the operation of the Alaska Interests prior to the Effective Time;

(j)     the Redoubt Interruption Claim; and

(k)     all contracts or agreements between a Seller or Sellers, on one hand, and PERL or any Affiliate of PERL (other than Sellers), on the other hand.

1.34     **Excluded Liabilities**.  Without limiting the definition of Assumed Liabilities or implying that Buyer is assuming any Liability other than the Assumed Liabilities, the following Claims against and Liabilities and obligations of Sellers are excluded and not assumed by Buyer:

(a)     All Liabilities associated with, related to or arising from debt instruments to which one or both Sellers is a party, except for Liabilities that relate to Permitted Encumbrances;

(b)     All accounts payable that have accrued prior to the Effective Time;

(c)     All royalty obligations associated with, related to or arising from the Alaska Interests that have accrued prior to the Effective Time;

(d)     All Claims, except Environmental Claims and Abandonment Obligations, arising out of the ownership or operation of the Alaska Interests prior to the Effective Time; and

(e)     All Bankruptcy Claims (except Environmental Claims and Abandonment Obligations) and Bankruptcy Costs (except Environmental Claims and Abandonment Obligations).

1.35     **Execution Date**.  Defined in the preamble.

1.36     **Fee Interests**.  All fee interests to the surface and in the Oil and Gas, including rights under grant deeds, mineral deeds, conveyances or assignments, as described in Exhibit A.

1.37     **Final Purchase Price**.  The actual Purchase Price, as adjusted in accordance with Section 3.2 and Section 3.3, determined based on the Final Settlement Statement.

1.38     **Final Settlement Statement**.  Defined in Section 9.9(a).

1.39     **Forest Indemnities**.  Sellers' rights to indemnification provided by Forest Oil Corporation under the Asset Sales Agreement and Membership Interest Purchase Agreement, each as amended, referenced in the Recitals to this Agreement and under that certain indemnity letter dated January 29, 2008, as supplemented on November 6, 2008.

1.40     **GAAP**.  Generally accepted accounting principles in Canada, as in effect from time to time.

1.41 **Gas**. Natural gas, including casinghead gas, gas-well gas and other hydrocarbon gases.

1.42 **Governmental Bonds**. All bonds or other forms of financial security (including all lease-specific abandonment bonds, areawide bonds, operator bonds, right of way bonds, supplemental bonds for abandonment accounts) required by the DNR or other Governmental Entities in connection with Buyer's acquisition and ownership of the Alaska Interests.

1.43 **Governmental Entity**. Any federal, state, native American, county, municipal or other federal, state or local governmental entity or judicial or regulatory agency, board, body, department, bureau, commission, instrumentality, court, tribunal or quasi-governmental entity in any jurisdiction (domestic or foreign) having jurisdiction over any Party or any affected asset, or over any of the transactions contemplated by this Agreement.

1.44 **J. Aron**. J. Aron & Company.

1.45 **Lands**. All of the unitized acreage in the Trading Bay Unit.

1.46 **Leases**. The Oil and Gas leases and subleases, and the surface and subsurface leasehold estates created thereby, as described in Exhibit A.

1.47 **Liability or Liabilities**. Collectively, all damages (including consequential and punitive damages), including damages for personal injury, death or damage to personal or real property (both surface and subsurface) and costs for remediation, restoration or clean up of contamination, whether the injury, death or damage occurred or occurs on or off any of the Alaska Interests by migration, disposal or otherwise; losses; fines; penalties, expenses; costs to remove or modify facilities on or under any of Alaska Interests; all Abandonment Obligations, including without limitation, plugging liabilities for all Wells, platforms, pipelines and other facilities; attorneys' fees; court and other costs incurred in defending a Claim; liens; and judgments; in each instance, whether these damages and other costs are foreseeable or unforeseeable.

1.48 **Material Amount**. An amount, as of the date of estimation or determination, equal to $1,000,000 or more.

1.49 **Minimal Defect**. Any individual Title Defect with a Defect Value of less than $1,000,000.

1.50 **Net Revenue Interest**. Sellers' interest after deducting any and all lessor's royalties, overriding royalty interests, carried working interests, and other non-operating (non-working) interests in and to all production of Oil and Gas saved, produced and sold from any property comprising the Alaska Interests.

1.51 **NORM**. Naturally occurring radioactive material.

1.52 **Oil**. Crude oil, distillate, drip gasoline, condensate and other liquid hydrocarbons.

1.53 **Organizational Documents**. With respect to any Person, its certificate of incorporation, formation or organization (or comparable) document, its by-laws, partnership agreement or any certificate of formation, limited liability company agreement or operating agreement, or any other similar organizational instrument or document governing such Person or applicable to ownership.

1.54 **Party or Parties**. Defined in the preamble of this Agreement.

1.55 **PEAH**. Defined in the preamble of this Agreement.

1.56 **PEAO**. Defined in the preamble of this Agreement.

1.57 **PERL**. Pacific Energy Resources Ltd., a Delaware corporation, which is a debtor in possession under the Bankruptcy Case, owner of all of the issued and outstanding membership interests of PEAH.

1.58 **Permits**. All transferable environmental and other governmental (whether federal, state, local or tribal) certificates, consents, permits, licenses, orders, authorizations, franchises and related instruments or rights relating to the ownership, operation or use of the Alaska Interests, including credits or the right to create credits or other transferable rights relating to past or future emissions reductions.

1.59 **Permitted Encumbrances**. Any mortgage, deed of trust, lien, encumbrance, Claim, royalty, obligation or interest (i) related to one or more Assumed Liabilities, (ii) set forth on Exhibit A or Exhibit B, or (iii) set forth on Schedule 2.

1.60 **Person**. Any individual, corporation, partnership, joint venture, association, limited liability company, joint stock company, trust, estate, unincorporated organization, Governmental Entity or other entity.

1.61 **Preliminary Purchase Price**. An estimate of the Purchase Price, as adjusted in accordance with Section 3.2 and Section 3.3, determined based on the Preliminary Settlement Statement.

1.62 **Preliminary Settlement Statement**. Defined in Section 9.8.

1.63 **Production Taxes**. All federal, state or local taxes, assessments, levies or other charges, which are imposed upon production from the Alaska Interests, including, without limitation, excise taxes on production, severance or gross production, as well as any interest, penalties and fines assessed or due in respect of any such taxes, whether disputed or not.

1.64 **Property** or **Properties**. The real properties included within or covered by the Leases, Lands or Units.

1.65 **Property Conditions**. The physical condition or any other aspect of the Alaska Interests, including (a) the structural integrity of any improvements to the Alaska Interests; (b) the conformity of improvements to the Alaska Interests to any plans or specifications for such Alaska Interests; (c) the conformity of the Alaska Interests to past, current or future applicable

zoning or building code requirements; (d) the existence of soil instability, past soil repairs, soil additions or conditions of soil fill, or susceptibility to landslides; (e) the sufficiency of any undershoring; (f) the sufficiency of any drainage; (g) whether the Alaska Interests are located wholly or partially in a flood plain or a flood hazard boundary or similar area; (h) any other matter affecting the stability or integrity of the land, or any buildings or improvements situated on or as part of the Alaska Interests; (i) the availability of public utilities and services for the Alaska Interests; (j) the fitness or suitability of the Alaska Interests for any intended use; (k) the potential for further development of the Alaska Interests; (l) the existence of vested land use, zoning or building entitlements affecting the Alaska Interests; or (m) the presence of toxic wastes, hazardous materials or friable asbestos in, on or about the Alaska Interests.

1.66 **Property Taxes**. All federal, state or local taxes, assessments, levies or other charges, which are imposed upon the Alaska Interests, including, without limitation, ad valorem, property, documentary or stamp, as well as any interest, penalties and fines assessed or due in respect of any such taxes, whether disputed or not.

1.67 **Purchase Price**. Defined in Section 3.1(a).

1.68 **PV-NRI**. Defined in Section 5.4(b).

1.69 **Redoubt Interruption Claim**. Any and all claims or rights of Sellers or their Affiliates relating to the business interruption arising from or related to the volcanic and seismic activity that began in March 2009.

1.70 **Records**. All books and records, files, records, data, correspondence, studies, surveys, reports, Oil and Gas sales contract files, gas processing files, geologic, proprietary geophysical and seismic data (including raw data and any interpretative data or information relating to such geologic, geophysical and seismic data) and other data (in each case whether in written or electronic format) in Sellers' possession and relating solely to the operation of the Alaska Interests, including all title records, prospect information, title opinions, title insurance reports, abstracts, property ownership reports, customer lists, supplier lists, sales materials, well logs, well tests, maps, engineering data and reports, health, environmental and safety information and records, Third-Party licenses, promotional materials, operational records, technical records, reserve estimates and economic estimates; production and processing records, division order, lease, land and right-of-way files, accounting and financial files, tax records (other than income tax), and contract files (including all files regarding the Contracts and related files); provided, however, "Records" shall not include (a) Sellers' general corporate, accounting and financial books, records and software, even if containing references to Alaska Interests, (b) books, records (including seismic data) and files that may not be disclosed under the terms of any Third Party agreement (and consent to make disclosure has not been obtained) or are not transferable without payment of fees or penalties (except as may be agreed to be paid by Buyer) or cannot be disclosed under Applicable Laws, (c) information entitled to legal privilege, including attorney work product and attorney-client communications (excluding title opinions, which shall be included in the Records), and information relating to Excluded Items, (d) Sellers' studies related to internal reserve assessments, (e) income tax information, (f) records relating to the acquisition or disposition (or proposed acquisition or disposition) of the Alaska Interests, including proposals received from or made to, and records of negotiations with, Persons other than Buyer

and economic analyses associated therewith, (g) seismic data already owned or held by Buyer, and (h) Excluded Items.

1.71 **Royalty Interests**. All royalties, overriding royalties, sliding scale royalties, shut-in royalties, rights to royalties in kind, or other interests in production of Oil and Gas, excluding working interests, as set forth on Exhibit A.

1.72 **Sale Order**. The sale order entered by the Bankruptcy Court approving the consummation of the purchase and sale of the Alaska Interests as contemplated by this Agreement.

1.73 **Sale Procedures Order**. The Sale Procedures Order entered by the Bankruptcy Court on July 1, 2009, as the same may be modified from time to time by the Bankruptcy Court.

1.74 **Securities Act**. The Securities Act of 1933, as amended, or any successor law thereto, as well as all regulations and rules issued pursuant to that act or any such successor law thereto.

1.75 **Seller** or **Sellers**. Defined in the preamble of this Agreement.

1.76 **Silver Point**. Silver Point Finance, LLC.

1.77 **Strict Liability**. Includes strict statutory liability, strict products liability and strict environmental liability.

1.78 **Tangible Assets**. All pipelines, flowlines, plants, gathering and processing systems, buildings, vehicles, compressors, meters, tanks, machinery, tools, pulling machines, utility lines, personal property, all computer and automation equipment located in proximity to the Alaska Interests (including SCADA equipment and Rosemont transmitters, telecommunications equipment, field radio telemetry and associated frequencies and licenses, pressure transmitters and central processing equipment that is used primarily in connection with the ownership or operation of the Alaska Interests), equipment, fixtures, and improvements and other appurtenances, on or to, the Alaska Interests, insofar as they are used or were obtained in connection with the ownership, operation, maintenance or repair of the Alaska Interests or relate to the production, treatment, sale, or disposal of Oil and Gas produced from the Alaska Interests or attributable thereto.

1.79 **Third Party**. A Person other than Buyer and its Affiliates or Sellers and their Affiliates.

1.80 **Title Defect**. Defined in Section 5.1.

1.81 **Title Defect Notice**. Defined in Section 5.2.

1.82 **Transaction Documents**. Defined in Section 15.1.

1.83 **Units**. The rights in any pooled or unitized or communitized acreage by virtue of the Lands being part thereof, as described on Exhibit A.

1.84 **Well or Wells**. All well bores, both abandoned and unabandoned, including Oil wells, Gas wells, injection wells, disposal wells and water wells associated with the Alaska Interests, including wells drilled after the Execution Date.

## ARTICLE 2
## PURCHASE AND SALE

2.1 **Sale of Interests**. Sellers agree to sell the Alaska Interests to Buyer, and Buyer agrees to buy the Alaska Interests from Sellers, for the consideration recited in and subject to the terms of this Agreement.

2.2 **Assumption**. From and after the Closing, but effective as of the Effective Time, Buyer shall assume and be responsible for all Assumed Liabilities, all on the terms more specifically provided in this Agreement.

## ARTICLE 3
## PURCHASE PRICE

3.1 **Purchase Price**. The total purchase price for the Alaska Interests will be $100 cash, subject to adjustment pursuant to Section 3.2 and Section 3.3 below (the "Purchase Price"). Notwithstanding any other provision of this Agreement to the contrary, the Purchase Price shall be subject to adjustment only as set forth in Section 3.2 and Section 3.3 below. Except as set forth in Section 3.2 and Section 3.3, Buyer and Sellers agree that there shall be no adjustments to the Purchase Price of any kind, of any amount, for any reason.

3.2 **Increases in Purchase Price**. The Purchase Price will be increased by the following amounts:

(a) the amount of any costs and expenses, accounts payable and other disbursements, including overriding royalties, rentals, tariffs, Property Taxes or Production Taxes, and penalties and interest, paid by Sellers on or after the Effective Time and fairly attributable to Buyer pursuant to this Agreement, including any capital expenditures permitted under this Agreement pursuant to Section 6.4(a)(iii);

(b) the amount of all prepaid expenses, including Property Taxes, that are paid by Sellers and fairly attributable to the Alaska Interests for the period of time on or after the Effective Time;

(c) the amount of any taxes paid by Sellers pursuant to Article 10;

(d) the amount of any refunds or credits received or enjoyed by or for Buyer's account from the State of Alaska for any overpaid royalties relating to the Leases for periods prior to the Effective Time; and

(e) the amount of all proceeds, receipts (including producing receipts, drilling receipts and construction overhead receipts), reimbursements, credits, and income paid to or received by Buyer, including proceeds from the sale of Oil and Gas, net of all applicable Property Taxes and Production Taxes and royalties paid by Buyer, with

respect to periods prior to the Effective Time, that are fairly attributable to Sellers pursuant to this Agreement.

3.3 **Decreases in Purchase Price.** The Purchase Price will be decreased by the following amounts (provided, however, that in no event shall the Purchase Price be decreased by more than the amount of the Deposit): the amount of all proceeds, receipts (including producing receipts, drilling receipts and construction overhead receipts), reimbursements, credits, and income paid to or received by Sellers, excluding proceeds from the sale of Oil and Gas, net of all applicable Property Taxes, Production Taxes and royalties paid by Sellers, with respect to periods from and after the Effective Time, that are fairly attributable to Buyer pursuant to this Agreement.

**ARTICLE 4**
**BUYER'S REVIEW**

4.1 **Buyer's Review Before the Execution Date.**

(a) Prior to the Execution Date, Sellers have made available to Buyer certain data relating to the Alaska Interests for Buyer's review, which Buyer acknowledges is necessarily limited by Sellers' status as non-operator of the Alaska Interests and the resulting lack of access to certain information possessed by the operator, Union Oil Company of California. Buyer acknowledges that it thoroughly reviewed all of this material before Buyer submitted its offer to purchase the Alaska Interests and executed this Agreement. Buyer shall notify Sellers in writing if it wishes to review files or data in addition to those previously provided, but Sellers' obligation to provide additional files or data shall be limited to files and data that are reasonably available to it as the non-operator of the Alaska Interests. **SELLERS HAVE NO OBLIGATION TO PROVIDE ACCESS TO, AND BUYER WAIVES ALL CLAIMS TO INSPECT, SELLERS' INTERPRETIVE, PREDICTIVE, CONFIDENTIAL, PRIVATE, PROPRIETARY OR PRIVILEGED INFORMATION OR WORK PRODUCT (INCLUDING PERSONNEL RECORDS), OR INFORMATION THE DISSEMINATION OF WHICH IS RESTRICTED BY APPLICABLE LAW OR CONTRACTS BETWEEN SELLERS AND ANY THIRD PARTY.** Sellers have no obligation to provide any documents or any other information to Buyer that is available to the general public, whether in the public records or from a Governmental Entity on request.

