**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: ) | |
| ) | Chapter 11 |
| PACIFIC ENERGY RESOURCES, LTD., ) | |
| *et al.,* ) | Case No. 09-10785 (KJC) |
| ) | |
| Debtors. ) | Jointly Administered |
| ) | |
| ) | |
| ) | Related Docket No. 455 |

**HEARING MEMORANDUM AND SUPPLEMENTAL OBJECTION OF UNION OIL COMPANY OF CALIFORNIA IN OPPOSITION TO THE SCOPE OF THE ALTERNATIVE MOTION OF PACIFIC ENERGY ALASKA OPERATING LLC FOR AN ORDER AUTHORIZING ABANDONMENT OF INTERESTS IN OIL AND GAS PROPERTIES AT TRADING BAY, ALASKA AND FOR REJECTION OF EXECUTORY CONTRACTS RELATING THERETO**

Union Oil Company of California ("**Union**"), by its undersigned counsel, hereby objects (the "**Objection**") to Pacific Energy Alaska Operating LLC's ("**PEAO**," and together with its affiliated debtor entities, the "**Debtors**") Alternative Motion for an Order Authorizing Abandonment of Interests in Oil and Gas Properties at Trading Bay, Alaska and Rejection of Executory Contracts Relating Thereto (the "**Abandonment Motion**") (Docket No. 455). By virtue of a combination of abandonment and rejection, PEAO is attempting improperly to unwind a series of transactions and interrelated agreements in a manner both unprecedented and in violation of the Code and applicable Alaska law. In support of its Objection, Union respectfully states as follows:

**PRELIMINARY STATEMENT**

Hidden beneath the surface of PEAO's motion to abandon property and reject executory contracts is an ulterior motive that contravenes the principles of the Bankruptcy Code, as well as the underlying agreements, fair play, and common sense. PEAO correctly notes that the decision

to abandon valueless property and reject executory contracts is left to a debtor's sound business judgment. Conspicuously, however, PEAO does not indicate the true result of granting the Motion in the form it proposes. The agreements that it attempts to reject and the property it seeks to abandon are only the burdensome portions of inextricably intertwined agreements that comprise one single contractual arrangement. The Bankruptcy Code does not permit this result; rather, a debtor in possession must assume an integrated agreement as a whole, not cherry pick only those pieces that suit its purpose.

Just as PEAO seeks to misapply the fundamental principles of contract rejection, its plan reveals a willingness to ignore contract assignment principles as well. The logical presumption of PEAO's assuming only a few pieces of the entire contractual arrangement is that it plans to assign what it deems to be the favorable portions to someone else. However, consistent with applicable nonbankruptcy law, the agreements governing the oil fields contemplate obligations personal to PEAO. Consequently, they may not be assumed or assigned without Union's consent.

This Court should not permit PEAO to use the complexity of the contractual arrangements at issue as a smokescreen. Despite their complexity and the fact that these interrelated obligations are contained in various documents, the agreements are self-referential and integrated. No one agreement can exist without the others. As such, they should be considered one contract for abandonment and assumption or rejection purposes. Union therefore objects to the scope of the Abandonment Motion to the extent PEAO seeks to retain pieces of the overall properties and contractual arrangements governing the oil fields in question which are integral to those it seeks to abandon or reject.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Oil and Gas Leases and Affiliated Agreements

1. PEAO is party to contractual agreements related to the development and management of: (i) the Trading Bay Unit ("**TBU**"), an off-shore oil and gas field located in Cook Inlet, near Anchorage, Alaska; and (ii) the Trading Bay Production Facility ("**TBPF**"), a series of buildings and other infrastructure designed provide access and services to the TBU. TBU includes eleven unitized,[1] off-shore oil and gas leases with the state of Alaska as lessor.[2] TBPF is an on-shore facility which collects and houses production from the TBU. It includes oil gathering pipelines, an air strip, a barge landing, and a road system.[3] The TBPF allows oil to be processed and pumped to a terminal where it can be loaded onto tankers for transport and sale. The TBPF was originally constructed for the benefit of the TBU by its working interest holders.[4] Without the TBPF, there would be no way to bring oil produced in the TBU to shore and then to market. Each of the various components of the relationship between Union and PEAO with regard to the oil fields and the TBPF is governed by one or more documents that regulate the interests of the parties and management of the operations.

