UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | Chapter 11 |
| | Case No. 09-10785  (KJC) |
| PACIFIC ENERGY RESOURCES, LTD., *et al.*, | Jointly Administered<br>Rel. Docket No. 455 and 456 |
| Debtors. | Hrg. Date: September 1, 2009 at 1:00 p.m. (ET)<br>Obj. Due: August 27, 2009 at 12:00 p.m. (ET)<br>(By Agreement with the Debtors) |

**OBJECTION OF THE STATE OF ALASKA TO
THE DEBTORS' ABANDONMENT MOTIONS**

The State of Alaska (the "State"), by its co-counsel, Morrison & Foerster LLP and

Stevens & Lee P.C., submits this Objection (the "Objection") to the *Alternative Motion of the*

*Debtors For an Order Authorizing Abandonment of Certain Interests in Oil and Gas Properties*

*in Alaska (Excluding Trading Bay) and Rejection of Executory Contracts Relating Thereto* (the

"Operated Alaska Interests Abandonment Motion") and the *Alternative Motion of Pacific Energy*

*Alaska Operating LLC For an Order Authorizing Abandonment of Interests in Oil and Gas*

*Properties at Trading Bay, Alaska and Rejection of Executory Contracts Relating Thereto*  (the

"Trading Bay Abandonment Motion," and collectively, the "Abandonment Motions").  In

support of the Objection, the State respectfully represents and alleges the following:[1]

I.      **PRELIMINARY STATEMENT**

1.      The State objects to the Operated Alaska Interests Abandonment Motion to the

extent that the Debtors seek to abandon the Operated Alaska Interests (as defined below) without

---

[1] Capitalized terms not otherwise defined in this Objection shall retain the meanings ascribed to them in
the Abandonment Motions.

adequately decommissioning the properties in accordance with Alaska law or providing the State with sufficient funds to do so. These properties are subject to comprehensive clean-up and decommissioning activities pursuant to their respective leases and various Alaska laws and regulations. These decommissioning activities are far from complete, and there are substantial costs and liabilities associated with the clean-up that remains. In the face of such reckless abandonment, imminent and substantial harm will be posed to the public, and the State and its taxpayers will be obligated to bear the costs of protecting the public.

2.      The State also objects to the Trading Bay Abandonment Motion solely to the extent that the Bankruptcy Court's order includes an express statement in the nature of a disclaimer that the abandoned property is not being abandoned to Union Oil (operator of the Group 2 Assets) or to the Lenders. Once abandoned by the Debtors, property is no longer subject to the jurisdiction of the Bankruptcy Court. State law determines which party is responsible for property once it is abandoned, and the State respectfully submits that the Bankruptcy Court does not have the authority to reassign such responsibility. Further, an action has been filed in Alaska state court to determine the post-abandonment responsibilities of the parties involved.

## II.    BACKGROUND

3.      On March 9, 2009, the Debtors filed voluntary petitions for reorganization under Chapter 11 of the United States Bankruptcy Code. The Debtors' cases are being jointly administered. The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Debtors' cases.

4.      On June 16, 2009, the Debtors filed a *Motion for an Order (A) Approving Procedures for Sale of the Debtors' Alaska Assets; (B) Scheduling Auction and Hearing to Consider Approval of Sale; (C) Approving Notice of Respective Dates, Times, and Places for Auction and For Hearing on Approval of (I) Sale and (II) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (D) Approving Forms of Notice; and (E) Granting Related Relief* [Docket # 129] (the "Sale Procedures Motion"), seeking approval of procedures for a sale (or sales) of the Alaska Assets (described below), which are located in and near Cook Inlet, Alaska and include interests in the Trading Bay Unit, the Trading Bay Field, the West MacArthur River field, the Redoubt Shoal field, and various other locations. The Debtors did not have a "stalking horse" bidder for these sales.

