IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PACIFIC ENERGY RESOURCES LTD., *et al.*, [1] | ) | Case No. 09-10785(KJC) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | **Related to Docket Nos. 456, 631, 633, 641,** |
| | ) | **642 and 793** |

**Hearing Date:  September 1, 2009 at 10:00 a.m. prevailing Eastern time**

## REPLY TO OBJECTIONS AND SUPPLEMENT TO *ALTERNATIVE* MOTION OF THE DEBTORS FOR AN ORDER AUTHORIZING ABANDONMENT OF CERTAIN INTERESTS IN OIL AND GAS PROPERTIES IN ALASKA (EXCLUDING TRADING BAY) AND REJECTION OF EXECUTORY CONTRACTS RELATING THERETO

The above-captioned debtors and debtors in possession (the "Debtors") hereby (a)

reply to the various objections filed to the *Alternative Motion of the Debtors for an Order*

*Authorizing Abandonment of Certain Interests in Oil and Gas Properties in Alaska (Excluding*

*Trading Bay) and Rejection of Executory Contracts Relating Thereto* (the "Motion"), and (b)

supplement the Motion as set forth herein.  By the Motion and in the absence of a sale, the

Debtors seek, pursuant to section 554 of title 11 of the United States Code (the "Bankruptcy

Code"), to abandon certain of their interests in oil and gas properties located in Alaska (outside

of an area commonly referred to as "Trading Bay"), and pursuant to section 365 of the

Bankruptcy Code, to reject certain identified executory contracts relating thereto (together, the

"Rejected Contracts").  A detailed description of the Debtors' interests in Alaska outside Trading

---

[1]    The Debtors in these cases, along with the last four digits of each of the Debtors' federal tax identification number, are:  Pacific Energy Resources Ltd. (3442); Petrocal Acquisition Corp. (6249); Pacific Energy Alaska Holdings, LLC (tax I.D. # not available); Carneros Acquisition Corp. (5866); Pacific Energy Alaska Operating LLC (7021); San Pedro Bay Pipeline Company (1234); Carneros Energy, Inc. (9487); and Gotland Oil, Inc. (5463).  The mailing address for all of the Debtors is 111 W. Ocean Boulevard, Suite 1240, Long Beach, CA 90802.

Bay that the Debtors seek to abandon, including the Rejected Contracts, are set forth in Exhibit A

to the Motion (together, the "Abandoned Assets").[2]  The Debtors request that abandonment of

the Abandoned Assets is effective *nunc pro tunc* to the petition date, except for one property

commonly referred to as the "Kustatan Production Facility" which the Debtors seek to abandon

effective September 30, 2009.  The Debtors are continuing their discussions with applicable

authorities and lessors in an effort to formulate a consensual abandonment order, but no

definitive agreement has been reached as yet.  The Debtors will promptly advise the Court if this

matter is resolved.

To be clear, the Motion was filed in the alternative and solely to the extent that

the Debtors are unable to effectuate a sale of some or all of the Abandoned Assets.  As of the

date of this filing, there is still a possibility that the Debtors will be able to sell these assets, but

no definitive sale agreement is currently in place or pending before the Court.  In support of this

reply and supplement, the Debtors respectfully state as follows:

### Preliminary Statement

1.      As stated in the Motion, the Abandoned Assets consist of 100% working

interests in certain oil and gas leases, several producing oil wells and associated equipment,

production facilities, and owned real property, and various oil and gas prospects in and around

Cook Inlet, Alaska (excluding the Debtors' interests in Trading Bay).  Pacific Energy Resources

Ltd. ("PERL") is the designated operator with respect to the producing properties included

within the Abandoned Assets.  There are also various exploration prospects included within the

---

[2]  Technically, the Abandoned Assets belong to Pacific Energy Alaska Operating LLC. Out of an abundance of
caution and in order to ensure that all interests in the Abandoned Assets are addressed by the Motion, the Debtors
filed the Motion jointly.

2

Abandoned Assets that have no operations and remain in their natural state. As to these properties, abandonment should be uncontroversial.

2.    Those Abandoned Assets that have ongoing operations have incurred, and continue to incur, significant losses and are unable to generate sufficient positive cash flow to sustain ongoing operations. The Debtors do not have the financial wherewithal or access to funding to continue to operate or maintain these Abandoned Assets. Assuming the hearing on the Motion goes forward, the Debtors also have not been able to reach agreement for the sale of the Abandoned Assets or any portion thereof on satisfactory terms.

