IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) Chapter 11 |
| | ) |
| PACIFIC ENERGY RESOURCES LTD., _et al._,[1] | ) Case No. 09-10785 (KJC) |
| | ) (Jointly Administered) |
| | ) |
| Debtors. | ) |

Deadline for Objections: October 27, 2009 at 4:00 p.m. ET
Hearing Date: November 3, 2009 at 10:00 a.m. ET

**DEBTORS' MOTION FOR AN ORDER: (A) VACATING THIS
COURT'S ABANDONMENT ORDER IN PART FOR CERTAIN
ALASKA ASSETS AND (B) AUTHORIZING THE DEBTORS
TO SELL SUCH ASSETS TO COOK INLET ENERGY, LLC**

Pacific Energy Resources Ltd. ("PERL"), Pacific Energy Alaska Holding, LLC ("PEAH") and

Pacific Energy Alaska Operating LLC ("PEAO") and the other above-captioned debtors and

debtors in possession (collectively, the "Debtors") hereby move this Court (the "Reconsideration

and Sale Motion") for entry of an Order (a) vacating this Court's _Order Granting Alternative_

_Motion of the Debtors for an Order Authorizing Abandonment of Certain Interests in Oil and_

_Gas Properties in Alaska (Excluding Trading Bay) and Rejection of Executory Contracts_

_Relating Thereto_ entered on September 11, 2009 (the "Abandonment Order") (Docket No. 876)

as it relates to Sold Assets (defined below) pursuant to section 105(a) of title 11 of the United

States Code (the "Bankruptcy Code"), Rule 9024 of the Federal Rules of Bankruptcy Procedure

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Pacific Energy Resources Ltd. (3442); Petrocal Acquisition Corp. (6249); Pacific Energy Alaska Holdings LLC (tax I.D. # not available); Carneros Acquisition Corp. (5866); Pacific Energy Alaska Operating LLC (7021); San Pedro Bay Pipeline Company (1234); Carneros Energy, Inc. (9487); and Gotland Oil, Inc. (5463). The address for all of the Debtors is 111 W. Ocean Boulevard, Suite 1240, Long Beach, CA.

(the "Bankruptcy Rules") and Rule 60 of the Federal Rules of Civil Procedure ("FRCP") and this

Court's general equity powers and inherent power to reconsider its own orders; (b) approving the

sale of the Sold Assets free and clear of all liens, claims, encumbrances and other interests

(except for Assumed Liabilities as defined in the Agreement (defined below)) pursuant to

sections 363(b), (f) and (m) of the Bankruptcy Code and Bankruptcy Rule 6004; (c) assuming

and assigning certain executory contracts and unexpired leases pursuant to section 365 of the

Bankruptcy Code and Bankruptcy Rule 6006; and (d) granting related relief.  Capitalized terms

that are not expressly defined herein shall have the meanings ascribed to such terms in the

proposed Purchase and Sale Agreement (the "Agreement") between certain of the Debtors (the

"Sellers"), on the one hand, and Cook Inlet Energy, LLC (the "Buyer"), which is substantially in

the form attached hereto as **Exhibit A**.

In support of this Reconsideration and Sale Motion, the Debtors respectfully state as follows:

## Introduction

1.      By this Reconsideration and Sale Motion, the Debtors propose to sell to

Cook Inlet Energy, LLC certain of their assets (the "Sold Assets") located in Alaska, consisting

generally of PEAO's interests in leased oil and gas production and exploration assets located in

Alaska (and related assets and contracts) that were formerly operated by PERL or presently

operated by Aurora Gas, LLC (an entity that is unrelated to the Debtors), other than other certain

oil and gas leases and related assets located in the Redoubt Unit as well as other Excluded Items

(as defined in the Agreement), and certain contracts and leases (the "Assumed Executory

Contracts") agreed to be assumed by the Debtors and assigned to the Buyer at the closing of the

proposed sale.  The proposed sale would provide the Debtors' estates (and therefore their

2

creditors) with significant benefits, including: (a) the receipt of $875,000 in sale proceeds;[2] (b) payment of certain cure amounts to counterparties to leases and contracts that will be assumed by the Buyer; (c) relief from the claims of such counterparties; (d) relief from the substantial claims of the State of Alaska and others that would arise from the abandonment of these assets; and (e) relief from the primary obligation of an operator of oil and gas assets for potential substantial decommissioning liabilities. The Debtors understand that the Buyer has obtained or will obtain the consent of the State of Alaska and other relevant oil and gas lessors to the sale.

2.      Certain of the Sold Assets have been abandoned pursuant to the Abandonment Order (the "Abandoned Assets");[3] however, this Court entered its Abandonment Order reluctantly and in contemplation of a reconsideration and a sale motion such as this Reconsideration and Sale Motion (as discussed below). Therefore, in addition to approval of the proposed sale, this Reconsideration and Sale Motion asks that this Court vacate its Abandonment Order in part (for the Sold Assets) upon the closing of the proposed sale. The Debtors also plan to withdraw certain related contracts and leases from their third motion for rejection of executory contracts and unexpired leases, which is pending before this Court (Docket No. 907) and is scheduled to be heard at the same hearing as this Reconsideration and Sale Motion, so that they may be assumed and assigned to the Buyer. The Debtors believe that the benefits to the Debtors' estates of the proposed sale are substantial and that vacation (in part) of the Abandonment Order

---

[2] The Debtors' investment banker Lazard Frères & Co. LLC ("Lazard") would be paid $250,000 of the sale proceeds. Lazard has agreed to reduce its minimum fee of $500,000 under its retention order to $250,000. Consultant Millstream Energy, Inc. would also be paid an amount up to $50,000 from the sale proceeds.

[3] Some of the Sold Assets are not Abandoned Assets, as PEAO did not seek to abandon certain of its exploratory (non-producing) assets in Alaska.

3

is appropriate to facilitate the sale as contemplated by this Court when it issued its Abandonment Order.

## Jurisdiction

3.      The Court has jurisdiction over this Reconsideration and Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This proceeding is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A), (M), (N) and (O).

4.      Venue of these proceedings and this Reconsideration and Sale Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The statutory predicates for the relief sought herein are sections 105, 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 and 9024, FRCP 60, and Rule 6004-1 of the Local Rules of the Bankruptcy Court.

## Background

6.      On March 9, 2009 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are continuing in possession of their property and are operating and managing their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No request has been made for the appointment of a trustee or an examiner in this case.  The Office of the United States Trustee appointed an Official Committee of Unsecured Creditors on March 19, 2009.

7.      The Debtors are a group of independent energy companies engaged in the acquisition, development and exploitation of oil and gas properties in the western United States. As of the Petition Date, the Debtors' current oil and gas assets were located offshore near

California and principally offshore in Alaska.  The Debtors acquired their current oil and gas

assets in transactions occurring in the fourth quarter of 2006 and during 2007, and their existing

secured debt is related to these acquisitions.  The Debtors' revenue is largely dependent on the

market price for the underlying crude oil produced, in addition to the level of production.  Their

revenue for 2008 was approximately $226.2 million.

