IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| PACIFIC ENERGY RESOURCES LTD., et al.,[1] | ) | Case No. 09-10785 (KJC) |
| | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | Related to Docket No. 550 |

**ORDER (I) APPROVING SALE OF THE
DEBTORS' BETA ASSETS FREE AND CLEAR OF ALL LIENS,
CLAIMS, ENCUMBRANCES AND OTHER INTERESTS PURSUANT TO
SECTIONS 363(b), (f) AND (m) OF THE BANKRUPTCY CODE, (II)
ASSUMING AND ASSIGNING CERTAIN EXECUTORY CONTRACTS
AND UNEXPIRED LEASES; AND (III) GRANTING RELATED RELIEF**

THIS MATTER is before the Court on the motion (the "Sale Motion") of Pacific

Energy Resources Ltd. ("PERL") and the other above-captioned debtors and debtors in

possession (collectively, the "Debtors") for entry of an order, pursuant to 11 U.S.C. §§

363(b),(f) and (m) and 365 (the "Bankruptcy Code"), and Rules 2002, 6004, and 6006 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 6004-1 of the Local

Rules of the Bankruptcy Court; (A) approving the Purchase and Sale Agreement (the

"Agreement")[2] and ancillary documents thereto, including but not limited to the Transition

Services Agreement ("TSA") between PERL and Beta Operating Company, LLC ("Beta"),

---

[1]   The Debtors in these cases, along with the last four digits of each of the Debtors' federal tax identification
number, are: Pacific Energy Resources Ltd. (3442); Petrocal Acquisition Corp. (6249); Pacific Energy Alaska
Holdings, LLC (tax I.D. # not available); Cameros Acquisition Corp. (5866); Pacific Energy Alaska Operating
LLC (7021); San Pedro Bay Pipeline Company (1234); Cameros Energy, Inc. (9487); and Gotland Oil, Inc.
(5463). The mailing address for all of the Debtors is 111 W. Ocean Boulevard, Suite 1240, Long Beach, CA
90802.

[2]   Unless otherwise noted, capitalized terms used herein have the meanings set forth in the Sale Motion, Sale
Procedures Order, Sale Procedures, Agreement or TSA (each as defined herein).

substantially in the forms filed separately with the Court, by and between PERL and the Rise

Energy Beta, LLC ("Rise") and SP Beta Properties, LLC ("Silver Point") (Rise and Silver Point

collectively, the "Successful Bidders") pursuant to which: (i) PERL agrees to sell to Rise the

Operating Interests, and (ii) PERL agrees to sell to the Successful Bidders in their respective

Buyer Percentages the Beta Interests and the SPBP Stock (the SPBP Stock, collectively with the

Operating Interests and the Beta Interests, the "Beta Assets") pursuant to a joint credit bid as set

forth in the Agreement; (B) granting the Debtors authority to sell the Beta Assets as further set

forth in the Agreement free and clear of liens, claims, interests and encumbrances (except as

otherwise provided in the Agreement, this Order, and the Settlement and Compromise with the

Previous Owners, and subject to the Assumed Beta Liabilities and the Assumed Operating

Liabilities) (the "Sale"); and (C) authorizing the Debtors to assume and assign the Assumed

Executory Contracts to the Successful Bidders or their assigns (as applicable); and

The Sale Motion having been served upon (i) Office of the United States Trustee;

(ii) counsel to the Official Committee of Unsecured Creditors (the "Creditors' Committee"); (iii)

counsel to the Lenders; (iv) parties known by the Debtors to assert liens, claims, rights, interests

or encumbrances of record in the Beta Assets; (v) federal, state and local taxing authorities who

have a reasonably known interest in the Beta Assets; (vii) the United States Attorney for the

District of Delaware; (vii) the Internal Revenue Service; (viii) the United States Department of

Justice; (ix) the United States Mineral Management Service (x) the counterparties to the

Assumed Executory Contracts; and (xi) those persons who have requested notice pursuant to

Bankruptcy Rule 2002 and the Notice of Rescheduled Auction (as defined below) having been

served on all known creditors of the Debtors; and

2

Notice of the Sale Motion having been provided in accordance with this Court's

*Order (A) Approving Procedures For Sale of the Debtors' Beta Assets; (B) Scheduling Auction and Hearing to Consider Approval of Sale; (C) Approving Notice of Respective Dates, Times, and Places for Auction and for Hearing on Approval of (i) Sale and (ii) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (D) Approving Forms of Notice; and (E) Granting Related Relief* [Docket No. 533] (the "Sale Procedures Order"); and

The objections to the Sale Motion by Aera Energy LLC ("Aera") and Noble Energy, Inc. ("Noble") have been resolved by agreement among the Debtors, Rise, Silver Point, Aera and Noble as announced to the Court at the hearing on the Sale Motion which took place on December 22, 2009 (the "Sale Hearing") and as memorialized herein; and

It further appearing that the legal and factual bases set forth in the Sale Motion and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation thereon,

NOW, THEREFORE, THE COURT HEREBY FINDS AND DETERMINES THAT:[3]

## Jurisdiction, Final Order and Statutory Predicates

A. This Court has jurisdiction over the Sale Motion pursuant to 28 U.S.C. § 1334. This proceeding is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (N) and (O). Venue is proper in this District and in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[3] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. See Fed. R. Bankr. P. 7052.

B. This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). To any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure as made applicable by Bankruptcy Rule 7054, the Court finds that there is no just reason for delay in the implementation of this Order, and directs entry of judgment as set forth herein.

C. This proceeding is a "core proceeding" within the meaning of 28 U.S.C. § 157(b)(2)(A), (N) and (O).

D. The proposed Sale constitutes a sale of property of the estates outside the ordinary course of business within the meaning of section 363(b) of the Bankruptcy Code.

**Good Faith of Successful Bidders**

E. Rise and Silver Point are purchasing the Beta Assets in good faith and are good faith purchasers within the meaning of 11 U.S.C. § 363(m), and are therefore entitled to the protection of that provision, and otherwise have proceeded in good faith in all respects in connection with this proceeding in that: (a) the Successful Bidders recognized that the Debtors were free to deal with any other party interested in acquiring the Beta Assets; (b) the Successful Bidders complied with the provisions in the Sale Procedures Order; (c) all payments to be made by the Successful Bidders, including but not limited to, any Cure Amounts (as defined below) and other agreements or arrangements entered into by the Successful Bidders in connection with the Sale have been disclosed; (d) the Successful Bidders have not violated 11 U.S.C. § 363(n) by any action or inaction; and (e) the negotiation and execution of the Agreement and any other agreements or instruments related thereto was in good faith.

