## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: ) | |
| ) | Chapter 11 |
| PACIFIC ENERGY RESOURCES, LTD., ) | |
| *et al.,* ) | Case No. 09-10785 (KJC) |
| ) | |
| Debtors. ) | Jointly Administered |
| ) | Hearing Date: April 19, 2010 at 3:00 p.m. |
| ) | Related Docket Nos.: 1296, 1320, 1382, 1383, 1441 |
| ) | |

## UNION OIL COMPANY OF CALIFORNIA'S RESPONSE TO DEBTORS' OBJECTION TO THE ADMINISTRATIVE CLAIM STATEMENTS OF UNION OIL COMPANY OF CALIFORNIA FOR ABANDONMENT AND ENVIRONMENTAL REMEDIATION COSTS [DOCKET NO. 1383] AND OPERATING COSTS [DOCKET NO. 1382] PURSUANT TO 11 U.S.C. §502(b) AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 3007

Union Oil Company of California ("**Union**"), by its undersigned counsel, hereby responds (the "**Response**") to debtor Pacific Energy Alaska Operating LLC's ("**PEAO**") Objection to the Administrative Claim Statements of Union Oil Company of California for Abandonment and Environmental Remediation Costs [Docket No. 1383] and Operating Costs [Docket No. 1382] Pursuant to 11 U.S.C. § 502(b) and Federal Rule of Bankruptcy Procedure 3007 (the "**Objection**"). For its Response, Union respectfully represents as follows:

### Preliminary Statement

Even before these cases were filed, through September 2, 2009, PEAO attempted to take advantage of its contractual relationship with Union to enjoy the benefits of part ownership of two oil fields, the Trading Bay Unit ("**TBU**") and the Trading Bay Field ("**TBF**"), without paying any of the associated costs. Although PEAO insists that it did *nothing* post-petition to incur Union's claims, its position is highly disingenuous.

The debtors in these cases (the "**Debtors**") are well aware that Union is contractually obliged, as the operator of the TBU and the TBF, to maintain the fields and to pay the costs of production and maintenance, which then must be proportionally reimbursed by other working interest owners, currently PEAO and Union[1]. During these cases, Union moved for relief from the automatic stay so it could protect itself to some extent by enforcing its statutory and contractual liens on PEAO's share of production. The Debtors, however, vigorously opposed that motion, insisting that they should pay the proceeds of that production to other creditors or to themselves. Union also moved to compel abandonment of PEAO's interests in TBU and TBF and rejection of the related contracts, but the Debtors petitioned this Court for extra time to sell the assets. PEAO has received post-petition benefits from Union, and not unwillingly. PEAO has fought to retain post-petition proceeds of production and to gain time to sell assets it knew Union had to expend funds to maintain on the estates' behalf. It chose not to relinquish those proceeds or abandon the TBU and TBF interests, although it could have accomplished the latter at any time. As a result, Union is entitled to administrative priority for the value of its post-petition production and maintenance claims against PEAO. Further, Union may be required to pay abandonment and environmental remediation costs on behalf of the estate. To the extent it does so, Union is entitled to an administrative claim for the value it provides the estates.

## Background

1.     Union and PEAO were both working interest owners in the TBU and the TBF; PEAO abandoned the estates' interest in TBU and TBF as of September 2, 2009. Union holds a 53.2% working interest and operates the fields, and PEAO held a 46.8% interest. Union is the operator of both the TBU and the TBF.

---

[1]   Marathon Oil Company is also a working interest owner in the Gas (GGS) WIPA of the TBU.

2.      The Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code on

March 9, 2009 (the "**Petition Date**").