(b) By entering into this Agreement, Buyer acknowledges and represents that it has reviewed and inspected the Alaska Interests to its satisfaction to enable it to submit its offer to purchase the Alaska Interests and to execute this Agreement, and that it is not entitled to a reduction in the Purchase Price (except in strict accordance with the adjustment provisions of Section 3.2 and Section 3.3), indemnification or any other recourse of any kind whatsoever against Sellers or any of their respective Associated Parties if Title Defects arise after the Execution Date. Buyer has undertaken all appropriate inquiry to its satisfaction, and has made an informed decision to acquire the Alaska Interests on the basis of its own investigations and without reliance on statements or investigations by any other Person, including Sellers, PERL and their respective Associated Parties.

4.2    <u>**No Representation or Warranty of Accuracy; Disclaimer**</u>.

(a)    Sellers make no representation or warranty whatsoever (express, statutory or implied) and expressly disclaim all representations and warranties as to the accuracy or completeness of the files or any other information that they have provided to Buyer or may provide to Buyer or that have been provided or may be provided by Sellers' Associated Parties or other Persons. Conveyance of the Alaska Interests shall be without representation or warranty whatsoever (express, statutory or implied) as to title, description, physical condition of the Alaska Interests (including the environmental condition), quality, value, fitness for purpose, merchantability or otherwise. Buyer shall satisfy itself prior to the Closing, and at the Closing will be deemed to have satisfied itself entirely as to the type, condition, quality and extent of the property and property interests that comprise the Alaska Interests being sold and conveyed to Buyer pursuant to this Agreement.

(b)    **BUYER ACKNOWLEDGES THAT, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, SELLERS HAVE NOT MADE, AND WILL NOT MAKE, ANY REPRESENTATION OR WARRANTY WHATSOEVER (EXPRESS, IMPLIED OR STATUTORY) IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY IT, INCLUDING THE ACCURACY OR COMPLETENESS OF DATA, INFORMATION OR MATERIALS FURNISHED AT ANY TIME TO BUYER OR ANY OF ITS ASSOCIATED PERSONS IN CONNECTION WITH THE ALASKA INTERESTS OR THE QUALITY OR QUANTITY OF OIL AND GAS RESERVES (IF ANY) ATTRIBUTABLE TO THE ALASKA INTERESTS, OR THE ABILITY OF THE ALASKA INTERESTS TO PRODUCE OIL AND GAS. NONE OF SELLERS' ASSOCIATED PARTIES (NOR ANY OTHER PERSON) IS AUTHORIZED TO MAKE ANY WARRANTY OR REPRESENTATION ON SELLERS' BEHALF. ALL DATA, INFORMATION AND OTHER MATERIALS FURNISHED BY SELLERS ARE PROVIDED TO BUYER AS A CONVENIENCE ONLY, AND RELIANCE ON OR USE OF THEM IS AT BUYER'S SOLE RISK.**

4.3    <u>**Acknowledgments of Buyer**</u>.  By proceeding with the transactions contemplated in this Agreement, Buyer shall be deemed to have acknowledged and admitted, that:

(a)    Buyer has been given full opportunity to adequately inspect the Alaska Interests;

(b)    Buyer is aware that the Alaska Interests have been used for the exploration, development, production, treating and transporting of Oil and Gas, and that physical changes to the environment may have occurred or will occur as a result of such use and that Sellers have disclosed, and Buyer is further aware, that there exists the possibility that there could have occurred or will occur from such use one or more releases of hazardous substances or releases of chemical substances into, or other pollution or contamination of or into, the ambient air, seawater, surface water, groundwater, soil, seabed or subsurface strata of any real property included in the Alaska Interests and of contiguous or a series of contiguous, real properties not a part of the

Alaska Interests and that pursuant to Alaska Statute 46.03.780 Buyer may be liable to the State of Alaska for damages based on the injuries to, including the death of, fish, animals, vegetation, or the environment of the State of Alaska;

(c) Buyer has entered into this Agreement based solely on its own investigation of the physical condition of the Alaska Interests (including the environmental condition of the Alaska Interests and the surrounding environment);

(d) Buyer acknowledges that at the Closing it will acquire the Alaska Interests based solely on its own investigation of the physical or other condition thereof and assumes the risk that adverse conditions outside the scope of Sellers' representations and warranties set forth in Section 13.1 may not be revealed by Buyer's own investigation. Buyer, with full knowledge of the foregoing and after conducting the investigations and evaluations referenced in the immediately preceding sentence and elsewhere in this Agreement, **IS ACQUIRING THE ALASKA INTERESTS ON AN "AS IS, WHERE IS, WITH ALL FAULTS" BASIS**, and, Buyer, by acquiring the Alaska Interests on an "AS IS, WHERE IS, WITH ALL FAULTS" basis, waives any other rights of indemnification, contribution or recourse it may have against or from Sellers or any of their Associated Parties with respect to the condition of and the Alaska Interests, including the environmental condition of the Alaska Interests and the surrounding environment and any and all damage to the Alaska Interests and the surrounding environment (including as a result of volcanic activity or other acts of God). As part of Buyer's agreement to purchase and accept the Alaska Interests "AS IS, WHERE IS, WITH ALL FAULTS" and not as a limitation on such agreement, except as specifically set forth in this Agreement to the contrary, Buyer hereby unconditionally and irrevocably waives and releases any and all actual or potential rights Buyer might have against Sellers regarding any form of warranty, express or implied, of any kind or type, relating to the Alaska Interests, its improvements or the Property Conditions, and such waiver and release is absolute, complete, total and unlimited in every way. Except as specifically set forth in this Agreement to the contrary, such waiver and release includes a waiver and release of express warranties, implied warranties, warranties of fitness for a particular use, warranties of merchantability, warranties of habitability, Strict Liability rights, and claims of every kind and type, including claims regarding defects which might have been discoverable, claims regarding defects which were not or are not discoverable, environmental claims, environmental liability claims, and all other extant or later created or conceived of Strict Liability or Strict Liability type claims and rights;

(e) In connection with the waivers, releases and limitations of liability set forth in this Agreement (including in Article 11), Buyer expressly waives any rights under Section 1542 of the California Civil Code, which provides:

"A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release which if known by him must have materially affected his settlement with the debtor."

Buyer has been advised by its legal counsel as to the significance of this waiver of Section 1542 relating to unknown, unsuspected and concealed Claims, and Buyer acknowledges that it fully understands and agrees to such waiver;

(f) Buyer hereby agrees, represents and warrants that the matters released, waived, and limited herein are not limited to matters which are known or disclosed. In this connection and to the extent permitted by law, including the decision of the Alaska Supreme Court in *Witt v. Watkins*, 579 P.2d 1065 (Alaska 1978), Buyer hereby agrees, represents and warrants that Buyer realizes and acknowledges that factual matters now unknown to it may have given or may hereafter give rise to causes of action, claims, demands, debts, controversies, damages, costs, losses, and expenses which are presently unknown, unanticipated and unsuspected, and Buyer further agrees, represents and warrants that the waivers and releases herein have been negotiated and agreed upon in light of that realization and that Buyer nevertheless hereby intends to release, discharge and acquit Sellers from any such unknown causes of action, claims, demands, debt, controversies, damages, costs, losses and expenses which might in any which way be included in the waivers and matters released as set forth in this Agreement;

(g) Buyer is aware that Sellers are not the operators of the Alaska Interests and that, upon acquisition of the Alaska Interests, Buyer will not be the operator of the Alaska Interests, which shall continue to be controlled by the operator, Union Oil Company of California; and

(h) Without limiting clauses (d) and (e) above, Buyer expressly acknowledges the following specific disclaimers:

(i) Buyer has made its own estimates of prospective data such as future Oil and Gas production rates, value of exploration prospects, operating costs and Abandonment Obligations, based on Buyer's own abilities and skills to explore, produce, operate, and abandon the Alaska Interests and is not relying on Sellers' own estimates of such data.

(ii) The Alaska Interests may contain asbestos, hazardous substances or NORM.

(iii) Portions of the Alaska Interests are or may be located in a "Wetland" as defined in the "Federal Manual for Determining Jurisdictional Wetland" or Applicable Laws.

(iv) Portions of the Alaska Interests are or may be located in a "Flood Zone" as defined by the U.S. Federal Emergency Management Administration or other Government Entities.

(v) Sellers do not represent or warrant that ownership, use, operation, maintenance, improvement or abandonment of any intellectual property rights included within the Alaska Interests would not infringe any patent, copyright, trademark or trade secret rights of any Person.

By initialing where indicated below, Buyer specifically agrees to the foregoing acknowledgements, disclaimers and releases in this Section 4.3.

BUYER _____
(Initials)

4.4 **Independent Evaluation**. Buyer has made an independent evaluation of the Alaska Interests and acknowledges that Sellers have made no statements or representations concerning the present or future value of the anticipated income, costs or profits, if any, to be derived from Alaska Interests or the quantity and quality of any Oil and Gas or other minerals, if any, that may be produced from the Alaska Interests, and that **SELLERS DO NOT IMPLIEDLY OR EXPRESSLY WARRANT ANY DESCRIPTION, TITLE, VALUE, QUALITY OR PHYSICAL CONDITION OF THE ALASKA INTERESTS (INCLUDING, WITHOUT LIMITATION, THE ENVIRONMENTAL CONDITION OF THE ALASKA INTERESTS), MERCHANTABILITY OR FITNESS FOR PURPOSE OF ANY OF THE ALASKA INTERESTS, OR OTHER PERSONAL PROPERTY OR FIXTURES LOCATED THEREON OR USED IN CONNECTION THEREWITH.** Buyer further acknowledges that, in entering into this Agreement, it has relied solely upon its independent examination of the Alaska Interests and the public records relating to the Alaska Interests and its independent estimates, computations, evaluations, reports, and studies based thereon. Buyer acknowledges that it has made such investigation of the Property Conditions as Buyer deems adequate, and shall rely solely upon its own investigation of such conditions and not upon any statement or opinion by Sellers or any Associated Party of Sellers or any Third Party. Except for representations in Section 13.1, Sellers shall not be responsible for any innocent or negligent misrepresentation or failure to investigate the Alaska Interests on the part of Sellers, any Associated Party of Sellers or any Third Party.

4.5 **Buyer's Confidentiality Obligations; Press Releases**.

(a) Except as set forth in Section 15.8, Buyer will keep confidential all information concerning the Alaska Interests, as set forth in the Confidentiality Agreement.

(b) In the event of termination of this Agreement, Buyer shall promptly, and in any event within five days of such termination, (i) return to Sellers all documentation or other information concerning the Alaska Interests, or otherwise pursuant to or in connection with this Agreement, that it obtained from Sellers or any Associated Party of Sellers, (ii) destroy all of its work papers and analyses that incorporate the information, and (iii) be subject to these confidentiality obligations for five years after the Execution Date, all in accordance with the Confidentiality Agreement. However, if the Closing occurs, then Buyer's confidentiality obligations under this Section 4.5 will not survive the Closing.

**ARTICLE 5**
**TITLE AND TITLE DEFECTS**

5.1    **Title Defect**.  "Title Defect" means any one or more of the following, provided, however, that each of the following is subject in all respects to any disclosure on Exhibit A or Exhibit B to the contrary, including the disclosure of any mortgage, deed of trust, lien, Encumbrance, Claim, royalty, obligation or interest:

(a)    Sellers' title to all or any part of the Alaska Interests becomes subject to an outstanding mortgage, deed of trust, lien or other monetary encumbrance or adverse Claim not listed or referenced on Exhibit A or Exhibit B that would induce a purchaser to suspend payment of proceeds for the Alaska Interest or require the furnishing of security or indemnity. Evidence that Sellers receive their full share of proceeds from a purchaser or Third-Party operator for an Alaska Interest shall constitute a presumption that no Title Defect exists with respect to such Alaska Interest;

(b)    Sellers' working interest would be reduced if a Third Party were to exercise a reversionary, back-in or other similar right affecting Sellers' title to the Leases not listed or referenced on Exhibit A or Exhibit B; or

(c)    Sellers default in any material respect under a material provision of a lease, farmout agreement or other Contract, which default results in a material loss of title to any part of the Alaska Interests;

provided, however, that the term "Title Defect" does not include (i) a lien or encumbrance in the form of a judgment secured by a supersedes bond or other security approved by the court issuing the order; (ii) the loss of lease acreage between the Execution Date and the Closing Date because the term of a Lease expires; (iii) any defect, Claim, encumbrance, exception, reservation or other matter in existence as of the Execution Date.

5.2    **Title Defect Notice**.  Buyer will have until ten days after the Execution Date to provide Sellers a written notice ("Title Defect Notice") of any Title Defect that Buyer in good faith finds unacceptable. Each Title Defect Notice must include, in reasonable detail, a description of (a) the Alaska Interest with respect to which the claimed Title Defect relates, (b) the nature of such claimed Title Defect, and (c) Buyer's calculation of the Defect Value in accordance with the guidelines set forth in Section 5.4. Any Title Defect that is not identified by a timely-delivered Title Defect Notice will thereafter be forever waived by Buyer and such Title Defect will transfer with the affected Alaska Interest.

5.3    **Determination of Title Defects and Defect Values**.

(a)    Within three Business Days after Sellers' receipt of a Title Defect Notice, Sellers will notify Buyer as to whether Sellers agree with the Title Defect claimed therein and/or the proposed Defect Value attributed to such Title Defect. If Sellers do not agree with any such claimed Title Defect and/or any such proposed Defect Value, then the Parties will promptly enter into good faith negotiations and will attempt to agree on such matters. The value agreed to by the Parties with respect to a Title Defect will be the Defect Value for such Title Defect.

(b)     If the Parties do not reach an agreement concerning either the existence of a Title Defect or the associated Defect Value within five Business Days after Sellers' receipt of a Title Defect Notice, then, upon Sellers' or Buyer's written request, the disputes will be submitted to the Bankruptcy Court for resolution.

5.4     **Calculation of Defect Value**.

(a)     If, because of a Title Defect, title to or Sellers' rights in a particular Alaska Interest fails completely with the effect that Sellers have no ownership interest in such Alaska Interest, the Defect Value will be the Allocated Value of such Alaska Interest.

(b)     If a Title Defect exists because Sellers own a lesser Net Revenue Interest in a Lease, then the Defect Value will be the Allocated Value for such Lease multiplied by a fraction (i) the numerator of which is the net present value, as of the Effective Time, of Sellers' interest in the future net revenues from such Lease (the "PV-NRI") minus the net present value as of the Effective Time, of Sellers' interest in the future net revenues from such Lease calculated based upon the same production, cost, and assumed future price estimates and discount rate and such other methods, techniques and assumptions utilized but taking into account the Title Defect, and (ii) the denominator of which is the PV-NRI.

(c)     If a Title Defect is a lien, encumbrance or other charge upon a particular Alaska Interest that is liquidated in amount, then the Defect Value for such Title Defect shall be the amount necessary to be paid to remove the Title Defect from the affected Alaska Interest.

(d)     If a Title Defect represents an obligation or burden upon a particular Alaska Interest of a type not described in Section 5.4(b) or Section 5.4(c), then the Defect Value with respect to such Title Defect will be the sum the Parties mutually agreed upon in good faith as the present value of the adverse economic effect such Title Defect will have on such Alaska Interest. If the Parties cannot reach an agreement as to such Defect Value, then the dispute will be submitted to the Bankruptcy Court for resolution.

(e)     If less than 100% of the assets comprising an Alaska Interest is subject to a Title Defect, the Parties agree that only the value of the portion of the Alaska Interest affected by the Title Defect will be used to consider the Defect Value; accordingly, the Parties agree that the value of any portion of the Alaska Interest (if less than 100% of the Alaska Interest) affected by the Title Defect will be based on an amount equal to (i) the product of (A) the Allocated Value of 100% of such Alaska Interest and (B) a fraction, the numerator of which is the average weighted production of the portion of the Alaska Interest affected by the Title Defect and the denominator of which is the aggregate average weighted production of 100% of the Alaska Interest, or (ii) if the Alaska Interest is not a producing Alaska Interest, as reasonably agreed to among the Parties. The Parties agree that the phrase "average weighted production" as used herein will be based on the historical production information from Sellers' records for the three full calendar months immediately preceding the Execution Date.

(f)     Notwithstanding the foregoing provisions of this Section 5.4, a Title Defect with respect to an Easement will be deemed a Title Defect of the Lease serviced by such Easement, unless an appropriate replacement Easement is obtained by Sellers therefor.