2. The TBU has been leased continuously from the State of Alaska since in 1962. Through a series of historic acquisitions and assignments, Union currently holds a 53.2% working interest in the TBU leases, and PEAO holds the remaining 46.8%. PEAO's predecessor

---

[1] Unitization is a process by which parties to mineral leases integrate their interests to provide for the unitized management, development, and operation of such leases to prevent, or to assist in preventing waste, to insure a greater ultimate recovery of minerals, and to protect the correlative rights of persons owning interests in the tracts of land affected.

[2] The eleven leases comprising TBU are State of Alaska Competitive Oil and Gas Leases ADL 17579, ADL 17594, ADL 17602, ADL 18716, ADL 18729, ADL 18730, ADL 18758, ADL 18772, ADL 18777, and ADL 21608.

[3] The leases underlying the TBPF are ADL 32299, ADL 37596, and ADL 32549.

[4] Use of the TBPF has subsequently been extended to working interest holders in Trading Bay Field, currently held by Union and PEAO in the same proportions as their interests in the TBU and TBPF. PEAO proposes to abandon the TBF and reject the related contracts in their entirety. Therefore, the TBF is not at issue in this Objection.

701687197v12

company, Forest Alaska Operating, LLC ("**FAO**"), acquired its interests in the TBU and TBPF in a single transaction shortly before Pacific Energy Resources, Ltd. purchased FAO and changed the company's name to Pacific Energy Alaska Operating LLC. Their working interests give Union and PEAO the right to extract oil and gas from the TBU. Finally, through the various assignments, PEAO is also party to the agreements that govern the relationship of the TBU lessees. Union is the operator of the TBU.

3. In addition to the mineral leases, the relationship between Union and PEAO is governed by the following agreements:

- *Unit Agreement for the Development and Operation of the Trading Bay Unit Area State of Alaska* dated February 6, 1967 between Union Oil of California, as Operator, and Standard Oil Company of California, et al., as non-Operators, as amended and including all Ratifications and Joinders (the "**Unit Agreement**")

- *Unit Operating Agreement - Trading Bay Unit,* dated August 25, 1967, between Union Oil Company of California, as Operator, and Marathon Oil Company, et al., as non-Operators, as amended and supplemented (the "**TBUOA**")

- *Unocal/Forest Oil Alignment Agreement, Trading Bay Field/Trading Bay Unit* dated as of January 1, 2002, between Union Oil Company of California and Forest Oil Corporation (the "**Alignment Agreement**")

- *Trading Bay Facilities Agreement* between Union and Forest Oil Company dated May 1, 2002; *and* Amendment No. 1 to Trading Bay Facilities Agreement dated effective April 16, 2007 (the "**Facilities Agreement**")

- *Fuel Gas Supply Agreement*, dated November 25, 2002, between Union Oil of California, as Operator of the Trading Bay Unit, Trading Bay Field, and Trading Bay Production Facility and Forest Oil Corporation

4. These agreements form an integrated, self-referential set of contractual rights and obligations that govern the entirety of the TBU. The TBPF is part of the TBU.[5] By virtue of the

---

[5] Indeed, the costs of operating and maintaining the TBPF are and have historically been billed to working interest owners in the regular joint interest billings ("**JIBs**") issued by the operating interest owner.

covenants contained in each agreement, particularly the TBUOA and the Alignment Agreement, no one part may be severed from its corresponding agreements. The Unit Agreement, for instance, serves to unite the oil and gas leases of the TBU in order to prevent waste and preserve resources and is inextricably intertwined with the underlying oil and gas leases. Unit Agreement at p. 1 and ¶ 18. The parties to the Unit Agreement are defined as "the owners of working, royalty, or other oil and gas interests" in the TBU. *Id.* The Unit Agreement modifies and amends the leases themselves, and its terms are covenants running with the land recorded pursuant to local law and thereby made binding upon all successors and assigns. Unit Agreement ¶¶ 18-19. To be a party to the Unit Agreement, one must also be a party to the TBUOA. Unit Agreement ¶ 28.

5.      The TBUOA governs the day-to-day operations of and the allocation of rights and duties within TBU. Costs, production, and property are all apportioned within a working interest participating area ("**WIPA**") according to a working interest holder's basic participating interest ("**BPI**"). TBUOA art. 10.2. A party's BPI is equal to its working interest in a WIPA. TBUOA art. 3.3. Currently, Union has a 53.2% BPI and PEAO has a 46.8% BPI. Pursuant to the TBUOA, offshore drilling platforms, pipelines, and the TBPF were constructed by the unit to support unit operations. TBUOA arts. 16.1, 7.2.