5.      In the Sale Procedures Motion, the Debtors define the "Alaska Assets" by describing them in two categories. The "Group 1 Assets" include (a) PEAO's interests in leased oil and gas production assets located in Alaska (and related assets and contracts) that are operated by PERL (the "Operated Alaska Interests"), (b) PEAO's interests in leased gas production assets located in Alaska (and related assets and contracts) that are operated by Aurora Gas, LLC, and (c) PEAH's 50% of the issued and outstanding common stock of the Cook Inlet Pipe Line Company. The "Group 2 Assets" include PEAO's interests in leased oil and gas production assets located in Alaska (and related assets and contracts) that are operated by Union Oil (the "Non-Operated Alaska Interests").

6.      On June 16, 2009, the Debtors filed two alternative motions: (a) the Operated Alaska Interests Abandonment Motion [Docket # 456] and (b) the Trading Bay Abandonment Motion [Docket # 455]. The Group 1 Assets, which include the Operated Alaska Interests (operated by PERL and located in and near Cook Inlet), are subject to the Operated Alaska

3

ny-881739
08/27/09/SL1 944394v1/104861.00001

Interests Abandonment Motion. The Group 2 Assets, which include the Non-Operated Alaska Interests (operated by Union Oil and located in the Trading Bay Unit and the Trading Bay Field), are subject to the Trading Bay Abandonment Motion. By these Abandonment Motions, the Debtors seek to abandon their interests in oil and gas properties located in Alaska and reject certain related and identified executory contracts, solely to the extent that the Debtors are unable to effectuate a sale of any or all of their interests in those assets.

7.      Following a hearing on July 1, 2009, the Court entered an Order approving the Sale Procedures Motion, setting the Bid Deadline for July 13, 2009, the Auction for July 20, 2009, and the Sale Hearing for July 27, 2009.

8.      At the Auction on July 20, 2009, the Debtors selected Ammadon Ltd. and Catherwood Ltd. ("A&C") as the Successful Bidder for the Group 1 Assets. Subsequently, however, A&C decided not to go forward with the sale. New Alaska Energy, the backup bidder, was also unable to consummate the sale, and as a result, the Debtors are moving forward with the Operated Alaska Interests Abandonment Motion to abandon the Group 1 Assets.

9.      While there was no Qualified Bid for the Group 2 Assets at the Auction, the Debtors entered into a Purchase and Sale Agreement with Ocar Energy LLC ("Ocar") on August 7, 2009 for the Group 2 Assets. The Bankruptcy Court entered an order on August 18, 2009 approving the proposed sale to Ocar but conditioning its approval on the ability of Ocar to demonstrate satisfactory evidence of financial ability to close the sale by 5:00 p.m. (PT) on August 31, 2009. Accordingly, the Debtors will only move forward with the Trading Bay Abandonment Motion if Ocar is unable to secure financing.

ny-881739
08/27/09/SL1 944394v1/104861.00001

### III.   ARGUMENT

### Abandonment of the Operated Alaska Interests
### Will Cause Substantial Imminent Harm to the Public

10.    In <u>Midlantic National Bank v. New Jersey Dep't of Envir. Protection</u>, 474 U.S.

494 (1986), the Supreme Court of the United States held that a trustee may not abandon property

in contravention of a state statute or regulation that is reasonably designed to protect the public

health or safety from identifiable hazards.  In determining whether abandonment is proper, the

courts examine two factors: (a) whether the property constitutes an imminent threat to the health

and safety of the public, and (b) whether the estate has unencumbered assets.  <u>In re MCI, Inc.</u>,

151 B.R. 103 (E.D. Mich. 1992).  "If the estate has unencumbered assets, then 'the bankruptcy

court should require stricter compliance with state environmental law before abandonment is

permitted.'" <u>Id.</u> at 108, *quoting* <u>In re Better-Brite Plating, Inc.</u>, 105 Bankr. 912, 919 (Bankr. E.D.

Wis. 1989).  The Midlantic Court further noted that a court "does not have the power to

authorize an abandonment without formulating conditions that will adequately protect the

public's health and safety." <u>Midlantic</u>, 474 U.S. at 507.

11.    The State of Alaska has a complex and comprehensive regulatory framework to

protect Alaska's precious natural resources and the health and safety of its citizens.  The Alaska

Department of Natural Resources, Division of Oil and Gas ("<u>DNR DOG</u>") leases Alaska state

land for oil and gas exploration.  Each lease, which is subject to a rigorous analysis to ensure that

Alaska's interests are met, provides for certain decommissioning obligations.