3.    Recognizing the potential limitations on abandonment imposed by the United States Supreme Court decision in *Midlantic Nat'l Bank v. New Jersey Dept. of Environmental Protection*, 474 U.S. 494, 507 (1986), the Motion contemplated that the Debtors would be required to take certain precautionary steps to ensure that the contemplated abandonment of the operated Abandoned Assets would not:  (a) contravene laws designed to protect public health and safety, and (b) pose an imminent threat to the public's welfare. Notably, the test under *Midlantic* is conjunctive. Hence, any party objecting to the proposed abandonment bears the burden of proving *both* (a) a violation of laws designed to protect the public's welfare; *and* (b) a risk of imminent harm.

4.    The Debtors have focused their efforts on eliminating any "imminent harm" that could be associated with the proposed abandonment of the Abandoned Assets. The Debtors submit that they have clearly met this standard (and indeed have far exceeded it) by implementing an abandonment protocol, as described in the *Alaska Operated Asset*

3

*Abandonment Transition Overview* (specifically at pages 14-15, the "Abandonment Protocol")

and associated *Alaska Operated Abandonment Forecast* (the "Abandonment Budget"), both of

which were prepared by the Debtors and presented to affected authorities and lessors. The

Abandonment Protocol and Abandonment Budget are attached hereto as **Exhibit A** and **Exhibit**

**B**, respectively.

       5.     The Abandonment Protocol, which was developed by the Debtors' skilled

technical staff and will cost the estates nearly $800,000, has been implemented by the Debtors

and will be concluded by September 4, 2009 (except with respect to the Kustatan Production

Facility which will be completed on September 30, 2009). The Abandonment Protocol primarily

includes "winterizing" pipelines, maintaining offshore facilities in navigable condition, shutting-

in wells (by closing and locking wellhead valves), and evacuating storage tanks. The Debtors

believe that these steps eliminate any "imminent harm to the public's welfare" that could result

from the contemplated abandonment.

       6.     The Debtors also have gone above and beyond the minimal standard of

avoiding imminent harm by taking other remedial measures to smooth the transition of the

Abandoned Assets to new owners or operators, most significantly by communicating the

Debtors' intentions with respect to abandonment. The Debtors have provided detailed financial

information and projections about the Abandoned Assets to affected parties, and even proposed

operational alternatives that include transition services funded by the landowners. In addition,

the Debtors are willing to make available to applicable authorities and lessors existing cash

bonds and deposits associated with the Abandoned Assets totaling nearly $8.0 million (the

"Pledged Cash") to help defray certain potential costs that may be incurred as a result of

abandonment. A detailed description of the Pledged Cash is attached hereto as **Exhibit C**.

       7.     Five objections or responses have been filed to the Motion by the

following parties: (a) the State of Alaska; (b) Cook Inlet Region, Inc. ("CIRI"); (c) United States

of America, on behalf of the Department of Interior, through the Bureau of Land Management

("BLM"); (d) Salamatof Native Association, Inc. ("Salamatof"); and (e) Marathon Oil Company

("Marathon"). With the exception of Marathon, the objections generally take the position that

the Debtors should not be permitted to abandon the Abandoned Assets based on the *Midlantic*

exception to section 554 of the Bankruptcy Code, unless the Debtors decommission, or fund the

decommissioning of, the Abandoned Assets in accordance with applicable non-bankruptcy law

(this is a process that is estimated by the Debtors to take three to four years to complete at a cost

of $30 million to $60 million).[3] For the reasons set forth below and based upon the

Abandonment Protocol and other precautionary measures implemented by the estates, the

Debtors urge the Court to overrule these objections.

**Abandonment Protocol**

       8.     As an initial matter, it bears emphasis that the Debtors will have no access

to capital for purposes of the Abandoned Assets after September 4, 2009, unless an order

authorizing the abandonment of the Abandoned Assets is obtained by such date. Thereafter, the

Debtors anticipate having limited funding in place solely to allow the Debtors to satisfy accrued

---

[3]   The State of Alaska estimates that decommissioning obligations could total $50 million to $80 million, which is significantly more than even the Debtors' projections. *See* State of Alaska Objection at p. 7.

administrative expenses and to ship oil currently stored in tanks at the Kustatan Production

Facility (the Debtors seek to abandon this property effective September 30, 2009).