8.    The Debtors obtained Court-approved debtor in possession financing

(final order at Docket No. 415 entered June 4, 2009) ("Final DIP Financing Order") from their

prepetition lenders, which was scheduled to expire in August but was extended from time to time

through the date of abandonment.  The Debtors' debtor in possession lenders (the "Lenders")

informed the Debtors that financing availability for the continuing operation of the Debtors

assets in Alaska would not be extended further.

9.    On June 16, 2009 (Docket No. 453), the Debtors sought by motion (the

"Sale Procedures Motion") and this Court approved by order entered July 1, 2009 (Docket

No. 532) certain sale procedures (the "Sale Procedures") for, among other things, an auction of

the Debtors' Alaska Assets (as such term is defined in the Sale Procedures), which included the

Sold Assets,[4] as well as other assets located in Alaska that are not the subject of this

Reconsideration and Sale Motion.[5]  Pursuant to the Sale Procedures, the Debtors conducted an

auction (the "Auction") on July 20, 2009.  Ammadon Limited and Catherwood Limited were

---

[4] A copy of the form of proposed Purchase and Sale Agreement between the Debtors and the Buyer contains a more detailed description of the Sold Assets and is attached hereto substantially in the form of **Exhibit A**.  .

[5] The Debtors' Alaska assets as of the Petition Date that are not Sold Assets, and therefore not the subject of this Motion, are the "Group 2 Assets," as such term is defined in the Sale Procedures, which consist of assets located principally at Trading Bay in Cook Inlet (near Anchorage) that are operated by Union Oil Company of California ("Union") and which were abandoned by order of this Court, and certain of the "Group 1 Assets," as such term is defined in the Sale Procedures, located at the Redoubt Unit, which are part of the Group 1 Assets, as such term is defined in the Sale Procedures, as well as PEAH's shares in Cook Inlet Pipeline Company.

collectively the successful bidder at the Auction (notice at Docket No. 652 dated July 22, 2009) but they were unable to close the sale. After the failure of the sale to close, the Debtors (with the assistance of investment banker Lazard) continued to market the Group 1 Assets.[6]

10.      Concurrently with their filing of the Sale Procedures Motion, the Debtors filed an alternative motion (the "Abandonment Motion") (Docket No. 456 filed June 16, 2009) seeking an order of this Court authorizing the Debtors to abandon certain Alaska Assets, including the Sold Assets (the "Abandoned Assets"), and to reject certain contracts and leases, including certain of the Assumed Executory Contracts (*i.e.*, the executory contracts and unexpired leases proposed to be assumed and assigned at the closing of the sale contemplated by this Reconsideration and Sale Motion).

11.      As stated in the Abandonment Motion, the Abandoned Assets had incurred significant losses and were unable to generate sufficient positive cash flow to sustain ongoing operations due in part to volcanic activity in the region that prevented the Debtors from transporting oil to the local refinery. In addition, there are substantial decommissioning obligations associated with certain of the Abandoned Assets that would be incurred as such properties are retired in the future,[7] and the Debtors lack sufficient unencumbered production to fund such decommissioning obligations for their Alaska assets.

12.      Since early April 2009, the Debtors have been actively soliciting bids on the Abandoned Assets, along with the Debtors' other assets in Alaska and California. Because

---

[6] The marketing of the Group 1 Assets continued even after the entry of the Abandonment Order.

[7]   For purposes herein, the term "decommissioning" refers to the process of disassembling an oil and gas drilling and processing platform, plugging and abandoning any oil and gas wells, restoring the surface, and removing all equipment or pipelines associated with such platform or wells in a manner consistent with applicable non-bankruptcy law.

of the significant liabilities associated with the Abandoned Assets, the Debtors believed that it was necessary to file the Abandonment Motion in order to protect the estates from further loss in the event "that no bidder materializes in the immediate future and the Debtors are unable to consummate a sale of any or all of the Abandoned Assets" (Abandonment Motion at ¶ 4).

13.      The hearing (the "Abandonment Hearing") on the Abandonment Motion was held by this Court on September 11, 2009.  The Abandonment Order, entered by this Court on September 11, 2009 (Docket No. 876), authorized the Debtors to abandon (and deemed abandoned) the Abandoned Assets and approved the rejection of related contracts and leases. The Abandonment Order did not specify which person or entity obtained title to the Abandoned Assets:

> ORDERED that nothing in this Order shall determine the party or parties who will gain title to the Abandoned Assets, upon abandonment by the Debtors' estates; provided, however, that title to the Abandoned Assets shall not vest in any of the DIP Lenders or Prepetition Secured Lenders;….

Abandonment Order at 4 (footnote omitted).

14.      The Court noted on the record at the Abandonment Hearing its willingness to reconsider the Abandonment Order when it stated:

> I don't think I have any choice under the circumstances but to enter the [abandonment] order effective today.  But I say that understanding that it doesn't change anybody's ability to file a motion for reconsideration. That's not an invitation.  It's just, it seems to me that if something of significance in a positive way should develop, that there is a vehicle and there could be others by which the parties could come back to the Court and seek relief on a sale.

9/11/09 Hearing Transcript ("Abandonment Hearing Transcript") at 47 lines 7-14 and 16-17.

15. Debtors' counsel clearly understood that the Court's statement quoted above anticipated a potential subsequent purchase of the assets after the Abandonment Order had been entered:

> And we've given the message to potential buyers that we're no longer going to consider offers that just pay the cure payments. We're past that point. So people better be stepping up and giving something of value.

Abandonment Hearing Transcript at 47 lines 18-21 (Statement of Ira D. Kharasch).

16. After the Abandonment Order was entered, the Debtors were able to reach an agreement with the Buyer for its purchase of the Sold Assets, as more fully described below.

### The Proposed Sale

17. As stated above, the Debtors propose to sell the Sold Assets to the Buyer pursuant to the Agreement. A copy of the Agreement, without exhibits or schedules, is attached hereto substantially in the form of **Exhibit A**.

18. The principal terms of the Agreement are summarized as follows:[8]

a. **Purchase Price.** The Agreement provides for a cash purchase price of $875,000 for the "Alaska Interests" (the Agreement's defined term for the Sold Assets), subject to certain post-closing adjustments that generally relate to Buyer's responsibility for costs and expenses and Buyer's entitlement to revenues relating to the Alaska Interests after the Effective Time. A $250,000 deposit from Buyer would be applied toward payment of the purchase price at the Alaska Interests Closing.[9] Buyer would also pay to Sellers (defined below) at the Alaska Interests Closing, for remittance to counterparties, the cure amounts described in the schedules to the Agreement.

b. **Assets to be Sold.** On the terms and subject to the conditions of the Agreement, on the Alaska Interests Closing Date, the Sellers shall sell, assign,

---

[8] To the extent of any inconsistency between this Sale Motion and the Agreement, the terms of the Agreement shall govern. The exhibits and schedules to the Agreement can be obtained from the Debtors' investment banker, Lazard Frères & Co. LLC, 600 Travis, Suite 2300, Houston, TX 77002, Attn: Robert L. Lynd (email: robert.lynd@lazard.com), subject to appropriate confidentiality restrictions. Capitalized terms not expressly defined herein have the meanings ascribed to such term.