4

**Highest and Best Offer**

      F.    Pursuant to the Sale Procedures Order and Notice of Rescheduled Auction and Hearing Re Debtors' Proposed Sale of Beta Assets and Assignment of Related Executory Contracts and Unexpired Leases (the "Notice of Rescheduled Auction"), interested parties were required to submit bids for the Beta Assets by December 9, 2009. The Successful Bidders are the only parties to have submitted an offer for the Beta Assets by the December 9, 2009 deadline. Because only one bid was received for the Beta Assets, the Debtors did not convene the Auction with respect to the Beta Assets after receiving the Successful Bidders' offer for the Beta Assets. The Sale Procedures for the Beta Assets afforded a full, fair and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Beta Assets. The Sale Procedures were duly noticed and effectuated in a noncollusive, fair and good faith manner and a reasonable opportunity has been given to any interested party to make a higher and better offer for the Beta Assets.

      G.    The Agreement reflects the highest and best offer for the Beta Assets. The Agreement provides for

      (i)(a) the credit bid by Rise of $80,000,000 of the Seller Indebtedness owing to Rise as of the Closing Date (the "Rise Credit Bid") in consideration of the acquisition by Rise of its Buyer Percentage of the Beta Interests and the SPBP Stock and 100% of the Operating Assets and (b) the credit bid by Silver Point through the assumption on the Closing Date by Silver Point of $177,500,000 of the Seller Indebtedness plus the balance of the revolving facility comprising a portion of the DIP Credit Agreement (but not to exceed $22,000,000) owed to Silver Point or

5

Silver Point's affiliates (the "Silver Point Credit Bid," together with the Rise Credit Bid, the "Credit Bid Amount") in consideration of the acquisition by Silver Point of its Buyer Percentage of the Beta Interests and the SPBP Stock;[4]

(ii) the Successful Bidders' assumption of their respective Buyer Percentages of the Assumed Beta Liabilities and the Assumed Operating Liabilities, including the assumption by Silver Point of $177,550,000 in Silver Point Indebtedness (as evidenced by an amended and restated credit agreement) plus the balance of the revolving facility comprising a portion of the DIP Credit Agreement (but not to exceed $22,000,000) owed to Silver Point's affiliates as described in the Agreement (collectively, the "Assumed Secured Debt");

(iii) the extinguishment of any Seller Indebtedness (including obligations and indebtedness arising under any ancillary loan documents to the Credit Agreements) that is not otherwise part of the Credit Bid Amount or the Assumed Secured Debt, except that the Successful Bidders shall retain a $75,000,000 claim (the "Remaining Claim") that is secured solely by the Excluded Interests, and to the extent the proceeds realized from the Excluded Interests do not satisfy the Remaining Claim, the remainder of the Remaining Claim shall be an allowed general unsecured claim in the Debtors' cases subject to paragraph 17 of this Order, as Silver Point's, Rise's and J. Aron & Company's respective rights to the Excluded Interests existed immediately prior to entry of this Order; and

---

[4] A description of the Seller Indebtedness and the Debtors' acknowledgement of the Seller Indebtedness owed to the Successful Bidders is contained in this Court's Final Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364, 365 and 507: (1) Approving Senior Secured Superpriority Postpetition Financing; (2) Authorizing Use of Cash Collateral; (3) Granting Liens and Providing Superpriority Administrative Expense Status; (4) Granting Adequate Protection; and (5) Modifying Automatic Stay, entered on June 24, 2009 (Docket No. 415) (the "Final DIP Order").

6

(iv) the Successful Bidders' agreement to fund, for the benefit of the Debtors' estates on the closing date of the Sale, the total amount of $11,938,402 (plus an existing cash balance in the estates totaling approximately $895,500) (the "Wind-Down Amount") in accordance with the wind-down budget (the "Wind-Down Budget") in the Successful Bidders' respective Buyer Percentages. The Wind-Down Budget is attached hereto as **Exhibit A**. The Debtors' receipt of any portion of the Wind-Down Amount shall be free and clear of all liens, claims and other interests of any kind or nature whatsoever, except as otherwise set forth in the next sentence. A portion of the Wind-Down Amount totaling $3,618,000 shall be used exclusively to satisfy the success and transaction fees set forth in the Wind-Down Budget, subject to Court approval of final fee applications solely in the case of estate professionals and excluding the Debtors' employees. To the extent disallowed, the funds budgeted for payment of success and transaction fees under the Wind-Down Budget shall be refunded to the Successful Bidders.

H.      Pursuant to the Sale Procedures Order and the Sale Procedures for Beta Assets appended thereto, the Successful Bidders are authorized to credit bid the Seller Indebtedness.

I.      The Agreement constitutes the highest and best offer for the Beta Assets, and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative. The Debtors' determination that the terms of the Agreement constitute the highest and best offer for the Beta Assets constitutes a valid and sound exercise of the Debtors' business judgment.

7

J.    The Agreement represents a fair and reasonable offer to purchase the Beta Assets under the circumstances of these Chapter 11 cases. No other person or entity or group of entities has offered to purchase the Beta Assets for greater economic value to the Debtors' estates (or any of them) than the Successful Bidders.

K.    Approval of the Sale Motion and the Agreement and the consummation of the transactions contemplated thereby are in the best interests of the Debtors, their creditors, their estates and other parties in interest.

L.    The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the Sale prior to, and outside of, a plan of reorganization.

M.    The consideration provided by the Successful Bidders pursuant to the Agreement constitutes reasonably equivalent value and fair consideration for the Beta Assets under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia.

N.    The Agreement was not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession or the District of Columbia. Neither the Debtors nor the Successful Bidders are entering into the transactions contemplated by the Agreement fraudulently for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims.

O.    The Debtors have full corporate power and authority to execute and deliver the Agreement and all other documents contemplated thereby, and no further consents or

8

approvals are required for the Debtors to consummate the transactions contemplated by the Agreement, except as otherwise set forth in the Agreement and the TSA.

**Successful Bidders are Not a Mere Continuation of the Debtors**

P. The Successful Bidders are not a mere continuation of the Debtors, there is not substantial continuity between the Successful Bidders and the Debtors, and there is no continuity of enterprise between the Debtors and the Successful Bidders.

Q. No common identity of incorporators, directors or stockholders exists between the Successful Bidders and the Debtors.

R. The Sale is not being entered into fraudulently. The Sale has been properly noticed.

S. The Successful Bidders are not holding themselves out to the public as a continuation of the Debtors.

**Successor Liability**

T. The Successful Bidders do not constitute successors to the Debtors or the estates.

U. The Sale does not amount to a consolidation, merger or *de facto* merger of the Successful Bidders and the Debtors or any of them.