3.      As of the Petition Date, the following six agreements (collectively, with the TBU

and TBF leases, the "**Agreements**") governed the relationship between Union and PEAO:

- *Unit Agreement for the Development and Operation of the Trading Bay Unit Area State of Alaska* dated February 6, 1967 between Union Oil of California, as Operator, and Standard Oil Company of California, et al., as non-Operators, as amended and including all Ratifications and Joinders

- *Unit Operating Agreement - Trading Bay Unit,* dated August 25, 1967, between Union Oil Company of California, as Operator, and Marathon Oil Company, et al., as non-Operators, as amended and supplemented

- *Trading Bay Field Joint Operating Agreement* between Union Oil Company of California and Marathon Oil Company dated June 12, 1996

- *Unocal/Forest Oil Alignment Agreement, Trading Bay Field/Trading Bay Unit* dated as of January 1, 2002, between Union Oil Company of California and Forest Oil Corporation

- *Trading Bay Facilities Agreement* between Union and Forest Oil Company dated August 28, 2009

- *Fuel Gas Supply Agreement*, dated November 25, 2002, between Union Oil of California, as Operator of the Unit Operating Agreement, Trading Bay Unit, Cook Inlet, Alaska, and Forest Oil Corporation

4.      As operator of the TBU and TBF, Union first pays all the expenses of operating and

maintaining the fields, and then, consistent with the terms of the agreements, Union issues joint

interest billings ("**JIBs**") to PEAO, detailing its share of the expenses.  PEAO stopped paying its

share of expenses well in advance of the Petition Date.  Consequently, Union exercised its

contractual and statutory lien rights to recoup what costs it could out of the proceeds of PEAO's

share of oil production.  As of the Petition Date, PEAO owed Union no less than $29,553,822.06.

Since that time, the amount of unpaid JIBS has nearly doubled.

5.      Because of the automatic stay, as of the Petition Date, Union could no longer

recoup PEAO's share of costs out of its share of production.  Union moved for relief from the

automatic stay on March 23, 2009 (Doc. No. 100) to allow it to enforce its lien rights in PEAO's share of production and to mitigate its losses in funding PEAO's share of expenses. The Court did not grant that motion, but ordered (Doc. No. 230) PEAO to hold the proceeds of its share of production (the "**Lift Proceeds**") in escrow pending further proceedings.[2] Union has since filed an adversary proceeding (the "**Adversary Proceeding**") (Case No. 09-51066) to determine the relative priority of claimants to the Lift Proceeds. Summary judgment motions in the Adversary Proceeding are fully briefed, and oral argument is scheduled for April 19, 2009. The lift proceeds, exclusive of interest, total $12,272,757.61.

6. On May 12, 2009, Union filed its Motion to Compel Assumption or Rejection of Certain Executory Contracts (Doc. No. 298). On May 15, 2009, Union filed its Motion to Compel Immediate Payment of Administrative Expenses (Doc. No. 315). By those motions, Union sought to mitigate the contractual obligation to pay ongoing expenses to third parties on behalf of PEAO while PEAO was in material breach and to receive reimbursement for the post-petition benefit Union had unwillingly been required to contribute to PEAO's estate. In their objections (Doc. Nos. 356 and 357), the Debtors argued, among other things, that they should be allowed more time to market their assets. Because the Court did not grant the requested relief, Union was required to expend further sums in support of the PEAO estate.

7. While the Debtors were marketing their Trading Bay assets, on June 16, 2009, they filed their Alternative Motion for an Order Authorizing Abandonment of Interests in Oil and Gas Properties at Trading Bay, Alaska and Rejection of Executory Contracts Relating Thereto (Doc. No. 455). The Debtors received offers on their Trading Bay assets, and the Court entered

---

[2]   The Lift Proceeds represent PEAO's share of the field production from March 9, 2009 (the Petition Date) to September 2, 2009 (the date the working interests were abandoned and the automatic stay was lifted).

an order approving a sale of those assets to Ocar Energy, LLC (Doc. No. 768). However, because of financing problems, the sale was not consummated.

8.      On September 2, 2009 (the "**Abandonment Date**"), the Court entered an order allowing the Debtors to abandon PEAO's interests in the TBU and the TBF (Doc. No. 832). Between the Petition Date and the Abandonment Date, the amount of unpaid JIBs that accumulated was $22,198,790.61, which amount includes professional fees spent protecting Union's rights.