(g)     The calculation of a Defect Value will take into consideration any and all applicable guidelines set forth in Sections 5.4(a) through 5.4(f).

5.5     **Consequences of Title Defect**.  Sellers will have five Business Days after the final determination of a Title Defect to elect, in their sole discretion, by written notice to the Buyer, whether or not to cure, or agree to cure, the Title Defect. In connection with the exercise of this election, Sellers may delay the Closing for up to 30 days while they investigate the Title Defect and possible curative measures, and such right to delay the Closing will be in addition to any other rights of Sellers' to delay the Closing under this Agreement. If Sellers elect not to cure a Title Defect which is not a Minimal Defect, Buyer shall have five Business Days after receipt of Sellers' notice to this effect to determine whether to (a) proceed to Closing under this Agreement with no adjustment to the Purchase Price or (b) terminate this Agreement.

5.6     **Description and Other Errors**.  If either Party determines, either before or within 30 days after the Closing, that the description of an Alaska Interest is incorrect or that certain Alaska Interests were erroneously included in or erroneously excluded from the respective definitions thereof, other sales information or any conveyancing instruments, then Sellers and Buyer shall meet and use their respective commercially reasonable efforts to resolve the error without need of further consideration, and shall, as applicable, execute and deliver, or use commercially reasonable efforts to cause to be executed and delivered, such other instruments of conveyance and take such other actions as either Party reasonably may request in connection therewith. If the Parties cannot resolve any such purported error within 15 days of the commencement of negotiations, then the issue will be submitted to the Bankruptcy Court for resolution.

### ARTICLE 6
### CERTAIN COVENANTS BETWEEN EXECUTION DATE AND CLOSING

6.1     **Assumption of Contracts and Leases; Payment of Cure Amounts**.

(a)     Except as otherwise provided in this Agreement, the sale of the Alaska Interests will be subject to the terms and conditions of all oil, gas and mineral leases, assignments, subleases, farmout agreements, unit agreements, joint operating agreements, pooling agreements, letter agreements, easements, rights-of-way, gathering and transportation agreements, obligations and other Contracts, in each case to the extent that Sellers are parties (or as such Contracts are otherwise binding upon Sellers) and that concern or pertain to the Alaska Interests (each of the foregoing, but expressly excluding any agreement that constitutes an Excluded Item, a "Related Agreement" and collectively, the "Related Agreements"). Obligations due to the non-Debtor counterparty of any Contract or Lease or Related Agreement as to which Contract or Lease the Sale Order authorizes assignment to Buyer, as determined by the Bankruptcy Court pursuant to Section 365 of the Bankruptcy Code, including without limitation all amounts set forth

in Schedule 4 ("Cure Amounts"), shall be paid by Buyer and not by Sellers. Sellers shall have no liability for Cure Amounts.

(b)     At the Closing and to the extent approved in the Sale Order, the Parties will execute and deliver all documents necessary for Buyer to assume the Related Agreements, Contracts, Leases, all Assumed Liabilities and all Abandonment Obligations, and the Buyer shall assume all of Sellers' obligations and liabilities under the Contracts and Leases from and after the Effective Time, including all Assumed Liabilities and Abandonment Obligations. Buyer's obligations shall apply to all Related Agreements, Contracts and Leases, whether or not recorded.

(c)     At the Closing, to the extent not previously paid, Buyer shall pay or cause to be paid any and all Cure Amounts directly to each non-Debtor counterparty as set forth in Schedule 4. Sellers expressly consent to the payment to each non-Debtor counterparty in the amounts listed in Schedule 4.

(d)     (i) To the extent any of the Related Agreements, Contracts or Leases constitutes an executory contract or an unexpired lease under Section 365 of the Bankruptcy Code, such Related Agreements, Contracts or Leases shall be deemed assumed by the applicable Seller and assigned by such Seller to Buyer pursuant to Section 365 of the Bankruptcy Code; and (ii) to the extent any of the Related Agreements, Contracts or Leases do not constitute an executory contract or unexpired lease subject to assumption and assignment under Section 365 of the Bankruptcy Code, then the rights and obligations under such Related Agreement, Contract or Lease shall be transferred to Buyer as part of the sale of the Alaska Interests with such rights and obligations being expressly assumed by Buyer.

6.2     **Third Party Notifications and Regulatory Approvals for the Alaska Interests**.

(a)     Buyer acknowledges that the sale of the Alaska Interests may require the providing of notice to, and Consent of, lessors, joint interest owners, farmers, sublessors, assignors, grantors, parties to agreements, Governmental Entities having jurisdiction (including any borough, municipality, city, or village in the State of Alaska, the State of Alaska, Department of Natural Resources, Division of Oil & Gas, the United States Bureau of Land Management, the Regulatory Commission of Alaska, the United States Environmental Protection Agency, the Alaska Oil and Gas Conservation Commission, and State of Alaska, Department of Natural Resources, Mental Health Trust Land Office), or any other Third Party.

(b)     Buyer acknowledges that it is and shall be solely responsible for obtaining all Consents applicable to the sale of the Alaska Interests from any Governmental Entities having jurisdiction (including any borough, municipality, city, or village in the State of Alaska, the State of Alaska, Department of Natural Resources, Division of Oil & Gas, the United States Bureau of Land Management, the Regulatory Commission of Alaska, the United States Environmental Protection Agency, the Alaska Oil and Gas Conservation Commission, and State of Alaska, Department of Natural Resources, Mental Health Trust Land Office). At least two days before the Closing Date, Buyer shall furnish Sellers with

copies, or other acceptable proof, of the granting or receipt of (i) Buyer's qualification to do business in Alaska as reflected by a Department of Commerce Good Standing Certificate, and (2) Buyer's qualification certificate or card, incumbency certificate, contact list and Power of Attorney from the Department of Natural Resources.

(c)     If Buyer does not furnish Sellers with all Consents applicable to the sale of the Alaska Interests from any Governmental Entities having jurisdiction (including a borough, municipality, city, or village in the State of Alaska, the State of Alaska, Department of Natural Resources, Division of Oil & Gas, the United States Bureau of Land Management, the Regulatory Commission of Alaska, the United States Environmental Protection Agency, the Alaska Oil and Gas Conservation Commission, and State of Alaska, Department of Natural Resources, Mental Health Trust Land Office) at least two days before the Closing Date, then Sellers may, at their option, elect to (i) delay the Closing as to any or all of the Alaska Interests, with no charge to either Party for the delay, to permit Buyer to obtain the Consents; (ii) waive the condition set forth in Section 7.3(d) and proceed with the Closing without all Consents; or (iii) elect not to proceed with the Closing and terminate this Agreement.

6.3     **Termination of Sellers' Insurance**.     Until the Closing Date, Sellers shall maintain all insurance that they have provided for the Alaska Interests.

6.4     **Conduct of Business Pending the Closing**.

(a)     Subject in all respects to the requirements and restrictions of, or as may result from or relate to, the Bankruptcy Case and orders entered therein, or the Credit Agreements, from the Execution Date to the Closing Date, except as provided herein or as otherwise consented to in writing by Buyer, Sellers, to the extent that Sellers have any control over such matters as the non-operator of the Alaska Interests, on a joint and several basis, will:

(i)     except as referenced in Exhibit A, not dispose of or relinquish any of the Leases (other than relinquishment resulting from the expiration of a non-producing Lease; and the abandonment of a Lease not operated by Sellers or their Affiliated Parties);

(ii)     not waive, compromise or settle, or violate, breach or default under, any material right or Claim included in the Leases;

(iii)     not make or enter into an agreement to make, terminate or amend an agreement for capital expenditures or workover expenditures with respect to the Leases in excess of $1,000,000 (net to Sellers' interest), except as required by Applicable Law or when required by an emergency when there shall have been insufficient time to obtain advance consent (provided, that Sellers will promptly notify Buyer of any such emergency expenditures);

(iv)     not incur Liabilities with respect to the Alaska Interests for which Buyer would be responsible after the Closing, other than transactions in the

normal, usual and customary manner, of a nature and in an amount consistent with past practices employed by Sellers with respect to the Alaska Interests;

(v) not take any affirmative action that would result in any of the Alaska Interests to be subject to any new encumbrances that would impose a Liability in excess of $50,000, without Buyer's consent;

(vi) not cancel any financial indebtedness owed to Sellers that is fairly attributable to the Alaska Interests for the period of time on or after the Effective Time;

(vii) not, except as otherwise provided in this Agreement, amend or terminate, or violate, breach, or default under, any agreement relating to the Alaska Interests where such amendment, termination, violation, breach or default would result in a Liability with respect to the Alaska Interests having a value in excess of $1,000,000;

(viii) use commercially reasonable efforts to preserve relationships with each Third Party having material business dealings with respect to the Alaska Interests;

(ix) pay all post-petition taxes and assessments with respect to the Alaska Interests that become due and payable prior to the Effective Time; and

(x) comply in all material respects with all Applicable Laws.

(b) Notwithstanding anything in Section 6.4(a) or elsewhere in this Agreement to the contrary, from and after the Execution Date, neither Seller shall have any obligation to pay any joint interest billings due to Union Oil Company of California or its affiliates.

6.5 **Preferential Rights to Purchase**.

(a) Sellers shall use the Allocated Value to provide any required preferential right to purchase notifications. Sellers shall provide such notifications promptly after the Execution Date with respect to each applicable Alaska Interest and shall comply in all material respects with the agreement in which the applicable preferential purchase right arises insofar as it pertains to such preferential right, to the extent required or authorized by the Bankruptcy Court.

(b) If, prior to the Closing Date, a holder of a preferential purchase right notifies Sellers that it elects to exercise its rights with respect to a Lease (in accordance with the agreement under which the preferential purchase right arises), such Lease will not be sold to Buyer (subject to the remaining provisions in this Section 6.5), and Buyer shall have five Business Days to determine whether to (a) proceed to Closing with no reduction in the Purchase Price or (b) terminate this Agreement. If Buyer elects to proceed to Closing, the Parties will remove such Lease (or portion thereof) from this

Agreement. Sellers shall promptly notify Buyer of the exercise of any preferential purchase rights in respect of the Alaska Interests.

(c)     If for any reason the purchase and sale of a Lease or portion thereof covered by an exercised preferential purchase right is not or cannot be consummated with the holder of the preferential purchase right within 120 days after the Closing Date and the holder of such preferential right does not object, or waives any objection, to the satisfaction of Buyer, to a sale of such Lease hereunder, provided Buyer has acquired the other Alaska Interests with no reduction in the Purchase Price pursuant to the terms of this Agreement, Sellers shall assign and convey to Buyer and Buyer shall accept from Sellers, within ten Business Days after Sellers' prompt notice of the same to Buyer, such Lease pursuant to the terms of this Agreement for no additional consideration (provided, that "Closing Date" with respect to such Lease shall mean the date of assignment of such Lease from Sellers to Buyer).

6.6     **Sale Procedures**.  The sale procedures regarding the transactions contemplated by this Agreement will be governed by the Sale Procedures Order and any other applicable orders, including the Sale Order, entered by the Bankruptcy Court.

6.7     **Payment of Deposit**.  At or prior to Buyer's execution of this Agreement, Buyer shall pay to Sellers by wire transfer of immediately available funds to an account or accounts specified by Sellers $100 (the "Deposit"). The Deposit shall be nonrefundable except as specifically set forth in Article 8. At the Closing, the Deposit shall be applied to the Preliminary Purchase Price.

6.8     **Financial Ability**.  Not later than 5:00 p.m. Pacific Time on August 11, 2009, Buyer will provide evidence satisfactory to Sellers that Buyer has a binding commitment letter for at least $60,000,000 in cash immediately available at Closing to satisfy Buyer's obligations hereunder, with such binding commitment letter having been issued by a financially sound bank or financial institution capable of fulfilling the commitment,

## ARTICLE 7
## CLOSING

7.1     **Closing Date**.  The purchase and sale of the Alaska Interests contemplated by this Agreement (the "Closing") shall take place at 611 Anton Boulevard, 14th Floor, Costa Mesa, California, on or before September 28, 2009 or at such other time and place as the Parties may agree; provided, however, that the Closing shall in any event be effective as of the Effective Time.

7.2     **Closing Obligations; Deliveries**.  Subject to the satisfaction of all of the conditions precedent to the Closing set forth in this Article 7, at the Closing the following shall occur:

(a)     **Certificate of Buyer**.  Buyer shall deliver to Sellers a certificate in form and substance satisfactory to Sellers, effective as of the Closing Date and executed by Buyer's duly authorized officer, certifying as to (i) Buyer's acknowledgement and agreement to the acknowledgements, disclaimers and releases set forth in Section 4.3, (ii)

compliance with the conditions set forth in Section 7.3(a) and (iii) the incumbency and specimen signature of each officer of Buyer executing this Agreement and the other Transaction Documents to which Buyer is or is intended to be a party.

(b) **Certificate of Sellers**. Each Seller shall deliver to Buyer a certificate in form and substance satisfactory to Buyer, effective as of the Closing Date and executed by such Sellers' duly authorized officer, certifying as to (i) compliance with the conditions set forth in Section 7.4(a), and (ii) the incumbency and specimen signature of each officer of such Seller executing this Agreement and the other Transaction Documents to which such Seller is or is intended to be a party.

(c) **Assignment and Bill of Sale**. Sellers and Buyer shall execute and deliver counterparts of the Assignment and Bill of Sale. The Assignment and Bill of Sale, when delivered at the Closing, shall be effective as of the Effective Time, be without warranty of any kind (e.g., title, fitness, condition), and shall restate (or incorporate by reference) the indemnities, releases and waivers contained in this Agreement.

(i) Exhibit A to this Agreement states Sellers' interest in the Alaska Interests, to the best of Sellers' knowledge and belief. The Assignment and Bill of Sale shall not, however, state or warrant the interests in the Alaska Interests assigned to Buyer.

(ii) The Parties shall execute and acknowledge any such other instruments reasonably necessary to effectuate the conveyance of the Alaska Interests to Buyer, including without limitation, separate instruments on any officially approved form for the assignment of the Leases and for each Lease, Easement, franchise, license or similar interest issued by a Governmental Entity.

(d) **Letters in Lieu**. Sellers shall prepare and the Parties shall execute letters-in-lieu-of-transfer orders (or other instruments) to give notice of the transactions hereunder to remitters of proceeds from the sale of Oil and Gas production from the Alaska Interests.

(e) **Consents**. Buyer shall deliver to Sellers evidence reasonably satisfactory to Sellers that Buyer has obtained all Consents required under Section 6.2(b) related to the sale of the Alaska Interests.

(f) **Financial Security**. Buyer shall deliver to Sellers evidence reasonably satisfactory to Sellers of Buyer's ability to perform fully its financial obligations under this Agreement, including Abandonment Obligations, together with evidence reasonably satisfactory to Sellers that Buyer has otherwise satisfied all requirements of Applicable Law with respect to transfer of the Alaska Interests, including Buyer's delivery to Sellers of the original counterpart of all Governmental Bonds.

(g) **Payment of Purchase Price**. Buyer will pay to Sellers an amount equal to the Preliminary Purchase Price, less the amount of the Deposit (which shall be credited toward the Purchase Price), by wire transfer of immediately available funds to an account or accounts specified by Sellers.

(h)    **Non-Foreign Affidavit**.  PEAO shall execute and deliver to Buyer a Non-Foreign Affidavit in substantially the form attached hereto as Exhibit D.

(i)    **Other Documents**.  The Parties shall execute and deliver other documents reasonably required to close the sale of the Alaska Interests and implement the related terms of this Agreement, including assignments, deeds, assumption agreements, additional bills of sale and the like, as well as instruments necessary under operating agreements, plans of unitization and Applicable Laws affecting the Alaska Interests to transfer the Alaska Interests and related obligations from Sellers to Buyer.

(j)    **Delivery of Possession**.  Sellers shall deliver possession of the Alaska Interests to Buyer at Buyer's expense as soon as practicable after the Closing Date.

7.3    **Sellers' Conditions**.  The obligations of Sellers to be performed at the Closing are subject to the satisfaction or waiver in writing by Sellers at or prior to the Closing, of the following conditions:

(a)    **Representations True; Performance of Obligations**.  All representations and warranties of Buyer contained in this Agreement shall be true in all material respects at and as of the Closing as if such representations and warranties were made at and as of the Closing, and Buyer shall have performed and satisfied in all material respects all obligations required by this Agreement to be performed and satisfied by it at or prior to the Closing.