6.      The pipelines, and other facilities that comprise the TBPF are restricted to use for TBU purposes only, except by agreement of the working interest owners. TBUOA art. 5.3D. The terms of the TBUOA are covenants running with the land. TBUOA art. 31.4. The TBUOA was recorded January 26, 1999 in the real property records of the Anchorage Recording District at Book 3214 Page 1 and also recorded in the fixture filing records of the Anchorage Recording District, at Book 3214 page 421 on January 26, 1999.

7.  The Alignment Agreement defines the parties' working interests relative to the TBU. The provisions of the Alignment Agreement are covenants running with the lands. Alignment Agreement art. 9.8. The assignments of interests reflected in the Alignment Agreement were approved by the State of Alaska and recorded in the real property records of the Anchorage Recording District on June 26, 2002.

8.  The Facilities Agreement allows PEAO to use an airstrip, barge landing, and road system adjacent to the TBPF for non-TBU purposes. Facilities Agreement recitals A, B. The Facilities Agreement is not assignable. Facilities Agreement ¶ 11(c).

The Bankruptcy Case

9.  On March 9, 2009 (the "**Petition Date**"), the Debtors filed voluntary petitions for bankruptcy protection under chapter 11 in this Court.

10. Since early April 2009, the Debtors have actively been soliciting bids for their assets. Abandonment Motion ¶ 4.

11. On June 16, 2009, the Debtors filed their Motion for an Order: (a) Approving Procedures for Sale of the Debtors' Alaska Assets; (b) Scheduling Auction and Hearing to Consider Approval of Sale; (c) Approving Notice of Respective Dates, Times, and Places for Auction and for Hearing on Approval of (i) Sale and (ii) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (d) Approving Forms of Notice; and (e) Granting Related Relief (Docket No. 453).

12. On the same date, PEAO filed its Abandonment Motion. Exhibit A to the Abandonment Motion lists the TBU assets PEAO intends to abandon or reject. Conspicuously absent from Exhibit A are the Unit Agreement, the Facilities Agreement, non-unitized portions

of PEAO's Trading Bay leases, and certain TBPF rights.[6]  PEAO has requested that the Court approve this incomplete and improper rejection despite the fact that the various agreements cannot function independently, either practically or by their own terms.

## ARGUMENT

### The Proposed Rejection and Abandonment Violates 11 U.S.C. § 365

13.    The practical effect of granting the Motion will be to allow PEAO to reject only the burdensome portions of an integrated contractual arrangement while retaining only the most beneficial portions.  This is a result that the Bankruptcy Code does not permit.  PEAO is correct in its assertion that Section 365 generally permits a debtor-in-possession, subject to court approval, to reject an executory contract.  *See* 11 U.S.C. § 365.  Additionally, Section 554(a) provides that "[a]fter notice and a hearing, the trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate."  11 U.S.C. § 554(a).  However, the combination abandonment/rejection procedure PEAO proposes is simply a means to eliminate all responsibility for involvement in an oil field development agreement while improperly retaining certain unit property to leverage value out of other non-unit assets owned by the Debtors.  Though the Bankruptcy Code does allow a trustee to abandon property and reject contracts, it does *not* allow a debtor to cherry pick favorable portions of an integrated agreement while rejecting or abandoning the rest.  Additionally, abandonment does not release, discharge or void existing covenants running with the land.  Consequently, the scope of the Abandonment Motion violates the Bankruptcy Code.

---

[6]  At the deposition of James Arlington, PEAO's Rule 30(b)(6) witness, held this afternoon (Eastern time), PEAO informed Union that they were now going to reject the Unit Agreement and the Alignment Agreement. Since this statement has not yet been translated into action, we address the Debtors' current litigation position with respect to these agreements in this Memorandum. However, even if these two agreements are later rejected, PEAO still may not retain a fee ownership interest in the TBPF, or the benefits of the Facilities Agreement or the non-unitized portions of the mineral leases for the reasons set forth in paragraphs 18-37, *infra.*

701687197v12

A.      <u>PEAO May Not Reject or Abandon Only Portions of an Integrated Contractual Arrangement</u>

14. Through the Abandonment Motion, PEAO seeks to rid itself of most of its TBU interests. However, it seeks to maintain: (i) the Unit Agreement and the Facilities Agreement; (ii) non-unitized portions of its TBU leases; and (iii) fee interests, surface rights, or easements associated with the TBPF. As described in paragraphs 4-8 above, each of these items is part of a larger, interrelated whole that must be assumed or rejected *in toto*.