12.    In addition to any decommissioning obligations that arise from a particular lease,

Alaska has developed a comprehensive administrative and regulatory framework to ensure that

the decommissioning of oil and gas facilities is consistent with Alaska's conservation, health and

5

safety interests. For instance, the Alaska Oil and Gas Conservation Commission ("AOGCC"), a quasi-judicial agency, has broad statutory authority to regulate certain decommissioning activities, and imposes decommissioning obligations on lessees, operators, working interest owners and other oil and gas interest owners (collectively, the "Alaska Regulations"). The Alaska Regulations also regulate the timing and requirements for when and how decommissioning must occur.

13.    The Operated Alaska Interests consist of wells, platforms, and other oil and gas production assets. The Alaska Regulations require operators and lessees to, *inter alia*, remove all materials, supplies, structures, and installations from the location, remove all loose debris from the location, fill and grade all pits or close them in another manner approved by the State as adequate to protect public health and safety, and generally leave the location in a clean and graded condition. See, e.g., 20 AAC 25.172 and 20 AAC 25.170. These requirements are designed to ensure that the health and safety of the environment and the general public are safeguarded. If the Operated Alaska Interests are not adequately decommissioned prior to abandonment, there is a substantial risk that the abandoned assets will pose an imminent threat to the health and safety of the public.

14.    In addition to decommissioning and dismantling the wells, platforms and other assets, the Debtors must "winterize" the wells, pipelines and other facilities prior to abandonment. The winterization process involves removing all of the water from the properties and freeze protecting the water disposal wells in order to protect against the freezing and cracking of the assets. If winterization is not completed, water on or inside the assets will freeze and likely lead to oil contamination of the ground or surrounding water.

ny-881739
08/27/09/SL1 944394v1/104861.00001

15.    In the Operated Alaska Interests Abandonment Motion, the Debtors indicated that
PERL intends to take (or has already taken) certain precautionary steps with respect to the
Abandoned Assets before the hearing, including, *inter alia*, coordinating with applicable
authorities and lessors to transition operations and appoint replacement operators, and
alternatively, "temporarily shutting-in properties where operations cannot be sustained and
collaborating with applicable authorities and lessors to transfer possession and control of such
assets in an orderly fashion." See Docket 456, ¶ 23.  The Debtors indicated that they could begin
the temporary shut-in process once a final decision is made to abandon the assets, and that the
process would take approximately two weeks to complete.  The State is not convinced, however,
that the efforts contemplated by the Debtors are sufficient to maintain the safety of the
surrounding environment.

### The State Should Receive Consideration from the Debtors to Cover the Costs of Abandonment

#### A.  *Costs of Abandonment*

16.    As noted by the Debtors in their Abandonment Motions, many of the Alaska
Assets have reached the end of their useful lives and are currently subject to substantial
decommissioning obligations.  The State believes that these decommissioning obligations could
cost at least $50 - $80 million with respect to certain properties operated by PERL that are no
longer producing and require decommissioning in the immediate term.

17.    In addition, there are several PERL-operated properties that have additional years
of potential productivity.  Any subsequent operator would need to invest a significant amount of
money in order to renovate the properties because the properties in their current state will not

7

profitably produce oil and gas. The full extent of any other environmental liabilities of the Operated Alaska Interests has not yet been calculated.

18.     In addition to the costly obligations associated with decommissioning the properties and remedying any environmental liabilities, some of the properties to be abandoned by the Debtors are capable of producing oil and gas and may be sold to another operator after the Debtors' abandonment. Upon abandonment, the State estimates that it will need to expend at least $1.3 million monthly to temporarily shut in or otherwise preserve these properties in working condition in order to facilitate a sale and prevent damage to the State's oil and gas resources. For example, the State will need to hire third party providers to ensure that the seals on the abandoned wells are intact and also hire third party providers to maintain the power for lights and equipment, including monitoring equipment, on the platforms and in the fields. Unless the properties are inspected, sealed as necessary and monitored, the environment will be at great risk.