9.       Ultimately, whether abandonment is authorized or not, the practical reality

is that the Debtors have no funds to continue ordinary course operations in Alaska or to take any

additional precautionary measures with respect to the operated Abandoned Assets beyond those

set forth in the Abandonment Protocol.  Having said that, it must be emphasized that no

additional steps are required for the Debtors to satisfy the minimal threshold of avoiding

"imminent harm" under the *Midlantic* decision.  The Abandonment Protocol clearly meets (and

indeed far exceeds) this standard.

10.       The Abandonment Protocol is a complex process prepared by the Debtors'

skilled and experienced oil and gas team that will require nearly one month to complete (longer

for the Kustatan Production Facility) at a cost of nearly $800,000 through September 4, 2009.

The Abandonment Protocol primarily consists of flushing and protecting pipelines, maintaining

navigation lighting on offshore facilities, closing and locking wellhead valves, and evacuating

storage tanks.  Each of these procedures is addressed further below.

11.       Pipeline Abandonment.  By September 4, 2009, the Debtors will have

flushed all pipelines included within the Abandoned Assets.  This "winterizing" process is

necessary in order to prevent fluids within the pipelines from freezing and corroding, which

could increase the risk of  pipe rupture or leakage.  Although fully evacuating pipelines of all

liquids is not practical, the Debtors are adding stabilizing chemical agents and corrosion

inhibitors to their onshore crude oil pipelines, which will preserve their structural integrity.  The

6

Debtors are pressure cleaning offshore crude oil pipelines with the use of a tool called a "pig" and replacing the crude oil in these pipelines with harmless produced water (there is no risk of this water freezing in the offshore pipelines because these pipelines are located in seawater that remains at temperatures above freezing). The Debtors are also utilizing the "pig" tool to pressure clean gas pipelines of any free-standing liquids in order to prevent such liquids from freezing in the pipelines. Finally, the Debtors will add corrosion inhibitor to onshore water pipelines to defend against internal corrosion and preserve the integrity of these pipelines.

12.     Offshore Platform Abandonment. The Abandoned Assets include an offshore oil platform called the Osprey platform. The United States Coast Guard will require that certain systems are maintained in an operational state on the platform, such as navigation lighting around the perimeter of the platform and a fog horn to alert marine vessels of the location of the platform. By September 4, 2009, the Debtors will configure a diesel generator to power the foregoing navigational systems independent of the platform's main system power grid. There are diesel storage tanks available at the facility that will allow the generator to operate for several weeks without re-fueling.

13.     Well Abandonment. By September 4, 2009, the Debtors will shut-in all wells included within the Abandoned Assets. This will be accomplished by closing and locking the wellhead valves, thereby preventing any oil production from entering the Debtors' pipelines.

14.     Storage Tank Abandonment. The Abandoned Assets include oil storage tanks at various locations. By September 4, 2009, the Debtors will evacuate (to the fullest extent practical) all storage tanks with the exception of those located at the Kustatan Production

7

Facility. The Debtors will sell the oil stored in their storage tanks, but this process will take a few weeks longer to accomplish at the Kustatan Production Facility where a final "lift" or delivery of the oil to a buyer is not expected to take place before mid-September. The Debtors therefore seek to abandon the Kustatan Production Facility as of September 30, 2009.

15.    As noted above, the Debtors believe that the Abandonment Protocol, by itself, clearly meets the minimal threshold for abandonment set forth in the *Midlantic* decision, to the extent it is applicable to this case. Yet, the Debtors have gone even further. In addition to the Abandonment Protocol, the Debtors have taken the following steps with respect to the operated Abandoned Assets:

(a) Notified applicable authorities and lessors of the Debtors' intent to abandon and provided such parties with the Debtors' analyses of potential impacts, proposed remedial steps and associated costs, as most clearly represented by the Abandonment Protocol and the Abandonment Budget;

(b) Conducted numerous meetings beginning in late June 2009 and continuing through the date of this filing regarding abandonment and transition with applicable authorities and lessors, including the State of Alaska and its various agencies;

(c) Provided applicable authorities and lessors, subject to confidentiality restrictions, full access to an online data-room that included detailed financial and operational information, title documents and material agreements; and

(d) Prepared and provided applicable authorities and lessors with various transition alternatives from and after the Debtors' abandonment of the operated Abandoned

8

Assets. For instance, the Debtors have suggested that affected landowners either re-hire the Debtors' staff, or compensate the Debtors in the form of a transition services agreement, in order to maintain and monitor the operated Abandoned Assets on a going forward basis or, alternatively, re-start operations. To date, the Debtors have not received a response from affected landowners, but these discussions continue.