[9] If the sale does not close, the deposit funds are available to pay the costs and expenses for, among other things, bringing this Motion.

transfer, convey and deliver to Buyer, and Buyer shall purchase, acquire and accept from the Sellers, the Alaska Interests identified in the Agreement, wherever located in each case to the extent, and only to the extent, of the Sellers' right, title and interest therein as of the Alaska Interests Closing Date.  The Alaska Interests generally include all of Sellers' right, title and interest in and to, except for the Excluded Items and subject to terms of the Agreement and its exhibits and schedules:  fee interests, leases and lands; easements; wells; contracts; tangible assets; oil and gas produced after the Effective Time (as such term is defined in the Agreement); unitization, communitization and pooling declarations, orders and agreements related to the properties being sold; permits; records; royalty interests; partnership and joint venture interests; indemnities and third party releases relating to the properties, in each case only to the extent such indemnities and releases relate to (i) activities occurring on or after the Effective Time or (ii) any claim or liability assumed by Buyer under the Agreement, provided that Sellers shall retain their interest in such indemnities and releases to the extent Sellers may potentially remain liable for any such claim or liability; intangibles, including operating revenues and accounts receivable relating to the period after the Effective Time, in each case associated with the properties or the production of oil and gas attributable thereto; leases or subleases of tangible property; leases for real property used by Sellers in connection with the operation of their business; and surety bonds, plugging bonds, abandonment bonds, standby trust agreements, escrow accounts for plugging, abandonment, decommissioning, removal and restoration obligations, and other bonds posted by or at the request of Sellers, and security deposits and other security furnished by Sellers or their predecessors in interest.

       c.       **Excluded Items.**  The Alaska Interests exclude items listed as exclusions in the exhibits and schedules to the Agreement, and additional items such as: pipelines, fixtures, equipment, interests in land or any other property owned by any third party; furniture in Sellers' Anchorage office; Sellers' geological or geophysical data containing information not related to the Alaska Interests; cash generated from transactions occurring prior to the Effective Time or deposits made prior to the Effective Time; items used, consumed or disposed of prior to the Alaska Interests Closing; rights to representations, warranties, indemnities and releases other than those specifically included in the Alaska Interests; rights under insurance policies held by Sellers or any of their affiliates covering any of the Alaska Interests; tangible assets currently in use in connection with the ownership or operation of other property not included in the Alaska Interests; records that are subject to attorney-client privilege, work product immunity or other privileges against disclosure enjoyed by Sellers or any of their associated parties; interests, properties or assets owned by any person other than Sellers; claims against operators or other third parties arising out of the operation of the properties or Alaska Interests prior to the Effective Time; any business interruption insurance claims relating to the volcanic and seismic activity that began at Mount Redoubt in March 2009; contracts between a Seller or Sellers, on one hand, and PERL or any affiliate of PERL (other than Sellers), on the other

hand; and claims and rights relating to litigation or other actions unrelated to the Alaska Interests.

      d.      **Assumed Liabilities.**  Liabilities to be assumed by Buyer generally include liabilities associated with ownership or operation of the Alaska Assets on or after the Effective Time; environmental liabilities associated with periods prior to, on or after the Effective Time; accounts payable that accrue on or after the Effective Time; royalty obligations that accrue on or after the Effective Time; claims arising out of the ownership or operation of the Alaska Interests on or after the Effective Time; plugging, abandonment, decommissioning, removal and/or restoration liabilities associated with, related to or arising from the Alaska Interests with respect to the periods prior to, on or after the Effective Time; imbalances owed by Sellers to third parties; post-petition suspended royalties; and certain Permitted Encumbrances (as defined in the Agreement).

      e.      **Excluded Liabilities.**  The following claims against and liabilities and obligations of Sellers are not proposed to be assumed by Buyer:  liabilities associated with debt instruments of Sellers, except for liabilities that relate to Permitted Encumbrances; accounts payable that have accrued prior to the Effective Time (other than certain postpetition suspended royalties); royalty obligations accrued prior to the Effective Time; claims, except environmental claims and abandonment obligations, arising out of the ownership or operation of the Alaska Interests prior to the Effective Time; and bankruptcy claims and bankruptcy costs, in each case except for environmental claims and abandonment obligations.

      f.      **Assumed Executory Contracts**.  Sellers generally shall assign to Buyer written contracts, contractual rights, interests and other written agreements and instruments covering or affecting any or all of the Alaska Interests or the production, handling or transportation of oil and gas attributable thereto or the use or ownership or operation of any of the Alaska Interests or the oil, gas, water or other substances produced therefrom, as scheduled on Exhibit B to the Agreement.  Sellers will not, however, assign their interests under their secured credit facilities or contracts between a Seller or Sellers, on one hand, and PERL or any affiliate of PERL, on the other hand.

      g.      **Representations and Warranties.**  Sellers would represent and warrant that the Agreement has been duly authorized, executed and delivered and is binding and enforceable against Sellers, subject to orders of the Court.  Buyer would acquire the Alaska Assets on an "AS IS, WHERE IS, WITH ALL FAULTS" basis and waive rights of indemnification, contribution or recourse it may have against or from Sellers or any of their associated parties.  Any title defects will transfer with the affected Alaska Interest.

      **h.**      **Release.**  The Agreement contains a general release by Buyer that includes any unknown matters.

10

   **i.**  **Access to Records.** The Agreement provides that Buyer must afford Sellers access to original or last-remaining copies of data or records provided to Buyer, at reasonable times and upon reasonable notice during regular business hours for as long as any Alaska Interests are in effect after the Effective Time or until all abandonment obligations have been fully satisfied and discharged or a longer period if required by applicable law**.**

   **j.**  **Closings.** The Alaska Interests Closing is subject to certain conditions precedent and certain deliveries by the parties and is contemplated to occur on or before November 4, 2009 or on such other date as the parties may agree.  The Agreement provides that the sale shall each be effective as of the Effective Time.

   **k.**  **Effective Time.** The Effective Time of the Alaska Interests sale will be 7:00 a.m. California time on the Alaska Interests Closing Date.

   19.  The State of Alaska shall not be precluded under the requested order approving this sale or the Agreement from exercising its authority to approve or disapprove any operator of any of the Sold Assets.