**Exemption from Recordation Taxes**

V. PERL undertook an extensive and well publicized effort to market the Beta Assets both prior to and after the Petition Date. The Auction was originally scheduled for

9

July 31, 2009 at which time no interested party submitted a bid for the Beta Assets in an amount equal to the amount owed on the Seller Indebtedness.

W.     Thereafter, PERL and the Successful Bidders began negotiations for the terms upon which the Successful Bidders would bid some or all of the Seller Indebtedness at the subsequently scheduled Auction. Pursuant to the Sale Procedures Order, the Auction was scheduled for December 11, 2009, but given that only one bid was received, no Auction was convened, as permitted by the Sale Procedures. The Debtors have since determined that the Successful Bidders' Credit Bid Amount was the highest and best bid for the Beta Assets.

X.     The Successful Bidders' credit bid was functionally a foreclosure sale as the Successful Bidders acquired the Beta Assets securing the repayment of the Seller Indebtedness in exchange for a credit on the Seller Indebtedness at a publicly conducted sale. This process is the equivalent in the nonbankruptcy context of a lender bidding a portion of its debt to acquire collateral in a foreclosure.

Y.     California Revenue and Tax Code § 11926 exempts from recordation taxes a transfer to a lender in the context of a foreclosure sale. Section 11926 exempts the payment of recordation taxes in respect of the Successful Bidders' acquisition of the Beta Assets as a result of or in lieu of a foreclosure sale.

## Assumption and Assignment of Executory Contracts and Unexpired Leases

Z.     Subject to, and at the date and time of, the Closing of the Sale of the Beta Assets contemplated by this Order, the Debtors may assume the Assumed Executory Contracts, as identified in the Agreement, and assign each of them to the Successful Bidders or their

10

designees[5] pursuant to 11 U.S.C. § 365 free and clear of all Encumbrances (as defined below) except as otherwise provided in the Agreement and subject to the Assumed Beta Liabilities and Assumed Operating Liabilities, and notwithstanding any anti-assignment clause as provided in 11 U.S.C. § 365(f). The assumption and assignment of the Assumed Executory Contracts pursuant to the terms of this Order is integral to the Agreement and is in the best interests of the Debtors and their estates, creditors and other parties in interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtors. Notwithstanding any finding herein to the contrary, the Court does not make any finding with respect to whether consent of Aera, SWEPI, and Noble (collectively, the "Previous Owners") is required for the Sale or whether the Sale may be approved without such consent, as the Previous Owners have given their consent to the Sale, provided the Settlement and Compromise with the Previous Owners of their objections (as set forth below) is approved by the Court and such consent is subject to the terms of that settlement and compromise. The Court herein approves the Settlement and Compromise with the Previous Owners set forth below.

AA.     The respective amounts set forth on the Second Amended Notice to Counterparties to Executory Contracts and Unexpired Leases That May Be Assumed And Assigned And Notice Identifying Buyers (the "Cure Notice") approved pursuant to the Sale Procedures Order, and served upon each counterparty to the Assumed Executory Contracts (each a "Counterparty"), are the sole amounts necessary under 11 U.S.C. §§ 365(b)(1)(A) and (B) and

---

5    As used in connection with matters relating to the assumption and assignment of the Assumed Executory Contracts, the term "Successful Bidders" shall mean either or both of the Successful Bidders or (to the extent permitted by the Agreement) their respective assignees.

11

(f)(2)(A) to cure all defaults and pay all actual pecuniary losses under the Assumed Executory Contracts (the "Cure Amounts"). The Successful Bidders shall pay the Cure Amounts listed on the Cure Notice for each of the Assumed Executory Contracts in the ordinary and normal course of business and such payment of the Cure Amounts shall be binding on all parties with respect to any defaults and pecuniary losses under the Assumed Executory Contracts.

BB.    The Successful Bidders have provided adequate assurance of future performance under the relevant Assumed Executory Contracts within the meaning of 11 U.S.C. §§ 365(b)(1)(C), (b)(3) (to the extent applicable) and (f)(2)(B).

CC.    Any objections to the assumption and assignment of any of the Assumed Executory Contracts to the Successful Bidders are hereby overruled. Any objections to the Cure Amounts are resolved as set forth herein. To the extent that any counterparty failed to timely object to its Cure Amount, such counterparty and all other parties are deemed to have consented to such Cure Amount and the assignments of its respective Assumed Executory Contracts to the Successful Bidders.

## Settlement and Compromise of the Noble and Aera Objections

DD.    Aera and Noble's objections to the Sale Motion have been resolved and compromised by a global agreement with the Debtors and the Successful Bidders, the terms of which are generally set forth herein, which the Court finds are reasonable and fair to the estates, their creditors, and the parties and hereby approves and authorizes the Debtors to implement such global agreement in conjunction with the Sale.

12

EE.     The Previous Owners contend that they have certain rights and

entitlements, by virtue of their sale agreements, recorded assignments, and related documents

(collectively, the "Initial Sale Documents") by and through which the Previous Owners sold their

respective interests in the Beta Assets to the Debtors. Among the rights the Previous Owners

contend they possess are certain consent and approval rights necessary in order to complete the

Sale to the Successful Bidders, the right to protection of certain separate property interests, and

the ability to participate in any restructuring or amendments to the MMS Trust Agreement and

its impact upon the MMS Supplemental Bond and certain items related thereto. The Debtors

and the Successful Bidders do not agree with many of the Previous Owners' contentions.

However, in order to effectuate the Sale on the terms specified in the Agreement, the Debtors

and the Successful Bidders acknowledge and agree that as a condition precedent to obtaining the

Previous Owners' consent and authorization, the Court shall approve the terms and conditions of

the agreement reached to resolve the Previous Owners' objections as outlined herein. The Court

hereby finds and approves the following (collectively, the "Settlement and Compromise with the

Previous Owners"), which are agreed to and stipulated by and between the Debtors, the

Successful Bidders, and the Previous Owners:

1.     The Debtors are authorized to enter into and take the necessary steps to

consummate the Settlement and Compromise with the Previous Owners in full and final

compromise of (and to dismiss with prejudice) the two pending adversary proceedings related to

the Production Payments (as defined in the Initial Sale Documents) granted to the Previous

Owners, *Aera Energy, LLC v. Pacific Energy Resources, Ltd.*, Adv. No. 09-51293, and *Noble

Energy, Inc., v. Pacific Energy Resources, Ltd.*, Adv. No. 09-51009, (collectively, the