9.      On February 8, 2010, this Court entered an order fixing a bar date for administrative claim requests (Doc. No. 1320). In accordance with that order, Union filed a claim for operating, maintenance, and other related expenses (the "**JIB Claim**") (Doc. No. 1382) and a claim for abandonment and environmental remediation costs (the "**Abandonment Claim**") (Doc. No. 1383) on March 5, 2010.

**Argument**

**I.      Union's JIB Claim is entitled to administrative priority.**

10.      11 U.S.C. § 503(b)(1)(A) provides that "[a]fter notice and a hearing, there shall be allowed, administrative expenses . . . including the actual, necessary costs and expenses of preserving the estate." To qualify as an administrative priority claim, "the debt must arise from a transaction with the debtor-in-possession . . . [and] the consideration supporting the claimant's right to payment [must be] beneficial to the debtor-in-possession in the operation of the business." *Calpine Corp. v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy)*, 181 F.3d 527, 532-33 (3d Cir. 1999); *see also Goody's Family Clothing, Inc. v. Mountaineer Property Co. II, LLC (In re Goody's Family Clothing, Inc.)*, 401 B.R. 656, 662 (D. Del. 2009) ("By placing creditors who are entitled to payment of these administrative expenses first in line, section[ ] 503 . . . advance[s] the estate's interest in survival above all other goals.").

5

The party seeking payment of an administrative expense must demonstrate "that the costs and fees for which it seeks payment provided an actual benefit to the estate and that such costs and expenses were necessary to preserve the value of the estate assets." *O'Brien*, 181 F.3d at 553. "Where a 'debtor-in-possession elects to continue to receive benefits from the other party to an executory contract pending a decision to assume or reject the contract, the debtor-in-possession is obligated to pay for the reasonable value of those services.'" *In re Enron Corp.*, 279 B.R. 79, 86 (Bankr. S.D.N.Y. 2002).

11. A beneficial part of PEAO's estate from the Petition Date through the Abandonment Date was its interest in the TBU and TBF assets. The JIBs represent the actual, necessary cost of preserving that estate. Without the maintenance represented in those costs, the wells in those fields would have ceased to function and would have been rendered worthless. By noting that they informed Union they had no intention of paying their TBU and TBF obligations, the Debtors assert indirectly that the JIB Claim did not arise from transactions with the debtor-in-possession. That self-serving assertion will not allow the Debtors to side-step the administrative priority jurisprudence evaluating similar circumstances. For example, in *In re Athens/Alpha Gas Corporation*, 332 B.R. 578, 580-81 (B.A.P. 8th Cir. 2005), the court found that ongoing costs and proceeds of gas production did indeed represent transactions between an estate and working interest owner creditors. In that case, the debtor was the oil field operator, and although the non-debtor working interest owners were paying their share of the cost of production, the debtor was using their shares of revenue to satisfy other creditors. *Id.* at 580. The court held that although the underlying contracts were pre-petition agreements, each lift of new gas production and related expenses was a new transaction, which entitled the working interest creditors to administrative priority. *Id.* at 581.