(b)    **No Pending Suits**.  No suit or other proceeding shall be pending or threatened before any court or Governmental Entity seeking to restrain, prohibit, or declare illegal, or seeking substantial damages in connection with, the sale of the Alaska Interests or related transactions contemplated by the Agreement.

(c)    **Governmental Bonds**.  Buyer shall have delivered to Sellers copies of all Governmental Bonds, together with evidence satisfactory to Sellers that all Governmental Bonds have been accepted by the applicable Governmental Entities; and Buyer shall have delivered to Sellers evidence reasonably satisfactory to Sellers that Buyer has otherwise satisfied all requirements of Applicable Law with respect to transfer of the Alaska Interests.

(d)    **Consents**.  Each Consent related to the Alaska Interests required under Section 6.2(b) shall have been obtained and shall be in full force and effect.

(e)    **Insurance**.  Sellers shall have received certificates, dated as of a date no more than five days prior to the Closing Date, from Buyer's insurers certifying that (i) Buyer has purchased insurance (on a claims made basis) covering Buyer's ownership of the Alaska Interests in such amounts, and with such deductibles and limits, as is commercially reasonable and (ii) such insurance will be in full force and effect as of the Closing Date.

(f)    **Additional Documents**. Buyer shall have delivered or provided to Sellers all contracts, information, approvals, documents and instruments (i) required to be

delivered or provided by Buyer pursuant to this Agreement prior to the Closing or (ii) as Sellers may have reasonably requested.

(g) **Bankruptcy Court Approval**. The Bankruptcy Court shall have issued the Sale Order and the Sale Order shall not have been reversed, vacated or stayed.

(h) **Actions**. Buyer shall have taken all actions described in <u>Section 7.2</u> as being required of Buyer.

(i) **Asset Exchange Agreement**. Union Oil Company of California, Marathon Oil Company and PEAO shall have executed the Asset Exchange Agreement, to be effective July 24, 2009, between PEAO and Union Oil Company of California, in their capacities as the working interest owners in the Oil working interest participating areas of the Trading Bay Unit and Union Oil Company of California and Marathon Oil Company, in their capacities as the working interest owners of the Grayling Gas Sands working interest participating area in the Trading Bay Unit, relative to Slot 10 in the B-1 Leg of the Steelhead Platform and the associated M-32RD Well to be Exchanged for Options on Two Gas Slots in the B-1 Leg of the Steelhead Platform, and such agreement shall have become effective.

(j) **Facilities Agreement**. Union Oil Company of California shall have executed an Amended and Restated Trading Bay Facilities Agreement acceptable to Sellers that grants to Sellers access to ADL 32299 and ADL 37596, and the North and South airstrip rights-of-way, and such other Trading Bay Production Facility assets as are required for Sellers and/or their successors to engage in the production and distribution of hydrocarbons without interference by Sellers and/or their successors with the existing Trading Bay Production Facility, with such agreement to be executed and recorded prior to the Closing. Such agreement shall be freely assignable to the successors to Sellers' Group 1 Alaska assets.

7.4 **Buyer's Conditions**. The obligations of Buyer to be performed at the Closing are subject to the satisfaction or waiver in writing by Buyer at or prior to the Closing, of the following conditions:

(a) **Representations True; Performance of Obligations** All representations and warranties of Sellers contained in this Agreement regarding the Alaska Interests shall be true in all material respects at and as of the Closing as if such representations and warranties were made at and as of the Closing, and Sellers shall have performed and satisfied in all material respects all obligations required by this Agreement to be performed and satisfied by them at or prior to the Closing.

(b) **No Pending Suits**. No suit or other proceeding shall be pending or threatened before any court or Governmental Entity seeking to restrain, prohibit, or declare illegal, or seeking substantial damages in connection with, the sale of the Alaska Interests or related transactions contemplated by the Agreement.

(c) **Bankruptcy Court Approval**. The Bankruptcy Court shall have issued the Sale Order and the Sale Order shall have become final and shall not have been reversed, vacated or stayed.

(d) **Actions**. Sellers shall have taken all actions described in Section 7.2 as being required of Sellers.

7.5 **Non-Waivable Conditions to Closing**. The obligations of Sellers and Buyer to be performed at the Closing are subject to the satisfaction of the following conditions prior to or at Closing.

(a) **Cure Amounts To Be Paid**. All Cure Amounts as set forth in Schedule 4 shall have been paid to the parties identified in Schedule 4.

(b) **Reconveyances of Lender ORRIs and Fractional Assignments to Lender Affiliates**. Any and all overriding royalty interests affecting the Alaska Interests in favor of J. Aron, Silver Point and their respective Affiliates shall be reconveyed, effective as of the Closing, without liability to Buyer. Any and all fractional assignments of interests and assets in the Trading Bay Unit previously made by Sellers to Case G LLC, SPCP Group PE Alaska, LLC, and SPCP Group III PE Alaska, LLC shall be reconveyed prior to Closing and included in the interests and assets being transferred to Buyer.

## ARTICLE 8
## TERMINATION

8.1 **Events of Termination**. This Agreement may be terminated at any time prior to the Closing:

(a) as provided in Section 5.5 or Section 6.5(b);

(b) as provided in Section 6.2(c)(iii);

(c) by mutual written consent of Buyer and Sellers;

(d) by Sellers, if the Closing has not occurred on or before October 14, 2009 through no fault of Buyer;

(e) by Sellers, if the Closing has not occurred on or before October 14, 2009 due, in whole or in part, to Buyer's failure to perform any covenant or obligation contained in this Agreement that is required to be performed by such date (including Buyer's failure to obtain any Consents);

(f) by either Sellers or Buyer, if the Bankruptcy Court does not enter the Sale Order on or before September 10, 2009; or

(g) by Sellers, with written notice to Buyer if there is a material violation or breach by Buyer of any covenant, representation, warranty or obligation contained in this

Agreement and such violation or breach has not been waived by Sellers or cured by Buyer within seven days after receipt of written notice thereof from Sellers; provided, however, that with respect to a violation of Buyer's covenant contained in Section 6.8, no notice shall be required and Sellers shall in their sole discretion be permitted to terminate this Agreement immediately upon such violation without permitting Buyer the opportunity to cure.

8.2    **Effect of Termination**.

(a)    **Liability; Deposit**.

(i)    If this Agreement is terminated pursuant to Section 8.1(a), 8.1(c), 8.1(d) or 8.1(f), such termination shall be without liability to any Party and Sellers shall refund the Deposit to Buyer within three Business Days of the date of such termination.

(ii)    If this Agreement is terminated pursuant to Section 8.1(b), 8.1(e), or 8.1(g), Buyer shall forfeit the Deposit, which shall be retained by Sellers as liquidated damages, and such termination shall otherwise be without liability to any Party.

(b)    **Survival of Confidentiality**.  Notwithstanding the termination of this Agreement or any other provision of this Agreement to the contrary, the terms of any confidentiality provisions contained in the Confidentiality Agreement shall remain in full force and effect.

## ARTICLE 9
## CERTAIN OBLIGATIONS AFTER CLOSING

After the Closing, Sellers and Buyer shall each take the following actions:

9.1    **Filing and Recording**.  Sellers will decide which Party will file or record the conveyance documents in the appropriate governmental records. The recording Party will provide either the original or photocopies of the filed or recorded document, including the recording data, as agreed to by the Parties, to the non-recording Party. Buyer shall reimburse Sellers for the filing, recording, and other reasonable fees that Sellers incur if Sellers file or record the documents.

9.2    **Copies**.  If originals or the last-remaining copies of any data or Records are provided to Buyer, Sellers may have access to them at reasonable times and upon reasonable notice during regular business hours for as long as any Alaska Interests are in effect after the Effective Time (or until all of the Abandonment Obligations have been fully satisfied and discharged or a longer period if required by Applicable Law). Sellers may, during this period and at their expense, make copies of the data and records pursuant to a reasonable request. Without limiting the generality of the two preceding sentences, for as long as any Alaska Interests are in effect after the Effective Time (or until all of the Abandonment Obligations have been fully satisfied and discharged or for a longer period if required by Applicable Law), Buyer may not destroy or give up possession of any original or last-remaining copy of the data or Records

without first offering Sellers the opportunity, at Sellers' expense, to obtain the original or a copy. After this period expires, Buyer must offer to deliver the data and Records (or copies) to Sellers, at Sellers' expense, before giving up possession or destroying them.

9.3    **Further Assurances**. Buyer and Sellers each shall, from time to time after the Closing and upon reasonable request from the other Parties, execute, acknowledge and deliver in proper form any conveyance, assignment, transfer or other instrument reasonably necessary to accomplish the sale of Alaska Interests and related obligations contemplated by this Agreement (including the correction of scrivener's errors in the preparation of documents delivered at the Closing).

9.4    **Post-Closing Consents**.

(a)    If the Closing occurs without any or all Consents, Buyer shall use its best efforts and proceed diligently after the Closing to obtain and promptly provide evidence of such Consents to Sellers.

(b)    From and after the Effective Time, Buyer will be responsible for all amounts due under any Contract or Lease that requires approval for assignment.

9.5    **Buyer's Compliance**. From and after the Closing, Buyer shall comply with (a) all Applicable Laws applicable to Buyer's ownership or operation of the Alaska Interests, and (b) all Contracts and Leases.

9.6    **Allocation of Proceeds, Costs and Expenses**.

(a)    All proceeds, receipts, reimbursements, receivables, credits and income attributable to the Alaska Interests, including all rights to production of Oil and Gas and proceeds from the sale of such production, to the extent accruing during the period prior to the Effective Time, shall be for the account of Sellers.

(b)    All proceeds, receipts, reimbursements, receivables, credits and income fairly attributable to the Alaska Interests, including all rights to production of Oil and Gas and proceeds from the sale of such production, accruing during the period from and after the Effective Time, shall be for the account of Buyer. For accounts pertaining to the Alaska Interests held by Sellers in suspense or escrow at the Effective Time, Sellers will pay in full the royalty accounts, if any, that were suspended because the amount due is less than the statutory minimum for payment and, as to all other such accounts, shall retain such funds and will disburse funds from time to time after the Closing upon proof satisfactory to Sellers that the money is due to the Person claiming it.

(c)    Except as otherwise provided in this Agreement and subject to the Purchase Price adjustments in Section 3.2 and Section 3.3, Sellers will be responsible for handling all invoices and making all payments and disbursements before the Closing Date and Buyer will be responsible for handling all invoices and making all payments and disbursements on or after the Closing Date.

9.7    **Plugging and Abandoning Wells and Platforms; Remediation; Security for Buyer's Obligations**.

(a)    Buyer recognizes, assumes and covenants to either timely perform and accomplish properly, or cause to be timely performed and accomplished properly, in accordance with Applicable Law and the Contracts and Leases, all of Sellers' obligations to plug, abandon, decommission, restore and remediate the Alaska Interests and the properties affected thereby, whether arising before, on or after the Effective Time, including obligations, as applicable, to:

(i)    obtain plugging exceptions in operator's name for each Well with a current plugging exception, or permanently plug and abandon the Well;

(ii)    plug, abandon, and if necessary, reabandon each Well;

(iii)    remove all equipment and facilities, including flowlines, pipelines, and platforms;

(iv)    close all pits; and

(v)    restore and remediate the surface, subsurface, seabed and offshore sites associated with the Alaska Interests (all of the foregoing in this Section 9.7(a), "Abandonment Obligations").

(b)    Buyer will pay all costs and expenses associated with the obligations assumed under Section 9.7(a). Subject to Section 9.7(c), at the Closing Buyer shall (i) deliver to Sellers satisfactory documentation that Buyer has secured all necessary bonds required by any Governmental Entity or Third Party in order to own the Assets.

(c)    Buyer shall maintain accurate records of its actual expenditures incurred in performing the Abandonment Obligations, and shall promptly deliver to Sellers reasonably detailed reports of such expenditures certified by an independent accounting firm promptly after the end of each calendar year in which Abandonment Obligations are performed. For purposes of this Agreement, any expenditures for an Abandonment Obligation completion of which requires approval from a Governmental Entity or Third Party shall not be deemed expended until the calendar year in which such approval is obtained. Sellers or their authorized representatives may audit Buyer's records for the purpose of verifying the actual expenditures incurred in performing the Abandonment Obligations. Any disputes concerning the amount of such expenditures or their attribution to performance of Abandonment Obligations shall be submitted to the Bankruptcy Court for resolution.

9.8    **Preliminary Settlement Statement**. Sellers will prepare, in accordance with this Agreement, a statement ("Preliminary Settlement Statement"), and deliver a copy to Buyer no later than three Business Days prior to the Closing Date, setting forth each adjustment to the Purchase Price they anticipate to be appropriate as of the Closing Date to determine the Preliminary Purchase Price and showing the calculation of such adjustments in accordance with Article 3. Buyer will have one Business Day after receipt of the Preliminary Settlement

Statement to review such statement and to provide written notice to Sellers of Buyer's objection, if any, to any item on the Preliminary Settlement Statement. Buyer's notice will clearly identify the item(s) objected to and the reasons and support for the objection(s). The Parties shall attempt to agree on the amount of the Preliminary Purchase Price to be paid at the Closing no later than one Business Day prior to the Closing. If the Parties do not agree by that date, the arithmetic average of Sellers' and Buyer's respective good faith estimates shall be used to determine the adjustments to the Preliminary Purchase Price. If Buyer does not provide written objection(s) within the one Business Day period, the Parties will treat the Preliminary Settlement Statement as correct for purposes of determining the Preliminary Purchase Price.

9.9 **Final Settlement Statement**.

(a) **Determination of Final Purchase Price**. After the Closing, Sellers will prepare, in accordance with this Agreement, a statement ("Final Settlement Statement"), and deliver a copy to Buyer no later than 30 days after the Closing Date, setting forth their determination of each adjustment to the Purchase Price but excluding any amounts paid by the Parties under Section 9.10 and Section 9.11, and showing the calculation of such adjustments in accordance with Article 3. Buyer will have five days after receipt of the Final Settlement Statement to review such statement and to provide written notice to Sellers of Buyer's objection to any item on the statement. Buyer's notice will clearly identify the item(s) objected to and the reasons and support for the objection(s). If Buyer does not provide written objection(s) within the five-day period, the Parties will treat the Final Settlement Statement as correct and the Final Purchase Price will not be subject to further adjustment. If Buyer provides written objection(s) within the five-day period, the Parties will treat the Final Settlement Statement as correct with respect to the items not objected to, and Buyer and Sellers will meet to negotiate and resolve the objections within three days of Sellers' receipt of Buyer's objections. If the Parties agree on all objections, the Parties will treat the adjusted Final Settlement Statement as agreed upon by the Parties as correct and the Final Purchase Price will not be subject to further adjustment. Any items not agreed to at the end of such three-day period may, upon either Sellers' or Buyer's written request, be submitted to the Bankruptcy Court for resolution.

(b) **Payment of Final Purchase Price**. If the Final Purchase Price is more than the Preliminary Purchase Price, Buyer will pay such difference to Sellers via wire transfer to an account or accounts specified by Sellers, in immediately available funds, within two Business Days after the Final Settlement Statement has been agreed to by the Parties or determined by the Bankruptcy Court, as applicable. If the Final Purchase Price is less than the Preliminary Purchase Price, Sellers will pay such difference to Buyer via wire transfer to an account specified by Buyer, in immediately available funds, within two Business Days after the Final Settlement Statement has been agreed to by the Parties or as determined by the Bankruptcy Court, as applicable.

9.10 **Post-Closing Revenues**. Except as expressly provided otherwise in this Agreement, Buyer shall pay to Sellers any and all amounts received after the Closing by Buyer (to the extent not accounted for in the Preliminary Settlement Statement or the Final Settlement Statement) that are attributable to the ownership of the Alaska Interests prior to the Effective Time. Except as expressly provided otherwise in this Agreement, Sellers shall pay to Buyer any

and all amounts received after the Closing by Sellers (to the extent not accounted for in the Preliminary Settlement Statement or the Final Settlement Statement) that are attributable to the ownership of the Alaska Interests on or after the Effective Time. The Party responsible for a payment required under this Section 9.10 shall pay the Party entitled to receive payment within ten Business Days after the end of the month in which such amounts were received by the Party responsible for payment and no further adjustments shall be made with respect to such amounts in the Final Settlement Statement.