15. The Bankruptcy Code simply does not permit a debtor to assume the benefits of a contract while rejecting only its burdens; a debtor must either assume or reject a contract *cum onere*. *See In re Fleming Cos.*, 499 F.3d 300, 308 (3d Cir. 2007) ("The debtor may not blow hot and cold. If he accepts the contract he must adopt the burdens. He cannot accept one and reject the other.") (quoting *In re Italian Cook Oil Corp.*, 190 F.2d 994, 997 (3d Cir. 1951)); *Schlumberger Res. Mgmt. Servs. v. CellNet Data Sys., Inc.*, *(In re CellNet Data Sys., Inc.)*, 327 F.3d 242, 249 (3d Cir. 2003) ("Under the Bankruptcy Code, a trustee may elect to reject or assume its obligations under an executory contract. This election is an all-or-nothing proposition—either the whole contract is assumed or the entire contract is rejected.").

16. The question of whether specific portions of a contract are severable is a matter of state law and the intentions of the parties. *See In re Buffets Holdings, Inc.*, 387 B.R. 115, 120 (Bankr. D. Del. 2008) ("The determination of whether a specific contract or lease is an indivisible agreement or is several agreements in one is a question of state law."). In this case, state law and the language of the agreements indicate beyond any doubt that they are meant to be construed as one interrelated, non-severable contract. Alaska oil and gas law provides that parties to oil and gas leases "may validly integrate their interests to provide for the unitized management, development, and operation of such tracts of land as a unit." ALASKA STAT. §

31.05.110 (2009).  This is exactly what has occurred here, as demonstrated by the self-referential and interrelated terms of the various agreements.

17. The Unit Agreement, which PEAO does not seek to reject, requires that all successors and assigns to the Unit Agreement take the Unit Agreement with all the appurtenant obligations, including the leases.  Unit Agreement ¶ 19.  In fact, the very first Whereas clause defines the parties to the Unit Agreement as "owners of working, royalty, or other oil and gas interests" in the TBU.  Unit Agreement p. 1.  It further requires that any party with a working interest subject to the Unit Agreement become a party to the TBUOA.  Unit Agreement ¶ 28.  Therefore, if PEAO rejects its unitized leases and the TBUOA, it is not only in breach of the Unit Agreement by virtue of rejecting the TBUOA, it has ceased to be a party to the Unit Agreement by virtue of no longer having a working interest in the unit.

18. Additionally, any rights in the TBPF are an incident of working interest ownership in the TBU and may not be retained by a non-working interest holder.  The TBUOA provides:

> All materials, equipment and other property, whether real or personal, the cost of which is chargeable as Costs and which are acquired in connection with the development and operation of that WIPA, or the proceeds from the sale thereof, shall be owned by the Parties in that WIPA upon the basis of their respective total BPI within that WIPA.

TBUOA art. 10.2(c).  Thus, so long as PEAO has a BPI in a WIPA, it also has a corresponding ownership interest in the TBPF.  Once that BPI no longer exists, PEAO no longer has an interest in the TBPF.  Further, the Alignment Agreement treats the TBPF as a unit asset and aligns working interest holders' interests therein accordingly.  Quite apart from this, even if the estate were to retain any interest in the TBPF, it would be of no value to the estate, as without a vote of 85% of the working interests, the TBPF may not be used for non-TBU purposes.  TBUOA arts. 16.3, 7.2, 5.3D.  The purpose of this requirement is to ensure that this critical piece of

9

infrastructure is available to the unit whenever needed and to prevent others from over-using or damaging the facility to the detriment of the unit.[7] As such, if PEAO rejects its TBU leases, all of its interests in the TBPF should be abandoned as burdensome or valueless to the estate.

19. Based on the foregoing, it is apparent that the various agreements must be interpreted together. Consequently, PEAO's attempt to abandon/reject only portions of the agreements must fail. PEAO either must retain its interest in the arrangement or abandon it entirely; the awkward and opportunistic middle ground that PEAO has chosen is impractical and in contravention of the Code.