19.     As noted above, the Debtors must also winterize the wells, pipelines and other facilities prior to abandonment to prevent water from freezing, which would likely result in oil seeping onto the ground or into the water. If the Debtors do not adequately winterize the properties before abandonment, the State will be forced to undertake this responsibility as well.

### B. Consideration Available to the State

20.     If the Debtors are not held responsible for the obligations described above, the Operated Alaska Interests will pose a threat of imminent and substantial harm to the public, and the State and its taxpayers will have to fund the costs of decommissioning the Debtors' properties and resolving any other environmental liabilities. These obligations belong with the Debtors, as operator and lessee of the Operated Alaska Interests.

8

21.    Because the Debtors will be unable to satisfy their decommissioning and environmental obligations prior to abandonment, the Bankruptcy Court should allow the State to (a) use the funds pledged to the State (in the form of bonds and an escrow account) in any manner the State deems appropriate with respect to the Debtors' abandoned properties, notwithstanding any limitation on the terms of the bonds and escrow, and (b) apply any royalty overpayments as necessary to cover the costs of decommissioning and other environmental liabilities, and (c) take any insurance proceeds (or any reimbursement of insurance premiums) from insurance policies designed to reimburse the Debtors for expenditures incurred in connection with environmental damages.  While the Debtors have pledged limited funds to the State to cover their decommissioning and environmental obligations associated with some of their assets, the amount pledged is dwarfed by the costs estimated above.

22.    As an example, the State conditioned its approval of PERL as operator of the Redoubt Unit upon PERL's posting of a bond in the amount of $12 million in favor of the State to cover the cost of decommissioning the Osprey Platform, which sits in the waters of Cook Inlet.  PERL proposed to meet this bonding obligation through a series of payments into an escrow account.  The State agreed to this arrangement, and in February 2008, the State and PERL entered into the Escrow Agreement for Abandonment Liabilities for the Redoubt Unit pursuant to which PERL agreed to pay $12 million into the escrow account by March 2010 in lieu of posting a bond adequate to fund the full dismantlement cost.  The escrow account specifically secures a portion of the Debtors' obligations to dismantle and remove the Osprey Platform.  PERL fell behind in its obligations under the agreement and only paid $6.6 million into the escrow account for the benefit of the State.  As of September 1, 2009, the Debtors will owe $1 million to the State on account of post-petition payment obligations.  In addition to the

9

money pledged under the escrow agreement, the State holds several bonds totaling $2,110,000

for the various properties leased and operated by PERL. The total amount PERL pledged to the

State is approximately $8,710,000.

23.    While the State is entitled to keep the pledged funds to cover the costs associated

with the Debtors' abandoned properties, the State requests the Bankruptcy Court's permission to

apply the funds in any manner the State deems appropriate with respect to all of the Debtors'

abandoned properties, notwithstanding any limitations on the terms of the pledged funds.

24.    In addition, the Debtors are responsible for making royalty payments to the State.

Earlier this year, the Debtors overpaid their royalty obligations. The State seeks the Bankruptcy

Court's permission to apply these overpayments as necessary to cover the costs of

decommissioning and other environmental liabilities.[2]

25.    The amounts pledged to the State are significantly short of the amount that will be

required to cover the substantial and necessary decommissioning and other expenses resulting

from the Debtors' abandonment. Accordingly, the State requests that the Bankruptcy Court

order the Debtors to provide additional consideration to cover the costs associated with the

abandoned properties for the purpose of safeguarding the health and safety of the environment

and the general public. As noted in the Midlantic case, the court must formulate conditions that

will adequately protect the public's health and safety prior to authorizing abandonment.

Midlantic, 474 U.S. at 507.

26.    Upon information and belief, PERL purchased three insurance policies (and paid

the premiums in full) to cover the costs of any environmental liabilities on the Operated Alaska

---

[2] The State would be able to setoff this amount based on damages that have been and will be incurred.

10

Interests. The State hereby requests that the Bankruptcy Court require the Debtors to assign their rights in those policies to the State (if the policies are assignable) so that the State will be able to use any proceeds to cover the environmental liability costs in the event of an environmental disaster. Alternatively, if the policies cannot be assigned, the State requests that any premium refund be remitted to the State to further cover the costs of necessary remediation and decommissioning.