16.     Lastly, the Debtors are prepared to waive any rights that the estates may have in the Pledged Cash and to cooperate with applicable authorities and lessors to make the Pledged Cash available to offset costs that may be incurred by such parties as a result of the contemplated abandonment.

## Arguments & Authorities

17.     Taken together, the Debtors believe that the Abandonment Protocol and the other remedial measures outlined above clearly satisfy the requisites for abandonment under section 554 of the Bankruptcy Code and, to the extent applicable, the standard set forth in *Midlantic*. As noted in the Motion, the threshold for approval of abandonment is low once the trustee or debtor-in-possession establishes that the assets at issue are unduly burdensome and are of no value or other benefit to the estate. *In re Slack*, 290 B.R. 282, 284 (Bankr. D.N.J. 2003) ("The trustee's power to abandon property is discretionary.") (citations omitted). Indeed, no objection has been filed challenging the Debtors' exercise of its reasonable business judgment in deciding to abandon the Abandoned Assets.

18.     The *Midlantic* decision, which arose out of an extreme set of facts, sets forth a limited exception to the generally permissive standard governing abandonment.

*Midlantic*, 474 U.S. at 507 ("Th[e] exception to the abandonment power vested in the trustee by § 554 is a narrow one. It does not encompass a speculative or indeterminate future violation of such laws that may stem from abandonment."). As stated by this Court in *In re Insilco Technologies, Inc.*, *Midlantic* and its progeny stand for the proposition that "property of the estate may not be abandoned if the abandonment will act to contravene laws designed to protect public health and safety and will pose an imminent threat to the public's welfare." 309 B.R. 111, 114 (Bankr. D. Del. 2004).

19.    Here, there can be no question that the Debtors have eliminated any risk of imminent harm associated with abandonment. The steps that the Debtors have taken or will take by September 4, 2009 (and September 30, 2009 with respect to the Kustatan Production Facility) under the Abandonment Protocol will ensure that (a) the integrity of the Debtors' pipelines are preserved, (b) the Debtors' offshore facilities remain in a navigable condition; (c) the Debtors' wells are shut-in; and (d) the Debtors' storage tanks are evacuated to the fullest extent possible. As a result, the proposed abandonment of the operated Abandoned Assets will not pose an imminent threat to the public's welfare. *See, e.g., In re Unidigital, Inc.*, 262 B.R. 283, 286-87 (Bankr. D. Del. 2001) (allowing abandonment of various chemicals because there was no evidence that such chemicals posed an imminent and identifiable harm to the public); *In re Guterl Special Steel Corp.*, 316 B.R. 843, 859 (Bankr. W.D. Pa. 2004) (permitting abandonment of a partially remediated site notwithstanding the presence of radioactive contamination given no imminent threat to public health and safety); *White v. Coon (In re Purco, Inc.)*, 76 B.R. 523, 533 (Bankr. W.D. Pa. 1987) (finding no evidence of imminent harm to preclude abandonment of 200

10

drums of cutback asphalt containing various chemicals, even if construed as hazardous waste and despite evidence of leakage).

20.    In addition, the Debtors have gone to great lengths to ensure that the contemplated abandonment comes as no surprise to any affected party.  Since the filing of the Motion over two months ago, the Debtors have instigated numerous calls and meetings with applicable authorities and lessors, and provided detailed information regarding the Abandoned Assets, in an effort to specifically outline the Debtors' intentions and to prepare these parties to take possession, custody and control of these properties immediately upon abandonment.  The Debtors have analyzed potential impacts and provided such analyses, along with descriptions of intended remedial measures, to all affected parties.  The Debtors also expect to incur nearly $800,000 in expenses by September 4, 2009 associated solely with the Abandonment Protocol, without taking into account the time and energy devoted to this project by the Debtors' staff and outside professionals.  Finally, the Debtors want to make the Pledged Cash available to affected parties to help defray the costs associated with abandonment.