<u>**Assumption and Assignment of Assumed Executory Contracts**</u>

   20.  In accordance with the Agreement, and subject to, and at the time of, the Closing, the Debtors seek to assume and assign to the Buyer certain executory contracts and unexpired leases to be designated by the Buyer (*i.e.*, the Assumed Executory Contracts).

   21.  The Debtors will serve this Reconsideration and Sale Motion and the cure notice substantially in the form attached hereto as **Exhibit B** (the "Cure Notice") upon each counterparty to the Assumed Executory Contracts (each a "Counterparty").  The Cure Notice shall state the date, time and place of the hearing on this Reconsideration and Sale Motion (the "Sale Hearing") as well as the date by which any objection to the assumption and assignment of Assumed Executory Contracts must be filed and served.  The Cure Notice also shall identify the amounts, if any, that the Debtors believe are owed to each Counterparty to an Assumed

11

Executory Contract in order to cure any defaults that exist under such contract (the "Cure Amounts").

22.     If a contract or lease is assumed and assigned pursuant to this Court's order approving same, then unless the Counterparty to the Assumed Executory Contract properly files and serves an objection to the Cure Amount contained in the Cure Notice, the Counterparty to the Assumed Executory Contract will receive at the time of the Closing (or as soon as reasonably practicable thereafter), the Cure Amount as set forth in the Cure Notice, with payment made pursuant to the terms of the Agreement.

23.     If an objection is filed by a Counterparty to an Assumed Executory Contract, such objection must set forth a specific default in any executory contract or unexpired lease and claim a specific monetary amount that differs from the amount, if any, specified by the Debtors in the Cure Notice.

24.     If any Counterparty objects for any reason to the assumption and assignment of the Assumed Executory Contract, then the Counterparty must file the objection by no later than 4:00 p.m. prevailing Eastern time on October 27, 2009.

25.     The Buyer shall be responsible for satisfying any requirements regarding adequate assurance of future performance that may be imposed under section 365(b) of the Bankruptcy Code in connection with the proposed assignment of any Assumed Executory Contract.  The Court shall make its determinations concerning adequate assurance of future performance under the Assumed Executory Contracts pursuant to 11 U.S.C. §365(b) at the Sale Hearing.  Cure Amounts disputed by any counterparty also shall be resolved by the Court at that hearing.

68773-002\DOCS_LA:209232.8

**Use of Proceeds**

26.     Net sale proceeds shall be distributed to the Lenders in accordance with paragraph 21 of the Final DIP Financing Order entered in these Cases and section 2.10(a) of the DIP Credit Agreement (as referenced in the Final DIP Financing Order).  The Debtors believe that it is in the best interests of their estates to comply with the above-referenced requirements of the DIP Credit Agreement and disburse a significant portion of the sale proceeds received by the Debtors upon closing the sale transaction contemplated by this Reconsideration and Sale Motion. Such disbursement of sale proceeds is cost effective to the estates, is consistent with practice in this District and is an appropriate means of adequately protecting the interests of the Lenders in the proceeds of the sale that constitute their collateral.

**Relief Requested**

27.     By this Reconsideration and Sale Motion, the Debtors are requesting that this Court, among other things, (a) vacate the Abandonment Order in part, with respect to the Sold Assets, pursuant to section 105(a) of the Bankruptcy Code, Bankruptcy Rule 9024 and FRCP 60 and this Court's general equity powers and inherent power to reconsider its own orders; (b) authorize the sale of the Sold Assets to the Buyer pursuant to the terms of the Agreement, free and clear of all liens, claims, encumbrances or other interests (except for Assumed Liabilities and permitted encumbrances) pursuant to sections 363(b), (f) and (m) of the Bankruptcy Code and Bankruptcy Rule 6004 and this Court's Local Rule 6004-1, with such liens, claims, rights, interests and encumbrances (collectively, the "Interests") to attach to the sale proceeds of the Sold Assets with the same validity (or invalidity), priority and perfection as existed immediately prior to such sale; and (c) approve the assumption and assignment of the

Assumed Executory Contracts under section 365 of the Bankruptcy Code and Bankruptcy Rule, subject to, and at the time of, the Closing under the Agreement.  Pursuant to Del. Bankr. L.R. 6004-1(b)(ii), the Debtors' proposed order granting the relief requested herein (the "Sale Order") accompanies this Reconsideration and Sale Motion.

## Basis for Relief

### A.    Vacation of the Abandonment Order in Part

28.    In the Abandonment Order, this Court retained jurisdiction "to hear and determine all matters arising from or relating to this Order."  Abandonment Order at 5.  On the record of the Abandonment Hearing, this Court stated that it signed the Abandonment Order "with the understanding that it doesn't change anybody's ability to file a motion for reconsideration,"  Abandonment Hearing Transcript at 47 lines 10-11.  This Court also stated that reconsideration is one "vehicle and there could be others by which the parties could come back to the Court and seek relief on a sale."  *Id*. lines 12-14.

29.    By this Reconsideration and Motion, the Debtors request that this Court modify its Abandonment Order to exclude the Sold Assets.  The Debtors request is made pursuant to Rule 9024 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), which incorporates Rule 60 of the Federal Rules of Civil Procedure ("FRCP") into bankruptcy cases, as well as section 105(a) of the Bankruptcy Code and this Court's general equity powers and inherent power to modify its own orders.

30.    The United States Court of Appeals for the Third Circuit stated that "[i]t is well settled that a bankruptcy court has the power to vacate or modify its orders, as long as it is equitable to do so."  *Marcus Hook Dev. Park, Inc. v. T.A. Title Ins. Co. (In re Marcus Hook Dev.*

14

*Park, Inc.)*, 943 F.2d 261, 265 n.5 (3d Cir. 1991) (citation omitted).  Judge Walrath of this Court

has stated:

> Vacating or modifying orders is "particularly appropriate where factual circumstances have changed."  "The basic policy tension in determining whether a final judgment should be set aside resolves around whether the factual or legal circumstances have change to such an extent that the Court's interests in deciding the case on the merits outweighs its interest in orderly procedures and the finality of judgments…"
>
> [T]he bankruptcy court may exercise more liberally its power to vacate orders granted under Rule 60(b)(6) if it is necessary to "accomplish justice" or to deal with "unforeseen contingencies."

*Vision Metals v. SMS Damag, Inc. (IN re SMS Demag, Inc.)*, 311 B.R. 692, 697-98 (Bankr. D.

Del. 2004) (citations omitted).[10]

         31.     The United States Court of Appeals for the Second Circuit recognized that

a federal court's power to vacate its own orders is particularly important in bankruptcy cases:

> A bankruptcy proceeding is one continuous, often long, proceeding, within which many other controversies and proceedings occur during the course of administration.  There is practical utility in the application of a rule which permits the vacation or modification of bankruptcy orders where subsequent events presented during administration demonstrate the necessity therefor; and to do so would not be inequitable.  Nor does the relatively unlimited power thus invoked raise any unanswerable objections of hardship or uncertainty when it is applied pursuant to well established bankruptcy principles.