13

"Production Payment Disputes") under the following terms: (i) Debtors' payment on or before the closing of the Sale to the respective Successful Bidders of the full principal amounts of the Production Payments, together with all accrued interest (as computed in accordance with the provisions related to the Production Payments in the Initial Sale Documents) on such principal amounts as follows, for Aera $6,038,489 (related to both the SWEPI and Aera Production Payments) and for Noble $1,179,935; (ii) the Successful Bidders' deposit of the total pre- and post-petition accrued but unpaid funds of $333,030.94 into the Sinking Fund Trust account to cure the defaults under the Sinking Fund Trust Agreement and their undertaking to assume and continue performing the obligations of that agreement, which relate to the SPBPC pipeline; in return for (iii) the Previous Owners' acknowledgement that the above-referenced payments in regards to the Production Payment are in full and final satisfaction of the Production Payments and that the Production Payments and all obligations related thereto are of no further force and effect and are terminated, and the Previous Owners' release of the Debtors, the Successful Bidders, their respective Affiliates and any subsequent title holders of the Beta Assets from and against any further obligations under or with respect to the Production Payments, including all claims by the Previous Owners for attorneys' fees and costs accrued at any time prior to the Sale; and (iv) Aera's and Noble's release of the Debtors, the Successful Bidders and their respective Affiliates from any and all claims for accrued interest and attorneys' fees related to any and all breaches of the Sinking Fund Trust Agreement prior to the date hereof.

2.    Aera shall assign, convey and transfer, at the sole cost and risk of the Successful Bidders (and shall cooperate with the Successful Bidders in their preparation of all filings and notices necessary) so that any and all interests or rights Aera possesses in regard to

14

certain FCC licenses, as more fully identified by their referenced FCC License Numbers:

WXY983 and KPD249. If such FCC licenses have not already been transferred of record, Aera

agrees to assign, convey and transfer these licenses to Successful Bidders, at their sole cost and

risk. In any event, Aera hereby agrees that it will use reasonable commercial efforts to cooperate

with the Successful Bidders and, if the FCC licenses are not assigned, conveyed or transferred

for any reason, Aera will cooperate with the Successful Bidders in order that they can obtain the

requisite FCC licenses necessary in connection with their ownership of the Beta Assets being

acquired by the Successful Bidders, provided such assistance will not impose material costs or

liabilities on Aera.

3.      As shall be more fully detailed in documents to be executed at the closing,

the Successful Bidders (and Beta, to the extent Beta becomes the operator of the Beta Assets) (i)

shall accept and assume the rights, duties and obligations of PERL under the MMS Trust

Agreement, which relates to the MMS Supplemental Bond, and the Sinking Fund Trust

Agreement and agree that the Previous Owners shall retain all rights and security interests they

possess with respect thereto, and (ii) shall honor and continue to perform any obligations of

PERL related to the MMS Trust Agreement and the Sinking Fund Trust Agreement.

Notwithstanding any provision herein to the contrary, the Previous Owners' liens and

encumbrances on any funds or property that secure obligations to the MMS and other

governmental bodies relating to the Beta Assets, including without limitation the MMS

Supplemental Bond and the MMS Trust Agreement, shall not be impacted by the assumption of

the MMS Trust Agreement (and the MMS Trust Agreement shall remain in full force and effect)

or any provision of this Order and the liens and encumbrances on such assets securing

15

obligations to the MMS and other governmental bodies relating to the Beta Assets, including those subject to the trust, shall be deemed to continue to secure the rights of the Previous Owners to the same extent, and with the same priority as currently exists.

4.    (i) The Amended and Restated Purchase and Sale Agreement by and between Aera and PERL, dated November 1, 2006, together with its schedules and attachments, as may have been amended and modified (the "Aera PSA"), (ii) the Purchase and Sale Agreement by and between SWEPI LP and PERL, dated November 13, 2006, together with its schedules and attachments, as may have been amended and modified (the "SWEPI PSA"), (iii) the Purchase and Sale Agreement by and between Noble and PERL, dated February 28, 2007 (the "Noble PSA"), and (iv) the Assignments and Bills of Sale delivered under the Aera PSA, the SWEPI PSA and the Noble PSA (the "Assignments") are not executory contracts as contemplated under Section 365 of the Bankruptcy Code and, as such, may not be rejected by the Debtors. The Previous Owners agree and acknowledge that, following the completion of the Settlement and Compromise with the Previous Owners and receipt and deposit of the payments contemplated thereunder, the Previous Owners shall release and relinquish any claim that any further debt, payment or other monetary obligation is currently due and owing as of the effective date of the Sale under the Aera PSA, the SWEPI PSA, the Noble PSA, and the Assignments, respectively.

5.    As shall be more fully detailed in documents to be executed at the closing, in connection with and in consideration for the foregoing, the Successful Bidders shall execute an agreement with Aera by which the Successful Bidders shall grant to Aera the benefit of certain contractual undertakings substantially the same as those found in certain provisions of the

16

Aera PSA. Those sections shall consist of and be deemed only to include Sections 11.07, 11.09, and 11.10 and Articles 18 (other than Sections 18.03(a) and (b) and 18.08) and 19 under the Aera PSA, which in each case shall be revised and restated to reflect current facts and the passage of time since original execution of the Initial Sale Documents. The Successful Bidders shall agree to perform such obligations only on their own behalf and not with respect to the Debtors from and after the effective date of closing of the Sale. With respect to the obligations under Sections 18.03, 18.04 (except the release and waiver provisions) and 18.05, the Successful Bidders shall only agree to comply with these covenants for Aera only with respect to those events, actions, occurrences and incidents (or portions of such events, actions, occurrences and incidents) that occur after the effective date of the closing of their purchase of the Beta Assets, and the Successful Bidders shall have no obligations to Aera thereunder with respect to events, actions, occurrences and incidents (or portions of such events, actions, occurrences and incidents) that occurred prior to the effective date of the closing on the Sale. The Successful Bidders' undertakings shall be several, not joint, pro rata to the interests they are acquiring in the Beta Assets and Beta shall be jointly and severally liable as operator for all such obligations. Additionally, references to "Related Agreements" shall be limited to the OCS Leases, the Unit Agreement, the Unit Operating Agreement, the Second Unit Operating Agreement and the other agreements listed on Exhibit B and, to the extent they are included within Section 11.07(b) of the Aera PSA (if at all), Exhibit N to the Aera PSA. The documentation shall also reflect the Successful Bidders' undertaking of the substantially similar obligations under the Noble PSA and the SWEPI PSA that are substantially similar to those provisions in the Aera PSA and subject to the same terms and conditions herein, in particular Sections 9.04, 9.06 and 9.07 and

17

Articles 14 and 15 of the Noble PSA and Sections 11.04, 11.06, and 11.07 and Articles 16 and 17 of the SWEPI PSA. It is expressly agreed that, as to the Successful Bidders, Beta and their respective successors and assigns, these undertakings shall supersede any undertakings and covenants in the Aera PSA, the Noble PSA, the SWEPI PSA and the Assignments and shall bind the Successful Bidders, Beta and their respective successors and assigns.