702122101v9

12. Here, similarly, Union not only continued to preserve the oil fields, it generated over $12 million in proceeds which currently are being held in escrow pending the outcome of the Adversary Proceeding. The expenditures also allowed PEAO the opportunity to market its assets. *See* Transcript of Oral Argument at 94-100, *In re Pacific Energy Resources Ltd.*, Case No. 09-10785 (June 3, 2009) (the "**June 3 Transcript**");[3] Transcript of Oral Argument at 27-32, *In re Pacific Energy Resources Ltd.*, Case No. 09-10785 (August 4, 2009) (the "**August 4 Transcript**");[4] Transcript of Oral Argument at 27-34, *In re Pacific Energy Resources Ltd.*, Case No. 09-10785 (August 12, 2009) (the "**August 12 Transcript**");[5] Transcript of Oral Argument at 18, *In re Pacific Energy Resources Ltd.*, Case No. 09-10785 (September 1, 2009) (the "**September 1 Transcript**").[6] Both the generation of Lift Proceeds and the amounts Union spent to maintain and preserve PEAO's working interests in the TBU and TBF, gave the Debtors an opportunity to market the estate's assets, benefiting the estate. *See, e.g.*, *In re Hayes Lemmerz International, Inc.*, 340 B.R. 461, 476 (Bankr. D. Del. 2006) (allowing administrative claim for repair and storage costs of leased equipment because it benefited the estate not to spend money to maintain leased equipment); *United Trucking Service, Inc. v. Trailer Rental Company, Inc. (In re United Trucking Service, Inc.)*, 851 F.2d 159, (6th Cir. 1988) (allowing administrative claim for repairs to leased trailers because not spending money on repairs benefited the estate by allowing it to use the money saved elsewhere). As discussed in paragraph 15, Section 503(b) and the case law do not require that Union be the guarantor of the Debtors' *success* in marketing estate assets in order to receive administrative treatment; nor do they require that Union be a

---

[3] Excerpt attached as Exhibit A.

[4] Excerpt attached as Exhibit B.

[5] Excerpt attached as Exhibit C.

[6] Excerpt attached as Exhibit D.

702122101v9

willing participant in the process. PEAO gained a decided benefit at Union's expense in being able to market TBU and TBF as operating oil fields in working condition.

13.    PEAO insists that it did not ask for these benefits, *See, e.g.*, Objection ¶ 33 and June 3 Transcript at 95, and even seems to imply in its Objection that by fulfilling its contractual duties, Union somehow violated PEAO's rights and/or the Bankruptcy Code.[7] Those assertions are preposterous. PEAO in fact vigorously *opposed* Union's attempts to lift the automatic stay or compel abandonment early in the case so that Union could protect its interests. *See* Doc. No. 150. PEAO's actions in this case belie its present statements that it had no interest in receiving post-petition benefits from Union. Put simply, one party telling another that it will no longer honor its contractual obligations is not a legal defense to payment. PEAO cannot be allowed the substantial post-petition benefits it fought for without paying for them.

14.    PEAO cites two cases for the proposition that a claim for preserving the value of estate assets pending a sale that does not occur does not warrant administrative treatment, *Broadcast Corp. v. Broadfoot (In re Subscription Television)*, 789 F.2d 1530 (11th Cir. 1986) and *Palley v. Refco, Inc. (In re Refco, Inc.)*, 331 Fed. Appx. 12 (2d Cir. 2009). Neither case is binding on this Court, and both of the cases are inapposite. In *Broadfoot*, a creditor in that chapter 7 case sought administrative priority for a claim under an executory contract to provide a scrambled television broadcast signal. *Broadfoot*, 789 F.2d at 1531. Under 11 U.S.C. § 365(d)(1), the trustee had sixty days to decide whether to assume or reject the contract. *Id.* The trustee used the signal for seventeen days, and then decided to liquidate the business. *Id.* Although he did not use the signal after the first seventeen days, he did not reject the contract until the sixtieth day. *Id.* The court allowed an administrative claim for the first seventeen days,

---

[7]    "Union is basically asserting a claim for an involuntary extension of credit out of the ordinary course of business to a debtor in violation of section 364(b) of the Bankruptcy Code." Objection ¶ 33.

but not the remaining forty-three, holding that although the trustee retained the right to use the signal and to assume the contract had he been able to sell the business, this provided only a speculative benefit to the estate. *Id.* at 1532. That result makes sense, because in Broadpoint, unlike the situation here, the Debtor did not continue to use the signal after seventeen days and therefore, received *no benefit* after the seventeenth day.

15.    The opposite is true here: PEAO in fact *used* the fields from March 9 through September 2, 2009. It lays claims to the *products* of those fields for that period, and there is no doubt it tried several times to sell those fields during that same period of time.