      9.11  **Post-Closing Expenses**.  Except as expressly provided otherwise in this Agreement, Sellers shall reimburse Buyer for any and all costs and disbursements paid after the Closing by Buyer during the 30-day period immediately following the Closing Date (to the extent not accounted for in the Preliminary Settlement Statement or the Final Settlement Statement) that are attributable to the ownership of the Alaska Interests prior to the Effective Time. Except as expressly provided otherwise in this Agreement, Buyer shall reimburse Sellers for any and all costs and expenses paid after the Closing by Sellers during the 30-day period immediately following the Closing Date (to the extent not accounted for in the Preliminary Settlement Statement or the Final Settlement Statement) that are attributable to the ownership of the Alaska Interests on or after the Effective Time. The Party responsible for a payment required under this Section 9.11 shall pay the Party entitled to receive payment within ten Business Days after the end of the month in which such amounts were received by the Party responsible for payment and no further adjustments shall be made with respect to such amounts in the Final Settlement Statement.

      9.12  **Audits**. Notwithstanding anything in this Agreement to the contrary, (a) Sellers shall have the right to conduct and participate in audits related to joint operations provided for under any operating or other Contract relating to the Alaska Interests in accordance with the terms thereof to the extent any such audit relates to the period of time prior to the Effective Time, (b) Buyer shall have the right to conduct and participate in audits related to joint operations provided for under any operating or other Contract relating to the Alaska Interests in accordance with the terms thereof to the extent any such audit relates to the period of time on or after the Effective Time, and (c) no audit Claim of Sellers or Buyer related to joint operations under any operating or other Contract relating to the Alaska Interests in accordance with the terms thereof is waived or released by Sellers or Buyer under this Agreement, nor shall any indemnity in this Agreement affect any such audit Claim by Sellers or Buyer related to joint operations under any operating or other Contract relating to the Alaska Interests in accordance with the terms thereof to the extent any such audit relates to the period prior to the Closing Date.

      9.13  **Reservation of Claims**. At the Closing, Sellers shall reserve all Claims, accounts receivable and rights of any kind concerning the Alaska Interests against any Third Party (to the extent such Claims, accounts receivable and rights would not be a recoupment or setoff against any Assumed Liability), which Claims, accounts receivable or rights accrue before the Effective Time (including those against overriding royalty owners, royalty owners, working-interest owners, and Oil or Gas purchasers), whether discovered before or after the Closing.

## ARTICLE 10
## TAXES, COSTS, AND FEES

10.1 **Property Taxes**. Property Taxes will be apportioned between Sellers and Buyer as of the Closing Date. Whether the Alaska Interests are valued based on the previous year's production or any other basis, Buyer is obligated to pay the current year's ad valorem tax assessment and all subsequent Property Taxes, subject to the following apportionment provisions. The basis of the apportionment will be the assessment for the tax year in which the Closing Date occurs or, if that assessment is not known, then the basis of the apportionment will be the assessment for the previous tax year. Buyer will be responsible for all Property Taxes and interest that are applied to the Alaska Interests retroactively after the Closing Date.

10.2 **Production Taxes**. All Production Taxes attributable to the Alaska Interests will be apportioned between the Parties as of the Closing Date. Sellers will be responsible for paying or withholding all Production Taxes that have accrued before the Closing Date and for filing all statements, returns, and documents pertinent to them. Buyer will be responsible for paying or withholding all Production Taxes that accrue or are applied retroactively after the Closing Date; for filing all statements, returns, documents incident to them; and for obtaining reimbursements, if any, relating to those taxes.

10.3 **Other Taxes**. Buyer will pay all applicable state and local sales taxes, use taxes, gross receipts taxes, business license taxes, other taxes (except taxes imposed on Sellers' income), and fees from and after the Closing Date. Buyer will pay all state and local taxes, including penalty and interest, if any, assessed after the Closing Date against any Party attributable to periods after the Closing Date with respect to this transaction or, if paid by Sellers, Buyer will promptly reimburse Sellers for amounts paid if related to the period after the Effective Time. Sellers will pay all applicable state and local sales taxes, use taxes, gross receipts taxes, business license taxes, other taxes (except taxes imposed on Seller's income), and fees prior to the Closing Date. Buyer will pay all state and local taxes, including penalty and interest, if any, assessed after the Closing Date against any Party attributable to periods prior to the Closing Date with respect to this transaction or, if paid by Buyer, Sellers will promptly reimburse Buyer for amounts paid if related to the period prior to the Effective Time. Buyer will pay all documentary stamp taxes and documentary transfer taxes.

## ARTICLE 11
## BUYER'S RELEASE, DISCHARGE, AND COVENANT NOT TO SUE; BUYER'S OBLIGATIONS TO INDEMNIFY, DEFEND, AND HOLD HARMLESS; DISPUTE RESOLUTION; RISK OF LOSS

11.1 **Buyer's Release and Discharge of Sellers and their Associated Parties**. Buyer releases and discharges Sellers and their Associated Parties from each Claim and Liability relating to the Alaska Interests and the transactions contemplated hereby (including all Abandonment Obligations), regardless of when or how the Claim or Liability arose or accrued, or arises or accrues, or whether the Claim or Liability is foreseeable or unforeseeable. **BUYER'S RELEASE AND DISCHARGE OF SELLERS AND THEIR ASSOCIATED PARTIES INCLUDE CLAIMS AND LIABILITIES RESULTING IN ANY WAY FROM THE NEGLIGENCE OR STRICT LIABILITY OF SELLERS OR THEIR ASSOCIATED**

PARTIES, WHETHER THE NEGLIGENCE OR STRICT LIABILITY IS ACTIVE, PASSIVE, JOINT, OR CONCURRENT. The only exception to Buyer's release and discharge of Sellers and their Associated Parties is stated in Section 11.4(c), and the release and discharge are binding on Buyer and its successors and assigns.

11.2 **Buyer's Covenant Not to Sue Sellers or their Associated Parties**. Buyer covenants not to sue Sellers or their Associated Parties with regard to any Claim or Liability relating to the Alaska Interests and the transactions contemplated hereby (including any Abandonment Obligations), regardless of when or how the Claim or Liability arose or accrued, or arises or accrues, or whether the Claim or Liability is foreseeable or unforeseeable. **BUYER'S COVENANT NOT TO SUE SELLERS OR THEIR ASSOCIATED PARTIES INCLUDES CLAIMS AND LIABILITIES RESULTING IN ANY WAY FROM THE NEGLIGENCE OR STRICT LIABILITY OF SELLERS OR THEIR ASSOCIATED PARTIES, WHETHER THE NEGLIGENCE OR STRICT LIABILITY IS ACTIVE, PASSIVE, JOINT, OR CONCURRENT.** The only exception to Buyer's covenant not to sue Sellers or their Associated Parties is stated in Section 11.4(c), and the covenant is binding on Buyer and its successors and assigns. Nothing in this Article 11 shall be construed or deemed to be a release, novation, or other similar agreement of any third party not signatory to this Agreement, including any predecessor in interest or title of any Seller.

11.3 **Buyer's Obligations to Indemnify, Defend, and Hold Sellers and their Associated Parties Harmless**. Buyer will indemnify, defend, and hold harmless Sellers and their Associated Parties for, and will pay to Sellers the amount of, each Claim and Liability relating to, arising, directly or indirectly, from or in connection with:

(a) any breach of any representation or warranty made by Buyer in this Agreement, the Assignment and Bill of Sale or any other certificate or document delivered by Buyer pursuant to this Agreement;

(b) any breach by Buyer of any covenant or obligation of Buyer in this Agreement, the Assignment and Bill of Sale or any other certificate or document delivered by Buyer pursuant to this Agreement; and

(c) the Alaska Interests and the transactions contemplated hereby (including all Abandonment Obligations),

regardless of when or how the Claim or Liability arose or accrued, or arises or accrues, or whether the Claim or Liability is foreseeable or unforeseeable. **BUYER'S OBLIGATIONS TO INDEMNIFY, DEFEND, AND HOLD SELLERS AND THEIR ASSOCIATED PARTIES HARMLESS INCLUDE CLAIMS AND LIABILITIES RESULTING IN ANY WAY FROM THE NEGLIGENCE OR STRICT LIABILITY OF SELLERS OR THEIR ASSOCIATED PARTIES, WHETHER THE NEGLIGENCE OR STRICT LIABILITY IS ACTIVE, PASSIVE, JOINT, OR CONCURRENT.** The only exception to Buyer's obligations to indemnify, defend, and hold Sellers and their Associated Parties harmless is stated in Section 11.4(c), and the obligations are binding on Buyer and its successors and assigns.

11.4 **Buyer's Obligations**.

(a) In each instance of Buyer's obligations to release, discharge, indemnify, defend, and hold Sellers and their Associated Parties harmless and its covenant not to sue Sellers or their Associated Parties, the Claims and Liabilities subject to the obligations include the following:

(i) the ownership of the Alaska Interests by Sellers, PERL or their respective Associated Parties, the operation of the Alaska Interests by Sellers, PERL or their respective Associated Parties, and the acts or omissions of Sellers, PERL or their respective Associated Parties in connection with the Alaska Interests, whether arising or accruing before or after the Effective Time.

(ii) the ownership of the Alaska Interests by Buyer, the operation of the Alaska Interests, by Buyer or its Associated Parties, and the acts or omissions of Buyer or its Associated Parties in connection with the Alaska Interests or under this Agreement , whether arising or accruing before or after the Effective Time.

(iii) the acts or omissions of any Third Party relating to the Alaska Interests (including, without limitation, Union Oil Company of California).

(b) Buyer's obligations under this Agreement to release, discharge, indemnify, defend, and hold Sellers and their Associated Parties harmless and its covenant not to sue Sellers or their Associated Parties include Claims and Liabilities arising in any manner from the following:

(i) the review, inspection and assessment of the Alaska Interests by Buyer and its Associated Parties;

(ii) any error in describing the Alaska Interests, or any error in the conveyance instruments;

(iii) rights and obligations of the Parties or any Third Party under the Alaska Interests;

(iv) closing without a Consent;

(v) failure by any Third Party to approve or consent to any aspect of this transaction;

(vi) obligations to plug and abandon Wells, pipelines and platforms and remediate the Alaska Interests;

(vii) payment of Property Taxes or other taxes applicable to any of the Alaska Interests;

(viii) payments or disbursements paid or payable by Sellers or Buyer to any Third Party;

(ix)    a physical or environmental condition relating to the Alaska Interests, including Claims and Environmental Liabilities, or failure to comply with the Environmental Laws;

(x)    remediation activities, including damages incurred by Buyer or its Associated Parties during or arising from remediation activities;

(xi)    lawsuits filed before the Effective Time, but amended after the Effective Time to include the Alaska Interests or Sellers' ownership of or activities regarding the Alaska Interests; and

(xii)    obligations to inspect or to repair or recondition any of the Alaska Interests.

(c)    Buyer's obligations to indemnify, defend, and hold Sellers and their Associated Parties harmless do not apply, however, to:

(i)    Claims or Liabilities with respect to the Alaska Interests that result from a judgment rendered or settlement reached in a lawsuit filed before the Effective Time, but only to the extent that acts or omissions that gave rise to the cause of action are attributable to the conduct or operation or ownership of Sellers or their Associated Parties before the Effective Time; or

(ii)    Claims that Sellers breached this Agreement or the Transaction Documents.

(d)    The Parties recognize that certain lawsuits with respect to the Alaska Interests may have been filed before the Effective Time, but concern activities continuing after the Effective Time, so that after the Execution Date, Buyer may be a proper party to such lawsuits. For these lawsuits, Buyer's obligations to indemnify, defend, and hold Sellers and their Associated Parties harmless will apply to activities occurring after the Effective Time. Sellers will continue to defend their own interests and provide principal counsel in an action under this Section 11.4(d) for which they remains a party after the Effective Time.

11.5    **Buyer's Duty to Defend**.  Buyer acknowledges that its obligations to indemnify, defend, and hold Sellers and their Associated Parties harmless under this Agreement include obligations to pay the attorneys' fees and court and other costs incurred by Sellers and their Associated Parties in defending all Claims. As to each Claim and Liability, Sellers, at their sole option, may elect to (a) manage their own defense, in which event Buyer shall reimburse Sellers and their Associated Parties for all attorneys' fees and court and other costs reasonably incurred in defending a Claim, upon delivery to Buyer of invoices for these fees and costs; or (b) tender its defense as to any Claim to Buyer, in which event Buyer will be responsible for all aspects of defending the Claim at issue and resulting Liabilities.

11.6    **Dispute Resolution**.  Any and all disputes between the Parties relating to, arising out of, in connection with, or attributable to this Agreement, including this Article 11, the Sale Procedures Order and/or the Sale Order, shall be submitted to the Bankruptcy Court for

resolution. Any decision of the Bankruptcy Court regarding this Agreement shall be conclusive and will be binding on the Parties and their respective successors and assigns, subject to any rights to rehearing, appeal or certiorari.

11.7 **Retroactive Effect**. In addition to the assumption of liabilities and releases and indemnities in the Agreement applicable to times from and after the Execution Date, Buyer acknowledges that its obligations to release, discharge, defend, and hold Sellers and their Associated Parties harmless and its covenant not to sue Sellers or their Associated Parties apply to matters occurring or arising before the Execution Date to the extent provided in this Agreement.

11.8 **Inducement to Sellers**. BUYER ACKNOWLEDGES THAT IT HAS EVALUATED ITS OBLIGATIONS UNDER THIS **ARTICLE 11** BEFORE IT DETERMINED AND SUBMITTED ITS OFFER TO PURCHASE THE ALASKA INTERESTS AND THAT ITS ASSUMPTION OF THESE OBLIGATIONS IS A MATERIAL INDUCEMENT TO SELLERS TO ENTER INTO THIS AGREEMENT WITH, AND CLOSE THE SALES OF THE ALASKA INTERESTS HEREUNDER.

11.9 **Risk of Loss**. Unless this Agreement is terminated, the risk of loss for damage to or destruction of the Alaska Interests will pass from Sellers to Buyer as of the Effective Time, **INCLUDING DAMAGE OR DESTRUCTION RESULTING IN WHOLE OR IN PART FROM THE NEGLIGENCE OR STRICT LIABILITY OF SELLERS OR THEIR ASSOCIATED PARTIES**. Damage to, or destruction of, any of the Alaska Interests will not be cause for Buyer to delay the Closing or terminate this Agreement.

## ARTICLE 12
## ENVIRONMENTAL MATTERS

12.1 **Buyer's Acknowledgment Concerning Possible Contamination of the Alaska Interests**. Buyer is aware that the Alaska Interests have been used for exploration, development, production, processing and transportation of Oil and Gas and that there may be petroleum, produced water, wastes, or other materials located on or under the Alaska Interests or associated with the Alaska Interests. Equipment and sites included in the Alaska Interests may contain asbestos, hazardous substances, or NORM. NORM may affix or attach itself to the inside of Wells, materials, and equipment as scale, or in other forms; the Wells, materials, and equipment located on or included in the Alaska Interests may contain NORM and other wastes or hazardous substances; and NORM-containing material and other wastes or hazardous substances may have been buried, come in contact with the soil, or otherwise been disposed of on the Alaska Interests. Special procedures may be required for the remediation, removal, transportation, or disposal of wastes, asbestos, hazardous substances, and NORM from the Alaska Interests. Buyer is aware that it may be strictly liable under Alaska Statute §46.03.822 for any hazardous substances that may or have been released on or from the Alaska Interests.

BUYER WILL ASSUME ALL LIABILITY FOR THE ASSESSMENT, REMEDIATION, REMOVAL, TRANSPORTATION, AND DISPOSAL OF WASTES, ASBESTOS, HAZARDOUS SUBSTANCES, AND NORM FROM THE ALASKA INTERESTS AND ASSOCIATED ACTIVITIES AND WILL CONDUCT THESE

ACTIVITIES IN ACCORDANCE WITH ALL APPLICABLE LAWS, INCLUDING THE ENVIRONMENTAL LAWS.