B.  PEAO May Not Reject or Abandon Only Portions of the Leases

20. Similarly, the piecemeal rejection of the TBU leases, characterized as abandonment, serves merely to cloak PEAO's attempt to rid itself of the operating agreements which form an integral part of the field operations and the accompanying obligations, and cannot be countenanced. If the estate wishes to continue to hold these valuable leases, it must bear the costs.

21. The TBU leases are, in fact, executory contracts and each one must be assumed or rejected in its entirety.[8] *See, e.g.*, *In re J.H. Land & Cattle Co., Inc.*, 8 B.R. 237, 239 (Bankr. W.D. Okla. 1981) (holding that oil and gas leases could be properly assumed or rejected under section 365); *In re Texaco, Inc.*, 79 B.R. 560, 563 (Bankr. S.D.N.Y. 1987) (noting that under an earlier order in the case, "Texaco was permitted to assume in accordance with § 365, oil and gas leases and other executory contracts.").

---

[7] Indeed, the fact that TBPF costs are billed as JIBs and that the operating interest owner holds a lien for unpaid JIBs allows the operating interest owner to protect itself against misuse of the TBPF.

[8] *But see Terry Oilfield Supply Co., Inc. v. American Security Bank, N.A.*, 195 B.R. 66, 70 (S.D. Tex. 1996) ("A mineral lease in Texas…is not a lease or other form of executory contract that a debtor may accept or reject."); *In re Heston Oil Co.*, 69 B.R. 34, 36 (N.D. Okla. 1986) (holding that the lessors performance was substantially

22. Courts dealing with other agreements similar in nature to oil and gas leases also have treated them as executory. For example, in *In re Resource Technology Corp.*, 254 B.R. 215, 224-25 (Bankr. N.D. Ill. 2000), the court decided that an agreement which allowed a lessee the right to enter onto a landfill and conduct methane extraction operations in exchange for royalty payments to the landfill owner was an executory contract under the accepted Countryman definition. Indeed, these same leases were treated as executory in the bankruptcy of Forcenergy, Inc., a predecessor in interest to PEAO.

23. Therefore, because the leases are executory contracts and form an integral component of the overall contractual arrangement between Union and PEAO, the principles of Section 365 of the Bankruptcy Code forbid PEAO from assuming the Leases in part and rejecting them in part as the Abandonment Motion currently provides. PEAO must either assume the Leases *cum onere* or reject them completely.

24. Additionally, even if this court finds that the Leases are not "executory contracts" falling within the ambit of Section 365 of the Bankruptcy Code, the Leases are covenants running with the land that may not be rejected. Courts addressing the issue routinely find that where covenants running with the land are properly construed as property interests, they may not be rejected. *See In re Fleishman*, 138 B.R. 641, 645-46 (Bankr. D. Mass. 1992) (distinguishing between executory contracts and covenants that run with the land); *In re 523 East Fifth Housing Preservation Dev. Fund Corp.*, 79 B.R. 568, 575 n.3 (Bankr. S.D.N.Y. 1987) (stating that the legislative history of Section 365 would not permit rejection of a covenant contained in the deed conveying property from a city to the debtor); *see also Kent's Run P'Ship, Ltd. v. Glosser*, 323

---

complete and that leases were therefore not executory). There do not appear to be any published cases interpreting whether mineral leases with multiple lessors are executory.

11

B.R. 408 (W.D. Pa. 2005) (distinguishing between vested interests in real property and executory contracts).

C.  Rejecting or Abandoning Only Portions of the Leases Would Leave No Mineral Interest in the Estate

25. If the Court allows a partial rejection or abandonment, non-unitized portions of the leases would be of no value to the estate. Consequently, they must be abandoned as well. Each of the TBU leases (each, a "**Lease**") was entered into in 1962 or 1963. Alaska oil and gas leases only last for a period of five years unless oil or gas is produced on the property in paying quantities or certain enumerated exceptions apply. The exceptions to oil and gas being produced in paying quantities under each Lease include: (i) extension by suspension of operations; (ii) extension by unit production; (iii) extension by drilling; (iv) extension by shut-in production; and (v) extension by suspension of production. State of Alaska Competitive Oil and Gas Lease ¶¶ 4-8. None of these exceptions would apply to extend the Leases. Consequently, a partial rejection or abandonment would result in their termination and leave no leased mineral interest in the estate.