27.    Further, to the extent that the Debtors have any other unencumbered assets, the Debtors should be obligated to use those assets to comply with state environmental law before abandonment is permitted.

### Abandonment to Union Oil and the Lenders

28.    The State objects to any language in the Bankruptcy Court's order that provides that the abandoned property is not being abandoned "to" Union Oil (operator of the Group 2 Assets) or to the Lenders.[3] State law determines which party is responsible for property once it is abandoned, and an action has been filed in state court in Anchorage, Alaska to resolve the issue of who has responsibility under state law for the dismantlement obligations associated with these properties.

29.    "Section 554 abandonment procedure is not intended to determine issues of ownership and possession of property." In re Manchester Heights Assocs., L.P., 165 B.R. 42, 45 (Bankr. W.D. Mo. 1994). Abandonment simply divests the debtor-in-possession or the trustee of possession of the property. After abandonment, the parties may use legal procedures available under state law to determine ownership and possession of the property. See In re Pilz Compact

---

[3] On August 12, 2009, Debtors' counsel informed the State that the parties had requested language in the order that expressly states that the abandoned property is not being abandoned "to" Union Oil or "to" the Lenders.

ny-881739
08/27/09/SL1 944394v1/104861.00001

Disc, Inc., 229 B.R. 630, 639-640 (Bankr. E.D. Pa. 1999) ("The determination of competing claims to the abandoned property must be made either by the state courts after abandonment, or by adversary proceeding procedure under Bankruptcy Rule 7001.") (citing 3 Norton Bankruptcy Law and Practice 2d, § 53.1, at 53-2 to 53-4 (1997) (footnotes omitted)).  The practical effect of abandonment "is to remove the asset entirely from the jurisdiction of the bankruptcy court."  In re Tarpley, 4 B.R. 145, 146-147 (Bankr. M.D. Tenn. 1980).  See also In re Grossinger's Assocs., 184 B.R. 429, 432 (Bankr. S.D.N.Y. 1995) (noting that abandonment "deprives the bankruptcy court of jurisdiction over that property").  To the extent that the State has state law rights against Union Oil (as operator of the Trading Bay properties) and the Lenders, nothing in the order authorizing the abandonment should impair (or enhance) those rights.

30.    Accordingly, the Bankruptcy Court's order should not address the effect of abandonment or subsequent ownership of the Debtors' interests in the abandoned property.

## IV.    CONCLUSION

31.    The State objects to the Operated Alaska Interests Abandonment Motion to the extent that the Debtors seek to abandon the Operated Alaska Interests without meeting the Alaska law requirements with respect to decommissioning and other environmental liabilities.  The State also objects to any language in the Bankruptcy Court's order that provides that the abandoned property is not being abandoned to Union Oil or to the Lenders.

**WHEREFORE,** the State requests that the Bankruptcy Court (a) compel the Debtors to abandon the properties in compliance with state law and provide funds and other consideration outlined herein to the State so that the State can protect the environment and the general public, and (b) refuse to enter any proposed order that provides that the abandoned property is not being

12

ny-881739
08/27/09/SL1 944394v1/104861.00001

abandoned to Union Oil or to the Lenders, and (c) grant such other and further relief as the Court

deems appropriate.

Dated: August 26, 2009

                                   Respectfully submitted,

                                   Lorenzo Marinuzzi
                                   Samantha Martin
                                   MORRISON & FOERSTER LLP
                                   1290 Avenue of the Americas
                                   New York, NY  10104
                                   Telephone: (212) 468-8000
                                   Facsimile: (212) 468-7900

                                   -and-

By: /s/ Joseph H. Huston, Jr.
                                   Joseph H. Huston, Jr. (No. 4035)
                                   STEVENS & LEE, P.C.
                                   1105 North Market Street, 7th Floor
                                   Wilmington, DE  19801
                                   Tel: (302) 425-3310
                                   Email: *jhh@stevenslee.com*

                                   *Counsel to the State of Alaska*

ny-881739
08/27/09/SL1 944394v1/104861.00001