21.    Where, as here, the debtor has taken reasonable steps to ensure that there is no adverse impact to the public's welfare, courts typically authorize abandonment notwithstanding the *Midlantic* exception.  *See, e.g., In re Oklahoma Refining Co.*, 63 B.R. 562, 564 (Bankr. W.D. Okla. 1986) (outlining remedial measures taken by trustee to minimize hazards associated with abandonment); *Franklin Signal Corp*, 65 B.R. 268, 271-273 (Bankr. D. Minn. 1986) (allowing abandonment provided that certain conditions are met to adequately protect the public health and safety, consisting of conducting an investigation to determine

11

environmental impacts and informing state and federal agencies about the situation); *Purco*, 76
B.R. at 533 (concluding that "abandonment will be permitted when the conditions are such that
abandonment will not render the public health and safety inadequately protected."); *Borden, Inc.
v. Wells-Fargo Business Credit (In re Smith-Douglass, Inc.)*, 856 F.2d 12, 16 (4th Cir. 1988)
(same).

       22.    The Court should also take into account that the Debtors do not have the
luxury of time or money in this case.  The Debtors lack the financial wherewithal (and have no
unencumbered funds) to do anything more than the remedial measures and the Abandonment
Protocol outlined herein.  *See In re St. Lawrence Corp.*, 248 B.R. 734, 739 n.6 (D.N.J. 2000)
(considering situations (1) when the estate lacks unencumbered funds with which to comply with
state law; (2) when compliance would take too long for the proceeding to be expeditious; or (3)
when compliance would allow environmental authorities to completely usurp administration of
the case).

       23.    Most importantly, however, no additional steps are required beyond the
Abandonment Protocol.  The Abandonment Protocol, by itself, clearly satisfies the limited
exception to abandonment set forth in *Midlantic* and ensures that there is no imminent threat to
the public's welfare.

### Reply to Objections

       24.    As mentioned above, the objections asserted by the State of Alaska, CIRI,
BLM and Salamatof to the Motion generally revolve around the argument that the Debtors
should not be permitted to abandon the Abandoned Assets pursuant to the *Midlantic* decision

because the Debtors will not meet the requirements of applicable non-bankruptcy law in terms of decommissioning the Abandoned Assets.  Of course, the Debtors cannot afford to pay $30 million to $60 million (or $50 million to $80 million if the State's estimate is to be believed) to effectuate a complete decommissioning process, nor do they have three to four years of time in which to do so.

25.     It is simply disingenuous to suggest that *Midlantic* requires the Debtors to satisfy decommissioning obligations under applicable non-bankruptcy law.  Rather, the Debtors are only required to take steps necessary to mitigate against an imminent threat to the public's welfare.  The Debtors have done that (and much more) by virtue of the Abandonment Protocol and other remedial measures described above.  The objecting parties bear the burden of proof that the *Midlantic* exception applies, notwithstanding the actions taken by the Debtors.  *See St. Lawrence Corp.*, 248 B.R. at 739 (placing the burden of proof as to the applicability of the *Midlantic* exception on the party opposing abandonment).  Yet, the objecting parties offer no factual basis for their objections.

26.     The State of Alaska argues that the Debtors must "winterize" their wells, pipelines and other facilities prior to abandonment, but that is precisely what the Debtors are doing (and quite a bit more) as part of the Abandonment Protocol.  The steps that the Debtors are taking as part of the Abandonment Protocol will eliminate any imminent risk of freezing and cracking, and resulting leakage, that could be caused during the wintertime.