*Otte v. Manufacturers Hanover Commercial Corp. (In re Texlon Corp.)*, 596 F.2d 1092, 1098

(2d Cir. 1979), quoted in part in *Marcus Hook*, 943 F.2d at 265 n.5.

---

[10] Judge Walrath states that "[c]ourts appling a more liberal standard <u>usually</u> do so where the debtor seeks to reorganize and continue its operations.  *Id*, at 678 (emphasis added; citation omitted).  Here, the Debtors are liquidating; however, the proposed sale would permit the Sold Assets to continue to be operated so that they are put to productive use and would result in a deferral of decommissioning obligations, which is to the public good as well as to the benefit of the Debtors' estates and creditors.

32.    An order may be modified or vacated under Bankruptcy Rule 9024, which

incorporates FRCP 60.  Rule 60 is entitled "Relief from Judgment or Order" and provides in

pertinent part that:

> On motion and just terms, the court may relief a party or its legal
> representative from a final judgment, order, or proceeding for the
> following reasons:
>
> (2) newly discovered evidence that, with reasonable diligence, could not
> have been discovered in time to move for a new trial under Rule 659(b);....
> [or]…
>
> (6) any other reason that justifies relief.

FRCP 60(b).  A motion under section 60(b) must be made within a reasonable time and, if the

grounds for relief are based on subsection (2) above, no more than a year after the order was

entered.  FRCP 60(c)(1). There is no specified time limit for a motion under subsection (6).  *See*

FRCP 60(d)(1) ("This rule does not apply to limit a court's power to:  (1) entertain an

independent action to relieve a party from a judgment order, or proceeding;….").

33.    The United States Court of Appeals for the Third Circuit recognizes that a

federal court may vacate its own orders under Rule 60(b) where it has retained jurisdiction:

> Of course the district court has jurisdiction to vacate its own orders of
> dismissal which were based upon the stipulation of the parties in reliance
> upon their settlement agreement.  Rule 60(b), Fed.R.Civ.P.  However, the
> district court appears to have been of the view that the dismissal of the
> original actions with prejudice deprived it of jurisdiction to entertain the
> ancillary complaints seeking enforcement of the settlement agreement.
> But there can be no question of the power of a Federal district court to
> vacate its own orders entered in civil actions over which it had original
> jurisdiction 'whenever such action is appropriate to accomplish justice.'

*Kelly v. Greer*, 334 F.2d 434, 436-37 (3d Cir. 1964) (citation omitted).  *See Shaffer v. GTE*

*North, Inc.*, 284 F.3d 500, 504-05 (3d Cir. 2002) (court retained jurisdiction to reinstate lawsuit

16

upon breach of settlement agreement but not jurisdiction for resolving disputes under settlement agreement).

34.     Although the general rule is that an abandonment of property of an estate is irrevocable, vacation of an order under Rule 60 is an exception to this general rule.  *Woods v. Kenan (In re Woods)*, 173 F.3d 770, 778 (10th Cir. 1999).  In *Woods*, the Tenth Circuit upheld a Bankruptcy Court order vacating a prior order closing the case in order to permit the sale of oil and gas wells even though the wells had been technically abandoned pursuant to section 554(c) of the Bankruptcy Code.[11]  *Id*. at 776-77 ("we conclude that a strict irrevocability rule does not properly account for Fed. R. Bankr. P. 9024, which provides that Fed. R. Civ. P. applies, with minor modifications, to all bankruptcy cases.") (footnote omitted).[12]  The United States Court of Appeals for the Sixth Circuit adopted the reasoning in *Woods*, holding that technical abandonment could be revoked under Rule 60(b).  *LPP Mortg., Ltd. v. Brinley*, 547 F.3d 643, 649 (6th Cir. 2008) ("The bankruptcy court did not abuse its discretion in determining that the equities weighed in favor of revoking the abandonment.").

35.     In *In re Lintz West Side Lumber, Inc*., the United States Court of Appeals for the Seventh Circuit upheld a Bankruptcy Court order vacating its own abandonment order. 655 F.2d 786, 788 (7th Cir. 1981) (Bankruptcy Act case).  In *Linz*, the property at issue had been abandoned to a purportedly secured creditor that was later found to have failed to perfect its

---

[11] Under section 554(c) of the Bankruptcy Code, "[u]nless the court orders otherwise, any property scheduled under section 521(1) of this title not otherwise administered at the time of the closing of the case is abandoned to the debtor and administered for purposes of section 350 of this title."  11 U.S.C. § 554(c).

[12] "We also uphold the bankruptcy court's reliance on Rule 60(b)(6), a 'grand reservoir of equitable power to do justice in a particular case.'  Rule 60(b)(6) relief is 'appropriate …when it offends justice to deny such relief,' and will be reversed 'only if we find a complete absence of a reasonable basis and we are certain that the decision is wrong.'"  *Id*. at 780 (citations omitted).

68773-002\DOCS_LA:209232.8

security interest in inventory and accounts receivables.  *Id*.  The creditor opposed revocation of

the abandonment order, citing cases where the revocation of an abandonment order was denied.

*Id*. at 789-90.  The Seventh Circuit, however, found that "most of these cases involve situations

in which the revocation of an abandonment order would unduly prejudice the rights of an

innocent owner following abandonment of the property."  *Id*. at 790 (footnote omitted).

      36.     The Seventh Circuit recognized the bankruptcy judge's "elementary

power" to reconsider his abandonment order:

> The case instead involves the bankruptcy judge's 'ancient and elementary power to reconsider' his own orders.  Long ago Judge Learned Hand concluded that there was no reason why a referee's orders 'should be as immutable as the Twelve Tables, once the ink is dry.  It is now well settled that a bankruptcy judge has the power to reexamine and revise an order which he entered during the pendency of bankruptcy proceedings.

*Id*. at 789 (citations omitted).  In affirming the revocation order the Seventh Circuit stated:

> There is no indication in the Rules of Bankruptcy Procedure that abandonment orders should be treated differently than other orders by a bankruptcy judge which are subject to reexamination.  Moreover, the provisions of Rule 60 of the Federal Rules of Civil Procedure are applicable to bankruptcy practice and would have provided a basis for setting aside the July 18 abandonment order even if the bankruptcy judge had been otherwise specifically prohibited from reconsidering such orders.  The absence of an explicit ban on reconsideration of abandonment orders in the Bankruptcy Rules and the availability of alternate relief tend to indicate that abandonment orders remain subject to the "ancient and elementary power (of the bankruptcy judge) to reconsider" his own orders.

*Id*. at 791 (citation omitted).

      37.     In *In re Argose, Inc*., Judge Walrath applied her power under section

105(a) of the Bankruptcy Code to modify her own prior order.  377 B.R. 148, 150 (Bankr. D.