6.     The Successful Bidders and the Debtors shall execute and grant to the Previous Owners a full and as broad a release as legally permissible with respect to any and all claims whatsoever that arose or relate, in whole or in part, to events, actions, occurrences and incidents that occurred prior to the effective date of the closing by the Successful Bidders and relate, in any respect, to the Beta Assets, the Noble PSA, the SWEPI PSA, the Aera PSA or the transactions contemplated therein. Such release shall include full waivers and releases, including any and all waivers and releases that appear in the Aera, Noble, or SWEPI PSAs.

(with accrued interest)

7.     Within 5 business days after receipt of the Production Payments, Noble

∧

✓

and Aera shall withdraw the Production Payment Disputes with prejudice.

**Section 363 Sale**

FF.     The conditions of 11 U.S.C. § 363(f) have been satisfied in full; therefore, the Debtors may sell the Beta Assets free and clear of any interest in such property, except as otherwise provided in the Agreement or this Order and subject to the Assumed Beta Liabilities and Assumed Operating Liabilities.

GG.     The Debtors are the sole and lawful owners of the Beta Assets. With respect to any and all entities and persons asserting any options, pledges, security interests, claims, equities, reservations, third party rights, replacement liens, superpriority claims, voting

18

trusts or similar arrangements, liens charges or other encumbrances (other than easements, restrictive covenants, leases, overriding royalty interests, production payments, covenants that may be subsequently determined to run with the land, and licenses encumbering property owned by the Debtors) or restrictions on or conditions to transfer or assignment of any kind (including, without limitation, restrictions or conditions on or to the transfer, assignment or renewal of licenses, permits registrations and authorizations or approvals of or with respect to governmental units and instrumentalities), whether direct or indirect, absolute or contingent, matured or unmatured, liquidated or unliquidated on or against the Beta Assets or the Debtors (collectively, the "Encumbrances"), except as otherwise provided in the Agreement and subject to the Assumed Beta Liabilities and Assumed Operating Liabilities, either (i) such person or entity has consented to the sale and transfer, license and assignment, as applicable, free and clear of its Encumbrance, with such Encumbrance to attach to the net proceeds of such sale and transfer, license and assignment, as applicable, respectively, (ii) applicable nonbankruptcy law permits sale of the assets free and clear of such Encumbrance, (iii) such Encumbrance is in bona fide dispute, (iv) such person or entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such Encumbrance, (v) Buyer is obligated to obtain governmental or regulatory approval after the Sale, or (vi) in the case of the Previous Owners, such person or entity has consented to the sale and transfer, license and assignment, as applicable, subject to the terms of the Settlement and Compromise with the Previous Owners contained herein.

HH.    The Successful Bidders would not have entered into the Agreement and would not consummate the transactions contemplated thereby if the sale of the Beta Assets to the Successful Bidders, the assumption, assignment and sale of the Assumed Executory Contracts to

19

the Successful Bidders, and the assumption of the Assumed Beta Liabilities and Assumed Operating Liabilities by the Successful Bidders were not, except as otherwise provided in the Agreement, this Order, and the Settlement and Compromise with the Previous Owners, and subject to the Assumed Beta Liabilities and Assumed Operating Liabilities, free and clear of all Encumbrances of any kind or nature whatsoever, or if the Successful Bidders would, or in the future could (except as provided in the Agreement or any amendments, and this Order, the Settlement and Compromise with the Previous Owners, and subject to the Assumed Beta Liabilities and Assumed Operating Liabilities), be liable for any of such Encumbrances or other future liabilities arising out of past conduct of the Debtors or the Debtors' past ownership of the Beta Assets.

II.     The Successful Bidders are not purchasing all of the Debtors' assets. The Successful Bidders are only purchasing the Beta Assets and are not purchasing any assets other than the Beta Assets, to the extent set forth in the Agreement. The Beta Assets do not include the Excluded Items, as defined in the Agreement. The Excluded Items shall remain subject to existing Encumbrances, if any.

JJ.     The Successful Bidders are assuming the Assumed Beta Liabilities and the Assumed Operating Liabilities, as set forth in the Agreement, together with those liabilities as reflected in the Settlement and Compromise with the Previous Owners, and are not assuming any obligations other than the Assumed Beta Liabilities, the Assumed Operating Liabilities, and the Settlement and Compromise with the Previous Owners.

KK.     The Debtors are assuming and assigning to the Successful Bidders the Assumed Executory Contracts in accordance with the terms of the Agreement and are not

20

assuming and assigning any executory contracts or leases other than the Assumed Executory Contracts.

LL. Given all of the circumstances of the Debtors' Chapter 11 cases and the adequacy and fair value of the purchase price under the Agreement, the proposed sale of the Beta Assets to the Successful Bidders constitutes a reasonable and sound exercise of the Debtors' business judgment and should be approved.

**Notice**

MM. Notice of the Auction and Sale Hearing was reasonably calculated to provide all interested parties with timely and proper notice of the Sale, Sale Hearing and Auction.

NN. As evidenced by the affidavits of service previously filed with the Court, proper, timely, adequate, and sufficient notice of the Sale Motion, Auction, Sale Hearing, the Sale and the transactions contemplated thereby, including without limitation, the assumption and assignment of the Assumed Executory Contracts to the Successful Bidders, has been provided in accordance with the Sale Procedures Order, 11 U.S.C. §§ 105(a), 363 and 365, and Bankruptcy Rules 2002, 6004, 6006, 9007 and 9008. The notices described above were good, sufficient, and appropriate under the circumstances, and no other or further notice of the Sale Motion, Auction, Sale Hearing, the Sale or the assumption and assignment of the Assumed Executory Contracts to the Successful Bidders is or shall be required.

OO. A reasonable opportunity to object and be heard with respect to the Sale, the Sale Motion, and the relief requested therein (including the assumption and assignment of

21

Assumed Executory Contracts to the Successful Bidders and any cure costs related thereto and the entry of this Order), has been afforded to all interested persons and entities.

**Miscellaneous**

PP.    Time is of the essence in consummating the Sale. In order to maximize the value of the Beta Assets, it is essential that the Sale occur promptly, and within the time constraints set forth in the Agreement. Accordingly, there is cause to lift the stays contemplated by Bankruptcy Rules 6004(h) and 6006(d).