16.    In addition, unlike the creditor in *Broadfoot*, Union was contractually obliged to spend money on behalf of the estate, and did spend $22,198,790.61 on behalf of PEAO over the course of six months without any reimbursement from PEAO. Further, the *Broadfoot* court stressed that the fact that the absence of a sale did not bar allowance of an administrative claim, but rather the issue was the value of the benefit conferred. *Id.* The court stated that, for example, "administrative priority may well be accorded to the claim of a creditor bound to provide burglar alarm protection [to a bankrupt retail jewelry business] under an executory contract."

17.    *Hayes Lemmerz* and *United Trucking,* cited by PEAO, give a further example of providing value to the estate. Where a debtor does not fulfill its contractual obligation to maintain leased equipment, the creditor lessor has provided value to the estate. In this case, Union has provided $22,198,790.61 in post-petition value to the estate by spending actual cash on PEAO's behalf, and is entitled to an administrative claim in that amount.

18.    *Refco* is similarly distinguishable. It is merely a summary order affirming the bankruptcy court's order which denied the administrative claims of two traders who asserted that

702122101v9

their post-petition trading maintained the value of the estate. *Refco*, 331 Fed. App. at 12. Although the opinion does note that the debtor's business was not sold, the key issue that informed the court's ruling was that the claimants, proceeding *pro se*, did not present any evidence to show that their trading resulted in value to the estate. *Id.* Here, Union has presented direct evidence of value to the estate (the $22 million itself, as well as the continued ownership value), and this Court's record is replete with evidence of such value, which cannot be credibly controverted. *See, e.g.*, Proofs of Claim Nos. 468, 508; Administrative Claim Statement (Doc. No. 1383) at Exhibits C-E; Affidavit of Kim Smith (Doc. No 103); Affidavit of Brian Findlay (Doc. No. 104).

19. The Debtors also assert that Union was the only beneficiary of its actions and that it was acting solely in its own self-interest. Objection ¶ 12(c), 34. As noted above, Union generated Lift Proceeds and maintained PEAO's assets, in accord with its duties under the Agreements. Operating interest owners by design act in a manner beneficial to all interest owners in an oil field. *See TCINA, Inc. v. Noco Inv. Co..*, 95 P.3d 193, 194-95 (Okla. Civ. App. 2004) (explaining the interdependence of interest holders in an oil field and the protective purpose of statutory operators' liens). Further, the fact that Union operated in its self-interest is irrelevant to the Court's analysis. *See In re Women First Health Care, Inc.*, 332 B.R. 115, 122 (Bankr. D. Del. 2005) ("Most activities of an interested party that contribute to the estate will also, of course, benefit that party to some degree, and the existence of a self-interest cannot in and of itself preclude reimbursement."). In light of the clear and direct benefit Union provided to the estate between the Petition Date and the Abandonment Date, Union is entitled to administrative priority for its JIB Claim of not less than $22,198,790.61 pursuant to 11 U.S.C. § 503(b)(1)(A).

10

## II.     Union's Abandonment Claim is proper and is entitled to administrative priority.

### A.     Union's Abandonment Claim should be allowed.

20.   As the Debtors note in their Objection, Section 502(e)(1)(B) of the Bankruptcy
Code provides:

> (T)he court shall disallow any claim for reimbursement or contribution of any
> entity that is liable with the debtor . . . to the extent that - . . .

> (B) such claim for reimbursement or contribution is contingent at the time of
> allowance or disallowance of such claim for reimbursement or contribution.

21.   "For a claim to be disallowed under section 502(e)(1)(B) of the Bankruptcy Code,
the claimant must assert a (i) contingent claim (ii) for reimbursement of a debt (iii) for which the
debtors and the claimant are co-liable. *All three elements* must be satisfied for the claim to be
disallowed." *In re RNI Wind Down Corp.*, 369 B.R. 174, 181 (Bankr. D. Del. 2007) (emphasis
supplied).  The party seeking disallowance bears the burden of proof on each element. *Id.*