12.2 **Disposal of Materials, Substances, and Wastes; Compliance with Law**. Buyer shall store, handle, transport and dispose of or discharge all materials, substances, and wastes from the Alaska Interests (including produced water, drilling fluids, NORM, and other wastes), whether present before or after the Effective Time, in accordance with Applicable Laws. Buyer shall keep records of the types, amounts, and location of materials, substances, and wastes that are stored, transported, handled, discharged, released, or disposed of onsite and offsite. When any Lease or other lease included in the Alaska Interests terminates or Buyer subsequently transfers any portion of the Alaska Interests, Buyer shall undertake additional testing, assessment, closure, reporting, or remedial action with respect to the Alaska Interests as is necessary to satisfy all local, state, or federal requirements in effect at that time and necessary to restore the Alaska Interests.

### ARTICLE 13
### REPRESENTATIONS AND WARRANTIES

13.1 **Representations by Sellers**. Each Seller represents and warrants to Buyer as follows:

(a) Subject to approval of the Bankruptcy Court and to the Sale Order, this Agreement and the Transaction Documents to which Sellers are parties have been duly authorized, executed and delivered by Sellers,

(b) This Agreement constitutes, and the Transaction Documents to which Seller is a party, when executed and delivered by Seller will constitute, the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, subject to the general principles of equity and all orders entered or to be entered in the Bankruptcy Case and any related proceedings.

13.2 **Representations by Buyer**. Buyer represents and warrants to Sellers as follows:

(a) **Existence**. Buyer is a corporation duly organized, validly existing and in good standing under the Applicable Laws of the State of Delaware.

(b) **Power, Authorization, Execution**. Buyer has all requisite corporate power and authority to execute, deliver, and perform this Agreement and the Transaction Documents to which it is a party and to consummate the transactions contemplated hereunder and thereunder. The execution, delivery, and performance of this Agreement and the Transaction Documents to which Buyer is a party have been duly authorized by all requisite parties, and this Agreement and the Transaction Documents to which it is a party has been duly executed and delivered by Buyer.

(c) **Qualifications and Bonding**. Buyer is now, and, upon and after the Closing, shall continue to be, qualified with all applicable Governmental Authorities to own and operate the Alaska Interests and has, and shall maintain, all necessary bonds,

permits and other authorizations required by any Governmental Entity or Third Party in order to own the Alaska Interests.

(d) **Enforceability**. This Agreement constitutes, and the Transaction Documents to which it is a party, when executed and delivered by Buyer will constitute, the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, except as enforceability may be subject to (i) bankruptcy, insolvency, reorganization or other similar Applicable Laws now or hereafter in effect affecting the enforcement of creditors rights generally, and (ii) general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law).

(e) **Non-Contravention**. The execution and delivery by Buyer of this Agreement and the Transaction Documents to which it is a party and the performance by Buyer of the terms hereof and thereof do not conflict with or result in a violation of:

(i) the Organizational Documents of Buyer, or

(ii) any material agreement, instrument, order, writ, judgment, or decree to which Buyer is a party or is subject.

(f) **Brokers**. Neither Buyer nor any Affiliate of Buyer has incurred any liability, contingent or otherwise, for broker's fees, finder's fees, agent's commissions, or other similar forms of compensation in connection with this Agreement or any contract or transaction contemplated hereby or thereby for which Sellers shall have any responsibility whatsoever. Buyer releases Sellers and their Associated Parties from, and shall fully protect, indemnify, and defend Sellers and their Associated Parties and hold them harmless from and against, any and all Liabilities relating to, arising out of or connected with, directly or indirectly, commissions, finders' fees, or other remuneration due to any such agent, broker, or finder claiming by, through, or under Buyer or any Affiliate of Buyer.

(g) **Investigation**. Buyer, for itself and on behalf of its Affiliates, investors, shareholders, directors and officers, represents and warrants that it is knowledgeable of the Oil and Gas business and of the usual and customary practices of producers and operators. Buyer has had access to and an opportunity to inspect all relevant information relating to the Alaska Interests, sufficient to enable Buyer to evaluate the merits and risks of its acquisition of the Alaska Interests. Buyer has had the opportunity to ask questions and receive answers relating to the Alaska Interests. In making its decision to enter into this Agreement and to consummate the transactions contemplated herein, Buyer has relied solely upon the representations and warranties made in this Agreement and upon its contractual rights in this Agreement to conduct its own independent, due-diligence investigation of the Alaska Interests. **ACCORDINGLY, BUYER, FOR ITSELF AND ON BEHALF OF ITS ASSOCIATED PARTIES ACKNOWLEDGES THAT NEITHER SELLERS NOR ANY ASSOCIATED PARTIES OF SELLERS HAVE MADE, AND SELLERS, FOR THEMSELVES AND FOR THEIR RESPECTIVE ASSOCIATED PARTIES, HEREBY EXPRESSLY DISCLAIMS AND NEGATES, ANY REPRESENTATIONS OR WARRANTIES (OTHER THAN THOSE**

EXPRESS REPRESENTATIONS AND WARRANTIES MADE IN THIS AGREEMENT), WHETHER EXPRESS, IMPLIED, AT COMMON LAW, BY STATUTE OR OTHERWISE, RELATING TO THE ALASKA INTERESTS.

    (h)    **Investment Matters**. Buyer:

    (i)    is an "accredited investor," as defined in Rule 501 of Regulation D promulgated under the Securities Act;

    (ii)    is acquiring the Alaska Interests for its own benefit and account and not with a view toward any sale or distribution thereof, nor with any present intention of making a distribution of any fractional undivided interests within the meaning of the Securities Act or any applicable state blue sky laws or other applicable securities laws; and

    (iii)    has received and thoroughly read this Agreement, including all schedules and exhibits hereto. Buyer has had an opportunity to discuss this Agreement and the disclosures herein with its legal counsel. Buyer acknowledges that it has had the opportunity to ask questions of Sellers and their Associated Parties and that Buyer has received satisfactory answers respecting, and has obtained such additional information as Buyer has desired in connection with, the transactions contemplated by this Agreement.

    (i)    **Funds Available**. Buyer has, or upon compliance with the covenant set forth in Section 6.8 will have, sufficient funds to enable it to pay the Purchase Price, pay Cure Amounts and satisfy Assumed Liabilities.

    (j)    **Bankruptcy**. There are no bankruptcy, reorganization or arrangement proceedings pending against, contemplated by, or to the knowledge of Buyer, threatened against Buyer.

    (k)    **Securities Matters**.

    (i)    Buyer acknowledges that the Alaska Interests have not been registered under the Securities Act or any other securities laws and may be sold, assigned, pledged or otherwise disposed of in the absence of such registration only pursuant to an exemption from such registration and in accordance with this Agreement.

    (ii)    Buyer intends to acquire the Alaska Interests for its own benefit and account and is not acquiring the Alaska Interests with the intent of distributing fractional undivided interests in them or otherwise selling them in a manner that would be subject to regulation by federal or state securities laws. If Buyer sells, transfers, or otherwise disposes of the Alaska Interests, or fractional undivided interests in them in the future, it will do so in compliance with Applicable Laws.

(iii)    Buyer has at no time been presented with or solicited by or through any public promotion or other form of advertising in connection with this transaction.

(l)    **Basis of Buyer's Decision**.  Buyer:

(i)    has reviewed and investigated the Alaska Interests to its satisfaction in order to enter into this Agreement;

(ii)    has evaluated the Alaska Interests to its satisfaction and has made an informed decision, as a prudent and knowledgeable Buyer, to acquire the Alaska Interests;

(iii)    is knowledgeable and experienced in the evaluation, acquisition, and operation of oil and gas properties;

(iv)    has evaluated the merits and risks of purchasing the Alaska Interests and has formed an opinion based solely upon its knowledge and experience and not in reliance on any statements or actions by Sellers or their Associated Parties; and

(v)    is acquiring the Alaska Interests "**AS IS, WHERE IS, WITH ALL FAULTS.**"

(m)    **Material Factor**.  Buyer acknowledges that its representations and warranties contained in this Agreement are a material inducement to Sellers to enter into this Agreement with Buyer, and to close the transactions contemplated hereunder.

### ARTICLE 14
### COMMUNICATIONS

Unless otherwise provided in this Agreement, any notice, request, instruction, correspondence or other document to be given hereunder by either Party to the other shall be in writing and delivered in person or by courier service requiring acknowledgment of receipt of delivery or mailed by certified mail, postage prepaid and return receipt requested, or by telecopier, as follows:

If to Sellers:          c/o Pacific Energy Resources Ltd.
                        Attn: President
                        111 W. Ocean Boulevard, Suite 1240
                        Long Beach, California 90802
                        Telephone:  (562) 628-1526
                        Facsimile:  (562) 628-1536

| with a copy to: | Rutan & Tucker, LLP |
|---|---|
| | Attn: Gregg Amber |
| | 611 Anton Blvd., Suite 1400 |
| | Costa Mesa, California 92626 |
| | Telephone: (714) 641-5100 |
| | Facsimile: (714) 546-9035 |
| | |
| and to: | Pachulski Stang Ziehl & Jones LLP |
| | Attn: Ira D. Kharasch |
| | 10100 Santa Monica Blvd., 11th Floor |
| | Los Angeles, California 90067 |
| | Telephone: (310) 277-6910 |
| | Facsimile: (310) 201-0760 |
| | |
| If to Buyer: | Ocar Energy LLC |
| | Attn: Gregor C. Flavell |
| | 3000-79 Wellington St. West |
| | Toronto, Ontario M5K 1N2 |
| | Telephone: (416) 407-5580 |

Notice given by personal delivery, courier service or mail shall be effective upon actual receipt. Notice given by telecopier shall be effective upon actual receipt if received during the recipient's normal business hours, or at the beginning of the recipient's next business day after receipt if not received during the recipient's normal business hours. Any Party may change any address to which notice is to be given to it by giving Notice as provided above of such change of address.

## ARTICLE 15
## MISCELLANEOUS

15.1 **Entire Agreement**. This Agreement, the Confidentiality Agreement, and the other documents and instruments and other agreements specifically referred to herein or delivered pursuant hereto, including the exhibits and the schedules hereto (collectively, the "Transaction Documents"), (a) constitute the entire agreement between the Parties with respect to the subject matter hereof and supersede all prior agreements and understandings, both written and oral, between the Parties with respect to the subject matter hereof except for the Confidentiality Agreement, which shall continue in full force and effect, and shall survive any termination of this Agreement or the Closing in accordance with its terms; and (b) are not intended to confer upon any other Person any rights or remedies hereunder. Each Party agrees that (i) the other Party (including its agents and representatives) has made no other representation, warranty, covenant or agreement to or with such Party relating to the transactions contemplated hereby other than those expressly set forth in the Transaction Documents, and (ii) such Party has not relied upon any representation, warranty, covenant or agreement relating to the transactions contemplated hereby, other than those referred to in clause (i) above.

15.2 **Successors and Assigns; Amendment; Survival**. This Agreement is binding on and inures to the benefit of the Parties and their respective successors, heirs, representatives, and

assigns and may be supplemented, altered, amended, modified, or revoked only in writing signed by both Parties. Neither the assignment of this Agreement nor of any Alaska Interests, or any part or portion thereof will relieve Buyer of its obligations under this Agreement unless and to the extent Sellers consent in writing to release Buyer, which consent may be withheld for any reason. All of the covenants, agreements, representations and warranties, and indemnities made by each Party contained in this Agreement shall survive the Closing.

15.3 **Exclusive Remedy**. If the Closing occurs, the express indemnities set forth in this Agreement shall be the exclusive remedies for the Parties for the breach of any representation, warranty or covenant set forth in this Agreement or any Claim arising out of, resulting from or related to the transactions contemplated hereby, and each Party hereby releases, waives and discharges, and covenants not to sue (and shall cause its Associated Parties to release, waive, discharge and covenant not to sue) with respect to, any cause of action not expressly provided for in this Agreement, including Claims under state or federal securities Laws and Claims available at common law, in equity or by statute.

15.4 **Choice of Law**. This Agreement and its performance shall be construed in accordance with, and enforced under, the internal laws of the State of California, without regard to choice of law rules of any jurisdiction, including California.

15.5 **Binding Effect; Assignment**. This Agreement shall be binding upon and inure to the benefit of Sellers and Buyer and their respective successors and permitted assigns. Neither this Agreement nor the rights and obligations under it may be assigned or delegated by Buyer without Sellers' prior written consent, which consent may be withheld for any reason, and an attempted assignment or delegation is null and void; provided, however, that Buyer may assign this Agreement to a wholly-owned subsidiary so long as Buyer remains primarily liable for any and all obligations of Buyer hereunder.

15.6 **No Admissions**. To the fullest extent permitted by Applicable Laws, including Federal Rule of Civil Procedure 408, neither this Agreement, nor any part of it, nor any performance hereunder, nor any payment of any amount hereunder, shall constitute or may be construed as a finding, evidence of, or an admission or acknowledgment of (a) any liability, fault, past or present wrongdoing, or violation of law, rule, regulation, or policy, by either Seller or Buyer or their respective Associated Parties or (b) any rights, claims or positions asserted by any Third Party.

15.7 **No Third Party Beneficiaries**. The only third party beneficiaries of this Agreement are the Associated Parties of Sellers and solely respect to Article 11. Except as set forth in the immediately preceding sentence, there are no Third Party beneficiaries of this Agreement.

15.8 **Public Communications**. Unless provided otherwise in this Agreement, no Party shall make or issue, or cause to be made or issued, any press release or public communication concerning this Agreement or the transactions contemplated by this Agreement without the other Parties' prior written consent, which consent shall not be unreasonably withheld; provided, however, that, upon giving the other Parties at least 24-hours' advance notice, any Party (or an Affiliate of such Party) may make or issue, or cause to be made or issued, any press release or

public communication as may be required by Applicable Laws or the public disclosure requirements applicable to such Party or any Affiliate of such Party.

15.9 **Headings and Titles**. The headings and titles in this Agreement are for guidance and convenience of reference only and do not limit or otherwise affect or interpret the terms or provisions of this Agreement.

15.10 **Bulk Transfer Law**. Buyer waives compliance with the provisions of any applicable bulk sales or bulk transfers Law.

15.11 **Severability**. The provisions of this Agreement are severable at Sellers' option. If a court of competent jurisdiction finds any part of this Agreement to be void, invalid or otherwise unenforceable, then Sellers may decide whether to enforce this Agreement without the void, invalid, or unenforceable parts or to terminate this Agreement.

15.12 **Counterparts**. This Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original, and all of which together shall be considered one instrument.

15.13 **Not to Be Construed Against the Drafter**. Each Party acknowledges that it has read this Agreement, has had opportunity to review it with an attorney of its choice, and has agreed to all of its terms. Under these circumstances, the Parties agree that the rule of construction that a contract be construed against the drafter may not be applied in interpreting this Agreement.

15.14 **No Waiver**. No waiver by either Party of any part of this Agreement shall be deemed to be a waiver of any other part of this Agreement or a waiver of strict performance of the waived part in the future.

15.15 **Expenses**. Except as otherwise expressly provided herein, all expenses incurred by each Party in connection with the transaction contemplated herein, including, without limitation, attorney's fees, are for the account of the Party incurring the same, and the Party incurring such expenses shall defend, indemnify, and hold harmless the other Party from and against such expenses.

15.16 **Time of Essence**. Time is of the essence in the performance of this Agreement.

15.17 **No Partnership**. Nothing contained in this Agreement shall be deemed to create a joint venture, partnership, tax partnership, or agency relationship between the Parties.

15.18 **Foreign Trade Law Compliance**. Both Parties agree that all imports, exports, and re-exports, if any, under this Agreement shall be undertaken in accordance with all Applicable Laws of the United States with respect to foreign trade and export control. Both Parties further agree to fully cooperate in complying with such Applicable Laws and in assisting the other Party with such compliance. If licenses of any kind are required, including United States trade or export licenses, exports/re-exports and/or technology sharing will occur only after such license(s) have been obtained. Buyer shall notify Sellers of any request of a United States Governmental Entity for information, documentation, or data relating to any Contract that Buyer

has entered into with Sellers. Buyer shall provide responses to requests from a United States Government Entity for information, documentation, or data of any kind to such entity promptly upon request. Copies of the responses to a United States Governmental Entity shall be provided to Sellers promptly upon Sellers' request.

Sellers are relying upon the representations and warranties of Buyer that it shall fully comply with all United States foreign trade and export control laws and regulations including any prohibitions on the transfer or release of products or technology contrary to such Applicable Laws or regulations.