26. Extension by suspension of operations only applies if, prior to the expiration of the primary term, the lessor suspends operations in the interest of conservation. Lease ¶ 4. The State of Alaska is the lessor, and it did not suspend operations on the non-unitized portions of the Leases for conservation purposes before 1968.

27. Extension by unit production applies so long as a Lease is subject to a unit agreement and there is a portion of production allocated to the land. Lease ¶ 5. If the lease is split into a unitized and non-unitized portion, this action would also not apply to prevent the non-unitized portion of the lease from lapsing by its terms.

701687197v12

28. Extension by drilling would not apply, as there must be production in paying quantities attributable to such land which ceases before the end of the primary term, and then drilling operations must commence within sixty days of the cessation of production. Lease ¶ 6. There was no such production on the non-unitized portions of these leases.

29. Extension by shut-in production does not apply, because that requires that on the land there be a shut-in well capable of producing in paying quantities. Lease ¶ 7. There are no such wells.

30. Finally, in order for there to be an extension by suspension of production, the State must order or consent to a suspension. Lease ¶ 8. Because there has been no production, there has been no such order or consent. Therefore, even if PEAO could split these leases into unitized and non-unitized portions, when it does so, the non-unitized portions will immediately end by their own terms. Because the Leases will terminate if split in the manner the Abandonment Motion contemplates, granting the Abandonment Motion as contemplated would leave valueless or burdensome assets in the estate.

D.   The Abandonment Motion as Contemplated Violates Covenants Running with the Land

31. By asking the Court to permit the contemplated simultaneous partial abandonment and rejection, PEAO is attempting to evade certain of its obligations in Trading Bay Unit in contravention of covenants running with the land. Specifically, the TBUOA states that "The provisions of this Agreement shall be covenants running with the lands, leases, and interests covered hereby, and shall be binding upon and inure to the benefit of the legal representatives, successors and assigns hereto." TBUOA art. 31.4. Among the covenants in the TBUOA is that "No well, platform, or production facility (including a pipeline) shall be used for other than [TBU purposes] without the approval of the Parties owning such well, platform, or production

facility, as provided in subsection 5.3D." TBUOA art. 16.3. PEAO seeks to maintain the Facilities Agreement. The Facilities Agreement allows PEAO to utilize the TBPF for certain non-TBU purposes, but only upon "[t]he affirmative vote of the Parties having eighty-five percent (85%) or more of the voting power as to any well, platform, or production facility." TBUOA art. 5.3D. When there are only two working interest owners, as is the case now, the vote of the owner with the greater BPI prevails. TBUOA art. 5.4. In order for another party to receive a similar authorization, a new vote would be necessary. To allow otherwise would be to hold that PEAO's rejection of the TBUOA eliminated the agreement and avoided its covenants running with the land. This result falls wholly outside the scope of Section 365.

32. Courts hold explicitly that the effect of rejection is not the elimination of the relationship between the parties or the voiding of the contract. *See*, *e.g.*, *Cinicola v. Scharffenberger*, 248 F.3d 110, 119 n.8 (3d Cir. 2001) (stating that certain contractual obligations survive the rejection and noting that "rejection does not affect the parties' substantive rights under the contract"); *In re Ground Round, Inc.*, 335 B.R. 253, 261 (B.A.P. 1st Cir. 2005) (stating that rejection "does not cause a contract to magically vanish" and that it does not affect the substantive rights under the contract); *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 687, 703 (Bankr. S.D.N.Y. 1992) (stating that rejection "does not embody the contract-vaporizing properties so commonly ascribed to it") (internal quotations omitted). It merely constitutes a breach as of the day before the petition date and allows all rights to flow therefrom against the debtor. Therefore, if PEAO retains the Facilities Agreement, it may not simply assign the agreement – that requires Union's agreement by virtue of TBUOA art. 5.4.

E.      PEAO May Not Assign the Facilities Agreement Without Consent

33. Implicit in PEAO's exclusion of the Facilities Agreement from its list of contracts to be rejected is that PEAO intends to assign such agreement. Even if it could assume this contract separate and apart from the rest of the contractual arrangements (which it cannot), nonbankruptcy law excuses Union from accepting performance from any party other than PEAO without consent.