27.     CIRI, BLM and Salamatof suggest that the Debtors should be required to conduct formal third party environmental assessments of the Abandoned Assets to determine

whether any imminent harm to the public health and welfare is imminent, and then to fund any identified remediation obligations. Aside from the fact that the Debtors do not have the funds or the time to pay for such environmental assessments, they are completely unnecessary in light of the Debtors' familiarity with the Abandoned Assets. Since 2007, the Debtors have operated the Abandoned Assets consistent with existing non-bankruptcy rules and regulations. The Debtors have people in the field monitoring and maintaining these assets. In the absence of abandonment, no environmental assessments would be done and none are necessary now in the context of the contemplated abandonment.[4] The Debtors' representatives are well-versed in the Abandoned Assets and will represent to the Court that there is no imminent threat to the environment associated with abandonment of these assets, given the Abandonment Protocol implemented by the estates. This is not a situation where a newly-appointed trustee unfamiliar with the assets of an estate is proposing to abandon such assets without considering potential environmental hazards. The Debtors know precisely what they are proposing to abandon and have thoroughly considered the ramifications of such abandonment. There is no imminent harm that needs to be remedied beyond the actions taken in the context of the Abandonment Protocol.

28.    Perhaps recognizing that requiring the Debtors to satisfy applicable non-bankruptcy decommissioning obligations is not a necessity under *Midlantic*, the State of Alaska takes the fallback position that the Debtors should be required to provide certain additional consideration to the State. First, the State wants access to the Pledged Cash. As noted above and in the Motion, the Debtors have no opposition to that. Second, the State wants to apply any

---

[4]    Neither CIRI, BLM or Salamatoff has a request for an environmental assessment pending, except as a result of objections filed to the pending Motion.

14

royalty overpayments to cover decommissioning costs incurred by the State. The Debtors are

willing to have such overpayments credited against any allowed administrative expenses that the

State may otherwise have against the estates, subject to a full accounting and reconciliation

process. Any remaining credits, however, must be refunded to the Debtors. Third, the State

wants the Debtors to assign to the State any insurance proceeds or refunded premiums for

insurance policies designed to reimburse the Debtors for expenditures incurred in connection

with environmental damage. The Debtors do not know whether these insurance policies are

assignable and are not willing to seek to assign such rights absent a global compromise

arrangement with the State and other objecting parties.[5] Finally, the State wants any and all

remaining unencumbered assets in the Debtors' estates to fund decommissioning obligations.

That is inappropriate and highly prejudicial to other creditors. As addressed above, the Debtors

have already taken (and funded) the steps necessary to satisfy the *Midlantic* exception. There is

nothing more that the Debtors are required to do.[6]

29.     As to Marathon's objection, Marathon does not appear to have an

objection to the Motion itself and admits that it has no interest in the Abandoned Assets. Rather,

Marathon merely reserves its rights to the extent that it has any interest in the Abandoned Assets

(or more specifically, the Rejected Contracts). Marathon wants to ensure that such rights (as

---

[5]   The State of Alaska incorrectly asserts that the Debtors have paid certain insurance premiums in full. *See* State of Alaska Objection at p. 10. In fact, the Debtors have financed those premiums on a monthly basis and do not expect any significant refunds if such policies are cancelled early.

[6]   The State of Alaska also objects to abandonment to the extent that any proposed order provides that the Abandoned Assets are not being abandoned to the Debtors' lenders. The Debtors previously included this language in the proposed abandonment order with respect to Trading Bay, but also intend to include a provision to this effect in the proposed order on the Motion addressed hereby. Given that the lenders are not in the chain of title and require this provision as a condition to consenting to abandonment on the terms proposed, the Debtors submit that the State's objection on this point should be overruled.

against any non-Debtor parties) shall not be affected by the Debtors' proposed abandonment and rejection.  The Debtors are willing to stipulate that this is the case.

### Conclusion

30.    For the reasons set forth above and solely to the extent the Debtors are unable to consummate a sale of any or all of the Abandoned Assets, the Debtors respectfully request that the Court grant the Motion, as modified hereby, and overrule any objections thereto.

Dated: August 27, 2009                          PACHULSKI STANG ZIEHL & JONES LLP


                                                     (#3648)

                                                Ira D. Kharasch (CA Bar No. 109084)
                                                James E. O'Neill (DE Bar No. 4042)
                                                Maxim B. Litvak (CA Bar No. 215852)
                                                919 North Market Street, 17th Floor
                                                Wilmington, Delaware 19801
                                                Telephone: (302) 652-4100
                                                Facsimile: (302) 652-4400
                                                E-mail:        ikharasch@pszjlaw.com
                                                               joneill@pszjlaw.com
                                                               mlitvak@pszjlaw.com

                                                Counsel for Debtors and Debtors in Possession

68773-002\DOCS_SF:67031.2