Del. 2007), citing *Marcus Hook*, 943 F.2d at 265 n.5, citing it for its "holding that the court

retains jurisdiction under section 105 to modify sale order under Rule 60(b) if it is appropriate to do so."

38.     Here, the Abandonment Order may be vacated based on subsections (2) and (6) of Rule 60 and this Court's inherent power to reconsider its own orders, its equitable powers and its authority under section 105(a) of the Bankruptcy Code.  The Buyer and Debtors had not agreed to the proposed sale at the time the Abandonment Order was entered or within the ten-day window for a request for a "new trial" under Rule 59(b) of the Federal Rules of Civil Procedure, as incorporated into bankruptcy cases by Bankruptcy Rule 9023.  Therefore evidence of the proposed sale should be considered "newly discovered evidence" for purposes of vacating the Abandonment Order under Rule 60(b)(2).

39.     Also, as set forth herein, the equities favor partial revocation of the Abandonment Order under Rule 60(b)(6).  By its express terms, the Abandonment Order did not determine the identity of the owner of each Abandoned Asset after the order was entered (other than to state that title would not vest in the Debtors' lenders).  Abandonment Order at 4.  Generally, an abandonment is made to the debtor or another party with a possessory interest.  *In re Quanta* Resources, 739 F.2d 912, 914 (3d Cir.1984) (abandonment under Section 554 revests title in debtor subject to liens); Leg. Hist. to 11 U.S.C. § 554, Sen. Rpt. 95-989, p 92 (1978) ("Abandonment may be to any party with a possessory interest in the property abandoned."), cited in *Ohio v. Kovacs*, 469 U.S. 274, 284 n. 12 (1985).  Here, in addition to arguably the Debtors, the only other parties with possessory interests in the oil and gas properties are the respective lessors, which the Debtor have been informed will have consented to the sale contemplated by this Reconsideration and Sale Motion.  Therefore, there is no prejudice to the

19

party (Debtors or lessors) to which the Sold Assets were abandoned.  Also, as stated above, the

proposed sale is beneficial to the estates because they will obtain a meaningful sale proceeds and

be relieved from substantial claims and potential decommissioning liabilities.

**B.**    <u>**Approval of the Sale**</u>

40.    Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after

notice and a hearing, may use, sell or lease, other than in the ordinary course of business,

property of the estate . . . ."  11 U.S.C. § 363(b)(1).  Section 105(a) provides in relevant part that

"[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry

out the provisions of this title."  11 U.S.C. § 105(a).

41.    A sale of the Debtors' assets should be authorized pursuant to section 363

of the Bankruptcy Code if a sound business justification exists for doing so.  *See, e.g., Meyers v.*

*Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *Fulton State Bank v. Schipper (In*

*re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991)); *In re Abbotts Dairies of Pennsylvania, Inc.*,

788 F.2d 143 (3d Cir. 1986); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir.

1986); *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983); *In re Titusville Country Club*, 128 B.R.

396 (W.D. Pa. 1991); *In re Delaware & Hudson Railway Co.*, 124 B.R. 169, 176 (D. Del. 1991).

The *Delaware & Hudson Railway* court rejected the pre-Code "emergency" or "compelling

circumstances" standard, finding the "sound business purpose" standard applicable and,

discussing the requirements of that test under *McClung* and *Lionel*, observing:

> A non-exhaustive list of factors to consider in determining if there
> is a sound business purpose for the sale include:  the proportionate
> value of the asset to the estate as a whole; the amount of elapsed
> time since the filing; the likelihood that a plan of reorganization
> will be proposed and confirmed in the near future; the effect of the

proposed disposition of the future plan of reorganization; the
amount of proceeds to be obtained from the sale versus appraised
values of the assets; and whether the asset is decreasing or
increasing in value.

124 B.R. at 176.

42.     The *Delaware & Hudson Railway* court further held that "[o]nce a court is

satisfied that there is a sound business reason or an emergency justifying the pre-confirmation

sale, the court must also determine that the trustee has provided the interested parties with

adequate and reasonable notice, that the sale price is fair and reasonable and that the Successful

Bidder is proceeding in good faith." *Id*.

43.     The Debtors have proposed the sale of the Sold Assets after thorough

consideration of all viable alternatives, and have concluded that the sale is supported by a

number of sound business reasons.  The Debtors do not currently have a viable alternative to the

sale.  The value of the Debtors' enterprise in Alaska is significantly below the total amount of its

existing related secured debt and, to continue operating, the Debtors relied on access to funding

under the DIP Credit Agreement, which is not forthcoming.  Hence, the Debtors have

determined, with the full support of the Lenders, that a going concern sale of the Debtors'

operations provides the best and most efficient means for maximizing the Debtors' estates.

44.     The Debtors, through Lazard, have extensively marketed the Sold Assets

along with other assets located in Alaska and have conducted the Auction, which did not result in

a viable sale of the Sold Assets.  The Debtors, after the failed efforts to sell the Sold Assets,

determined that the only alternative was to abandon the Sold Assets.  The Court reluctantly

approved that abandonment, leaving the door open for the Debtors to once again pursue approval

of a sale.

45.     After the Abandonment Order was entered, the Debtors and Lazard

continued to market the Sold Assets, which efforts resulted in the offer from the Buyer.  As a

result of the Debtors' marketing efforts, the Debtors believe that the Buyer's offer has been fully

tested by the market and thus constitutes fair and reasonable consideration for the Sold Assets.

46.     Based on the foregoing, the sale of the Sold Assets is justified by sound

business reasons and is in the best interests of the Debtors and their estates.  Accordingly,

pursuant to section 363(b) of the Bankruptcy Code, the Debtors request approval of the sale to

the Buyer substantially on the terms set forth in the Agreement as attached hereto as **Exhibit A**.

### The Asset Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code for a Sale Free And Clear of Liens, Claims, and Interests

47.     Section 363(f) of the Bankruptcy Code provides:

The trustee may sell property under subsection (b) or (c) of this
section free and clear of any interest in such property of an entity
other than the estate, only if –

(1) applicable nonbankruptcy law permits sale of such property
free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to
be sold is greater than the aggregate value of all liens on such
property;

(4) such interest is in a bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable
proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

68773-002\DOCS_LA:209232.8

48.     As quoted above, section 363(f) of the Bankruptcy Code provides for the

sale of assets "free and clear of any interests."  The term "any interest," as used in section 363(f),

is not defined anywhere in the Bankruptcy Code.  *Folger Adam Security v.*

*DeMatteis/MacGregor, JV*, 209 F.3d 252, 259 (3d Cir. 2000).

49.     In *Folger Adam*, the Third Circuit specifically addressed the scope of the

term "any interest."  209 F.3d at 258.  The court observed that while some courts have "narrowly

interpreted that phrase to mean only *in rem* interests in property," the trend in modern cases is

towards "a broader interpretation which includes other obligations that may flow from ownership

of the property."  Id. at 258 (citing 3 COLLIER ON BANKRUPTCY 363.06[1]).