QQ.    All findings of fact and conclusions of law announced by the Court at the Sale Hearing are hereby incorporated herein

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1.    All objections to the Sale Motion or the relief requested therein that have not been withdrawn, waived, or settled as announced to the Court at the hearing on the Sale Motion or by stipulation filed with the Court, and all reservations of rights included therein, are, except as provided in other orders of the Court, hereby overruled on the merits or the interests of such objections have been otherwise satisfied or adequately provided for.

2.    The Agreement and TSA and all other documents attached as exhibits to the Agreement and TSA (substantially in the form thereof) are hereby approved in all respects, and shall be deemed in full force and effect, binding and benefiting the Debtors and the Successful Bidders and their respective assigns or designees.

3.    The Debtors are authorized and empowered to execute and deliver to the Successful Bidders the Agreement and the other agreements contemplated thereby (including,

22

without limitation, the TSA) and contemplated by this Order, including those reflected in the Settlement and Compromise with the Previous Owners, and to implement and consummate all of the transactions and perform all obligations contemplated by this Order, the Settlement and Compromise with the Previous Owners, and the Agreement, including, without limitation, to sell the Beta Assets to the Successful Bidders and to assume and assign to the Successful Bidders the Assumed Executory Contracts, all on the terms of the Agreement, for the purchase price set forth therein (subject to any adjustments set forth therein), and determined in accordance with the Agreement. The Debtors are authorized and empowered to deliver deeds, bills of sale, assignments and other such instruments and/or documentation that may be necessary or requested by the Successful Bidders in accordance with the terms of the Agreement to evidence the transfers required or otherwise contemplated by the Agreement.

4.     The Debtors are hereby authorized to execute and deliver the releases, documents and take such other steps as necessary to effectuate the terms of the Settlement and Compromise with the Previous Owners, including making the payments set forth therein, and resolution of the objections of Aera and Noble, as more fully set forth in paragraphs DD through EE (including subparts 1 through 6) herein. Moreover, the Settlement and Compromise with the Previous Owners of the Aera and Noble objections, the adversary proceedings, and all provisions therein, are fair and reasonable to the estates, their creditors and within the sound business judgment of the Debtors.

5.     The Debtors are hereby authorized to take any and all actions necessary to consummate the Agreement and the Settlement and Compromise with the Previous Owners,

23

including any actions that otherwise would require further approval by shareholders, members, or their board of directors without the need of obtaining such approvals.

6.      Upon the Closing, the Successful Bidders shall take title to and possession of the Beta Assets in accordance with and subject to the Agreement, Assumed Beta Liabilities and Assumed Operating Liabilities (collectively, the "Assumed Liabilities"). Pursuant to 11 U.S.C. § 363(f) and the Agreement, including any amendments thereto, with the exception of such Assumed Beta Liabilities and Assumed Operating Liabilities (including, with respect to Silver Point, the Assumed Secured Debt) or as otherwise contemplated by the Agreement, the transfer of title to the Beta Assets and the Assumed Executory Contracts is free and clear of any interest and free of all Encumbrances, including, any options, pledges, security interests, claims, equities, reservations, third party rights, voting trusts or similar arrangements, liens, charges or other encumbrances (other than easements, restrictive covenants, leases, overriding royalty interests, production payments, covenants running with the land, and licenses encumbering property owned by the Debtors) or restrictions on or conditions to transfer or assignment of any kind (including, without limitation, restrictions or conditions on or to the transfer, assignment or renewal of licenses, permits registrations and authorizations or approvals of or with respect to governmental units and instrumentalities, expect as contemplated under the Agreement), whether direct or indirect, absolute or contingent, matured or unmatured, liquidated or unliquidated on or against the Beta Assets or the Debtors.  Notwithstanding the foregoing, all liens on the Beta Assets in favor of the Successful Bidders or their predecessors with respect to the Seller Indebtedness shall continue in full force and effect in favor of Silver Point, solely on the Beta Assets acquired by Silver Point and with respect to the Assumed Secured Debt assumed by

24

Silver Point, as and to the extent provided in Paragraph 17 of this Order. Except for the Assumed Beta Liabilities and the Assumed Operating Liabilities or as otherwise contemplated by the Agreement, the Settlement and Compromise with the Previous Owners, and this Order, all Encumbrances shall attach solely to the net proceeds of the sale with the same extent, validity and priority as they attached to the Beta Assets immediately prior to the Closing. The Successful Bidders shall not be required to seek or obtain relief from the automatic stay under 11 U.S.C. § 362 to enforce any of their remedies under the Agreement or any other Sale-related document. The automatic stay imposed by 11 U.S.C. § 362 is modified solely to the extent necessary to implement the preceding sentence and the other provisions of this Order.

    7.    Except as otherwise set forth in the Agreement and this Order, the Successful Bidders are not expressly or impliedly agreeing to assume any of the Debtors' liabilities, the transactions contemplated by the Agreement do not amount to a consolidation, merger or a *de facto* merger of the Debtors and the Successful Bidders, the Successful Bidders are not a mere continuation of the Debtors nor do the Successful Bidders constitute successors to the Debtors, and the transactions contemplated by the Agreement are not being entered into fraudulently or in order to escape liability for the Debtors' debts.

    8.    This Order shall be binding in all respects upon the Debtors, their estates, all creditors of, and holders of equity interests in, any Debtor, any holders of Encumbrances on the Beta Assets (whether known or unknown), all owners of easements, restrictive covenants, leases, overriding royalty interests, production payments and licenses encumbering property owned by the Debtors, all non-Debtor parties to the Assumed Executory Contracts, the Previous Owners, the Successful Bidders, all successors and assigns of the Successful Bidders, each

25

Debtor and its respective affiliates and subsidiaries, the Beta Assets and any trustees, if any, subsequently appointed in the Debtors' Chapter 11 cases or upon a conversion to Chapter 7 under the Bankruptcy Code of any of the Debtors' cases. This Order and the Agreement, including the Debtors' obligations under the TSA, shall inure to the benefit of the Debtors, their estates, their creditors, the Previous Owners, the Successful Bidders and their respective successors and assigns, including but not limited to Beta.

9. As provided for under the TSA, during the PERL Services Term (as such term is defined in the TSA), PERL is hereby ordered to take all action necessary to maintain in full force and effect and hold in trust for the benefit of the Successful Bidders, the Previous Owners, and Beta, the MMS Supplemental Bond, and any other bonds posted by or at the request of PERL (collectively, the "Bonds"), including surety bonds and bonds for plugging, abandonment, decommissioning, removal and restoration obligations, together with any U.S. Treasury notes or other investment securities, trust accounts, cash or other collateral that may be posted, held or pledged pursuant thereto, whether by PERL or its predecessors in interest, and whether held directly by PERL or by a Governmental Entity or other Third Party, including those listed on Schedule 1.63 of the Agreement. Following the discontinuation or termination of the PERL Services pursuant to the TSA, PERL is hereby ordered to deliver to Beta, at Beta's sole cost and expense, (i) each such Bond and all such underlying security or other collateral or (ii) to the extent PERL is not permitted to transfer a Bond, all underlying security or other collateral with respect to such Bond so that Beta may obtain a replacement Bond.