22.   Although Union's Abandonment Claim is a claim for contribution supported by
Union's right of reimbursement from PEAO, PEAO's argument that Union's claim for
abandonment and remediation liability must fail because the claim is contingent is erroneous and
attempts to oversimplify the evolving jurisprudence on this issue. *See, e.g., RNI Wind Down
Corp.*, 369 B.R. at 183 and n.6 (explaining the difference between contingent and unliquidated
claims).  A claim is contingent when it "'has not yet accrued and . . . is dependent upon some
future event that may never happen.'  In order for this element to be satisfied, the claim must be
contingent on the date of the Court's ruling." *Id.* at 182-83.  Here, the claim is not contingent,
because it is a complete certainty that the TBU and the TBF will run out of oil and need to be
abandoned, plugged, and cleaned up.  Under oil and gas leases and other contracts with the State
of Alaska to which PEAO is a party, the lessees, including the PEAO, are responsible for
delivering up the lands associated with the production and marketing of oil from the TBU and

11

702122101v9

the TBF "in good order and condition" and "in condition satisfactory to Lessor" (the State of Alaska) at the time such facilities are abandoned or surrendered. Alaska Competitive Oil and Gas Lease ¶ 36, 33. Separately, Alaska state law requires that "[a]ll wells that have been permitted . . . must be abandoned [in accordance with the procedures established at 20 AAC 25.105-.172] before expiration of the owner's rights in that property . . . ." 20 AAC 25.105(a). Additionally, Alaska state law imposes strict liability, jointly and severally, for the costs of environmental cleanup on entities that operate and develop oil leases within the state's borders. AS 46.03.822. Because the TBU and TBF *will* be abandoned and because Alaska law requires *all* lessees to comply with its plugging and remediation procedures, PEAO *will* have to pay its share and therefore Union's claim is not contingent.[8]

   23.   Of the cases PEAO cites for the proposition that unliquidated claims are contingent, the majority are from outside this circuit and not binding on this court. The two cases cited from the bankruptcy court from this district, *In re APCO Liquidating Trust*, 370 B.R. 625 (Bankr. D. Del. 2007) and *In re Kaiser Group Int'l*, 289 B.R. 597 (Bankr. D. Del. 2003), are directly contradictory to *RNI Wind Down Corp.*, an opinion also issued by this district's bankruptcy court, on the issue of whether an unliquidated claim is contingent. The *RNI Wind Down Corp.* court made a well-reasoned argument that throughout the Bankruptcy Code, there is a distinction drawn between claims which are contingent and those which are unliquidated. *RNI Wind Down Corp.*, 369 B.R. at 183 and n.6. The *APCO* court did not examine whether an unliquidated claim is contingent, but rather cited a few non-binding cases for the proposition. *APCO*, 370 B.R. at

---

[8] PEAO cannot escape its responsibility to clean up even if § 502(e) were applicable here. The Judicial Code, 28 U.S.C. § 959(b), requires all debtors to comply with applicable state regulatory law. See *Midlantic National Bank v. New Jersey DEP*, 474 U.S. 494 (1986); *In re Wall Tube & Metal Products, Co.*, 831 F.2d 118 (6th Cir. 1987). That the cleanup obligation will inevitably arise in the future does not permit the estate to escape liability for the cleanup. It is of no moment whether PEAO pays cleanup costs directly to the State of Alaska or indirectly by reimbursing Union for paying such costs on its behalf.

12

636. The *Kaiser* court simply assumed without support that an unliquidated claim is contingent. *Kaiser*, 289 B.R. at 608. Because the *RNI Wind Down Corp.* court offers the most thorough and well-reasoned distinction based on its review and analysis of the content and structure of the Bankruptcy Code—rather than simply relying on the opinions of out-of-circuit courts or assuming without citation that an unliquidated claim is contingent—this Court should view *RNI Wind Down Corp.* as the more persuasive decision, which expressly recognizes that simply being unliquidated does not make a claim contingent.