15.19 **Rules of Construction**. For purposes of this Agreement:

(a)     Unless the context otherwise requires, (i) "or" is not exclusive; (ii) an accounting term not otherwise defined has the meaning assigned to it in accordance with GAAP; (iii) words in the singular include the plural and words in the plural include the singular; (iv) words in the masculine include the feminine and words in the feminine include the masculine; (v) any date specified for any action that is not a Business Day shall be deemed to mean the first Business Day after such date; (vi) a reference to a Party includes its successors and permitted assigns; (vii) the word "includes" and its syntactical variants mean "includes, but is not limited to" and corresponding syntactical variants, and the rule *ejusdem generis* shall not be invoked to restrict or limit the scope of the general term or phrase followed or preceded by an enumeration of particular examples; (viii) the words "hereof," "herein," and "hereunder" and words of similar import shall refer to this Agreement as a whole and not to any particular provision of this Agreement; and (ix) any reference to dollars shall be a reference to U.S. dollars.

(b)     References in this Agreement to Articles, Parts, Sections, or other subdivisions are, unless otherwise specified, to corresponding Articles, Parts, Sections, or other subdivisions of this Agreement. Neither the captions to Articles, Parts, Sections, or other subdivisions of this Agreement nor the Table of Contents shall be deemed to be a part of this Agreement.

(c)     All Exhibits and Schedules to this Agreement are hereby incorporated by reference herein, form a part of this Agreement, and shall have the same force and effect as if actually set out in the body of this Agreement. All references to this Agreement shall include all Exhibits and Schedules, as well as all attachments incorporated herein. All references in this Agreement to Exhibits and Schedules refer to the Exhibits and Schedules to this Agreement, unless expressly provided otherwise.

(d)     In the event of a conflict between (i) the provisions of this Agreement and (ii) the provisions of any other document, the provisions of this Agreement shall control and prevail as between the Parties.

(e)     References herein to any agreement or other instrument shall, unless the context otherwise requires (or the definition thereof otherwise specifies), be references to the same as it may from time to time be changed, amended, modified, amended and restated, or extended.

The Parties have executed this Agreement on the date below their signatures, to be enforceable and binding as of the Execution Date.

Dated: _Aug 7_, 2009

PACIFIC ENERGY ALASKA OPERATING LLC

By: _____
Name: Darren Katic
Title: President

Dated: _Aug 7_, 2009

PACIFIC ENERGY ALASKA HOLDINGS, LLC

By: _____
Name: Darren Katic
Title: President

Dated: _Aug 9_, 2009

OCAR ENERGY LLC

By: _____
Name: Gregor C. Flavell
Title: Managing Director

Error! Unknown document property name.-Error! Unknown
document property name.-Error! Unknown document
property name.
Error! Unknown document property name. Error! Unknown
document property name. o08/07/09

-47-

**Exhibit A**
**to**
**Purchase and Sale Agreement**
*(Alaska Group 2)*

**LEASES COMPRISING THE ALASKA INTERESTS**

**TRADING BAY UNIT**

| | |
|---|---|
| Chevron (Unocal) | 53.2% |
| PEAO | 46.8% |

Interests:

Unitized portions only as described herein; Group 2 does not include acreage in the following leases that is not unitized in the Trading Bay Unit and not described below.

| Lease/Lessor | Original Lessee (interest delineated in description assigned to PEAO) | Lease Date | Property Description |
|---|---|---|---|
| State of Alaska ADL 18730 | Union Oil Company of California and The Ohio Oil Company | 10/1/1962 | Trading Bay Unit, Tract 11<br><br>As to a 46.80000% working interest in 2,880.00 acres, more or less, and described as follows:<br><br>T. 9 N., R. 13 W., Seward Meridian<br><br>Section 26:  W ½;<br>Section 27:  All;<br>Section 28:  All;<br>Section 33:  All;<br>Section 34:  All;<br><br>Which pertains to all depths excluding the Grayling Gas Sands Formation, as depicted in Exhibits "A" and "B", Trading Bay Unit Expansion, Revised October 15, 2002, Effective January 1, 2002. |
| State of Alaska ADL 18772 | The Atlantic Refining Company | 9/1/1962 | Trading Bay Unit, Tract 14<br><br>As to a 46.80000% working interest in 1,600.00 acres, more or less, and described as follows: |

| Lease/Lessor | Original Lessee (interest delineated in description assigned to PEAO) | Lease Date | Property Description |
|---|---|---|---|
| | | | T. 9 N., R. 13 W., Seward Meridian<br><br>Section 15: All;<br>Section 22: All;<br>Section 23: W ½;<br><br>Which pertains to all depths excluding the Grayling Gas Sands Formation, as depicted in Exhibits "A" and "B", Trading Bay Unit Expansion, Revised October 15, 2002, Effective January 1, 2002. |
| State of Alaska ADL 18729 | Union Oil Company of California and The Ohio Oil Company | 10/1/1962 | Trading Bay Unit, Tract 10<br><br>As to a 46.80000% working interest in 3,085.00 acres, more or less, and described as follows:<br><br>T. 8 N., R. 13 W., Seward Meridian<br><br>Section 5: All;<br>Section 6: All;<br>Section 7: All;<br>Section 8: All;<br>Section 18: All;<br><br>Which pertains to all depths excluding the Grayling Gas Sands Formation, as depicted in Exhibits "A" and "B", Trading Bay Unit Expansion, Revised October 15, 2002, Effective January 1, 2002. |
| State of Alaska ADL 18777 | The Atlantic Refining Company | 9/1/1962 | Trading Bay Unit, Tract 17<br><br>As to a 46.80000% working interest in 796.00 acres, more or less, and described as follows:<br><br>T. 9 N., R. 13 W., Seward Meridian<br><br>Section 18: SE ¼ ;<br>Section 19: All; |

| Lease/Lessor | Original Lessee (interest delineated in description assigned to PEAO) | Lease Date | Property Description |
|---|---|---|---|
| | | | Which pertains to all depths excluding the Grayling Gas Sands Formation, as depicted in Exhibits "A" and "B", Trading Bay Unit Expansion, Revised October 15, 2002, Effective January 1, 2002. |
| State of Alaska ADL 17594 | Union Oil Company of California and The Ohio Oil Company | 3/1/1962 | Trading Bay Unit, Tract 3<br><br>As to a 46.80000% working interest in 4,956.00 acres, more or less, and described as follows:<br><br>T. 9 N., R. 13 W., Seward Meridian<br><br>Section 16: All;<br>Section 17: S ½,<br>        NE ¼;<br>Section 20: All;<br>Section 21: All;<br>Section 29: All;<br>Section 30: All;<br>Section 31: All;<br>Section 32: All;<br><br>Which pertains to all depths excluding the Grayling Gas Sands Formation, as depicted in Exhibits "A" and "B", Trading Bay Unit Expansion, Revised October 15, 2002, Effective January 1, 2002. |
| State of Alaska ADL 17579 | Pan American Petroleum | 2/1/1962 | Trading Bay Unit, Tract 2<br><br>As to a 46.80000% working interest in 2,240.00 acres, more or less, and described as follows:<br><br>T. 8 N., R. 13 W., Seward Meridian<br><br>Section 4: All;<br>Section 9: W ½;<br>Section 16: NW ¼; |

| Lease/Lessor | Original Lessee (interest delineated in description assigned to PEAO) | Lease Date | Property Description |
|---|---|---|---|
| | | | Section 17: All; Section 20: N ½, SW ¼;<br><br>Which pertains to all depths excluding the Grayling Gas Sands Formation, as depicted in Exhibits "A" and "B", Trading Bay Unit Expansion, Revised October 15, 2002, Effective January 1, 2002. |
| State of Alaska ADL 21068 | Arco | 7/1/1963 | Trading Bay Unit, Tract 18<br><br>As to a 46.80000% working interest in 160.00 acres, more or less, and described as follows:<br><br>T. 9 R. 14 W., Seward Meridian,<br><br>Section 24: SE ¼;<br><br>Which pertains to all depths excluding the Grayling Gas Sands Formation, as depicted in Exhibits "A" and "B", Trading Bay Unit Expansion, Revised October 15, 2002, Effective January 1, 2002. |
| State of Alaska ADL 18716 | Lloyd Powers | 9/1/1962 | Trading Bay Unit, Tract 9<br><br>As to a 46.80000% working interest in 462.50 acres, more or less, and described as follows:<br><br>T. 8 N., R. 13 W., Seward Meridian<br><br>Section 19: N ½, SE ¼;<br><br>Which pertains to all depths excluding the Grayling Gas Sands Formation, as depicted in Exhibits "A" and "B", Trading Bay Unit Expansion, Revised October 15, 2002, Effective January 1, 2002. |

| Lease/Lessor | Original Lessee (interest delineated in description assigned to PEAO) | Lease Date | Property Description |
|---|---|---|---|
| State of Alaska ADL 17602 | Pan American Petroleum Corp. | 2/1/1962 | Trading Bay Unit, Tract 6

As to a 46.80000% working interest in 640.00 acres, more or less, and described as follows:

T. 8 N., R. 14 W., Seward Meridian

Section 1: E ½;
Section 12: E ½;

Which pertains to all depths excluding the Grayling Gas Sands Formation, as depicted in Exhibits "A" and "B", Trading Bay Unit Expansion, Revised October 15, 2002, Effective January 1, 2002. |
| State of Alaska ADL 18731 | Union Oil Company of California and The Ohio Oil Company | 10/1/1962 | Trading Bay Unit, Tract 12

As to a 46.80000% working interest in 560.00 acres, more or less, and described as follows:

T. 9 N., R. 13 W., Seward Meridian

Section 8:  S ½ SE ¼,
        NE ¼ SE ¼;
Section 9:  SE ¼ SE ¼,
        W ½ SW ¼;
Section 10: SW ¼ NE ¼,
        SE ¼ NW ¼,
        SW ¼,
        W ½ SE ¼;

Which pertains only to those depths that are included in the Hemlock Participating Area, as depicted in Exhibits "A" and "B", Trading Bay Unit Expansion, Revised October 15, 2002, Effective January 1, 2002. |

| Lease/Lessor | Original Lessee (interest delineated in description assigned to PEAO) | Lease Date | Property Description |
|---|---|---|---|
| State of Alaska ADL 18758 | Shell Oil Company | 9/1/1962 | Trading Bay Unit, Tract 13<br><br>As to a 46.80000% working interest in 480.00 acres, more or less, and described as follows:<br><br>T. 9 N., R. 14 W., Seward Meridian<br><br>Section 25: E ½;<br>Section 36: NE ¼;<br><br>Which pertains to all depths excluding the Grayling Gas Sands Formation, as depicted in Exhibits "A" and "B", Trading Bay Unit Expansion, Revised October 15, 2002, Effective January 1, 2002. Containing 560.00 acres, more or less. |

# TRADING BAY FIELD

PEAO has an interest in 3,840 gross developed acres in the single oil and gas lease (ADL-18731) that comprises the Trading Bay Field, 560 acres of which are committed to the Trading Bay Unit as Tract 12 in the Hemlock Participating Area in which it has a 46.8% Working Interest. The State of Alaska oil and gas lease, ADL-18731, producing wells and monopod platform located on the lease are operated by Chevron.

| Lease/Lessor | Original Lessee (interest delineated in description assigned to PEAO) | Lease Date | Property Description |
|---|---|---|---|
| State of Alaska ADL 18731 | Union Oil Company of California and The Ohio Oil Company | 10/1/1962 | Trading Bay Field<br><br>As to a 46.80000% working interest in 3,280.00 acres, more or less, for all depths excluding the Grayling Gas Sands Formation and as to a 50.00000% working interest in 3,280.00 acres, more or less, for the Grayling Gas Sands Formation, described as follows:<br><br>Section 3: All;<br>Section 4: All;<br>Section 5: All;<br>Section 8: N ½,<br>           SW ¼,<br>           NW ¼ SE ¼;<br>Section 9: N ½,<br>           E ½SW ¼,<br>           W ½SE ¼,<br>           NE ½SE ¼;<br>Section 10: N ½ N ½,<br>           SW ¼ NW ¼,<br>           SE ¼ NE ¼,<br>           E ½SE ¼.<br><br>As to a 46.80000% working interest in 560.00 acres, more or less, and described as follows:<br><br>T. 9 N., R. 13 W., Seward Meridian<br><br>Section 8: S ½ SE ¼,<br>           NE ¼ SE ¼;<br>Section 9: SE ¼ SE ¼, |

| Lease/Lessor | Original Lessee (interest delineated in description assigned to PEAO) | Lease Date | Property Description |
|---|---|---|---|
| | | | W ½ SW ¼; <br> Section 10: SW ¼ NE ¼, <br> SE ¼ NW ¼, <br> SW ¼, <br> W ½ SE ¼; <br><br> Which pertains to all other depths excluding the Hemlock Participating Area, as depicted in Exhibits "A" and "B", Trading Bay Unit Expansion, Revised October 15, 2002, Effective January 1, 2002. |

The Trading Bay Unit/Trading Bay Field leases are subject to certain operating agreements that contain lien provisions in favor of the unit operator.

Sellers' interest in the "Trading Bay Production Facility", including the surface Fee Interests, all related Easements, and all right, title and interest in and to all Tangible Assets located on or used or formerly used directly and exclusively in connection with the Trading Bay Production Facility less and except certain facilities at the Trading Bay Production Facility associated with Grayling Gas Sands gas production.

The non-unitized portions of the Trading Bay Unit leases with the exception of (less and except) the Trading Bay Field lease.

**LIENS AND TITLE DEFECTS**

Title Defects

1.      Each of the Leases is in good standing insofar as it covers the lands described in Exhibit A as being within each said lease or "segment" thereof.

2.      PEAO holds in each Lease (insofar as each lease covers the lands described in Exhibit A as being within each said lease or "segment" thereof) the undivided percentage working interest or overriding royalty interest that is described in Exhibit A as being held therein by PEAO.

Liens

Liens under the DIP Credit Facility and the Second Lien Credit Agreement; provided, however, that any liens pursuant to the DIP Credit Facility and the Second Lien Credit Agreement will be extinguished at Closing, and the Alaska Interests, the Stock and Properties shall be transferred to Buyer free and clear of any and all Liens, Claims, Liabilities, interests, other encumbrances and Title Defects relating to or in connection with the DIP Credit Facility and the Second Lien Credit Agreement.

**Preferential Right**

ADL 18731- the Trading Bay Field Lease - is subject to a Preferential Right in favor of Unocal pursuant to the Trading Bay Field Joint Operating Agreement by and between Union Oil Company of California and Marathon Oil Company Dated June 12, 1996.

**Exhibit B**
**to**
**Purchase and Sale Agreement**
*(Alaska Group 2)*

**CERTAIN CONTRACTS COMPRISING THE ALASKA INTERESTS**

11/25/02 Fuel Gas Supply Agreement between Unocal and Forest Oil Corporation.

Trading Bay Field Joint Operating Agreement by and between Union Oil Company of California and Marathon Oil Company Dated June 12, 1996.

Unocal/Forest Oil Alignment Agreement Trading Bay Field I Trading Bay Unit dated January 1, 2002.

Trading Bay Unit Operating Agreement by and between Union Oil Company of California and Marathon Oil Company et al, as amended, dated February 27, 1967.

Unit Agreement for the Development and Operation of the Trading Bay Unit Area, State of Alaska, as amended, dated February 6, 1967.

Asset Exchange Agreement, to be effective July 24, 2009, between PEAO and Union Oil Company of California, in their capacities as the working interest owners in the Oil working interest participating areas of the Trading Bay Unit and Union Oil Company of California and Marathon Oil Company, in their capacities as the working interest owners of the Grayling Gas Sands working interest participating area in the Trading Bay Unit, relative to Slot 10 in the B-1 Leg of the Steelhead Platform and the associated M-32RD Well to be Exchanged for Options on Two Gas Slots in the B-1 Leg of the Steelhead Platform.[1]

---

[1] Execution of the Asset Exchange Agreement is subject to certain conditions precedent.