34. Section 365(c) prohibits nonconsensual assignment of an agreement for which "applicable law excuses a party . . . to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession…"). 11 U.S.C. § 365 (2009). This provision has been interpreted to mean that where a contract is inherently personal such that applicable nonbankruptcy law prevents nonconsensual assignment, the debtor may not assign the agreement, even in a bankruptcy. *See, e.g., In re EBC I, Inc.*, 380 B.R. 348 (Bankr. D. Del. 2008) (preventing assignment of a contract that was not assignable under state law).

35. Though there is no reported Alaska case expressly adopting this rule, it is a matter of longstanding contract law that a counterparty may not assign "personal" contractual duties—those that either require a peculiar personal skill or qualification or that are premised upon a party's "special confidence" in the counterparty. *See* 29 Williston on Contracts § 74:29 contracts (4th ed. 2009) (describing contracts that may not be assigned because of "peculiar skill" involved); 6 Am. Jur. 2d *Assignments* § 28 (2009) (stating that contracts requiring a "special confidence" may not be assigned without consent); *see also In re EBC I, Inc.*, 380 B.R. 348, 363 (Bankr. D. Del. 2008) (recognizing that under applicable state law contract was not assignable since the identity of the contracting parties was "material to the ongoing performance of the contract").

701687197v12

36. The agreements at issue here impute "personal" obligations that, under nonbankruptcy law, may not be assigned without consent, as evidenced by the law governing such agreements as well as the circumstances specific to these particular agreements. First, Alaska state law prevents a party from entering an oil and gas lease without the specific, personal approval of the government, and that party must meet certain specific qualifications. *See* 11 ALASKA ADMIN. CODE § 82.200. Furthermore, Union structured and negotiated these agreements with specific qualifications in mind: the TBPF includes an airstrip, a barge landing, and roadways. Users of these facilities must be knowledgeable of and adhere to strict safety and licensing standards. Beyond this, PEAO is a working interest owner in the TBU, and as the operator, Union is better able to hold TBU working interest owners accountable for their actions and any damages than it would be a stranger to the unit. Taken together, these facts indicate that Union relied on the peculiar skills and a special confidence in its contract counterparty's ability to perform. Thus, to require Union to accept performance from an unknown third party would be inequitable and would violate basic principles of contract law, as set forth above. Consequently, these agreements may not be assigned without Union's consent as set forth in Section 365(c) of the Bankruptcy Code.

37. Additionally, in the Third Circuit, if applicable nonbankruptcy law prohibits a debtor from assigning a contract without consent, it similarly may not even *assume* that contract without the counterparty's consent. *See In re West Elecs. Inc*, 852 F.2d 79, 83 (3d Cir. 1988) (stating that if consent was necessary for an assignment, it would similarly be necessary for assumption); *In re Access Beyond Techs., Inc.*, 237 B.R. 32, 48 (Bankr. D. Del. 1999) (stating that, under the plain language of Section 365, because applicable law prohibited nonconsensual assignment, the debtor could not assume the executory contract). Consequently, because the

counterparty's obligations under the agreements with Union are inherently personal, the debtor may neither assume nor assign them without Union's consent.

38.     Because the Facilities Agreement may not be assigned, PEAO's apparent plan to assume and assign it is simply not viable.

## CONCLUSION

For the foregoing reasons, Union respectfully requests that this Court enter an order (i) conditioning the Abandonment Motion on PEAO's abandoning all TBU interests and rejecting all executory contracts related thereto; and (ii) granting such other and further relief as may be just and proper.

Dated: August 21, 2009
       Wilmington, Delaware                Respectfully submitted,

                                           By: /s/ *Carmella P. Keener*
                                           Norman M. Monhait (ID No. 1040)
                                           Carmella P. Keener (ID No. 2810)
                                           Rosenthal, Monhait & Goddess, P.A.
                                           919 North Market Street, Suite 1401
                                           P.O. Box 1070
                                           Wilmington, DE  19899-1070
                                           Telephone: (302) 656-4433
                                           Facsimile: (302) 658-7567
                                           nmonhait@rmgglaw.com

                                           and

                                           Richard L. Epling
                                           David A. Crichlow
                                           Roger Elder
                                           PILLSBURY WINTHROP SHAW PITTMAN LLP
                                           1540 Broadway
                                           New York, NY 10036
                                           Telephone: (212) 858-1000
                                           Facsimile: (212) 858-1500

                                           Counsel to Union Oil Company of California

701687197v12