50.     As determined by the Fourth Circuit in *In re Leckie Smokeless Coal Co.*,

99 F.3d 573, 581-582 (4th Cir. 1996), a case cited approvingly and extensively by the Third

Circuit in *Folger Adam*, the scope of 11 U.S.C. § 363(f) is not limited to in rem interests.  Thus,

the Third Circuit in *Folger Adam* stated that *Leckie* held that the debtors "could sell their assets

under §363(f) free and clear of successor liability that otherwise would have arisen under federal

statute."  *Folger Adam*, 209 F.3d at 258.

51.     Section 363(f) is drafted in the disjunctive.  Thus, satisfaction of any of

the requirements enumerated therein will suffice to warrant the sale of the Sold Assets free and

clear of all liens, claims, rights, interests or encumbrances (except for Assumed Liabilities) as

provided in the Agreement (collectively, the "Interests"), except with respect to any Interests that

are Assumed Liabilities under the Agreement.  *See Citicorp Homeowners Servs., Inc. v. Elliot*,

94 B.R. 343, 345 (E.D. Pa. 1988).

52.     The Debtors submit that at least one of the requirements of section 363(f) of the Bankruptcy Code is met as to each Interest that is not an Assumed Liability, and that any such Interest has consented to the sale or will be adequately protected by either being paid in full at the time of Closing or attaching to the net proceeds of the sale, subject to any claims and defenses the Debtors may possess with respect thereto. The Debtors accordingly request authority to convey the Sold Assets to the Buyer, free and clear of all Interests (except for the Interests that are Assumed Liabilities under the express terms of the Agreement), with such Interests to attach to the proceeds of the sale, with the same validity (or invalidity), priority and perfection as existed immediately prior to the sale.

53.     The Debtors have conducted lien searches in Delaware (the State of organization of each of PERL, PEAH and PEAO) and the land title records of the Anchorage Recording District in Alaska of purported lienholders of, and interest owners in, the Debtors' assets in conjunction with the proposed sale of the Sold Assets. The Debtors have served such purported lienholders and other interest owners notice of this Reconsideration and Sale Motion, and will serve such parties with notice of any Sale Order entered by this Court .

54.     Accordingly, this Court should approve the sale of the Sold Assets to the Buyer, free and clear of Interests (other than Assumed Liabilities) under Bankruptcy Code section 363(f), and any potential claimants should be compelled to look exclusively to the proceeds of the sale for satisfaction of their claims.

### Good Faith Under Section 363(m) of the Bankruptcy Code

55.     Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

56.     While the Bankruptcy Code does not define "good faith," the Third Circuit

in *In re Abbotts Dairies of Pennsylvania, Inc*., 788 F.2d 143 (3d Cir. 1986), has stated:

> [t]he requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings.  Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

788 F.2d at 147 (citations omitted).

57.     The Debtors intend to make an appropriate showing at the hearing on this

Reconsideration and Sale Motion that the Agreement with the Buyer is the result of a negotiated,

arm's-length transaction, in which the Buyer at all times acted in good faith under the standard

set forth in *Abbotts Dairies*.  The Debtors thus request that the Court find that the Buyer will be

purchasing the Sold Assets in good faith within the meaning of section 363(m) of the Bankruptcy

Code.

**C.      Authorization of Assumption and Assignment of the Assumed Executory Contracts**

58.     As required by the Agreement, and in order to enhance the value to the

Debtors' estates, the Debtors request approval of the assumption and assignment of the Assumed

Executory Contracts to the Buyer, subject to, and at the time of, the Closing of the transactions

contemplated under the Agreement.

59.     The Assumed Executory Contracts are those contracts or leases that are to be assumed by the Debtors and assigned to the Buyer as part of the sale transaction under the Agreement.  The Debtors further request that any order approving this Reconsideration and Sale Motion provide that the Assumed Executory Contracts will be assigned to, and remain in full force and effect for the benefit of, the Buyer, notwithstanding any provisions in the Assumed Executory Contracts, including those described in sections 365(b)(2) and (f)(1) and (3) of the Bankruptcy Code, that prohibit such assignment.

60.     Section 365(f)(2) of the Bankruptcy Code provides, in pertinent part, that:

> The trustee may assign an executory contract or unexpired lease of the debtor only if –
>
> (A)     the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B)     adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

61.     Under section 365(a), a debtor "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  Section 365(b)(1), in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing that:

> (b)(1)  If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee --
>
> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;
>
> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or

26

lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

62.     Although section 365 of the Bankruptcy Code does not set forth standards for courts to apply in determining whether to approve a debtor in possession's decision to assume an executory contract, it is well established that the decision to assume or reject an executory contract or unexpired lease is a matter within the "business judgment" of the debtor. *See In re Taylor*, 913 F.2d 102 (3d Cir. 1990); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36 (3d Cir. 1989).  Accordingly, assumption or rejection of any executory contract is appropriate where the assumption or rejection would benefit the estate.  *Sharon Steel*, 872 F.2d at 40.

63.     The assumption and assignment of the Assumed Executory Contracts will be a necessary part of the Agreement and, as stated above, will therefore benefit the Debtors' estates.

64.     The Debtors will send the Cure Notices to all Counterparties notifying such Counterparties of the potential assumption by the Debtors and assignment to the Buyer of the Assumed Executory Contracts at the Sale Hearing.  The Cure Notices set forth the "cure" amounts, if any, owing on each of the Assumed Executory Contracts, according to Debtors' books and records.

65.     Counterparties to the Assumed Executory Contracts will have a sufficient opportunity to file an objection to the proposed cure amounts set forth in the Cure Notices.  To

27

the extent no objection is filed with regard to a particular cure amount, the Debtors request that

any order approving this Reconsideration and Sale Motion contain a provision that such cure

amount shall be binding on the applicable contract or lease counterparty. The payment of the

cure amounts specified in the Cure Notices (or a different amount either agreed to by the Debtors

or resolved by the Court as a result of a timely-filed objection filed by a contract or lease

counterparty) will be in full and final satisfaction of all obligations to cure defaults and

compensate the counterparties for any pecuniary losses under such contracts or leases pursuant to

section 365(b)(1) of the Bankruptcy Code, unless the Debtors determine that a particular lease or

contract is not truly executory, and does not need to be cured to transfer the Sold Assets to the

Buyer and this Court enters a subsequent order so finding or, alternatively, the Buyer

subsequently elects not to have any Assumed Executory Contract assumed or assigned to it prior

to the Closing.

66.    Cure Amounts disputed by any Counterparty will be resolved by the Court

at the hearing on this Reconsideration and Sale Motion. In accordance with the Agreement, the

Buyer shall bear and pay any Cure Amounts that are determined to be owed.