10. Except for the Assumed Beta Liabilities and the Assumed Operating Liabilities and the Wind-Down Amount, or as otherwise provided for in this Order or the

26

Agreement, or the Settlement and Compromise with the Previous Owners, the Successful Bidders shall not have any liability or responsibility for any liability or other obligation of the Debtors arising under or related to the Beta Assets. Without limiting the generality of the foregoing, and except as otherwise specifically provided herein, in the Agreement, or the Settlement and Compromise with the Previous Owners, the Successful Bidders shall not be liable for any claims against the Debtors or any of their predecessors or affiliates, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtors or any obligations of the Debtors arising prior to the Closing, whether relating to or arising out of the Business, the Excluded Items or the Beta Assets or otherwise, other than the Assumed Beta Liabilities and the Assumed Operating Liabilities and the Wind-Down Amount. Upon the Closing, the Debtors' estates shall take title to and possession of the Wind-Down Amount fully funded by the Successful Bidders. Any residual resulting from unused amounts under the Wind-Down Budget shall revert to the Debtors' estates; provided, however, that to the extent any portion of the $3,618,000 in success and transaction fees is disallowed, such disallowed amounts shall revert, pro rata, to the Successful Bidders.

11.    Subject to, and at the time of, the Closing, the Debtors are authorized to assume and assign each Assumed Executory Contract to the Successful Bidders free and clear of all Encumbrances, except as otherwise provided in the Agreement and subject to the Assumed Liabilities. The payment of Cure Amounts (if any) shall (a) effect a cure of all defaults existing thereunder as of the Closing Date, (b) compensate for any actual pecuniary loss to such non-Debtor party resulting from such default, and (c) together with the assumption of the Assumed Executory Contracts by the Successful Bidders, constitute adequate assurance of future

27

performance thereof. The Successful Bidders shall then have assumed the Assumed Executory Contracts and, pursuant to 11 U.S.C. §§ 365(f) and 365(k), the assignment by the Debtors of such Assumed Executory Contracts shall not be a default thereunder. After the payment of the relevant Cure Amounts, neither the Debtors nor the Successful Bidders shall have any further liabilities to the non-Debtor parties to the Assumed Executory Contracts other than the Successful Bidders' obligations under the Assumed Executory Contracts that become due and payable on or after the Closing Date, or otherwise pursuant to the Assumed Beta Liabilities and Assumed Operating Liabilities, except as otherwise provided in the Settlement and Compromise with the Previous Owners, this Order, or the Agreement, and subject to the Assumed Beta Liabilities and Assumed Operating Liabilities.

12.     Any provisions in any Assumed Executory Contract that prohibit or condition the assignment of such Assumed Executory Contract or allow the party to such Assumed Executory Contract to terminate, recapture, impose any penalty, condition on renewal or extension or modify any term or condition upon the assignment of such Assumed Executory Contract, constitute unenforceable anti-assignment provisions that are void and of no force and effect. All other requirements and conditions under 11 U.S.C. §§ 363 and 365 for the assumption by the Debtors and assignment to the Successful Bidders of the Assumed Executory Contracts have been satisfied. Upon the Closing, in accordance with 11 U.S.C. §§ 363 and 365, the Successful Bidders shall be fully and irrevocably vested with all rights, title and interest of PERL under the applicable Assumed Executory Contracts.

13.     The failure of the Debtors or the Successful Bidders to enforce at any time one or more terms or conditions of any Assumed Executory Contract shall not be a waiver of

such terms or conditions, or of the Debtors' and Successful Bidders' rights to enforce every term and condition of the Assumed Executory Contracts.

14. Upon the Closing and the payment of the relevant Cure Amounts by the Successful Bidders, the Successful Bidders (as applicable) shall be deemed to be substituted for PERL as a party to the applicable Assumed Executory Contracts and the Debtors shall be relieved from all liability on such Assumed Executory Contracts as set forth in the Agreement.

15. The Successful Bidders have provided adequate assurance of future performance under the relevant Assumed Executory Contracts within the meaning of 11 U.S.C. §§ 365(b)(1 )(C), 365(b)(3) (to the extent applicable) and 365(f)(2)(B).

16. There shall be no rent accelerations, assignment fees, increases or any other fees charged to Successful Bidders as a result of the assumption and assignment of the Assumed Executory Contracts.

17. Pursuant to 11 U.S.C. §§ 105(a), 363 and 365, all parties to the Assumed Executory Contracts are forever barred and enjoined from raising or asserting against Successful Bidders any assignment fee, default, breach or claim or pecuniary loss, or condition to assignment, arising under or related to the Assumed Executory Contracts existing as of the Closing or arising by reason of the Closing, except for any amounts that are Assumed Liabilities being assumed by the Successful Bidders under the Agreement, this Order or the Settlement and Compromise with the Previous Owners.

18. Effective immediately upon the Closing, and except as to the Remaining Claim (i) first, upon consummation of the Rise Transactions, any portions of the Seller Indebtedness (including obligations and indebtedness arising under any ancillary loan documents

29

to the Credit Agreements) owed to Rise shall be extinguished, and Rise shall cease to be a lender with respect to any facility governing the Seller Indebtedness, except for the Excluded Interests (defined below), (ii) second, upon consummation of the Silver Point Transactions, any portions of the Seller Indebtedness (including obligations and indebtedness arising under any ancillary loan documents to the Credit Agreements) owed to Silver Point that are not part of the Credit Bid Amount or the Assumed Secured Debt shall be extinguished, except for the Excluded Interests (defined below), (iii) third, the Debtors shall cease to be obligated under the Assumed Secured Debt, and (iv) fourth, all liens and security interests of Rise and Silver Point covering assets of the Debtors, other than Silver Point's lien and security interest in the Beta Assets being acquired by Silver Point and other than the security interest in the Excluded Interests, shall terminate ((i) – (iv) are deemed to occur in the order set forth). "Excluded Interests" means all of the right, title and interest of any of the Successful Bidders and any of their predecessors or affiliates or any of the Debtors' estates in (i) all payments or proceeds from insurance covering the Debtors' business interruption and debt service and related losses resulting from the eruptions of Mount Redoubt and related events and any refunds of insurance premiums associated with the abandonment of operations of the Debtors' Alaska operations and assets or otherwise, (ii) any proceeds from the sale of crude oil or other petroleum products produced from the oil fields commonly known as Trading Bay Unit and Trading Bay Field, including without limitation those which are currently held in a segregated interest-bearing account by order of this Court dated April 28, 2009 (Docket No. 230), other than such proceeds which are required to remain in the Pacific Energy Alaska Operating, LLC estate pursuant to Paragraph 35 of the Final DIP Order, (iii) all payments or proceeds resulting from deposits made by potential purchasers of the Debtors' operations in