24.   It is not surprising that the *RNI* Court has the better of this reasoning, because to equate unliquidated claims with contingent claims would read section 502(c) out of the Bankruptcy Code. That section provides, "there shall be estimated for purpose of allowance under this section – (1) any contingent *or* unliquidated claim, the fixing *or* liquidation of which, as the case may be, would unduly delay the administration of the case . . . (emphasis supplied)". The use of the disjunctive, "or" makes clear that contingent and unliquidated claims are not the same. Section 502(c) is often employed where liability is certain, but the amount of that liability is not yet known. *See* 11 U.S.C. § 502(c) (providing for estimation of unliquidated claims); *In re G-1 Holdings, Inc.*, 323 B.R. 583, 599 (Bankr. D.N.J. 2005) (applying estimation procedures to unliquidated asbestos claims). In such cases, the Court can estimate the amount of future harm or damages if the failure to do so would unduly delay administration of the estate.

**B.     It is premature to decide the priority status of Union's Abandonment Claim.**

25.   Finally, even if the Court were to decide Union's claim is contingent (and it is not), there is no reason to disallow it at this time. To date, there has been no plan proposed in this case, nor has the case been converted to a chapter 7 liquidation, so it is premature to adjudicate this unliquidated claim. There is no guarantee when the case will be closed, or even that a plan will be confirmed, before Union's Abandonment Claim is liquidated in whole or in part. Indeed,

13

in related contexts, courts have refused to apply various provisions of § 502 where the relief sought would be premature. *See, e.g., In re Alleghany Int'l, Inc.*, 106 B.R. 75 (Bankr. W.D. Pa. 1989) (debtor's request to disallow punitive damage claims based on § 502(b)(1) held premature, where claims were unliquidated and no plan had been submitted); *In re Hillsborough Holdings Corp.*, 247 B.R. 510 (Bankr. M.D. Fla. 2000) (post-confirmation request to discharge punitive damages on the basis of potential negative impact on future operations was rejected as premature).

26.    To the extent the Debtors feel they need to know the value of the claims against the estates for purposes of drafting a plan, they can request that this Court estimate the value of Union's claim under 11 U.S.C. § 502(c). *See In re Sneijder*, 407 B.R. 46, 55 (Bankr. S.D.N.Y. 2009) (noting it is appropriate to hold an estimation hearing under § 502(c)(1) to determine the value of a large, unliquidated claim for purposes of assessing the feasibility of a plan). Estimation of environmental liabilities will likely have to be done in any event in this case if a plan of reorganization is going to comply with 28 U.S.C. § 959(b).

27.    As noted above, for a debt to qualify as an administrative expense, it must be an actual and necessary cost of preserving the estate, it must arise from a postpetition transaction with the debtor, and it must accord the estate an actual benefit. 11 U.S.C. § 503(b)(1); *In re Insilco Tech., Inc.*, 309 B.R. 111, 114 (Bankr. D. Del. 2004). Although there is no Alaska case law on the issue, another jurisdiction with well-developed oil and gas law, Texas, has decided that all entities in the chain of title of an oil or gas field remain liable for environmental remediation costs. *Seagull Energy E&P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 347 (Tex. 2006). Thus, although PEAO's estate has abandoned the TBU and the TBF, it remains liable for cleaning them up. *See Juniper Dev. Group v. Kahn (In re Hemingway Transp., Inc.*, 993 F.2d

915, 929-30 (1st Cir. 1993) (payment of estate's CERCLA liability benefits the estate even where contaminated property is no longer part of the estate). To the extent Union pays the cost on behalf of the estate, it is entitled to an administrative claim. *Id.*