Exhibit C
to
**Purchase and Sale Agreement**
*(Alaska Group 2)*

**FORM OF ASSIGNMENT AND BILL OF SALE**

RECORDING REQUESTED BY AND
WHEN RECORDED RETURN TO:

(Space Above This Line For Recorder's Use Only)

ASSIGNMENT AND BILL OF SALE

STATE OF CALIFORNIA    §

COUNTY OF [ORANGE]    §

This Assignment and Bill of Sale ("<u>Assignment</u>") is effective as of August 1, 2009, at 7:00 a.m. Pacific Time ("<u>Effective Time</u>"), and is from PACIFIC ENERGY ALASKA OPERATING LLC, a Delaware limited liability company, with an address of 111 West Ocean Boulevard, Suite 1240, Long Beach, California 90802 ("<u>PEAO</u>") to OCAR ENERGY LLC, a Delaware limited liability company, with an address of 3000-79 Wellington Street West, Ontario M5K 1N2 ("<u>Buyer</u>").

ARTICLE I
Definitions

Capitalized terms used herein, but not otherwise defined, shall have the respective meanings assigned to them in the Purchase and Sale Agreement, dated as of August 7, 2009, between PEAO and Buyer ("<u>Purchase Agreement</u>").

ARTICLE II
Grant

For One Hundred Dollars ($100.00) and other good and valuable consideration, the receipt and sufficiency of which PEAO acknowledges, PEAO hereby bargains, sells, assigns and conveys to Buyer, its successors and assigns, the Alaska Interests, subject to the terms of this Assignment, the Purchase Agreement, and each Contract and Lease, including the exhibits, schedules and attachments to each of the foregoing, and subject to any and all applicable instruments of record in the Official Records of [_____], and the DNR and the Regulatory Commission of Alaska, excluding, however, the Excluded Items.

TO HAVE AND TO HOLD the Alaska Interests from and after the Effective Time, subject to the exceptions, reservations and limitations set forth herein and in the Purchase Agreement, unto Buyer, its successors and assigns forever.

## ARTICLE III
### Acceptance and Assumption

Buyer accepts this Assignment and, except to the extent specifically excepted or reserved by PEAO, hereby assumes and agrees to perform all PEAO's obligations and liabilities under each of the Contracts and Leases comprising the Alaska Interests (including, without limitation, compliance with express and implied covenants and payment of costs, rentals, shut-in-payments, minimum royalties, and production royalties). Buyer's obligations under this Article III apply to all applicable agreements and instruments, whether recorded or not.

## ARTICLE IV
### Certain Representations and Covenants by Buyer

Section 1. Buyer represents that it has acquired the Alaska Interests for its own benefit and account and has not acquired the Alaska Interests with the intent of distributing fractional undivided interests in them or otherwise selling them in a manner that would be subject to regulation by federal or state securities laws.

Section 2. If Buyer sells, transfers, or otherwise disposes of the Alaska Interests or fractional undivided interests in them in the future, it will do so in compliance with Applicable Laws.

Section 3. Buyer will comply with all Applicable Laws applicable to Buyer's ownership or operation of the Alaska Interests.

Section 4. If any of the terms of any document affecting or comprising the Alaska Interests requires that a Third Party (including any Governmental Entity) concur with, consent to or approve any part of the assignment made by this Assignment, Buyer will obtain such concurrence, consent or approval at its sole cost, risk and expense.

## ARTICLE IV
### Other Provisions

Section 1. This Assignment is in all respects subject to the terms, conditions and provisions of the Purchase Agreement. The terms of this Assignment shall not expand, limit or modify any of the provisions of the Purchase Agreement, and to the extent of any conflict between this Assignment and the Purchase Agreement, the terms of the Purchase Agreement shall prevail in all instances. Nothing in this Assignment shall be deemed to amend or supersede the Purchase Agreement in any respect. The provisions of the Purchase Agreement are not intended to, and shall not be merged into, or waived by, this Assignment.

Section 2. The provisions of this Assignment are severable. If a court of competent jurisdiction finds any part of this Assignment to be void, invalid, or otherwise unenforceable, this

holding will not affect other portions that can be given effect without the invalid, void or otherwise unenforceable portion.

Section 3. All covenants and agreements in this Assignment bind and inure to the benefit of the respective successors and assigns of PEAO and Buyer, are covenants running with the land, and are effective as stated, whether or not the covenants and agreements are memorialized in other assignments and other conveyances executed and delivered by the parties and their respective successors and assigns from time to time.

Section 4. Recitation of or reference to any encumbrance, burden, defect, agreement or other instrument in this Assignment, or incorporated by reference into this Assignment, does not operate to ratify, confirm, revise, or reinstate the encumbrance, burden, defect, agreement or instrument if it has previously lapsed, expired or otherwise terminated. The inclusion of any reference to any encumbrance, burden, defect, agreement or instrument shall not operate to subject any such interest to any such encumbrance, burden, defect, agreement or other instrument except to the extent that such encumbrance, burden, defect, agreement or other instrument is valid and presently subsisting with respect to such interest; nor shall the reference to any such encumbrance, burden, defect, agreement or other instrument be deemed to constitute a recognition by the parties that any such encumbrance, burden, defect, agreement or other instrument is valid except to the extent that such encumbrance, burden, defect, agreement or other instrument is presently in force and effect.

Section 5. This Assignment and its performance will be construed in accordance with, and governed by, the internal laws of the State of California, without regard to the choice of law rules of any jurisdiction, including those of the State of California.

Section 6. The word "includes" and its syntactical variants mean "includes, but not limited to" and its corresponding syntactical variants. The rule of ejusdem generis may not be invoked to restrict or limit the scope of the general term or phrase followed or preceded by an enumeration of particular examples.

Section 7. All exhibits, schedules and attachments referenced in and attached to this Assignment are incorporated herein.

Section 8. This instrument may be executed in counterparts, all of which together will be considered one instrument. This Assignment may be recorded in the real property records of any county, and may be filed with the DNR, the Regulatory Commission of Alaska and any other federal, state or local governmental department or agency.

Section 9. All parties producing, purchasing or receiving any hydrocarbons produced from or attributable to the Alaska Interests, or having such, or proceeds therefrom in their possession for which they or others are accountable to Buyer by virtue of the provisions of this Assignment, are authorized and directed to treat and regard Buyer as the assignee and transferee of PEAO and entitled in PEAO's place and stead to receive such hydrocarbons and all proceeds therefrom; and such parties and each of them shall be fully protected in so treating and regarding Buyer, and shall be under no obligation to see to the application by Buyer of any such proceeds or payments received by it.

Section 10.    Separate assignments of the Alaska Interests may be executed on officially approved forms by PEAO to Buyer, in sufficient counterparts to satisfy Applicable Laws. Those assignments shall be deemed to contain all of the exceptions, reservations, warranties, rights, titles, powers and privileges set forth herein as fully as though they were set forth in each such assignment. The Alaska Interests conveyed by such separate assignments are the same as, and not in addition to, the Alaska Interests conveyed herein.

Section 11.    Any depth limitations, unit designations, unit tract descriptions, descriptions of undivided leasehold interests and well names contained in, or incorporated by reference into, this Assignment shall not be deemed to expand, limit or otherwise modify the interests being assigned and conveyed pursuant to this Assignment.

Section 12.    Some of the land descriptions contained in, or incorporated by reference into, this Assignment may refer only to a portion of the land covered by a particular lease. Reference is made to the land descriptions contained in the applicable recorded documents of title. To the extent that the land descriptions contained in, or incorporated by reference into, this Assignment are incomplete, incorrect or not legally sufficient, the land descriptions contained in the recorded documents of title are incorporated herein by this reference.

Section 13.    References in, or incorporated by reference into, this Assignment to instruments on file in the public records are made for all purposes. Unless provided otherwise, all recording references are to the official real property records of the county or counties in which the Alaska Interests are located and in which records such documents are or in the past have been customarily recorded, whether deed records, oil and gas records, oil and gas lease records, conveyance records or other records.

*[Signatures begin on next page]*

This Assignment and Bill of Sale is executed on the dates indicated below, but effective as of the Effective Time.

**PACIFIC ENERGY OPERATING LLC**     **OCAR ENERGY LLC**


By:_____     By:_____

Name:_____     Name:_____

Title:_____     Title:_____

Date:_____     Date:_____

State of California        )
County of _____     )


On _____, before me, _____,
                                (insert name and title of the officer)
Notary Public, personally appeared _____,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same
in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument
the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

    I certify under PENALTY OF PERJURY under the laws of the State of California that
the foregoing paragraph is true and correct.

    WITNESS my hand and official seal.


Signature_____          (Seal)


State of California        )
County of _____     )


On _____, before me, _____,
                                (insert name and title of the officer)
Notary Public, personally appeared _____,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same
in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument
the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

    I certify under PENALTY OF PERJURY under the laws of the State of California that
the foregoing paragraph is true and correct.

    WITNESS my hand and official seal.


Signature_____          (Seal)

**Exhibit D**
**to**
**Purchase and Sale Agreement**
*(Alaska Group 2)*

**FORM OF NON-FOREIGN AFFIDAVIT**

**Non-Foreign Affidavit**

Section 1445 of the Internal Revenue Code provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person. To inform the transferee that withholding of tax is not required upon disposition of a U.S. real property interest by Pacific Energy Alaska Operating LLC, a Delaware limited liability company ("PEAO"), PEAO hereby certifies the following:

1.      PEAO is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Internal Revenue Code and income tax regulations);

2.      PEAO 's U.S. taxpayer identification number is 20-5497021; and

3.      The address of PEAO's principal executive office is:

> 111 W. Ocean Boulevard, Suite 1240
> Long Beach, California 90802

The undersigned understands that this certification may be disclosed to the Internal Revenue Service by the transferee and that any false statement contained herein could be punished by fine, imprisonment, or both.

Under penalty of perjury, I declare that I have examined this affidavit and to the best of my knowledge and belief it is true, correct, and complete, and I further declare that I have authority to sign this document on behalf of PEAO.


Date: _____          _____

                                        Name:
                                        Title:

**Schedule 1**
**to**
**Purchase and Sale Agreement**
*(Alaska Group 2)*

**CERTAIN CONSENTS**

<u>**Contracts Requiring Consent to Assign Include Without Limitation**</u>:

- 11/25/02 Fuel Gas Supply Agreement between Unocal and Forest Oil Corporation.

# Schedule 2
## to
## Purchase and Sale Agreement
### *(Alaska Group 2)*

## PERMITTED ENCUMBRANCES

### Liens

| Date | Document No. | Document | Grantor/Debtor | Grantee/Secured |
|------|--------------|----------|----------------|-----------------|
| 01/26/1999 | 1999-005696-0 (Anchorage Recording District 3412/211) | Fixture Statement | Forcenergy | UNOCAL |
| 02/09/1999 | 1999-009338-0 (Anchorage Recording District 3421/269) | Assignment | Forcenergy Marathon Oil Company | Union Oil of California/UNOCAL |
| 03/15/2002 | 2002-017746-0 | Amendment (1999-005696-0) | Forcenergy Inc. Forest Oil Corporation | Union Oil Company of California UNOCAL |
| 04/02/2002 | 2002-021955-0 | Amendment | Forcenergy Inc. Forest Oil Corporation | Forest Oil Corporation |
| 02/11/1999 | 1999-009902-0 | Fixture Statement | Forcenergy Inc. | Union Oil Company of California UNOCAL Alaska Resources |
| 02/12/1999 | 1999-010098-0 | Fixture Statement | Forcenergy Inc. | Union Oil Company of California UNOCAL |
| 03/15/2002 | 2002-017741-0 | Notice of Lien (Anchorage Recording District 3412/421) | Forest Oil Corporation | Union Oil Company of California UNOCAL |
| 03/15/2002 | 2002-017742-0 | Notice of Lien | Forest Oil Corporation | Union Oil Company of California UNOCAL |
| 03/15/2002 | 2002-017743-0 | Fixture Statement | Forest Oil Corporation | Union Oil Company of California UNOCAL |
| 03/15/2002 | 2002-017744-0 | Fixture Statement | Forest Oil Corporation | Union Oil Company of California |

| | | | | UNOCAL |
|---|---|---|---|---|
| 05/03/04 | 2004-001961-0 (Homer Recording District) | Fixture Statement | Forest Oil Corporation Devon Energy Production Company, L.P. | ConocoPhillips Alaska Inc. |

(a) **There is a possible overriding royalty interest of Chevron U.S.A. Inc. in ADL 17602 and ADL 18758: As disclosed in footnotes 4 (on page 7) and 9 (on page 29) of that certain title opinion dated January 24, 1997 (effective as of December 12, 1996) prepared by the Alaska law firm of Delaney, Wiles et al. and provided to PEAO by Forest Oil Corporation, Chevron U.S.A. Inc. reserved out of that certain assignment dated December 17, 1986, to Amoco Production Company of an undivided percentage working interest in ADL 17602) an overriding royalty interest purportedly equal to "5% of 100% of all oil, gas, or other hydrocarbon substances produced from ADL 17602,..."**

In the Post-Closing Limited title Opinion of Joseph J. Perkins, Jr., of the Guess & Rudd law firm, dated December 27, 2006, Mr. Perkins states that his examination of the DNR records for the Leases "disclosed that an identical reservation was made out of a similar assignment of an undivided percentage working interest in ADL 18758." This identical reservation was not identified or discussed in that certain title opinion dated January 24, 1997 prepared nu the Alaska law firm of Delaney, Wiles et al.,

Mr. Perkins continues: "the DNR computer records for these two leases do not disclose the existence of these possible overriding royalty interests. Moreover, as was the case in 1997 when Delaney, Wiles et al. delivered its title opinion on said leases, it is not possible to establish from any documents on file with DNR whether these overriding royalty interests later were transferred or merged back into the undivided percentage working interest which they burdened." Perkins Opinion at pp. 3-4.

(b) **Sellers have recently learned that Union Oil Company of California ("Union") is claiming that PEAO is responsible for 46.8% of an overriding royalty interest in favor of Reva Co. purportedly for the period from April 2006 production up through current production. Union informs Sellers that Reva Co. is owed approximately $78,000.**

Reva Co.'s interest is derived from the sale effective 8/1/1963 of the Powers family's interests in old Alaska State Lease #18716, to ARCO subject to a production payment for $750 an acre on 3,132 acres for a total production payment due to Reva Co. successor in the amount of $2,340,750 to be paid out of 3% of net sales. Union informs Sellers that it has reviewed its files which show the assignment of the #18716 to Richfield Oil Corporation reserving overriding royalty outlined on Exhibit A of that document which refers to the production payment for $750 an acre on 3,132 acres for a total production payment. The interest was transferred to Reva Co. in 1998.

Union and PEAO are actively involved in resolving the issue of who is responsible to pay Reva Co the unpaid 46.8%. Union has indicated that it is Union's understanding that Unocal used to be responsible for 100% of the ORRI. Then Union became operator and initially paid 100% of the ORRI. However, now Union is claiming Union is only responsible for 53.2% of the overriding royalty interest to Reva Co.

## ALLOCATED VALUE

| Property | Allocated Value ($ in thousands) | |
|---|---|---|
| Platform Dolly Varden | $ | 18,417 |
| Platform Grayling | | 580 |
| Platform King Salmon | | 11.501 |
| Platform Steelhead | | 7,638 |
| Platform Monopod | | 5,455 |
| Trading Bay Production Facility | | TBD[1] |
| Pipelines | | TBD |
| | $ | 43,592 |

---

[1]  Allocated values for the production facility and pipelines are to be agreed at Closing. At that time a reallocation of values between all properties will also be required.

**Schedule 4**
**to**
**Purchase and Sale Agreement**
*(Alaska Group 2)*

**Cure Amounts to be Paid by Buyer at Closing**

Union Oil Company of California: $43,592,117.16 as of June 30, 2009. The indebtedness to Union Oil Company of California continues to accrue on a daily basis. For determination of the final Cure Amount to be paid at Closing, Buyer shall contact Union Oil Company of California to obtain the final Cure Amount. Union Oil Company of California cure amount shall satisfy the assumption of the following agreements, all as may be amended:

- Trading Bay Field Joint Operating Agreement by and between Union Oil Company of California and Marathon Oil Company Dated June 12, 1996.

- Unocal/Forest Oil Alignment Agreement Trading Bay Field I Trading Bay Unit dated January 1, 2002.

- Trading Bay Unit Operating Agreement by and between Union Oil Company of California and Marathon Oil Company et al, as amended, dated February 27, 1967.

- Unit Agreement for the Development and Operation of the Trading Bay Unit Area, State of Alaska, as amended, dated February 6, 1967.

- 11/25/02 Fuel Gas Supply Agreement between Unocal and Forest Oil Corporation