67.    The Buyer will be responsible for providing evidence of "adequate

assurance of future performance" to the extent required in connection with the assumption and

assignment of any Assumed Executory Contract. The meaning of "adequate assurance of future

performance" for the purpose of the assumption of executory contracts and unexpired leases

pursuant to section 365 of the Bankruptcy Code depends on the facts and circumstances of each

case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Arrari

(In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco*

*Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance

does not mean an absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. &*

*Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985).  If necessary, the Buyer will provide

evidence of its ability to provide adequate assurance of future performance under any of the

Assumed Executory Contract to Counterparties to the Assumed Executory Contracts at the Sale

Hearing.

### Notice

68.    The Debtors have served, or will serve, by overnight delivery, this

Reconsideration and Sale Motion (and the Agreement without exhibits or schedules) and the

Notice of Reconsideration and Sale Motion on: (i) Office of the United States Trustee; (ii)

counsel to the Official Committee of Unsecured Creditors; (iii) counsel to the Debtors' secured

lenders; (iv) parties known by the Debtors to assert liens, claims, rights, interests or

encumbrances of record in the Alaska Assets (as such term is defined in the Sale Motion); (v)

federal, state and local taxing authorities who have a reasonably known interest in the Alaska

Assets; (vi) the United States Attorney for the District of Delaware; (vii) the Internal Revenue

Service; (viii) the United States Department of Justice; (ix) the counterparties to the Assumed

Executory Contracts (as such term is defined in the Sale Motion); (x) the parties that objected to

the Debtors' previous motions for abandonment and/or sale of the Debtors' Alaska assets; and

(xi) those persons who have requested notice pursuant to Rule 2002 of the Federal Rules of

Bankruptcy Procedure.

69.    The Debtors have served, or will serve, by overnight delivery, the Notice

of Sale Hearing, substantially in the form attached hereto as **Exhibit C** on their known creditors.

70.     Several sections of the Bankruptcy Code and Bankruptcy Rules dictate the

sufficiency of notice and adequacy of service.  As discussed below, the content and manner of

service of this Reconsideration and Sale Motion and the notices related thereto satisfies all such

requirements:

Section 363 Notice:  Section 363 of the Bankruptcy Code provides
that a trustee may sell assets other than in the ordinary course of
business "after notice and hearing."  Under section 102(1) of the
Bankruptcy Code, the phrase "after notice and hearing" means
"notice as is appropriate in the particular circumstances, and such
opportunity for a hearing as is appropriate in the particular
circumstances."  11 U.S.C. § 102(1)(A).  In accordance with the
Sale Procedures Order, creditors have been provided notice of the
salient details regarding this Reconsideration and Sale Motion and
the hearing on the relief requested hereby.  Accordingly, notice is
sufficient under section 363 of the Bankruptcy Code.

Federal Rule of Bankruptcy Procedure 2002:  Bankruptcy Rule
2002 requires twenty days' notice of proposed sales of assets other
than in the ordinary course of business.  In addition, Bankruptcy
Rule 2002 provides that notice of a sale shall "include the time and
place of any public sale, the terms and conditions of any private
sale and the time fixed for filing objections."  FED. R. BANKR. P.
2002.  Local Rule 2002-1(b) specifies the parties on whom a
motion for a sale other than in the ordinary course of business must
be served in cases pending in this jurisdiction.  The Debtors have
provided sufficient notice of the hearing on this Reconsideration
and Sale Motion to the appropriate parties.

Federal Rules of Bankruptcy Procedure 6004 and 6006:
Bankruptcy Rule 6004 requires that notices of sales of assets out of
the ordinary course of business comply with Rule 2002.  As set
forth above, the Debtors have complied with Bankruptcy Rule
2002.  Bankruptcy Rule 6006 requires notice of a motion to
assume or assign an executory contract or unexpired lease to be
served on the counterparty to such contract or lease, as well as on
other parties in interest as this Court may direct.  The Cure Notices
and this Reconsideration and Sale Motion have been or will be
served on counterparties to the Assumed Executory Contracts and
thus satisfies this requirement.

Procedural Due Process:  The notice of this Reconsideration and
Sale Motion that is being provided is "reasonably calculated" to

apprise interested parties of the pendency of the matter and to afford them an opportunity to object. *See Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950). Parties in interest have been and should be found to have been afforded adequate notice of this Reconsideration and Sale Motion and the hearing on the relief requested hereby.

71.     The Debtors submit that the notice of this Reconsideration and Sale Motion that they have provided, and intend to provide, is reasonable and appropriate and should be approved by this Court as adequate and sufficient notice.

72.     The Debtors request, pursuant to Bankruptcy Rules 6004(g) and 6006(d), that the order approving this Reconsideration and Sale Motion become effective immediately upon its entry.

### Conclusion

73.     The proposed vacation of the Abandonment Order in part to permit the sale, and the proposed sale itself, is proper, necessary and serves the best interests of the Debtors, their estates, their creditors and all parties in interest. The Debtors thus request that the Court vacate the Abandonment Order as it relates to the Sold Assets and approve the proposed sale of the Sold Assets, pursuant to the terms of the Agreement, free and clear of all interests, liens, claims, and encumbrances including successor liabilities (but excluding Assumed Liabilities), as requested, including, without limitation, the assumption and assignment of the Assumed Executory Contracts, to the Buyer.

68773-002\DOCS_LA:209232.8

**No Prior Request**

74.     No prior request for the relief sought in this Reconsideration and Sale Motion has been made to this or any other court except that the Debtors previously sought this Court's approval of the sale of the Sold Assets to other buyers who were unable to close the sale.

75.     WHEREFORE, the Debtors respectfully request that this Court (i) vacate the Abandonment Order as it relates to the Sold Assets effective as of the date the sale of the Sold Assets closes, (ii) grant this Reconsideration and Sale Motion and authorize the sale of the Sold Assets to the Buyer on substantially the terms of the proposed Agreement; (iii) approve the assumption and assignment of the Assumed Executory Contracts in accordance with the Agreement; and (iv) grant such other and further relief as is just and proper.

Dated:  October 14, 2009               PACHULSKI STANG ZIEHL & JONES LLP

                                       */s/ Scotta E. McFarland*
                                       Ira D. Kharasch (CA Bar No. 109084)
                                       Maxim B. Litvak (CA Bar No. 215852)
                                       Robert M. Saunders (CA Bar No. 226172)
                                       James E. O'Neill (Bar No. 4042)
                                       Scotta E. McFarland (Bar No. 4184)
                                       919 North Market Street, 17th Floor
                                       P.O. Box 8705
                                       Wilmington, DE  19899-8705
                                       Telephone:  302/652-4100
                                       Facsimile:  310/652-4400
                                       Email:        ikharasch@pszjlaw.com
                                                     mlitvak@pszyjlaw.com
                                                     rsaunders@pszjlaw.com
                                                     joneill@pszyjlaw.com
                                                     smcfarland@pszjlaw.com
                                       Counsel for Debtors and Debtors in Possession