30

Alaska or claims relating thereto, including without limitation, Catherwood Limited and its affiliated entities, and (iv) any assets or proceeds of assets related to any Alaska properties not otherwise bid or assumed to which the Successful Bidders, or their predecessors-in-interest or successors-in-interest, would otherwise be entitled if they were not bidders. As set forth in paragraph G(iii) above, the Successful Bidders shall retain the Remaining Claim as an allowed first priority senior secured (as to the Excluded Interests only) $75,000,000 claim and as an unsecured claim to the extent of any deficiency. As further consideration to the Debtors' estates, the Successful Bidders are deemed to have assigned to the estates solely for the benefit of unsecured creditors (and not to be used for any other purposes) other than Forest Oil Corporation (or any successors or assigns thereof) any distributions on account of the Remaining Claim and all subordination rights against Forest Oil Corporation (or any successors or assigns thereof) as to any and all assets that become available to the estates other than the Excluded Interests. Notwithstanding anything to the contrary herein, no portion of the Wind-Down Amount shall be used to investigate, pursue or prosecute any rights associated with the Excluded Interests, except as may be necessary to further the Debtors' estates' interests in item (ii) above regarding proceeds from Trading Bay Unit and Trading Bay Field.

19.     The Successful Bidders are good faith purchasers within the meaning of 11 U.S.C. § 363(m) and, as such, are entitled to the full protections of 11 U.S.C. § 363(m).

20.     The Successful Bidders have given substantial consideration under the Agreement for the benefit of the Debtors, their estates and creditors. The consideration given by the Successful Bidders shall constitute valid and valuable consideration for the releases of any potential claims and liens pursuant to this Order, which releases shall be deemed to have been

31

given in favor of the Successful Bidders by all holders of liens against or interests in, or claims against any of the Debtors or any of the Beta Assets, other than holders of liens or claims relating to the Assumed Beta Liabilities and the Assumed Operating Liabilities or the Previous Owners under the Settlement and Compromise with the Previous Owners set forth herein. The consideration provided by the Successful Bidders for the Beta Assets under the Agreement is fair and reasonable and accordingly the purchase may not be avoided under 11 U.S.C. § 363(n).

21.     Pursuant to Bankruptcy Rules 7062, 9014, 6004(g) and 6006(d), this Order shall be effective immediately upon entry and the Debtors are authorized to effect the Closing of the Sale immediately upon entry of the Sale Order.

22.     This Order is and shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agreement.

23.     California Revenue and Tax Code § 11926 exempts from recordation taxes a transfer to a lender in the context of a foreclosure sale. Section 11926 exempts the payment of recordation taxes in respect of the Successful Bidders' acquisition of the Beta Assets.

32

24.     The Original Certificate is hereby cancelled and a new stock certificate for SPBP shall be issued to the Successful Bidders in the requisite Buyer Percentages as provided for under the Agreement.

25.     This Order constitutes authorization under all applicable jurisdictions' versions of the Uniform Commercial Code for the Successful Bidders to file UCC termination statements with respect to all security interests in or liens on the Beta Assets.

26.     The failure specifically to include any particular provision of the Agreement or TSA in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Agreement and TSA be authorized and approved in their entirety.

27.     This Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the Agreement, all modifications thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtors (or any of them) are a party or which has been assigned by the Debtors to the Successful Bidders, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale. For the avoidance of doubt, the Successful Bidders and their respective predecessors-in-interest shall maintain the rights to any proceeds of Excluded Interests as such rights existed immediately prior to entry of this Order, and any such proceeds of Excluded Interests received by the Successful Bidders and/or Debtors shall be distributed by the Successful Bidders and/or Debtors, as applicable, in accordance with the respective agreements governing such Seller Indebtedness as they existed immediately prior to the entry of this Order.

33

28.     Upon entry of this Order, all Seller Indebtedness (including obligations and indebtedness arising under any ancillary loan documents to the Credit Agreements) remaining after application of the Credit Bid Amount other than the Assumed Secured Debt, and any documents evidencing any Seller Indebtedness (including ancillary loan documents to the Credit Agreements) other than documents evidencing the Assumed Secured Debt (as to which Silver Point, and not the Debtors, shall be the obligor), shall be extinguished and terminated; provided, however, that the Successful Bidders and their respective predecessors-in-interest shall maintain, through the Remaining Claim, the rights to any proceeds of Excluded Interests as such rights existed immediately prior to entry of this Order, and any such proceeds of the Remaining Claim received by the Successful Bidders and/or Debtors shall be distributed by the Successful Bidders and/or Debtors, as applicable, in accordance with the respective agreements governing such Seller Indebtedness as they existed immediately prior to entry of this Order.

29.     The provisions of Bankruptcy Rules 6004(g) and 6006(d) shall not apply to stay consummation of the Sale of the Beta Assets to the Successful Bidders under the Agreement, as contemplated in the Sale Motion and approved by this Sale Order, and the Seller and the Successful Bidders are hereby authorized to consummate the transactions contemplated and approved herein immediately upon entry of this Sale Order.

30.     In resolution of the Creditors' Committee's objections to the Sale and the Creditors' Committee's support of the Sale, the Successful Bidders shall, prior to or at the date and time of the Closing of the Sale of the Beta Assets contemplated by this Order, pay the sum of $1,400,000 into a trust account designated by the Debtors for the sole and exclusive benefit of, and ultimate distribution to, holders of allowed general unsecured claims against the Debtors'

34

estates. Such amount shall be, for avoidance of doubt, irrevocable and free and clear of all liens, claims and other interests of any kind or nature whatsoever, including any and all claims of the Successful Bidders, and shall be in addition to the Wind-Down Amount otherwise funded pursuant to this Order.

31. To the extent that any provisions of this Order shall be inconsistent with the provisions in the Agreement, TSA or any related instrument or document, any prior order, or any pleading with respect to the motions in this case, the terms of this Order shall control.

Dated: December 23, 2009

Honorable Kevin J. Carey
United States Bankruptcy Judge

35