28.   PEAO cites *Insilco* for the proposition that a debtor must own or have a current interest in property subject to environmental liability in order for a claimant for those expenses to merit administrative priority.  Objection ¶ 29.  However, PEAO's quoted language is taken out of context – in that case, this Court determined that the contaminated property had been sold by the debtor four years *before* it filed bankruptcy, and therefore had never been property of the estate.  *Insilco*, 309 B.R. at 114.  Here, by contrast, the TBU and the TBF were estate property for six months during this bankruptcy case.  Moreover, TBU and TBF have not been sold to anyone; the September 2, 2009 abandonment ordered by this Court effectively abandoned the estate's working interests in these two properties back to the PEAO corporate shell.  Thus, while the properties may have left the estate in a legal sense, they are in fact still owned by the corporate entity PEAO.  In that regard, this case is more like the Court of Appeals' decision in *Commonwealth of Pennsylvania Department of Environmental Resources v. Conroy,* 24 F.3d 568 (3d Cir. 1994) (Alito, J.), where that court found that costs incurred by the State of Pennsylvania in cleaning up contaminated sites were entitled to administrative priority.  This Court, in its *Insilco* decision, distinguished *Conroy*, stating that the case "involved property that was part of a debtor's estate," but acknowledged that the cases granting administrative priority to clean up costs would be applicable in a situation where the property was in the debtor's estate. 309 B.R. at 115 (and cases cited therein).  Union respectfully submits that the *Insilco* court's careful and narrow reasoning actually supports the granting of administrative priority to Union under the facts at issue in this case—which are more similar to *Conroy* and the cases cited by the

15

702122101v9

*Insilco* court as properly recognizing a creditor's right to administrative priority when it has extended a benefit to the estate by incurring a clean-up cost for estate property. *See Insilco*, 309 B.R. at 114-15.

29. Further, Union did in fact spend monies to prevent harm to the environment during the six months that TBU and TBF unquestionably were part of the estate. By shutting the field in during the eruption of Mt. Redoubt and then restarting production when it was safe to do so, Union prevented any possibility that a spill or other contamination from the underwater wells, drilling platforms or related pipelines would occur. Courts have found, in related contexts, that parties who take steps to prevent further harm and preserve estate assets in compliance with environmental regulations are entitled to administrative priority. *See In re Wall Tube*, 831 F.2d at 124 (permitting administrative treatment to expenses to assess environmental hazards and to "preserve [the property] in compliance"). As discussed previously, Union spent $22 million of its own money on PEAO's behalf in this regard, and in doing so helped to preserve the property.

30. Finally, this Court in its *Insilco* decision stated that "the Debtors may not be able to discharge any duty to comply with the Consent Orders . . ." the debtors had agreed to pre-petition. 309 B.R. at 116. In a case such as this, where a debtor has not abandoned or sold the property prior to the petition date, 28 U.S.C. § 959(b) prevents discharge of the obligation to remediate the property where there is certain to be a clean up obligation in the future. *See, Insilco*, 309 B.R. at 115 n.9. For this additional reason, disallowance of Union's claim is not warranted and is premature.

31. PEAO's assertion that the value of the Abandonment Claim somehow makes a difference to its allowability is without legal ground. The TBU and the TBF are offshore oil fields, and properly abandoning and remediating such fields is neither easy nor inexpensive.

Union's claim of at least $200,000,000.00 is Union's estimate of PEAO's 46.8% share of the cost to properly abandon these properties.

## Conclusion

For the foregoing reasons, Union respectfully requests that this Court enter an order (i) allowing its JIB Claim in full and assigning it administrative priority; (ii) allowing its Abandonment Claim; (iii) denying relief sought in the Objection; and (iv) granting such other and further relief as may be just and proper.

Dated: April 14, 2010
    Wilmington, Delaware

Respectfully submitted,

By: _____

Norman M. Monhait (ID No. 1040)
Rosenthal, Monhait & Goddess, P.A.
919 North Market Street, Suite 1401
P.O. Box 1070
Wilmington, DE  19899-1070
Telephone: (302) 656-4433
Facsimile: (302) 658-7567
nmonhait@rmgglaw.com

and

Richard L. Epling
David A. Crichlow
Roger C. Elder
PILLSBURY WINTHROP SHAW PITTMAN LLP
1540 Broadway
New York, NY 10036
Telephone: (212) 858-1000
Facsimile: (212) 858-1500

*Counsel to Union Oil Company of
California, a California Corporation*