IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| PACIFIC ENERGY RESOURCES LTD., *et al.*,[1] | ) Case No. 09-10785 (KJC) |
| | ) (Jointly Administered) |
| Debtor. | ) |
| | ) |

---

## DISCLOSURE STATEMENT IN RESPECT OF FIRST AMENDED CHAPTER 11 PLAN OF LIQUIDATION FOR PACIFIC ENERGY RESOURCES LTD., ET AL.

---

### IMPORTANT DATES

- Date by which ballots must be received: September 29, 2010

- Date by which objections to Confirmation of the Plan must be filed and served: September 29, 2010

- Hearing on Confirmation of the Plan: October 12, 2010 at 1:00 p.m. (prevailing Eastern time)

Dated: August 27, 2010

PACHULSKI STANG ZIEHL & JONES LLP
Ira D. Kharasch (CA Bar No. 109084)
James E. O'Neill (DE Bar No. 4042)
Maxim B. Litvak (CA Bar No. 215852)
Scotta E. McFarland (DE Bar No. 4184)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705
Telephone: 302/652-4100
Facsimile: 310/652-4400

Counsel for Debtors and Debtors in Possession

---

[1] The Debtors in these cases, along with the last four digits of each of the Debtors' federal tax identification number, are: Pacific Energy Resources Ltd. (3442); Petrocal Acquisition Corp. (6249); Pacific Energy Alaska Holdings, LLC (tax I.D. # not available); Carneros Acquisition Corp. (5866); Pacific Energy Alaska Operating LLC (7021); Carneros Energy, Inc. (9487); and Gotland Oil, Inc. (5463). The mailing address for all of the Debtors is 111 W. Ocean Boulevard, Suite 1240, Long Beach, CA 90802.

# TABLE OF CONTENTS

Page

I. PREFATORY STATEMENT AND DEFINITIONS ................................................................ 1

II. INTRODUCTION AND OVERVIEW .............................................................................. 1

    A.    Introduction ................................................................................................ 1

    B.    Disclaimers ................................................................................................ 2

    C.    An Overview of the Chapter 11 Process ................................................... 3

    D.    Plan Overview ............................................................................................ 3

          1.    Summary of Classification and Treatment of Claims and Interests under the Plan ................................................................. 4

    E.    Voting on the Plan ..................................................................................... 5

          2.    Who May Vote ............................................................................... 5

          3.    How to Vote ................................................................................... 6

    F.    Confirmation of the Plan ............................................................................ 6

          1.    Generally ....................................................................................... 6

          2.    Objections to Confirmation ........................................................... 7

          3.    Hearing on Confirmation ............................................................... 7

III. HISTORY, ORGANIZATION AND ACTIVITIES OF THE DEBTORS ..................... 7

    A.    General Description of the Debtors' Business and Primary Assets ............ 7

    B.    The Debtors' Corporate Structure and Financial Performance .................. 8

    C.    PERL's and PEAO's Liabilities ................................................................. 9

    D.    Need for Bankruptcy Relief ....................................................................... 9

    E.    First Day Motions and Other Post-Petition Activities ............................ 10

          4.    Joint Administration ..................................................................... 10

          5.    Noticing and Claims Agent .......................................................... 10

          6.    Employment of Chief Restructuring Officer ............................... 10

          7.    Employees .................................................................................... 11

          8.    Cash Management ......................................................................... 11

| | 9. | Critical Trade ................................................................. 12 |
| | 10. | Prepetition Taxes ........................................................... 12 |
| | 11. | Utilities........................................................................... 12 |
| | 12. | Royalties ......................................................................... 12 |
| | 13. | Insurance Premium Financing ........................................ 13 |
| | 14. | Interim Compensation for Professionals......................... 13 |
| | 15. | Ordinary Course Professionals ...................................... 13 |
| | 16. | Claims and Equity Trading ............................................ 14 |
| | 17. | DIP Financing and Cash Collateral............................... 14 |
| F. | | Retention of Debtors' Professional Persons ........................................... 15 |
| G. | | Appointment of Committee and Employment of Committee's Professional Persons ................................................................................................ 16 |
| H. | | Contract and Lease Rejections................................................................ 16 |
| I. | | Exclusivity Extensions........................................................................... 16 |
| J. | | Bar Date for Filing Proofs of Claim and Administrative Expense Requests........ 17 |
| K. | | Filing of Schedules and Statements of Financial Affairs........................ 17 |
| L. | | Employee Incentive Program.................................................................. 17 |
| M. | | Abandonment of Interests in Estate Property ......................................... 18 |
| N. | | Certain Union Motions ........................................................................... 20 |
| O. | | Union Litigation ..................................................................................... 22 |
| P. | | Settlement with Holders of Alaska Overriding Royalty Interests ......................... 22 |
| Q. | | Sale of the Beta Assets and Certain of the Alaska Assets ...................... 23 |
| R. | | Resolved Adversary Proceedings ........................................................... 25 |
| S. | | Claims Objections and Motions to Deem Claims Paid........................... 26 |
| T. | | Preference Actions ................................................................................. 26 |

IV. ESTATE ASSETS AND PROJECTED CREDITOR RECOVERIES ................................... 26

| A. | | Estate Assets .......................................................................................... 26 |
| B. | | Projected Creditor Recoveries ............................................................... 27 |

V. DESCRIPTION OF THE PLAN .................................................................. 29

VI. THE TERMS OF THE BETA SALE ORDER ..................................................... 30

VII. INTER-ESTATE SETTLEMENT UNDER THE PLAN ........................................ 31

    A.    Description of the Settlement.................................................... 31

    B.    Applicable Legal Standard........................................................ 32

    C.    The Settlement Should Be Approved ........................................ 32

VIII. TREATMENT OF ADMINISTRATIVE EXPENSES AND TAX CLAIMS ................. 33

    A.    Introduction.......................................................................... 33

    B.    Administrative Expenses ........................................................ 33

    C.    Tax Claims ........................................................................... 34

IX. CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS 34

    A.    Summary .............................................................................. 34

    B.    Classification and Treatment of Claims and Interests ................. 34

        1.    Class 1 – Priority Non-Tax Claims................................ 35

        2.    Class 2 – Miscellaneous Secured Claims........................ 35

        3.    Class 3 – Senior Lender Claims.................................... 36

        4.    Class 4 – General Unsecured Claims Against PERL.......... 36

        5.    Class 5 – General Unsecured Claims Against PEAH .......... 37

        6.    Class 6 – General Unsecured Claims Against PEAO .......... 37

        7.    Class 7 – General Unsecured Claims Against Petrocal, Carneros Acquisition, Carneros Energy and Gotland ........................................... 38

        8.    Class 8 – Intercompany Claims .................................... 38

        9.    Class 9 – Subordinated Debt Claims ............................. 38

        10.    Class 10 – Interests in the Debtors................................ 38

X. ACCEPTANCE OR REJECTION OF PLAN ...................................................... 39

    A.    Identification of Unimpaired Classes........................................ 39

    B.    Identification of Impaired Classes ........................................... 39

    C.    Classes Permitted and Not Permitted to Vote............................ 39

D. Nonconsensual Confirmation.................................................................40

E. Postpetition Interest ..............................................................................40

XI. MEANS FOR IMPLEMENTATION OF THE PLAN .......................................40

A. Continued Corporate Existence and Vesting of Assets of Liquidating Debtors... 40

B. Dismissal of Chapter 11 Cases of Petrocal, Carneros Acquisition, Carneros Energy and Gotland ................................................................................40

C. No Substantive Consolidation................................................................41

D. Retained Rights of Action .....................................................................41

E. Corporate Governance ...........................................................................41

F. Wind-Down............................................................................................42

G. Funding for the Plan..............................................................................44

H. Inter-Estate Settlement ..........................................................................44

I. Corporate Action/Dissolution ...............................................................44

J. Interests in Affiliates and Subsidiaries .................................................45

K. Payment of Plan Expenses ....................................................................45

L. Dissolution of the Official Committee...................................................45

XII. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES.............45

A. Rejection of Executory Contracts and Unexpired Leases......................45

B. Bar Date for Rejection Damages ...........................................................46

XIII. LITIGATION, OBJECTIONS TO CLAIMS, AND DETERMINATION OF TAXES......46

A. Litigation; Objections to Claims; Objection Deadline...........................46

B. Temporary or Permanent Resolution of Disputed Claims .....................47

C. Setoffs ...................................................................................................47

D. Preservation of Retained Rights of Action ...........................................47

XIV. INJUNCTION AND EXCULPATION PROVISIONS .....................................48

A. Injunctions.............................................................................................48

1. Generally...................................................................................48

2.    Injunction Related to Rights of Action and Terminated Claims, Administrative Expenses or Interests.........................................48

B.    Exculpation ...............................................................................49

XV. PENSION PLANS, OTHER RETIREE BENEFITS AND LABOR CONTRACTS...........49

XVI. NO REGULATED RATE CHANGE WITHOUT GOVERNMENT APPROVAL...........49

XVII. EXEMPTION FROM CERTAIN TRANSFER TAXES ....................................49

XVIII. REQUIREMENTS FOR CONFIRMATION ...............................................49

A.    Acceptances Necessary to Confirm Plan ...............................................49

B.    Best Interest of Creditors Test ........................................................50

C.    Feasibility of Plan .....................................................................52

D.    Classification...........................................................................52

E.    Confirmation of Plan Without Necessary Acceptances; Cramdown ...................52

XIX. EFFECT OF CONFIRMATION ...............................................................54

A.    Binding Effect of Confirmation ........................................................54

B.    Good Faith .............................................................................54

C.    No Limitations on Effect of Confirmation.............................................54

XX. RISK FACTORS...............................................................................54

XXI. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ...................55

A.    Consequences to the Debtors ..........................................................56

1.    Holders of Claims. ...............................................................56

2.    Non-United States Persons. ......................................................57

3.    Importance of Obtaining Professional Tax Assistance..........................57

XXII. ALTERNATIVES TO PLAN .................................................................57

A.    Liquidation Under Chapter 7 ..........................................................57

B.    Dismissal...............................................................................58

C.    Alternative Plan .......................................................................58

D.    No Res Judicata Effect.................................................................58

XXIII. CONCLUSION .............................................................................59

# I.

## PREFATORY STATEMENT AND DEFINITIONS

Pursuant to Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§101, et seq. (the "Bankruptcy Code"), Pacific Energy Resources Ltd. ("PERL"), *et al.* (the "Debtors"), hereby submit this disclosure statement (the "Disclosure Statement") in support of the First Amended Chapter 11 Plan of Liquidation for Pacific Energy Resources Ltd., *et al.* (the "Plan"). The definitions contained in the Bankruptcy Code are incorporated herein by this reference. The definitions set forth in Article II of the Plan shall also apply to capitalized terms used herein that are not otherwise defined. For purposes herein, Debtor Petrocal Acquisition Corp. is referred to as "Petrocal," Debtor Pacific Energy Alaska Holdings, LLC is referred to as "PEAH," Debtor Carneros Acquisition Corp. is referred to as "Carneros Acquisition," Debtor Pacific Energy Alaska Operating LLC is referred to as "PEAO," Debtor Carneros Energy, Inc. is referred to as "Carneros Energy," and Debtor Gotland Oil, Inc. is referred to as " Gotland."

# II.

## INTRODUCTION AND OVERVIEW

### A.    Introduction

On March 9, 2009 (the "Petition Date"), the Debtors commenced the above-referenced bankruptcy cases (the "Chapter 11 Cases") by filing voluntary petitions under Chapter 11 of the Bankruptcy Code.

This Disclosure Statement, submitted in accordance with section 1125 of the Bankruptcy Code, contains information regarding the Plan proposed by the Debtors. A copy of the Plan is attached to the Disclosure Statement as Exhibit 1. The Disclosure Statement is being distributed to you for the purpose of enabling you to make an informed judgment about the Plan.

The Disclosure Statement contains information concerning, among other matters: (1) the Debtors' background; (2) the assets available for distribution under the Plan; and (3) a summary of the Plan. The Debtors strongly urge you to review carefully the contents of this Disclosure Statement and the Plan (including the exhibits to each) before making a decision to accept or reject the Plan. Particular attention should be paid to the provisions affecting or impairing your rights as a Creditor.

Following a hearing on August 24, 2010, the Bankruptcy Court approved this Disclosure Statement as containing sufficient information to enable a hypothetical reasonable investor to make an informed judgment about the Plan. A copy of the order approving the Disclosure Statement is attached hereto as Exhibit 2 (the "Disclosure Statement Order"). Under section 1125 of the Bankruptcy Code, this approval enabled the Debtors to send you this Disclosure Statement and solicit your acceptance of the Plan. The Bankruptcy Court has not considered for approval the Plan itself or conducted a detailed investigation into the contents of this Disclosure Statement.

Your vote on the Plan is important. Absent acceptance of the Plan, there may be protracted delays or a chapter 7 liquidation. These alternatives may not provide for distribution of as much value to Holders of Allowed Claims as does the Plan. Accordingly, the Debtors urge you to accept the Plan by completing and returning the enclosed ballot(s) no later than September 29, 2010.

**B.**     **Disclaimers**

THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE DEBTORS' PROPOSED PLAN. PLEASE READ THIS DOCUMENT WITH CARE. THE PURPOSE OF THE DISCLOSURE STATEMENT IS TO PROVIDE "ADEQUATE INFORMATION" OF A KIND, AND IN SUFFICIENT DETAIL, AS FAR AS IS REASONABLY PRACTICABLE IN LIGHT OF THE NATURE AND HISTORY OF THE DEBTORS AND THE CONDITION OF THE DEBTORS' BOOKS AND RECORDS, THAT WOULD ENABLE A HYPOTHETICAL REASONABLE INVESTOR TYPICAL OF HOLDERS OF CLAIMS OR INTERESTS OF THE RELEVANT CLASS TO MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN.

FOR THE CONVENIENCE OF CREDITORS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF QUALIFIES ANY SUMMARY. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.

NO REPRESENTATIONS CONCERNING THE DEBTORS' FINANCIAL CONDITION OR ANY ASPECT OF THE PLAN ARE AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE OR REJECTION THAT ARE OTHER THAN AS CONTAINED IN OR INCLUDED WITH THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION.

THE FINANCIAL INFORMATION CONTAINED HEREIN, UNLESS OTHERWISE INDICATED, IS UNAUDITED. MOREOVER, BECAUSE OF THE DEBTORS' FINANCIAL DIFFICULTIES, AS WELL AS THE COMPLEXITY OF THE DEBTORS' FINANCIAL MATTERS, THE BOOKS AND RECORDS OF THE DEBTORS, UPON WHICH THIS DISCLOSURE STATEMENT IN PART IS BASED, MAY BE INCOMPLETE OR INACCURATE. HOWEVER, REASONABLE EFFORT HAS BEEN MADE TO ENSURE THAT ALL SUCH INFORMATION IS FAIRLY PRESENTED.

PACHULSKI STANG ZIEHL & JONES LLP ("PSZ&J") IS GENERAL INSOLVENCY COUNSEL TO THE DEBTORS. PSZ&J HAS RELIED UPON INFORMATION PROVIDED BY THE DEBTORS IN CONNECTION WITH PREPARATION OF THIS DISCLOSURE STATEMENT. ALTHOUGH PSZ&J HAS PERFORMED CERTAIN LIMITED DUE DILIGENCE IN CONNECTION WITH THE PREPARATION OF THIS DISCLOSURE STATEMENT, COUNSEL HAS NOT INDEPENDENTLY VERIFIED ALL OF THE INFORMATION CONTAINED HEREIN.

2

THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS LEGAL, BUSINESS OR TAX ADVICE. EACH CREDITOR OR INTEREST HOLDER SHOULD CONSULT HIS OR HER OWN LEGAL COUNSEL AND ACCOUNTANT AS TO LEGAL, TAX AND OTHER MATTERS CONCERNING HIS OR HER CLAIM.

**C.      An Overview of the Chapter 11 Process**

Chapter 11 of the Bankruptcy Code contains numerous provisions, the general effect of which is to provide the debtor with "breathing space" within which to propose a restructuring of its obligations to third parties. The filing of a chapter 11 bankruptcy petition creates a bankruptcy "estate" comprising all of the property interests of the debtor. Unless a trustee is appointed by the Bankruptcy Court for cause (no trustee has been appointed in these Chapter 11 Cases), a debtor remains in possession and control of all its assets as a "debtor in possession." The debtor may continue to operate its business in the ordinary course on a day-to-day basis without Bankruptcy Court approval. Bankruptcy Court approval is only required for various enumerated kinds of transactions (such as certain financing transactions) and transactions out of the ordinary course of a debtor's business. The filing of the bankruptcy petition gives rise to what is known as the "automatic stay" which, generally, enjoins creditors from taking any action to collect or recover obligations owed by a debtor prior to the commencement of a Chapter 11 case. The Bankruptcy Court can grant relief from the automatic stay under certain specified conditions or for cause.

The Bankruptcy Code authorizes the creation of one or more official committees to protect the interests of some or all creditors or interest holders. The fees and expenses of counsel and other professionals employed by such official committees and approved by the Bankruptcy Court are generally borne by a bankruptcy estate. One committee -- the Official Committee of Unsecured Creditors (the "Committee") -- has been appointed in these Chapter 11 Cases, which represents the collective interests of general unsecured creditors.

A chapter 11 debtor emerges from bankruptcy by successfully confirming a plan of reorganization. Alternatively, the assets of a debtor may be sold and the proceeds distributed to creditors through a plan of liquidation, such as the Plan. A plan may be either consensual or non-consensual and provide, among other things, for the treatment of the claims of creditors and interests of shareholders and holders of options or warrants. The provisions of the Debtors' Plan are summarized below.

**D.      Plan Overview**

The following is a brief overview of the material provisions of the Plan and is qualified in its entirety by reference to the full text of the Plan. The Plan is a plan of liquidation (as discussed below).

The Plan provides for the classification and treatment of Claims against and Interests in the Debtors. The Plan designates nine (9) Classes of Claims and one (1) Class of Interests. These Classes and Plan treatments take into account the differing nature and priority under the Bankruptcy Code of the various Claims and Interests. Pursuant to the Plan, the Debtors will ultimately be dissolved and all existing Interests in the Debtors will be extinguished and

3

cancelled.

The Plan effectuates a distribution of the assets of the Estates to creditors in accordance with the priorities set forth in the Bankruptcy Code. Although the Plan recognizes that each of the Debtors is a separate and distinct corporate entity, the Plan encompasses a settlement amongst the Estates that results in the distribution of the Unsecured Creditor Fund, the Alaska Fund, if any, and the Wind-Down Fund, if any, and a waiver of Intercompany Claims. The Plan provides that all holders of Allowed Administrative Expenses and Priority Claims against the Debtors shall be paid in full. Holders of Secured Claims generally will retain their liens or receive their collateral under the Plan. All remaining assets will be distributed to Holders of Allowed General Unsecured Claims against PERL, PEAH and PEAO. Because the Estates of Petrocal, Carneros Acquisition, Carneros Energy and Gotland have no assets, the Chapter 11 Cases of these Debtors will be dismissed under the Plan. Holders of Subordinated Debt Claims shall receive no distributions under the Plan. All Interests in the Debtors shall be cancelled. Taken together, the Plan proposes to fairly and efficiently distribute the Debtors' assets in a manner that will allow these cases to be promptly resolved.

1.    **Summary of Classification and Treatment of Claims and Interests under the Plan**

The following chart briefly summarizes the treatment of Creditors and Interest Holders under the Plan.[2] Amounts listed below are estimated. Actual Claims and distributions will vary depending upon, among other things, recoveries on Distributable Assets.

a.    Unclassified Claims

| Description | Estimated Allowed Claims | Estimated Recovery Percentage | Treatment |
|---|---|---|---|
| Administrative Expenses | PERL ($1.6 million) PEAO ($20,000) | 100% | Paid in full in Cash on the Effective Date or as soon thereafter as the Administrative Expense is Allowed. |
| Tax Claims | PERL ($310,000) PEAO ($375,000) | 100% | A Tax Claim due and payable before the Effective Date will be paid on the Effective Date or as soon thereafter as it is Allowed. |

b.    Classified Claims

| Class No. | Description | Estimated Allowed Claims | Estimated Recovery Percentage | Treatment |
|---|---|---|---|---|
| 1 | Priority Non-Tax Claims | $0 | 100% | Paid in full in Cash on the Effective Date or as soon thereafter as Allowed. |

---

[2]  This chart is merely a summary of the classification and treatment of Claims and Interests under the Plan. References should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Claims and Interests.

4

| 2 | Miscellaneous Secured Claims | $0 | 100% | Distribution equivalent to value of collateral. The Debtors are not aware of any Miscellaneous Secured Claims. |
|---|---|---|---|---|
| 3 | Senior Lender Claims | $75,000,000 | Value of collateral | Each Holder of an Allowed Senior Lender Claim shall receive any and all rights, Claims and Liens in the Excluded Interests to which such Holder of an Allowed Senior Lender Claims is entitled pursuant to the terms of the Beta Sale Order. The value of the "Excluded Interests" shall be liquidated in the amount of $35,000,000. |
| 4 | General Unsecured Claims against PERL | $13.5 million to $27.3 million | 8.7% to 17.7%[3] | Each Holder of an Allowed General Unsecured Claim against PERL will receive a pro rata share (calculated as a percentage of Allowed General Unsecured Claims against PERL) of the Net Distributable Assets of PERL. |
| 5 | General Unsecured Claims against PEAH | $21 million | 0% plus[4] | Each Holder of an Allowed General Unsecured Claim against PEAH will receive a pro rata share (calculated as a percentage of Allowed General Unsecured Claims against PEAH) of the Net Distributable Assets of PEAH, if any. |
| 6 | General Unsecured Claims against PEAO | $105 million to $275 million | 0% to 1.0% plus[5] | Each Holder of an Allowed General Unsecured Claim against PEAO will receive a pro rata share (calculated as a percentage of Allowed General Unsecured Claims against PEAO) of the Net Distributable Assets of PEAO, if any. |
| 7 | General Unsecured Claims against Petrocal, Carneros Acquisition, Carneros Energy and Gotland | $0 | N/A | On the Effective Date, the Chapter 11 Cases of Petrocal, Carneros Acquisition, Carneros Energy and Gotland shall be deemed dismissed because such Debtors have no assets, and Holders of Allowed General Unsecured Claims against such Debtors, if any, shall receive no distribution. |
| 8 | Intercompany Claims | $0 | N/A | Intercompany Claims shall be extinguished on the Effective Date and receive no distribution. |
| 9 | Subordinated Debt Claims | N/A | N/A | Holders of Subordinated Debt Claims shall receive no distribution. |
| 10 | Interests in the Debtors | N/A | N/A | All Interests in all of the Debtors shall be extinguished. |

## E.  Voting on the Plan

### 2.  Who May Vote

The Plan divides Allowed Claims and Interests into multiple Classes. Under the Bankruptcy Code, only Classes that are "impaired" by the Plan are entitled to vote (unless the Class receives no compensation or payment, in which event the Class is conclusively deemed not to have accepted the Plan). A Class is Impaired if legal, equitable or contractual rights attaching

---

[3]  These projections assume that the claims of Forest Oil Corporation against PERL are subordinated, as currently proposed under the Plan

[4]  Recoveries at PEAH depend upon the outcome of litigation against third parties, if any.

[5]  Recoveries at PEAO depend upon the outcome of litigation against third parties, which is uncertain at this time.

68773-002\DOCS_SF:73639.1

to the Claims or Interests in the Class are modified, other than by curing defaults and reinstating maturities. Under the Plan, Administrative Claims and Priority Tax Claims are unclassified and are not entitled to vote. Classes 1 and 2 are unimpaired and are therefore conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and are not entitled to vote under the Plan. Classes 7, 9 and 10 receive nothing under the Plan and are therefore conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote under the Plan. Classes 3 through 6 are Impaired and entitled to vote to accept or reject the Plan. Class 8 consists of the Debtors who are supportive of the treatment under the Plan. Only those votes cast by Holders of Allowed Claims shall be counted in determining whether a sufficient number of acceptances have been received to obtain Plan Confirmation.

3.    **How to Vote**

All votes to accept or to reject the Plan must be cast by using the appropriate form of ballot. No votes other than ones using such ballots will be counted except to the extent ordered otherwise by the Bankruptcy Court. A form of ballot is being provided to Creditors in Classes 3 through 6 by which Creditors in such Classes may vote their acceptance or rejection of the Plan. The ballot for voting on the Plan gives Holders of Classes 3 through 6 Claims one important choice to make with respect to the Plan – you can vote for or against the Plan. To vote on the Plan, after carefully reviewing the Plan and this Disclosure Statement, please complete the ballot (1) by indicating on the enclosed ballot that (a) you accept the Plan or (b) reject the Plan and (2) by signing your name and mailing the ballot in the envelope provided for this purpose. Omni Management Group, LLC, as the Balloting Agent, will count the ballots.

IN ORDER TO BE COUNTED, BALLOTS MUST BE COMPLETED, SIGNED AND RECEIVED BY THE BALLOTING AGENT, OMNI, NO LATER THAN SEPTEMBER 29, 2010 AT THE FOLLOWING ADDRESS:

Pacific Energy Resources Ltd.
C/O Omni Management Group, LLC
16161 Ventura Blvd., Ste C
PMB 428
Encino, CA 91436

IF YOUR BALLOT IS NOT PROPERLY COMPLETED, SIGNED AND RECEIVED AS DESCRIBED, IT WILL NOT BE COUNTED. IF YOUR BALLOT IS DAMAGED OR LOST, YOU MAY REQUEST A REPLACEMENT BY MAKING A WRITTEN REQUEST TO THE ADDRESS SHOWN ABOVE. FACSIMILE OR ELECTRONICALLY TRANSMITTED BALLOTS WILL NOT BE COUNTED.

**F.    Confirmation of the Plan**

1.    **Generally**

"Confirmation" is the technical term for the Bankruptcy Court's approval of a plan of reorganization or liquidation. The timing, standards and factors considered by the Bankruptcy Court in deciding whether to confirm a plan of reorganization are discussed in Article XVIII

6

below.

2.      **Objections to Confirmation**

Any objections to Confirmation of the Plan must be in writing and must be filed with the Clerk of the Bankruptcy Court and served on counsel for the Debtors, the Committee, and the United States Trustee on or before the date set forth in the notice of the Confirmation Hearing sent to you with this Disclosure Statement and the Plan. Bankruptcy Rule 3007 governs the form of any such objection.

3.      **Hearing on Confirmation**

The Bankruptcy Court has set October 12, 2010 at 1:00 p.m. (prevailing Eastern time) for a hearing (the "Confirmation Hearing") to determine whether the Plan has been accepted by the requisite number of Creditors and whether the other requirements for confirmation of the Plan have been satisfied. The Confirmation Hearing will be held before the Honorable Kevin J. Carey, at the United States Bankruptcy Court for the District of Delaware, located at 824 Market Street, 5th Floor, Courtroom No. 5, Wilmington, Delaware 19801. The Confirmation Hearing may be continued from time to time and day to day without further notice. If the Bankruptcy Court confirms the Plan, it will enter the Confirmation Order.

## III.

## HISTORY, ORGANIZATION AND ACTIVITIES OF THE DEBTORS

A.      **General Description of the Debtors' Business and Primary Assets**

Prior to the sale of substantially all operating assets described further below, the Debtors were a group of independent energy companies engaged in the acquisition, development and exploitation of oil and gas properties in the western United States. The Debtors' purpose was to provide the operational focus necessary to their oil and gas properties to exploit the full potential of those properties.

As of the Petition Date, all of the principal assets of Petrocal, Carneros Acquisition, Carneros Energy, and Gotland had been sold to third parties. The oil and gas assets of PERL, referred to as the "Beta Assets," were leased from the Minerals Management Service of the United States Department of Interior and were located in federal waters approximately nine miles off the coast of Huntington Beach, California (in the San Pedro Channel area). The oil and gas assets of PEAO, referred to as the "Alaska Assets," were principally located offshore in Alaska. PERL and PEAO acquired these oil and gas assets in transactions occurring in the fourth quarter of 2006 and during 2007, and their prepetition secured debt was related to the acquisition of those properties.

San Pedro Bay Pipeline Company ("SPBP") owned and operated the pipeline from the Beta Assets to shore, where it connected to another pipeline that connected to the Conoco/Phillips refinery located in Los Angeles, California. The chapter 11 case of SPBP was dismissed by order of the Bankruptcy Court entered on December 23, 2009, as part of the sale of

7

the Beta Assets, discussed below.

The Debtors, at the time of the filing of their chapter 11 cases, were headquartered in Long Beach, California, and also had offices in Anchorage, Alaska, and Bakersfield, California. PERL had approximately one hundred employees (some of whom provided services to other Debtors). At this time, all of the offices have been closed and the Debtors are utilizing space at the former Long Beach office pursuant to an agreement with the purchaser of the Beta Assets. Aside from professionals, there are currently two consultants and one employee working for the Debtors.

## B.     The Debtors' Corporate Structure and Financial Performance

PERL is a publicly held Delaware corporation with stock that was traded on the Toronto Stock Exchange. Effective March 11, 2009, the Toronto Stock Exchange ("TSX") suspended trading of PERL's common shares on the TSX for its failure to meet the continued listing requirements of the TSX as a result of PERL filing insolvency proceedings, PERL's failure to meet the financial conditions of the TSX, and the low share price of PERL's shares on the TSX. PERL's shares were scheduled to be delisted from the TSX at the close of markets on April 10, 2009.

On March 12, 2009, PERL obtained an order (the "CCAA Order") from the Supreme Court of British Columbia ("BCSC") under the *Companies' Creditors Arrangement Act* (Canada), which, among other things, stayed all rights and remedies of all individuals, firms, corporations or governmental bodies/agencies against PERL for a period ending on April 9, 2009, thereby barring the TSX from taking delisting action against PERL. On April 9, 2009, PERL obtained an extension of the CCAA Order from the BCSC, which extended the term of the CCAA Order to September 9, 2009. The CCAA Order was not extended beyond September 9, 2009, but the TSX has not yet taken delisting action against PERL, and trading of the PERL's common shares on the TSX remains suspended.

PERL owns 100% of the stock or interests in Petrocal, PEAH, and Carneros Acquisition Corp. Prior to its sale as part of the sale of the Beta Assets, PERL also owned 100% of the stock of SPBP. PEAH owns 100% of the interests of PEAO and, prior to abandonment by order of the Bankruptcy Court entered on May 24, 2010, PEAH owned 50% of the stock of Cook Inlet Pipeline Company, a non Debtor that owns a pipeline that transports oil and gas from producing assets in Alaska formerly owned by PEAO to the Drift River terminal for sale to a third-party purchaser. Carneros Acquisition owns 100% of the stock of Carneros Energy, which in turn owns 100% of the stock of Gotland.

Prior to the Petition Date, the Debtors' revenue was largely dependent on the market price for the underlying crude oil produced, in addition to the level of production. Their revenue for 2008 was approximately $226.2 million and in 2009, the revenue was approximately $95.6 million.

8

C.     **PERL's and PEAO's Liabilities**

In connection with PERL's acquisition of the Beta Assets, PERL, as the borrower, and its subsidiaries (other than PEAO and PEAH), as guarantors, entered into a *Credit and Guaranty Agreement*, dated as of November 30, 2006 (as amended, restated, supplemented or otherwise modified from time to time, the "PERL Credit Agreement"), with certain lenders (the "PERL Lenders") and J. Aron & Company ("J. Aron"), as administrative agent for the PERL Lenders. As of the Petition Date, approximately $44.2 million in principal obligations were outstanding under the PERL Credit Agreement. Subject to certain validly perfected prior liens, the obligations under the PERL Credit Agreement were secured by a first priority, senior lien on substantially all of the real and personal property of PERL and its subsidiaries (except PEAO and PEAH).

In connection with PEAO's acquisition of the Alaska Assets, PEAO, as borrower, entered into a *First Lien Credit Agreement*, dated as of August 24, 2007 (as amended, restated, supplemented or otherwise modified from time to time, the "PEAO First Lien Credit Agreement"), with certain lenders (the "PEAO First Lien Lenders"), Silver Point Finance LLC ("Silver Point"), as administrative agent for the PEAO First Lien Lenders, and J. Aron, as documentation agent. The obligations under the PEAO First Lien Credit Agreement are guaranteed by PEAH. As of the Petition Date, approximately $98.5 million in principal obligations were outstanding under the PEAO First Lien Credit Agreement. Subject to certain validly perfected prior liens, the obligations under the PEAO First Lien Credit Agreement were secured by a first priority, senior lien on substantially all of PEAO's and PEAH's real and personal property (including PEAH's fifty-percent interest in the Cook Inlet Pipe Line Company).

Also in connection with PEAO's acquisition of the Alaska Assets, PEAO, as borrower, entered into a *Second Lien Credit Agreement*, dated as of August 24, 2007 (as amended, restated, supplemented or otherwise modified from time to time, the "PEAO Second Lien Credit Agreement"), certain lenders (the "PEAO Second Lien Lenders"), Silver Point, as administrative agent for the PEAO Second Lien Lenders, and J. Aron, as documentation agent. The obligations under the PEAO Second Lien Credit Agreement are guaranteed by PEAH, PERL and the other Debtors. As of the Petition Date, approximately $347.3 million in principal obligations were outstanding under the PEAO Second Lien Credit Agreement. Subject to certain validly perfected prior liens, the obligations under the PEAO Second Lien Credit Agreement were secured by a second priority lien on substantially all of the Debtors' real and personal property.

D.     **Need for Bankruptcy Relief**

The Debtors went into default under the prepetition credit facilities described above beginning in late March 2008. Due to a variety of factors, including the drastic fall in the price of crude oil in the last calendar quarter of 2008, the stress on the Debtors' cash flow worsened. The Debtors and their prepetition lenders entered into forbearance agreements beginning on December 19, 2008. The last of the forbearance periods expired on February 17, 2009, and on the same date, the lenders sent a letter stating that the Debtors were in default under the prepetition credit facilities. The Debtors determined that they could no longer operate outside of

chapter 11 and commenced these cases on the Petition Date.

## E.    First Day Motions and Other Post-Petition Activities

On the Petition Date, the Debtors sought approval from the Bankruptcy Court of certain motions and applications (collectively, the "First Day Motions"), which the Debtors filed simultaneously with, or around the same time as, their voluntary petitions. The Debtors sought this relief to minimize disruption of the Debtors' business operations as a result of the filing of the Chapter 11 Cases, to establish procedures in the Chapter 11 Cases regarding the administration of the Chapter 11 Cases and to facilitate the Debtors' reorganization efforts. Specifically, the First Day Motions and other critical motions during the Chapter 11 Cases addressed the following issues, among others:

### 4.    Joint Administration

The Debtors are affiliated entities and, therefore, on the Petition Date, filed their *Motion for Order Directing Joint Administration of Related Chapter 11 Cases* [Docket No. 3] (the "Joint Administration Motion"). The Joint Administration Motion sought authority from the Court for the Clerk of the Bankruptcy Court, the Debtors, the Committee and all parties in interest to utilize a single general docket for these cases and combine notices to creditors of the Debtors' respective estates and other parties in interest, which would result in significant savings to the Estates. On March 10, 2009, the Bankruptcy Court entered its order directing joint administration of these Chapter 11 Cases [Docket No. 36].

### 5.    Noticing and Claims Agent

Because of the size of these Chapter 11 Cases (there are more than five thousand creditors and other parties in interest listed on the mailing matrix filed with the chapter 11 petitions), pursuant to rule 2002-1(F) of the Local Rules of Bankruptcy Procedure for the District of Delaware (the "Local Rules"), the Debtors were required to retain a noticing and claims agent. On the Petition Date, the Debtors filed the *Application of Debtors Pursuant to 28 U.S.C. § 156(c) and Local Rule 2002-1(F) for Authorization to (1) Employ and Retain Omni Management Group, LLC as Claims, Balloting, Noticing and Administrative Agent for the Debtors and (2) Appoint Omni Management Group, LLC as Agent of the Bankruptcy Court Nunc Pro Tunc to the Petition Date* [Docket No. 4]. Omni's retention was approved by the Bankruptcy Court by order entered on March 10, 2009 [Docket No. 41]. Omni maintains the claims register in these Chapter 11 Cases and will serve as the balloting agent to receive and tabulate the ballots on the Plan.

### 6.    Employment of Chief Restructuring Officer

On the Petition Date, the Debtors filed their *Motion Pursuant to U.S.C. Sections 327(a) and 328(a) for Entry of an Order Approving the Services Agreement Between Pacific Energy Resources Ltd., et al., Scott W. Winn and Zolfo Cooper Management, LLC, Nunc Pro Tunc to the Petition Date* (the "Zolfo Motion") [Docket No. 5] seeking approval of the continued employment of Scott Winn, a Senior Managing Director of Zolfo Cooper, as their Chief Restructuring Officer, and Zolfo Cooper Management, LLC to perform other services as needed. On April 10, 2009, the Committee filed an objection to certain aspects of the compensation

structure [Docket No. 173]. After the parties reached a resolution of the Committee's objection, the Bankruptcy Court approved the Zolfo Motion by order entered on May 1, 2009 [Docket No. 267]. Pursuant to that order, the employment of Winn and Zolfo Cooper was approved.

### 7. **Employees**

On the Petition Date, the Debtors filed their *Motion Pursuant to Bankruptcy Code Sections 105(a), 363, and 507(a) for an Order Authorizing the Debtors to (i) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation; (ii) Remit Withholding Obligations; (iii) Maintain Employee Compensation and Benefits Programs and Pay Related Administrative Obligations; and (iv) Have Applicable Banks and Other Financial Institutions Receive, Process, Honor, and Pay Certain Checks Presented for Payment and Honor Certain Fund Transfer Requests* [Docket No. 10] (the "Wages Motion").

As of the Petition Date, PERL employed approximately one hundred (100) employees (the "Employees"), thirty-six of whom were salaried with the remaining sixty-four being hourly Employees who worked on oil platforms off the shores of California and Alaska. The Employees performed work for all of the Debtors as needed. The Debtors allocated the cost of the Employees among the Debtors based on actual costs of the Employees that perform work for Debtors other than PERL and entered that cost on the books of the Debtors receiving the services as accounts payable to PERL. None of the Employees was subject to a collective bargaining agreement with the Debtors.

On March 10, 2009, the Bankruptcy Court entered its order authorizing the payment of certain prepetition Employee related claims and the continuation of certain Employee benefits postpetition [Docket No. 45], but continued the hearing on the payment of the temporary staffing agencies and unused vacation to an Employee upon his/her termination. After issues related to those matters were resolved among the parties, on April 8, 2009, the Bankruptcy Court entered a supplemental order approving such payments [Docket No. 148].

### 8. **Cash Management**

On the Petition Date, the Debtors filed the *Motion of Debtors for Order Under Bankruptcy Code Sections 105, 345, 363, 364, 503(b), 1107 and 1108 Authorizing (i) Maintenance of Existing Bank Accounts, (ii) Continued Use of Existing Business Forms, (iii) Continued Use of Existing Cash Management System, (iv) Providing Administrative Priority Status to Postpetition Intercompany Claims, and (v) Waiver of Section 345(b) Deposit and Investment Requirements* (the "Cash Management Motion") [Docket No. 9]. The prepetition cash management system utilized by PERL and PEAO was a network of integrated bank accounts maintained at Wells Fargo Bank, N.A. that facilitated the timely and efficient collection, management and disbursement of funds used in the Debtors' business.

The Bankruptcy Court entered its interim order granting the relief requested by the Debtors in the Cash Management Motion on March 10, 2009 [Docket No. 40]. On April 3, 2009, the Committee filed an objection to the Cash Management Motion on the basis that the Committee needed more time to analyze intercompany transactions [Docket No. 133]. On April 9, 2009, the Bankruptcy Court entered a final order approving the Cash Management Motion. [Docket No. 163].

11

9. **Critical Trade**

On the Petition Date, the Debtors filed the *Debtors' Motion for an Order Authorizing, but not Requiring, the Payment of Prepetition Claims of Critical Vendors* [Docket No. 13], which sought authority for the Debtors to pay, in their sole discretion, up to $800,000 to suppliers of materials used in the Debtors' business, which were often supplied by critical vendors who would otherwise be unwilling to do business with a company in bankruptcy. On March 10, 2009, the Bankruptcy Court entered its order authorizing the payment, up to $800,000, to certain critical vendors, in the Debtors' sole discretion [Docket No. 39].

10. **Prepetition Taxes**

On the Petition Date, the Debtors filed the *Motion of the Debtors for an Order (i) Authorizing the Debtors to Pay Certain Prepetition Taxes and Regulatory Fees in the Ordinary Course of Business and (ii) Authorizing Banks and Financial Institutions to Honor and Process Checks and Transfers Related Thereto* [Docket No. 11]. On March 10, 2009, the Bankruptcy Court entered its order approving the payment of specified taxes [Docket No. 38]. The Debtors filed two supplemental motions seeking authority to pay additional prepetition taxes, one on May 14, 2009 [Docket No. 311] and one on August 17, 2009. The Bankruptcy Court approved these supplemental motions by orders entered on June 2, 2009 [Docket No. 383] and September 14, 2009 [Docket No. 882], respectively.

11. **Utilities**

On the Petition Date, the Debtors filed the *Motion of the Debtors for an Order Under Section 366 of the Bankruptcy Code (a) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Service, (b) Deeming Utility Providers Adequately Assured of Future Performance, and (c) Establishing Procedures for Determining Adequate Assurance of Payment* (the "Utility Motion") [Docket No. 12]. On March 10, 2009, the Bankruptcy Court entered the interim order approving the procedures requested and setting the Utility Motion for a final hearing [Docket No. 37]. There being no objections to the Utility Motion, the Bankruptcy Court, on April 8, 2009, entered the final order [Docket No. 145] implementing the procedures proposed by the Debtors in the Utility Motion to ensure adequate assurance of future payment to utility service providers.

12. **Royalties**

PERL and PEAO, as operators of certain oil and gas properties, were responsible for the payment of royalties and overriding royalties related to those operated properties. On the Petition Date, the Debtors filed their *Emergency Motion for Authority to Pay or Honor Prepetition and Postpetition Obligations to Royalty Interests* (the "Royalty Motion") [Docket No. 15]. Several parties filed responses to the Royalty Motion, including the Committee, and on June 10, 2009, the Bankruptcy Court entered an order approving the payment of certain overriding royalties to the Debtors' postpetition secured lenders and the withdrawal of the balance of the Royalty Motion.

68773-002\DOCS_SF:73639.1

13.    **Insurance Premium Financing**

On the Petition Date, the Debtors filed the *Motion of Debtors for an Order Granting Debtors the Authority to (1) Make Payments Pursuant to a Prepetition Insurance Premium Financing Agreement, (2) Enter Into New Premium Financing Agreements and Pay Related Brokers Fees* (the "Insurance Premium Finance Motion") [Docket No. 16]. On March 10, 2009, the Bankruptcy Court entered an order approving the Insurance Premium Finance Motion [Docket No. 44].

When the time came for the Debtors to enter into a new insurance premium financing agreement, the company extending the financing insisted that the terms of the financing be approved by the Bankruptcy Court. On May 10, 2009, the Debtors filed the *Motion of Debtors for an Order Approving Terms of Insurance Premium Finance Agreement and Granting Debtors the Authority to Enter Into New Premium Financing Agreement on Terms Specified by AFCO Acceptance Corporation* [Docket No. 310]. The Bankruptcy Court entered an order granting this motion on June 2, 2009 [Docket No. 382].

14.    **Interim Compensation for Professionals**

On the Petition Date, the Debtors filed the *Motion of Debtors for an Order Establishing Procedures for Interim Compensation Pursuant to Section 331 of the Bankruptcy Code* (the "Interim Comp Motion") [Docket No. 8]. The Debtor, under the Interim Comp Motion, sought approval of procedures for the application, interim allowance and payment of Professional Persons on a monthly basis. On April 8, 2009, the Bankruptcy Court entered its order approving the monthly compensation procedures proposed by the Debtors [Docket No. 147].

On July 13, 2009, the Bankruptcy Court entered the *Order Appointing Fee Auditor and Establishing Related Procedures Concerning the Payment of Compensation and Reimbursement of Expenses of Professionals and Members of Official Committees and Consideration of Fee Applications* [Docket No. 592] appointing Warren H. Smith & Associates, P.C. (the "Fee Auditor") as fee auditor is these Chapter 11 Cases. Pursuant to this Order, the Fee Auditor has been reviewing all of the Professional Persons' fees and expenses and has been making recommendations to the Bankruptcy Court regarding same.

15.    **Ordinary Course Professionals**

On the Petition Date, the Debtors filed the *Motion of Debtors Pursuant to Sections 105(a),327, 328 And 330 of the Bankruptcy Code for an Order Authorizing the Debtors to Retain, Employ and Compensate Certain Professionals Utilized by the Debtors in the Ordinary Course of Business* (the "OCP Motion") [Docket No. 7], seeking authority of the Bankruptcy Court to employ certain specified professionals without having to file applications for employment and compensation with respect to such professionals. The "Ordinary Course Professionals" consisted primarily of different professional firms that provided, among other things, various ongoing legal, accounting and reserve engineering services. On April 9, 2009, the Bankruptcy Court entered its order authorizing the employment of ordinary course professionals using the procedures outlined by the Debtors in the OCP Motion [Docket No. 161].

16. **Claims and Equity Trading**

On the Petition Date, the Debtors filed the *Debtors' Motion for Interim and Final Orders Establishing Procedures and Restrictions on Claims and Equity Transfers* (the "Trading Restrictions Motion") [Docket No. 14.] On March 10, 2009, the Bankruptcy Court entered an interim order approving the Trading Restrictions Motion and set it for a final hearing. The Committee, Union Oil Company of California ("Union"), and the United States Trustee filed objections to the Trading Restrictions Motion and on April 8, 2009, the Committee filed its *Motion of Official Committee of Unsecured Creditors to Extend Restrictions on Claims and Equity Transfers to Include Debtors' Secured Lenders* (the "Committee's Motion to Extend") [Docket No. 153], which was joined by Union. The Bankruptcy Court denied the Committee's Motion to Extend and asked the parties to submit an order on the Trading Restrictions Motion.

17. **DIP Financing and Cash Collateral**

On the Petition Date, the Debtors sought authority to use cash collateral and approval of postpetition financing (the "DIP Loans") by filing their *Motion to Approve Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 365 and 507: (1) Approving Senior Secured Superpriority Postpetition Financing; (2) Authorizing Use of Cash Collateral; (3) Granting Liens and Providing Superpriority Administrative Expense Status; (4) Granting Adequate Protection; (5) Modifying Automatic Stay; and (6) Scheduling a Final Hearing* (the "DIP Motion") [Docket No. 18]. On March 10, 2009, the Bankruptcy Court entered its interim order (the "Interim DIP Order") [Docket No. 42] authorizing the Debtors to borrow up to $9.5 million under the Interim DIP Order. Union, Aera Energy LLC ("Aera"), Noble Energy, Inc. ("Noble") and the Committee (collectively, with Union, Aera and Noble, the "Objecting Parties") filed objections to the DIP Motion. The final hearing on the DIP Motion was held on June 3, 2010, and the *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 365 and 507: (1) Approving Senior Secured Superpriority Postpetition Financing; (2) Authorizing Use of Cash Collateral; (3) Granting Liens and Providing Superpriority Administrative Expense Status; (4) Granting adequate Protection; and (5) Modifying Automatic Stay* was entered on June 4, 2009 (the "Final DIP Order") [Docket No. 416], approving the DIP Motion and the DIP Loans, and incorporating resolutions of certain of the objections raised by the Objecting Parties.

The Final DIP Order provided, among other things, for postpetition loans to be made to PERL, PEAH and PEAO and guaranteed by the other Debtors: (i) a term loan to be used to satisfy the prepetition first lien loan on the Beta Assets, (ii) a term loan to be used to satisfy the prepetition first lien loan on the Alaska Assets, and (iii) a revolving loan with new advances of up to $44 million. In exchange, the DIP Lenders[6] were granted first priority liens on the majority of the Debtors' assets, subject only to certain prior liens and carve outs for the fees and expenses of professionals (the "Carve Out"), and a superpriority administrative claim (subject to the Carve Out). No lien or superpriority Claim of the DIP Lenders attached to Avoidance Claims, except for any Avoidance Claims arising under section 549 of the Bankruptcy Code.

---

[6] J. Aron & Company was the lead arranger, administrative agent, collateral agent for the "Beta Collateral" as defined in the Final DIP Order, syndication agent and lender, and Silver Point Finance, LLC, as collateral agent with respect to the "PEA Collateral" as defined in the Final DIP Order, and certain other lenders are herein referred to as the "DIP Lenders".

Further, paragraph 35 of the Final DIP Order provided for a carve-out in favor of the Estates in the first $2 million (in aggregate) from cash proceeds with respect to either (i) any cash proceeds received by the Debtors as a result of the Union Adversary (as defined in Section O below), or (ii) any cash proceeds received by the Debtors as a result of the recovery of certain production payments from Aera and Noble. The Debtors ultimately recovered approximately $400,000 out of the amounts owed to Aera and Noble, which leaves up to approximately $1.6 million available as potential proceeds out of the Union Adversary. These funds are referred to as the "Alaska Fund" under the Plan and will be available solely to Creditors of PEAO.

By virtue of paragraph 38 of the Final DIP Order, the DIP Lenders also assigned to the Estates, for the benefit of holders of general unsecured claims, any available subordination rights vis-a-vis Forest Oil Corporation ("Forest Oil"), though any party's rights and obligations under the prepetition subordination agreement dated August 24, 2007 were preserved.

## F.     Retention of Debtors' Professional Persons

On the Petition Date, the Debtors sought to employ PSZ&J as their bankruptcy counsel with regard to the filing and prosecution of their Chapter 11 Cases by filing the *Application of the Debtors Pursuant to Section 327(a) of the Bankruptcy Code, Rule 2014 of the Federal Rules of Bankruptcy Procedure and Local Rule 2014-1 for Authorization to Employ and Retain Pachulski Stang Ziehl & Jones LLP as Counsel for the Debtors and Debtors in Possession Nunc Pro Tunc to the Petition Date* [Docket No. 17]. An order was entered authorizing that retention, effective as of the Petition Date, on April 9, 2009 [Docket No. 162].

Further, the Debtors sought approval of the employment of three other law firms to serve as special counsel: Schully, Roberts, Slattery & Marino; PLC as special oil and gas counsel, Rutan & Tucker, LLP as special corporate and litigation counsel; and Devlin Jensen[7] as Special Canadian Counsel. The Bankruptcy Court approved the employment of those firms by orders entered on March 19, 2009 [Docket No. 202] and April 8, 2009 [Docket Nos. 265 and 266], respectively.

Also, on the Petition Date, the Debtors filed the *Application of Debtors Pursuant to 11 U.S.C. Sections 327(a) and 328(a) for an Order Authorizing the Employment of Albrecht & Associates, Inc. as Agent for Pacific Energy Resources Ltd. and Pacific Energy Alaska Operating LLC Nunc Pro Tunc to the Petition Date* (the "Albrecht Application") [Docket No. 6] and the *Application of Debtors Pursuant to U.S.C. Sections 327(a) and 328(a) for Authority to Employ Lazard Frères & Co. LLC, as Investment Banker to the Debtors Nunc Pro Tunc to the Petition Date* (the "Lazard Application") [Docket No. 32] to assist PERL and PEAO in the sale of their oil and gas properties. On April 8, 2009, the Debtors filed an application to employ Millstream Energy, Inc. (the "Millstream Application") [Docket No. 158] as their internal consultant with respect to the valuation of the oil and gas reserves and to coordinate and support the evaluation and marketing efforts of Albrecht and Lazard. The Committee filed objections to all three of these applications. After extensive negotiations, the Committee, the Debtors, Albrecht, Lazard and Millstream reached agreements on the terms of the three engagements. On May 1, 2009, the Bankruptcy Court approved the Lazard Application, as amended by agreement

---

[7]   Effective as of May 1, 2009, Devlin Jensen was registered as a Law Corporation in British Columbia and changed its name to Lunny MacInnes Law Corporation.

[Docket No. 264] and on May 15, 2009, entered orders approving the Albrecht Application [Docket No. 313] and the Millstream Application [Docket No. 314], each as amended by agreement.

After the sale of the majority of Debtors' oil and gas properties, Albrecht filed its first and final fee application [Docket No. 1287] seeking approval of its $1,250,000 success fee. The Bankruptcy Court entered an order allowing such fee on February 9, 2010 [Docket No. 1319]. Lazard filed monthly fee applications throughout the Chapter 11 Cases seeking approval of its monthly charges and, on March 2, 2010, filed its third quarterly and final fee application seeking final allowance of its monthly fees and its success fee in the cumulative amount of $1,824,193.32, plus expenses. Millstream has filed fee applications for its hourly fees, its success fees in the amount of $100,000 and a termination fee in the amount of $20,550.

The Debtors also filed the *Application of Debtors for Entry of an Order Authorizing the Employment and Retention of Meyers Norris Penny LLP as Auditors to the Debtors nunc pro tunc to the Petition Date* on April 14, 2009 [Docket No. 195]. Meyers Norris had served as the Debtors' auditor before the Petition Date and the Debtors sought approval to continue using the firm as auditors postpetition. The Bankruptcy Court entered an order approving this application on June 3, 2009 [Docket No. 390].

## G.      Appointment of Committee and Employment of Committee's Professional Persons

On March 19, 2009, the United States Trustee appointed the Committee as the representative of the Debtors' general unsecured creditor constituency in these Chapter 11 Cases. The Committee is composed of Forest Oil, Marathon Oil Corporation, and Bateman & Company Ltd. The Committee retained Steptoe & Johnson LLP as lead counsel, Pepper Hamilton LLP as Delaware counsel, and Deloitte Financial Advisory Services LLP as financial advisors in the Chapter 11 Cases.

## H.      Contract and Lease Rejections

The Debtors filed four motions seeking to reject specified contracts and leases. The first such motion [Docket No. 259], filed on April 30, 2009, sought approval of the Debtors' rejection of a car lease, the employment contract of one of the Alaska employees and a lease of a condo in Alaska. The second rejection motion [Docket No. 845], filed on September 4, 2009, sought approval of the rejection of five additional employment agreements and the office leases in Bakersfield, California and Anchorage, Alaska. The third rejection motion [Docket No. 907], filed on September 18, 2009, sought to reject various agreements related to the operations of certain of the Alaska Assets and a property in Wyoming. On October 16, 2009, the Debtors filed the fourth rejection motion [Docket No. 1013] seeking rejection of certain personal property leases and operations contracts. The Bankruptcy Court granted, without modification, the first and second rejection motions [Docket Nos. 381 and 932, respectively]. The third and fourth rejection motions were granted as modified [Docket Nos. 1158 and 1159, respectively].

## I.      Exclusivity Extensions

The Debtors filed requests for extensions of the Debtors' exclusive periods in which to file a plan of reorganization and solicit acceptances thereof on June 12, 2009 [Docket No. 448],

October 16, 2009 [Docket No. 1011], March 2, 2010 [Docket No. 1371], and July 1, 2010 [Docket No. 1687]. The Debtors have filed the Plan within their exclusive period to propose a plan.

## J. Bar Date for Filing Proofs of Claim and Administrative Expense Requests

On April 15, 2009, the Debtors filed a motion requesting that the Bankruptcy Court set a deadline by which parties, including governmental units, must file proofs of claim (the "Bar Date Motion") [Docket No. 201]. The Committee filed an objection to the Bar Date Motion asking the Bankruptcy Court to give the creditors more time to file claims [Docket No. 220]. The Bankruptcy Court, on May 5, 2009, entered its order [Docket No. 277] establishing June 23, 2009, as the deadline for filing against the Debtors Claims that arose prior to the Petition Date (the "General Bar Date"), and September 8, 2009, as the bar date for governmental units. A schedule of filed proofs of claim is maintained by Omni, the Debtors' claims agent.

On January 21, 2010, the Debtors filed the *Motion of Debtors for an Order (1) Fixing Deadline for Filing Administrative Expense Requests, (2) Approving Form and Manner of Notice Thereof, and (3) Granting Related Relief* [Docket No. 1296], requesting that the Bankruptcy Court establish March 15, 2010, as the bar date for filing requests for payment of administrative expenses arising between the dates of March 9, 2009 and February 15, 2010. On February 8, 2010, the Bankruptcy Court entered an order granting the relief requested in this motion [Docket No. 1320].

## K. Filing of Schedules and Statements of Financial Affairs

On March 20, 2009, the Debtors filed a motion seeking an extension of the April 8, 2009 deadline to file Schedules of Assets and Liabilities and Statements of Financial Affairs (collectively, the "Schedules and Statements") to April 28, 2009 [Docket No. 96]. The Bankruptcy Court approved that request by its Order entered on April 8, 2009 [Docket No. 146]. On April 28 and 29, 2009, the Debtors filed their Schedules and Statements with the Bankruptcy Court, which set forth, inter alia, the assets of the Debtors and the prepetition claims against the Debtors based on their books and records. The Debtors reserve their right to further amend the Schedules and Statements.

## L. Employee Incentive Program

On May 11, 2009, the Debtors filed the *Debtors' Motion for an Order Approving a Key Employee Incentive Plan and Authorizing Payments Thereunder* [Docket No. 289] (the "KEIP Motion"). Pursuant to the KEIP Motion, Debtors requested approval of a key employee incentive plan (the "KEIP") that provided for a select group of twenty-five executives, managers, supervisors, and key hourly employees[8] to receive bonuses if certain specified performance targets were met. The total bonuses to be paid under the KEIP ranged between zero and approximately $1.4 million. On June 3, 2009, the Bankruptcy Court entered its *Order Approving*

---

[8] The employees who participated in the KEIP were divided into four initiative groups: the first group's bonuses were dependent upon reaching certain targets related to the sale of the Beta Assets, the second group's bonuses were dependent upon reaching certain targets related to the sale of the Alaska Assets, and the third and fourth groups' bonuses were tied to targets relating to maintenance of oil production and controlling lease operating costs for the Beta Assets and the Alaska Assets, respectively.

17

*Key Employee Incentive Plan and Authorizing Payments Thereunder* (the "KEIP Order") [Docket No. 394], granting the relief requested in the KEIP Motion.

On August 15, 2009, the Debtors filed *Debtors' Motion for an Order Approving a Supplemental Employee Incentive Plan to Facilitate an Orderly Abandonment of Alaska Assets* (the "Supplemental Incentive Motion") [Docket No. 753]. The Supplemental Incentive Plan consisted of two separate subparts: (a) the Alaska Key Employee Supplemental Incentive Plan for three managers and (b) the Alaska Key Employee Retention Plan for 24 rank-and-file employees. Under the two subparts, the Debtors would be authorized to pay participating employees, depending on certain targets being met, up to an aggregate amount of approximately $100,000 to incentivize these employees to remain with the Debtors while they wound-down the Debtors' Alaska operations prior to abandonment of the Debtors' unsold Alaska Assets. On September 1, 2009, the Court entered its Order approving the Supplemental Incentive Motion (the "Supplemental Incentive Order") [Docket No. 824].

Pursuant to the KEIP Order, the Debtors paid participating employees a total aggregate amount of $314,425.73. The employees that participated in the Supplemental Incentive Plan received a total aggregate amount of $81,787.23 pursuant to the Supplemental Incentive Order.

## M. **Abandonment of Interests in Estate Property**

### 1. **Spurr Platform**

On May 11, 2009, the Debtors filed the *Motion of the Debtors for an Order Authorizing Abandonment of Interests in the Spurr Platform Located in Alaska and Rejection of Executory Contracts Relating Thereto* (the "Spurr Abandonment Motion") [Docket No. 291], seeking the Bankruptcy Court's approval of the Debtors' abandonment of any and all interests in an offshore oil and gas platform located in Cook Inlet, Alaska (the "Spurr Platform") to Marathon Oil Company, the other owner of the Spurr Platform, and the rejection of related contracts. The Spurr Platform had ceased operations prior to the Petition Date and was being decommissioned. PEAO owned a 50% interest in the Spurr Platform and was responsible for 31.6% of the decommissioning costs, or an estimated amount of between $6.6 million and $11.1 million. The Committee and Marathon Oil Company filed objections to the Spurr Abandonment Motion. On October 6, 2009, the Bankruptcy Court entered an order approving the abandonment of the Debtors' interest in the Spurr Platform, but did not determine what entities held title to the Spurr Platform after such abandonment and the order did not affect the rights of Marathon Oil Company to assert claims against the Debtors regarding the decommissioning of the Spurr Platform so long as such claims were filed within thirty days after the entry of the order [Docket No. 973]. Marathon filed a motion seeking allowance of an administrative claim for the expected decommissioning liabilities, but later withdrew such request.

### 2. **Certain of the Alaska Assets**

The Debtors, not being certain that they would be successful in their attempts to sell the Alaska Assets and being mindful of the detriment to the Estates in holding such assets, filed on June 16, 2009, the *Alternative Motion of Pacific Energy Alaska Operating LLC for an Order Authorizing Abandonment of Interests in Oil and Gas Properties at Trading Bay, Alaska and Rejection of Executory Contracts Relating Thereto* (the "Trading Bay Abandonment Motion")

18

[Docket No. 455] and the *Alternative Motion of the Debtors for an Order Authorizing Abandonment of Certain Interests in Oil and Gas Properties in Alaska (Excluding Trading Bay) and Rejection of Executory Contracts Relating Thereto* (the "Non-Trading Bay Abandonment Motion") [Docket No. 456].

Pursuant to the Trading Bay Abandonment Motion, the Debtors sought approval of the abandonment of PEAO's interests in twelve offshore oil and gas leases located in an area of Cook Inlet known as Trading Bay, if those properties could not be sold. These leases had been unitized and were known collectively as the Trading Bay Unit. One other lease was also located in Trading Bay and known as the Trading Bay Field. The Trading Bay Unit and the Trading Bay Field are operated by Union.[9]

Pursuant to the Non-Trading Bay Abandonment Motion, the Debtors sought approval of the abandonment of PEAO's interests in various other oil and gas leases also located in Cook Inlet, Alaska, but outside the area known as Trading Bay, if such properties could not be sold. The major producing fields in this group of properties were the West McArthur River field and the Redoubt Shoal field and the major explorations projects were called Raptor, Middle Lake, Susitna Basin and Corsair.

Various parties objected to the Trading Bay Abandonment Motion and the Non-Trading Bay Abandonment Motion. All objections were either resolved or overruled and the Bankruptcy Court entered its order granting the Trading Bay Abandonment Motion (the "Trading Bay Abandonment Order") on September 2, 2009 [Docket No. 832] and its order granting the Non-Trading Bay Abandonment Motion (the "Non-Trading Bay Abandonment Order") on September 11, 2009 [Docket No. 876]. Neither of the orders determined the owner of the interests being abandoned after the abandonment and each preserved certain claims of the parties as set forth in the orders. Union asserts that entry of the Trading Bay Abandonment Order had no effect on the liens and claims asserted by Union as to PEAO's abandoned interests in Trading Bay, or any of the leases or contracts relating thereto.

After the entry of the Non-Trading Bay Abandonment Order, the Debtors received a viable offer from Cook Inlet Energy, LLC ("CIE") to purchase certain of the assets that had been abandoned (the "Sold Assets"). On October 14, 2009, the Debtors filed the *Debtors' Motion for an Order (a) Vacating This Court's Abandonment Order in Part for Certain Alaska Assets and (b) Authorizing the Debtors to Sell Such Assets to Cook Inlet Energy, LLC* (the "Vacation and Sale Motion") [Docket No. 998]. Twelve objections were filed to the Vacation and Sale Motion, most of which addressed issues with the sale rather than the vacation of the Non-Trading Bay Abandonment Order as it related to the Sold Assets. Daniel Donkel, an owner of an overriding royalty interest in certain of the Alaska Assets, filed an appeal of the Non-Trading Bay Abandonment Order (the "Donkel Appeal").

All of the objections and the appeal were resolved by the Debtors, and on November 25, 2009, the Bankruptcy Court entered its *Conditional Order (a) Vacating This Court's Abandonment Order in Part for Certain Alaska Assets and (b) Authorizing the Debtors to Sell Certain Alaska Assets* (the "Vacation and Sale Order") [Docket No. 1157]. The Vacation and

---

[9]  The relationship of the Debtors and Union is discussed more fully below in Article III.N.

Sale Order was conditional because the Donkel Appeal had deprived the Court of jurisdiction to vacate the Non-Trading Bay Abandonment Order. The Vacation and Sale Order provided that it would become effective only upon the dismissal of the Donkel Appeal. The Donkel Appeal was dismissed on December 11, 2009, and on December 24, 2009, the Debtors filed the *Notice of Effective Date of Conditional Order (a) Vacating this Court's Abandonment Order in Part for Certain Alaska Assets and (b) Authorizing the Debtors to Sell Certain Alaska Assets and (II) Closing on Sale Agreement* [Docket No. 1211]. Additional details regarding this sale are provided in Section Q.2 below.

### 3. Stock of Cook Inlet Pipe Line Company

On April 30, 2010, PEAH filed the *Motion of Pacific Energy Alaska Holdings, LLC for an Order Authorizing Abandonment of Cook Inlet Pipe Line Company Stock* [Docket No. 1560]. The stock at issue represented 50% of the issued and outstanding shares of the common stock of Cook Inlet Pipe Line Company ("CIPL"). CIPL owns the Cook Inlet pipeline and Drift River terminal, which transports oil from wells located in or near Cook Inlet, Alaska. The declining volume of oil transported through the pipe line, the costs associated with repairs and clean-up occasioned by the volcanic eruption of Mt. Redoubt and the significant future decommissioning obligations associated with CIPL's assets resulted in the asset being a detriment to the Estates. On May 24, 2010, the Bankruptcy Court entered an order approving the abandonment of the CIPL common stock [Docket No. 1604].

CIPL has also asserted administrative claims against the estates of PEAO and PERL. The amount currently at issue is $519,213.20. The Debtors have objected to these claims and a contested hearing has been held. The matter is currently under submission with the Bankruptcy Court. In the event that such administrative claims are allowed over the Debtors' objections, the Debtors anticipate having sufficient funds available to satisfy such claims.

### N. Certain Union Motions

Union, an affiliate of Chevron Corporation, holds a majority working interest, and is the designated operator, in certain properties that are included within the Alaska Assets. Specifically, as of the Petition Date, PEAO and Union shared a working interest in the Trading Bay Field and the Trading Bay Unit. The Trading Bay Field consisted of approximately 5,840 developed acres with one offshore platform and twenty-five producing wells. The Trading Bay Unit consisted of approximately 16,179 developed acres with four offshore platforms and sixty-six producing wells. As of the Petition Date, PEAO had a 46.8% working interest and Union had a 53.2% working interest in each of the Trading Bay Field and the Trading Bay Unit.

As the operator at Trading Bay, Union would allocate a portion of the revenues and the costs of production to PEAO based upon its working interest in the underlying assets. Union alleged that through the end of February, 2009, the accrued and unpaid expenses (net of production) assessed by Union against PEAO on account of PEAO's share of the operating costs of Trading Bay was approximately $26.2 million. Union asserted a first priority lien in PEAO's working interests and the proceeds of the oil and gas production thereof to secure PEAO's obligations. Union now asserts in excess of $50 million in claims against PEAO relating to such unpaid allocated costs.

20

Union has played an active roll in these Chapter 11 Cases. In addition to filing objections to various motions filed by the Debtors, Union has filed various motions and claims of its own, not all of which are addressed herein. One such motion was the *Motion of Union Oil Company of California for Relief from Automatic Stay* (the "Union Stay Relief Motion") [Docket No. 100] filed on March 23, 2009. In the Union Stay Relief Motion, Union asserted that (i) it held a perfected lien against PEAO's working interest in Trading Bay, (ii) the prepetition amount due was in excess of $26 million more than the proceeds of PEAO's interest in the production, (iii) estimated that the amount owing would increase by another $22.2 million by the end of 2009, and (iv) alleged that it was not adequately protected. Union sought relief from the Bankruptcy Court to lift the stay to allow Union, among other things, to enforce its lien rights. The Debtors and other parties objected to the Union Stay Relief Motion on the grounds that the liens and the amount of the claim were disputed.

On April 28, 2009, the Bankruptcy Court entered the *Order Governing Further Proceedings on Motion of Union Oil Company of California for Relief From Automatic Stay* (the "Union Stay Order") [Docket No. 230], requiring the purchaser of PEAO's interest in the postpetition production from Trading Bay to turn the proceeds over to PEAO, and required PEAO to deposit such funds in a segregated, interest-bearing account. The funds could not be used without further order of the Court or consent of Union and other specified parties in interest. The entitlement to the funds in this account is the subject of a pending adversary proceeding commenced by Union and discussed below. On August 13, 2009, the Bankruptcy Court approved a stipulation among Union, the Debtors and other interested parties whereby Union withdrew the Union Stay Relief Motion, but the segregated account remained in place.

Shortly after the Union Stay Order was entered, Union filed its *Motion of Union Oil Company of California to Compel Immediate Assumption or Rejection of Certain Executory Contracts* ( the "Assumption or Rejection Motion") [Docket No. 298, filed on May 12, 2009]. Union asked the Bankruptcy Court to compel PEAO to assume or reject six agreements related to the operations at Trading Bay. Union also filed the *Motion of Union Oil Company of California to Compel Immediate Payment of Administrative Expense* (the "Administrative Expense Motion" and together with the Assumption or Rejection Motion, the "Union Operating Expense Motions") [Docket No. 315, filed on May 15, 2009], pursuant to which Union requested allowance of no less than $8,835,382.86 as an administrative expense claim related to PEAO's purported share of postpetition operating expenses at Trading Bay. By the time Union filed the Union Operating Expense Motions, Union alleged that it had incurred $31 million in unreimbursed costs attributable to PEAO's interests in Trading Bay and that PEAO's unreimbursed share of the operating costs were escalating at the rate of approximately $4 million a month. The Debtors, the Committee and other parties filed objections to the Union Operating Expense Motions.

On June 15, 2009, the Bankruptcy Court entered an order denying the Administrative Expense Motion, without prejudice [Docket No. 450] and granting in part the Assumption or Rejection Motion, requiring the Debtors to file a motion to assume or reject the agreements at issues so that the matter would be heard on July 27, 2009, at the hearing when the motion to sell the Debtors' Alaska Assets (described below) was to be heard, or, if no sale motion was heard, by August 4, 2009. As discussed above, on June 16, 2009, the Debtors filed the Trading Bay Abandonment Motion, wherein they sought approval of the rejection of PEAO's agreements

21

with Union if PEAO's interests in Trading Bay were not sold. On September 2, 2009, the Bankruptcy Court entered the Trading Bay Abandonment Order approving the rejection of those contracts.

On March 5, 2010, Union filed two motions seeking allowance of administrative expenses. One of the motions sought allowance of $21,714,283.21 in postpetition operating costs purportedly attributable to PEAO's working interests in Trading Bay [Docket No. 1382], and the other motion sought allowances of administrative expense claims for at least $200,000,000 for PEAO's alleged share of the projected future costs of abandonment and remediation at Trading Bay. The Debtors objected to both of these motions and a contested hearing has been held. The matter is currently under submission with the Bankruptcy Court.

As noted in Article XX of this Disclosure Statement, PEAO's estate does not have sufficient funds available to satisfy a substantial administrative claim in favor of Union. Hence, there is a risk that the Plan is not feasible, and cannot be confirmed, as to PEAO to the extent that a material portion of Union's administrative claim is allowed.

## O.    Union Litigation

On June 18, 2009, Union filed a complaint (Adversary Case No. 09-51066) (the "Union Adversary") against PEAO and Silver Point, the secured lender who also claims a lien on the Debtors' share of the proceeds of production arising from Trading Bay. Union sought a declaratory judgment determining the validity and priority of Union's alleged liens against the working interests and production owned by PEAO in certain oil and gas properties located at Trading Bay, and Union's rights to the proceeds of such production. Pursuant to the Union Stay Order, the Debtors have placed in a segregated account approximately $12.3 million in proceeds arising from Trading Bay. Union and Silver Point have filed, fully briefed and argued cross summary judgment motions in the Union Adversary. The matter is currently under submission with the Bankruptcy Court.

PEAO does not claim a direct interest in the escrowed funds that is superior to both Union and Silver Point, however, PEAO does have a potential indirect interest in the litigation by reason of paragraph 35 of the Final DIP Order (as described in Section E.17 above). Pursuant to that provision, the Estates are entitled to the first $2 million from cash proceeds received by the Debtors from, among other items, the Union Adversary. At this time, the amount available to is approximately $1.6 million, which is designated the "Alaska Fund" under the Plan available to Creditors of PEAO.

## P.    Settlement with Holders of Alaska Overriding Royalty Interests

In June 2009, holders of overriding royalty interests (the "ORRI Holders") in certain of the Alaska Assets filed a Complaint in the Alaska Bankruptcy Court against PERL, PEAH, PEAO, J. Aron and Silver Point seeking the recovery of proceeds from the sale of oil and gas production attributable to the overriding royalty interests of the ORRI Holders. The parties reached a settlement of the dispute.

On November 13, 2009, the Debtors filed the *Debtors' Motion to Approve Settlement of Alaska Adversary and to Authorize Payment to Holders of Overriding Royalty Interests* (the

22

"ORRI Settlement Motion") [Docket No. 1127], whereby the Debtors sought approval of the payment to the ORRI Holders of all proceeds the Debtors were holding that were attributable to the ORRI Holders' overriding royalty interests in full and complete satisfaction of all claims of the ORRI Holders against the Debtors for proceeds attributable to those interests. The Bankruptcy Court entered an order approving the ORRI Settlement Motion on December 4, 2009 [Docket No. 1191].

## Q.    Sale of the Beta Assets and Certain of the Alaska Assets

### 1.    Sale of Beta Assets

On June 19, 2009, the Debtors, without a stalking horse bidder, filed the *Debtors' Motion for an Order (a) Approving Procedures For Sale of the Debtors' Beta Assets; (b) Scheduling Auction and Hearing to Consider Approval of Sale; (c) Approving Notice of Respective Dates, Times, and Places for Auction and for Hearing on Approval of (i) Sale and (ii) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (d) Approving Forms of Notice; and (e) Granting Related Relief* (the "Beta Sale Procedures Motion") [Docket No. 478]. The Committee and Aera objected to the motion. On July 1, 2009, the Bankruptcy Court entered an order granting the Beta Sale Procedures Motion and setting the auction of the Beta Assets for July 31, 2009 [Docket No. 533].

On July 2, 2009, the Debtors filed the *Debtors' Motion for an Order: (i) Approving Sale of Debtors' Beta Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests Pursuant to Sections 363(b), (f) and (m) of the Bankruptcy Code, (ii) Assuming and Assigning Certain Executory Contracts and Unexpired Leases, and (iii) Granting Related Relief* (the "Beta Sale Motion") [Docket No. 550]. Westchester Fire Insurance Company and ACE USA, Noble, Aera and the Committee filed objections to the Beta Sale Motion. The auction was held as scheduled, but did not result in a successful bidder. The Debtors' sale efforts, however, continued and on November 23, 2009, the Debtors filed a notice of a rescheduled auction on December 11, 2009 and sale hearing on December 22, 2009 [Docket No. 1151]. On December 21, 2009, the Debtors filed a status report on the sale of the Beta Assets [Docket No. 1226]. In that status report, the Debtors informed the Bankruptcy Court and interested parties that they intended to seek authority to consummate a credit bid sale of the Beta Assets to Rise Energy Beta, LLC ("Rise"), a successor in interest to J. Aron and SP Beta Properties, LLC ("SP" and together with Rise, the "Beta Purchasers"), an affiliate of Silver Point. The Purchase and Sale Agreement with the Beta Purchasers was filed on December 22, 2009 [Docket No. 1231] and the Bankruptcy Court entered the Beta Sale Order [Docket No. 1239] on December 23, 2009. Additional details regarding the Beta Sale Order are provided in Article VI below.

The purchase price for the Beta Assets was a credit bid by Rise of $80,000,000, the assumption by SP of $177,550,000 of the indebtedness of the Debtors to the prepetition and postpetition secured lenders, the assumption of various other liabilities and the extinguishment of the balance of the prepetition and postpetition secured indebtedness, except that the Beta Purchasers retained a $75,000,000 claim secured by certain enumerated assets designated the Excluded Interests (as described in Article VI below), and the Beta Purchasers agreed to fund the Debtors' Wind-Down Budget in the amount of $11,938,402 plus certain existing cash balances. The Beta Sale Order also approved the resolution of the Debtors' disputes with Aera and Noble

23

over certain production payments, yielding $400,000 in cash for the Estates, plus the creation of the Unsecured Creditor Fund in the amount of $1.4 million.

## 2. Sale of Certain of the Alaska Assets

On June 16, 2009, the Debtors filed three motions relating to the Alaska Assets: (i) the *Debtors' Motion for an Order (a) Approving Procedures For Sale of the Debtors' Alaska Assets; (b) Scheduling Auction and Hearing to Consider Approval of Sale; (c) Approving Notice of Respective Dates, Times, and Places for Auction and for Hearing on Approval of (i) Sale and (ii) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (d) Approving Forms of Notice; and (e) Granting Related Relief* (the "Alaska Asset Sale Procedures Motion") [Docket No. 453]; (ii) the Trading Bay Abandonment Motion and (iii) the Non-Trading Bay Abandonment Motion.[10] The Bankruptcy Court entered its order approving the Alaska Asset Sale Procedures Motion on July 1, 2009 [Docket No. 532], scheduling the auction of the Alaska Assets for July 20, 2009 and setting the hearing on the sale of the Alaska Assets on July 27, 2009.

On July 2, 2009, the Debtors filed the *Debtors' Motion for an Order (i) Approving Sale of Debtors' Alaska Assets Free and Clear of all Liens, Claims, Encumbrances and Other Interests Pursuant to Section 363(b), (f) and (m) of the Bankruptcy Code; (ii) Assuming and Assigning Certain Executory Contracts and Unexpired Leases; and (iii) Granting related Relief* (The "Alaska Asset Sale Motion") [Docket No. 545]. The Alaska Asset Sale Motion divided the Alaska Assets into two groups: (i) the Group 1 Assets were (a) PEAO's interests in leased oil and gas production and exploration assets located in Alaska (and related assets and contracts) that were operated or held for exploration by PERL, (b) PEAO's interests in leased gas production assets located in Alaska (and related assets and contracts) that were operated by Aurora Gas, LLC, and (c) PEAH's 50% of the issued and outstanding common stock of CIPL, and (ii) the Group 2 Assets were PEAO's interests in the properties at Trading Bay operated by Union. The Debtors received eleven objections to the sale of the Alaska Assets and to the assumption and assignment of related contracts.

The Debtors initially did not receive any qualified bids for the Group 2 Assets, but did receive a late bid that was ultimately approved by the Bankruptcy Court, subject to a financing contingency. Because this buyer was never able to fund the purchase, the Group 2 Assets were abandoned pursuant to the Trading Bay Abandonment Order entered on September 2, 2009 [Docket No. 832].

As to the Group 1 Assets, on July 22, 2009, the Debtors filed the *Notice of the Auction Results* [Docket No. 652] stating that a successful bidder and a back-up bidder had been selected by the Debtors for the purchase and sale of the Group 1 Assets, however, neither of these parties was willing and able to close the sale. As a result of the failure of the sale to close to either the successful bidder or the back-up bidder, the Group 1 Assets were abandoned pursuant to the Non-Trading Bay Abandonment Order entered September 11, 2009 [Docket No. 876].

---

[10] The Trading Bay Abandonment Motion and the Non-Trading Bay Abandonment Motion are discussed in Article III.M.2 above.

After the Non-Trading Bay Abandonment Order was entered, the Debtors were able to reach an agreement with CIE for the sale of certain of the Debtors' Alaska Assets, including certain of the Group 2 Assets, referred to as the Sold Assets, for a cash price of $875,000, subject to certain post-closing adjustments. In order to consummate this sale, the Debtors filed the Vacation and Sale Motion [Docket No. 998]. The Debtors also receive a competing bid for the Sold Assets and conducted an auction that yielded an ultimate purchase price of $2.25 million. As set forth above in Section M.2 of this Article, twelve objections were filed to the Vacation and Sale Motion, most of which addressed issues with the sale rather than the partial vacation of the Non-Trading Bay Abandonment Order. Also, Daniel Donkel had filed the Donkel Appeal. All of the objections and the appeal were resolved by the Debtors and on November 25, 2009, the Bankruptcy Court entered the Vacation and Sale Order [Docket No. 1157]. The Vacation and Sale Order was conditional because the Donkel Appeal had deprived the Court of jurisdiction to vacate the Non-Trading Bay Abandonment Order. The Vacation and Sale Order provided that it would become effective only upon the dismissal of the Donkel Appeal. The Donkel Appeal was dismissed on December 11, 2009, and on December 24, 2009, the Debtors filed the *Notice of Effective Date of Conditional Order (a) Vacating this Court's Abandonment Order in Part for Certain Alaska Assets and (b) Authorizing the Debtors to Sell Certain Alaska Assets and (II) Closing on Sale Agreement* [Docket No. 1211].

## R.    Resolved Adversary Proceedings

During the pendency of these Chapter 11 Cases, there have been four adversary proceedings resolved. On June 1, 2009, Marathon Oil Company filed a complaint (Adversary Case No. 09-51004) (the "Marathon Adversary") seeking a declaratory judgment against the Debtors and other parties as to the respective rights and obligations of those parties regarding the costs of abandoning and decommissioning the certain oil and gas facilities in Cook Inlet, Alaska known as the Spurr Facilities. The Marathon Adversary was dismissed by Marathon on September 28, 2009.

On June 3, 2009 and July 2, 2009, Noble and Aera, respectively, filed complaints against PERL (Adversary Case No. 09-51009 (the "Noble Adversary") and Adversary Case No. 09-51293 (the "Aera Adversary"), respectively) seeking, among other things the payment of funds attributable to certain production payments reserved at the time of the sale of the Beta Assets to PERL. Both of these adversary proceedings were settled as part of the sale of the Beta Assets and the settlements were approved by the Beta Sale Order [Docket No. 1239]. The settlement provided, among other things, that the Debtors would pay the full principal amounts of the production payments, plus all accrued interest to Noble and Aera, as applicable, with Noble and Aera waiving any claims for attorneys' fees or expenses. This resulted in the Estates recovering approximately $400,000 out of funds previously segregated for the benefit of Aera and Noble under the Final DIP Order. The Aera Adversary was dismissed on March 17, 2010, and the Noble Adversary was dismissed on March 18, 2010.

New Alaska Energy, LLC ("NAE") was one of the bidders for the Alaska Assets. As such, it paid a $250,000 deposit to the Debtors. After the auction of the Alaska Assets, NAE was selected as the back-up bidder and eventually, the successful bidder. NAE failed to close the sale and the Debtors refused to return the deposit. On November 25, 2009, NAE filed a complaint (Adversary Case No. 09-52825) (the "NAE Adversary") against the Debtors seeking the return

25

of its deposit amount. The NAE Adversary was settled by an agreement that the Debtors would return $25,000 to NAE and retain the balance of the deposit plus accrued interest. An order approving the settlement was entered on April 19, 2010.

## S.   Claims Objections and Motions to Deem Claims Paid

The Debtors have filed five omnibus objections to claims [Docket Nos. 1349, 1350, 1351, 1416, and 1417], three motions requesting that various claims be deemed satisfied because they have been paid [Docket Nos. 1384, 1476 and 1549] and four objections to requests for administrative expense claims [Docket Nos. 676, 792, 1441 and 1442]. At this time, most of the claims filed against the Debtors have been allowed for the appropriate amount, deemed satisfied or disallowed.

## T.   Preference Actions

On April 5, 2010, the Committee filed its *Motion of the Official Committee of Unsecured Creditors: (I) for Standing to Pursue Causes of Action Belonging to Debtors' Estates Arising Under Chapter 5 of the Bankruptcy Code; and (II) for Approval of Procedures and Authority Governing Settlement of Chapter 5 Causes of Action Filed by Official Committee of Unsecured Creditors* (the "Committee Avoidance Claims Motion") [Docket No. 1478]. On April 19, 2010, the Bankruptcy Court granted the Committee Avoidance Claims Motion [Docket No. 1521]. Pursuant to section 546(a)(1) of the Bankruptcy Code, the deadline to file such actions is March 9, 2011.

To date, the Committee has utilized its Delaware counsel, the law firm of Pepper Hamilton LLP, to pursue Avoidance Claims on a contingency basis. It is anticipated that the Liquidating Debtors will continue to employ this firm on the same terms from and after the Effective Date of the Plan.

IV.

ESTATE ASSETS AND PROJECTED CREDITOR RECOVERIES

## A.   Estate Assets

The anticipated Effective Date of the Plan for purposes herein is October 15, 2010. As of the Effective Date, the Debtors project that the assets of the Estates will consist primarily of: (a) cash in the amount of approximately $5.8 million (of which $1.4 million constitutes the Unsecured Creditor Fund, approximately $461,000 resides at PEAO, and the rest is held by PERL); (b) potential recoveries from the Alaska Fund of up to approximately $1.6 million, which is the subject of the Union Adversary discussed in Article III.O above; and (c) potential litigation and settlement recoveries from Avoidance Claims (against third parties that received payments from the Debtors during the 90-days prior to the Petition Date) or other causes of action that may be available to the Estates.

The Unsecured Creditor Fund has been segregated solely for the benefit of general unsecured creditors in accordance with the terms of the Beta Sale Order. The remaining cash constitutes the Wind-Down Fund created under the Beta Sale Order for the purpose of funding the wind-down costs of the Estates, the Alaska Fund, and other miscellaneous cash on hand. The

26

Debtors estimate that approximately $1.0 million or less of the Wind-Down Fund will remain after all Allowed Administrative Expenses Claims, Priority Tax Claims and Priority Non-Tax Claims are paid.

In terms of potential litigation claims that may exist and would be preserved under the Plan in addition to Avoidance Actions, the Estates may have viable affirmative causes of action against third parties, including:

(i)      Forest Oil and DeGolyer and MacNaughton: generally, that proven and probable reserves of oil and gas do not go from a valuation of approximately $450 million in August 2007 to $2 million in September/December 2009 absent some level of misrepresentation or wrongdoing;

(ii)      Union: that its actions as operator at Trading Bay (particularly with respect to expense control) were not in the best interests of the venture, and thus fiduciary duties to PEAO as non-operator were breached; and

(iii)      according to assertions made by certain constituents in these cases, Goldman Sachs, J. Aron, Silver Point and affiliates: lender liability and similar theories in connection with the acquisition and/or disposition of the Debtors' assets and efforts to obtain additional financing (acknowledging major hurdles exist in the form of releases in favor of such lenders).

The foregoing potential claims are subject to further review, investigation and analysis, and are certain to be vigorously contested by the defendants in any such actions. The Debtors have not allocated any value to such litigation claims for purposes of the Plan or this Disclosure Statement, as any recoveries are speculative at this time.

Forest Oil believes that the Debtors' statements regarding potential litigation claims against Forest Oil are without merit. Forest Oil asserts that PERL's purchase of the Alaska assets was the result of a fully open and diligenced sale process, where all parties had access to necessary information, and was financed by very sophisticated lenders that evaluated their own investment decisions and structured the financing for the purchase. Additionally, Forest Oil asserts that any decline in value of the Alaska assets was not the result of any wrongdoing by Forest Oil, but was the result of, among other things, the failure of the Debtors to appropriately hedge their commodity price exposure to protect against the historic drop in oil prices following the acquisition, the failure of the Debtors to effectively manage and exploit the Alaska assets following their acquisition, that the Debtors were forced to operate the Alaska assets under expensive and constraining financing terms and subject to significant overriding royalty interests taken by the lenders, the result of acts of God, including volcanic activity shortly after the Debtors filed for bankruptcy, and the fact that the Debtors were required, under the terms of post-petition financing, to market and ultimately sell the Alaska assets at a fire sale during an unprecedented financial market collapse.

## B.      Projected Creditor Recoveries

Under the Plan, Holders of Allowed Administrative Expense Claims (including Professional Persons), Priority Tax Claims and Priority Non-Tax Claims will be paid in full.

27

Holders of Miscellaneous Secured Creditors will have the benefit of their collateral or payment in full equivalent to the value of their collateral.

Pursuant to the Beta Sale Order, the Senior Lenders previously received distributions in the form of a credit in connection with a successful bid to acquire the Beta Assets. The Senior Lenders retained a $75,000,000 claim, defined under the Beta Sale Order as the Remaining Claim, secured solely by the Excluded Interests (as described further in Article VI below). For purposes of the Plan, the value of the Excluded Interests is liquidated in the amount of $35,000,000. The balance of the Remaining Claim is entitled to treatment as an Allowed General Unsecured Claim, however, the Senior Lenders have assigned all recoveries on this Claim, along with all subordination rights as to Forest Oil, to the Holders of Allowed General Unsecured Claims (other than Forest Oil).

Holders of Allowed General Unsecured Claims against each Liquidating Debtor will receive a *pro rata* share of the distributable assets of such Debtor, if any. Holders of Allowed General Unsecured Claims also will have the benefit of any subordination rights or carve-outs assigned to such Holders by the Holders of the Senior Lender Claims under the Beta Sale Order, the Plan, or any other order of the Bankruptcy Court.

The Debtors estimate that the Holders of Allowed General Unsecured Claims against PERL will receive a distribution ranging from approximately 8.7% to 17.7% of the amount of the Allowed General Unsecured Claims. (These projections assume that the claims of Forest Oil against PERL are subordinated, as currently proposed under the Plan.) The Holders of Allowed General Unsecured Claims against PEAO and PEAH are not expected to receive a material distribution out of currently available and liquid assets, but could realize a recovery from (a) as to PEAO, out of the Alaska Fund depending on the outcome of the Union Adversary, and (b) other potential and pending litigation. The Holders of Allowed General Unsecured Claims against the remaining Debtors will not receive a distribution on account of their Allowed General Unsecured Claims.

Holders of Intercompany Claims and Subordinated Debt Claims shall receive no distributions under the Plan. The Plan effectuates a subordination of Forest Oil's claims as contemplated by the Beta Sale Order and the Final DIP Order. All Interests in the Debtors shall be cancelled.

Forest Oil disputes the validity of the purported assignment by the lenders of their subordination rights under the Senior Subordinated Accreting Note to the estate because of, among other things, the fact that the subordination provisions were only for the benefit of the lenders. Forest Oil reserves the right to challenge the provisions which purport to assign Forest Oil's rights under the Senior Subordinated Accreting Note in connection with confirmation of the Plan. In addition, for the avoidance of doubt, Forest Oil asserts that the subordination described herein does not affect any claims of Forest Oil that do not arise under the Senior Subordinated Accreting Note.

A more detailed outline of the Debtors' projections for creditor recoveries, and sources and uses of Cash, under the Plan is annexed hereto as Exhibit 3. The projected recoveries under the Plan set forth herein assume an Effective Date of October 15, 2010.

The following two paragraphs contain disclosures prepared by Union, and do not represent the views or opinions of the Debtors. Indeed, the Debtors dispute the assertions below:

Union believes that the Debtors' statements with respect to satisfaction of claims in the Plan and the Disclosure Statement are materially misleading. Although 11 U.S.C. § 1141(d)(3) provides that there is no debtor discharge under a liquidating chapter 11 plan, Union asserts that this Disclosure Statement says that treatment of claims under the Plan shall be "in full satisfaction, settlement, release, and extinguishment" of such claims. The Debtors do not use the word "discharge," but Union believes that the quoted language states that effectively, certain claims will be discharged or "released" or "extinguished" under the Plan, which treatment is tantamount to a discharge. Union asserts that this statement is incorrect, because there can be no discharge as a matter of law. Union asserts that all claims shall survive this bankruptcy to the extent they are not paid in full.

Union further believes that the Debtors' disclosures with respect to their Wind-Down are inadequate and materially misleading. Union asserts that the Disclosure Statement suggests that the Debtors will liquidate and distribute Distributable Assets, and then simply cease to exist, effectively walking away from PEAO's Trading Bay obligations and responsibilities without cleaning up, remediating, shutting in or otherwise administering its Trading Bay assets and satisfying its Trading Bay liabilities. Union believes that, because the Plan Representative may not administer assets which are not assets of the estates, before dissolving, PEAO will be required to wind up under Delaware law, which generally provides that the corporate existence of a company which has dissolved will continue for at least three years, with a representative, trustee or receiver to liquidate the company's assets for the satisfaction of creditors. Further, in the case of the Trading Bay assets, which are no longer part of the Estates, Union asserts that no plan approved by the Bankruptcy Court can relieve the Debtors of their state law dissolution obligations to administer the assets for a minimum of three years. Moreover, Union asserts that such assets will remain subject to Union's liens until the Debtors' obligations to Union are satisfied in full.

As noted above, the Debtors dispute the foregoing assertions by Union. The issues raised by Union may result in objections to the Plan, further modifications to the Plan, and/or a determination by the Bankruptcy Court overruling Union's objections.

## V.

## DESCRIPTION OF THE PLAN

A DISCUSSION OF THE PRINCIPAL PROVISIONS OF THE PLAN AS THEY RELATE TO THE TREATMENT OF CLASSES OF ALLOWED CLAIMS AND INTERESTS IS SET FORTH IN ARTICLES VII THROUGH XIV BELOW. THE DISCUSSION OF THE PLAN THAT FOLLOWS CONSTITUTES A SUMMARY ONLY, AND SHOULD NOT BE RELIED UPON FOR VOTING PURPOSES. YOU ARE URGED TO READ THE PLAN IN FULL IN EVALUATING WHETHER TO ACCEPT OR REJECT THE DEBTORS' PROPOSED PLAN OF LIQUIDATION. IF ANY INCONSISTENCY EXISTS BETWEEN THIS SUMMARY AND THE PLAN, THE TERMS OF THE PLAN CONTROL. ALL CAPITALIZED TERMS NOT OTHERWISE DEFINED HAVE THE MEANINGS ASCRIBED TO THEM IN THE PLAN.

# VI.

## THE TERMS OF THE BETA SALE ORDER

The Plan incorporates the various settlements approved by the Bankruptcy Court in the Beta Sale Order. Below is a summary of certain of those terms of the Beta Sale Order that most materially affect the terms of the Plan:

1. The prepetition and postpetition Claims of the Senior Lenders have been extinguished except for the sum of $75,000,000 designated the Remaining Claim, that is secured solely by the Excluded Interests. The Excluded Interests consist of the following: (a) all payments or proceeds from insurance covering the Debtors' business interruption and debt service and related losses resulting from the eruptions of Mount Redoubt and related events and refunds of insurance premiums associated with the abandonment of operations of the Debtors' operations and assets in Alaska and otherwise, (b) any proceeds from the sale of crude oil and other petroleum products produced from Trading Bay, including those that are currently held in segregated account that is the subject of the Union Adversary other than the Alaska Fund that is required by paragraph 35 of the Final DIP Order to stay in the PEAO Estate, (c) all payments or proceeds resulting from deposits made by potential purchasers of the Debtors' operations in Alaska or claims relating thereto, and (d) any assets or proceeds related to any Alaska properties not bid or assumed to which the Senior Lenders, or their predecessors-in-interest or successors-in-interest, would otherwise by entitled if they were not bidders.

2. The Senior Lenders have assigned to the Debtors' Estates solely for the benefit of unsecured creditors, other than Forest Oil (or any successors or assigns thereof), any distributions on account of the Remaining Claim and all subordination rights against Forest Oil (or any successor or assigns thereof) as to any and all assets that become available to the Estates other than the assets listed above as collateral for the Remaining Claim. Specifically, under that certain Senior Subordinated Accreting Note in the original principal amount of $29,250,000, dated as of August 24, 2007, executed by PERL in favor of Forest Oil, the rights of Forest Oil are expressly subordinated and junior to payment in full of all obligations of the Senior Indebtedness (as defined therein). Because such indebtedness has not been paid in full and all rights of the Senior Lenders as to Forest Oil have been assigned to the Estates by virtue of the Beta Sale Order, Forest Oil is not entitled to any distribution in these Chapter 11 Cases. The Plan effectuates such subordination of Forest Oil's Claims as contemplated by the Forest Subordinated Note and the Beta Sale Order.

Forest Oil disputes the validity of the purported assignment by the lenders of their subordination rights under the Senior Subordinated Accreting Note to the estate because of, among other things, the fact that the subordination provisions were only for the benefit of the lenders. Forest Oil reserves the right to challenge the provisions which purport to assign Forest Oil's rights under the Senior Subordinated Accreting Note in connection with confirmation of the Plan. In addition, for the avoidance of doubt, Forest Oil asserts that the subordination described herein does not affect any claims of Forest Oil that do not arise under the Senior Subordinated Accreting Note.

68773-002\DOCS_SF:73639.1

3.      Prior to the closing of the sale of the Beta Assets pursuant to the Beta Sale Order, the Senior Lenders deposited $1,400,000 in cash, free and clear of all liens, claims and encumbrances, into a trust account designated by the Debtors for the sole and exclusive benefit of, and ultimate distribution to, Holders of Allowed General Unsecured Claims.

4.      The Senior Lenders funded $11,938,402 (plus existing cash) for a "Wind-Down Amount" to be used for the funding of the winding down of the Debtors' estates. Of this amount, the sum of $3,618,000 was funded solely for the purpose of satisfying the success and transaction fees of professionals (such fees relate to the sale of the Beta Assets and the Alaska Assets that were sold).

5.      The Debtors paid the full principal amount of the production payments owed to Aera and Noble ($6,038,489 and $1,179,935, respectively), plus accrued interest in complete satisfaction of these claims. In addition, the Senior Lenders deposited $333,030.94 into a sinking fund trust account to cure certain defaults relating to SPBP's pipeline. The Debtors' Estates received the residual sum of approximately $400,000 that had been set aside for the benefit of Aera and Noble under the Final DIP Order.

## VII.

## INTER-ESTATE SETTLEMENT UNDER THE PLAN

The Plan effectuates a global settlement (the "Settlement") amongst the various Estates as to any Intercompany Claims, and rights associated with the Unsecured Creditor Fund in the amount of $1,400,000, the Wind-Down Fund estimated to total approximately $1,000,000 in available funds after payment of anticipated administrative and priority claims, and the Alaska Fund, if any, in an amount of up to $1.6 million depending on the outcome of the Union Adversary. The Settlement lays the framework for distributions to Holders of Allowed General Unsecured Claims set forth in the Plan, and has been approved by the Committee.

### A.      Description of the Settlement

The Settlement involves several key components, which are summarized below:

1.      The Unsecured Creditor Fund shall be allocated in its entirety to the Holders of Allowed General Unsecured Claims against PERL, and the Wind-Down Fund, if any, shall be allocated in its entirety to the PERL estate, but sufficient funds will be made available out of the Wind-Down Fund to ensure that all administrative and priority claims of the various Debtors are satisfied in full.

2.      No distribution out of the Unsecured Creditor Fund or the Wind-Down Fund shall be made to, or for the benefit of, the remaining Debtors, except as set forth in the Plan.

3.      The Alaska Fund, if any, shall be allocated in its entirety to the Holders of Allowed General Unsecured Claims against PEAO.

4.      Mutual release of any Claims or Rights of Actions amongst the Debtors.

31

The foregoing Settlement is incorporated in the Plan pursuant to section 1123(b)(3)(A) of the Bankruptcy Code. Further, the Plan shall be construed as a motion under Bankruptcy Rule 9019 for approval of the Settlement.

**B.      Applicable Legal Standard**

Approval of the Settlement as part of the Plan is generally governed by four factors: (i) the probability of success in litigation; (ii) the likely difficulties of collection; (iii) the complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it; and (iv) the paramount interest of the creditors.

Although not directly on point under the circumstances of these Chapter 11 Cases, the Debtors submit that each of these factors is satisfied with respect to the Settlement.

**C.      The Settlement Should Be Approved**

The Debtors believe that the Settlement is reasonable and in the best interests of the Estates by resolving inter-estate claims that may exist as to the Unsecured Creditor Fund, the Wind-Down Fund and the Alaska Fund, if any, in an equitable and efficient manner. The Settlement also allows for a prompt and efficient distribution of the remaining assets in the Estates to creditors and wind-up of the Debtors' affairs pursuant to the terms of the Plan.

PEAO owes approximately $68 million to PERL and approximately $50 million to PEAH. Even without consideration of these substantial Intercompany Claims, PEAO has minimal assets available to satisfy what the Debtors estimate could be up to $275 million in potential Allowed General Unsecured Claims. Hence, the value of the Intercompany Claims of PERL and PEAH against PEAO, even if Allowed in full, are minimal. Rather than attempting to collect on such Claims and further diluting the minimal assets available to third party creditors of PEAO, the Settlement contemplates a release of such Intercompany Claims. In exchange, PERL will ensure that sufficient funds are set aside in order to satisfy all administrative and priority claims incurred on behalf of the PEAO and PEAH estates. In addition, PEAO and PERL shall retain any and all litigation rights that may be available to these estates against third parties (other than the other Debtors).

Notably, the Unsecured Creditor Fund and the Wind-Down Fund were created in the context of the Beta Sale Order. The Beta Assets were wholly owned by PERL, and not PEAO or PEAH. As a result, when also taking into account the substantial $68 million claim that PERL has against PEAO, it is entirely appropriate to allocate the entirety of the Unsecured Creditor Fund and the Wind-Down Fund to PERL.

Similarly, the cash available to the Alaska Fund, if any, will be solely derived from the Union Adversary, which arises out of the dispute regarding validity and priority of Union's alleged liens against working interests and production owned by PEAO in certain oil and gas properties located in Trading Bay in Alaska, and Union's rights to the proceeds of such production. Thus, the Alaska Fund is solely attributable to the liquidation of PEAO's assets.

Hence, the Settlement effectuates a fair allocation of the Unsecured Creditor Fund, the Wind-Down Fund, and the Alaska Fund, if any, under the circumstances and provides for an

32

appropriate release of Intercompany Claims. The Settlement was negotiated closely by the Committee and the Debtors, and has the Committee's support.

It also bears mention that the Settlement is warranted give that there is no basis to effectuate a substantive consolidation of the Estates. Since inception, the Debtors have followed corporate formalities and made clear in their dealings with creditors the particular Debtors involved in any given transaction. For instance, with respect to the Alaska Assets, PEAO was the sole title holder. PERL was the sole title holder as to the Beta Assets. PERL operated certain of the Alaska Assets, as well the Beta Assets, but had no involvement with, and did not assume any obligations of, PEAO as to assets that were not operated by PERL. Hence, it would be inequitable to dilute creditor claims against PERL by claims asserted against PEAO, and vice versa.

In sum, the Debtors submit that the Settlement represents a positive resolution of inter-estate issues that is supported by the paramount interests of creditors, and should be approved by the Bankruptcy Court.

## VIII.

## TREATMENT OF ADMINISTRATIVE EXPENSES AND TAX CLAIMS

### A.    Introduction

As required by the Bankruptcy Code, Administrative Expenses and Tax Claims are not placed into voting Classes. Instead, they are left unclassified, are not considered Impaired, do not vote on the Plan, and receive treatment specified by statute or agreement of the parties.

### B.    Administrative Expenses

Under the Plan, on the Effective Date, each Holder of an Allowed Administrative Expense will receive, in full satisfaction, settlement, release, and extinguishment of such Allowed Administrative Expense, Cash equal to the full amount of such Allowed Administrative Expense, unless such Holder and the Liquidating Debtors have mutually agreed in writing to other terms, or an order of the Bankruptcy Court provides for other terms; provided, however, that (a) requests for payment of all Administrative Expenses must be filed and served as described in Article XIV(B)(3) of the Plan, and (b) certain different and additional requirements shall apply to the Administrative Expenses of professionals and certain other Persons requesting compensation or reimbursement of expenses pursuant to sections 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code as set forth in Article XIV(B)(3) and (4) of the Plan.[11]

---

[11]    As discussed in Article XX, there are various Administrative Claims asserted by Union against PEAO that are material, but remain unresolved. Union's Administrative Claims exceed $200 million. Hence, there is a risk with respect to PEAO's Estate that the Plan is not feasible to the extent that these Administrative Claims are allowed.

33

**C.**    **Tax Claims**

Pursuant to section 1123(a)(1) of the Bankruptcy Code, Tax Claims are not to be classified and thus Holders of Tax Claims are not entitled to vote to accept or reject the Plan.

As required by section 1129(a)(9) of the Bankruptcy Code, on or as soon as practicable after the Effective Date, each Holder of an Allowed Tax Claim against any of the Debtors will receive, in full satisfaction, settlement, release, and extinguishment of such Allowed Tax Claim, Cash equal to the portion of the Allowed Tax Claim due and payable on or prior to the Effective Date according to applicable non-bankruptcy law. Any Allowed Tax Claim (or portion thereof) against any of the Debtors not yet due and payable as of the Effective Date will be paid by the Liquidating Debtors no later than when due and payable under applicable non-bankruptcy law without regard to the commencement of the Chapter 11 Cases; provided that (1) any default prior to the Effective Date with respect to Tax Claims against any of the Debtors shall be deemed cured and (2) upon request of the Liquidating Debtors, the Bankruptcy Court shall determine the amount of any Disputed Claim for, or issues pertaining to, Tax Claims. Any Holder of a Tax Claim may agree to accept different treatment as to which the Liquidating Debtors and such Holder have agreed upon in writing.

## IX.

## CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

**A.**    **Summary**

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes only to the extent that any remainder of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest is also classified in a particular Class only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released or otherwise satisfied prior to the Effective Date.

In accordance with section 1122 of the Bankruptcy Code, the Plan provides for the classification of six (6) Classes of Claims and one (1) Class of Interests. Administrative Expenses and Tax Claims have not been classified and are excluded from the following Classes in accordance with section 1123(a)(1) of the Bankruptcy Code.

**B.**    **Classification and Treatment of Claims and Interests**

The treatment of each Class of Claims and/or Interests is set forth below. Unless the Bankruptcy Court has specified otherwise prior to Confirmation, the Liquidating Debtors shall, in their sole and absolute discretion, determine whether a postpetition payment by or on behalf of any of the Debtors in respect of a Claim either (x) shall reduce the Allowed amount thereof or (y) shall reduce the amount to be paid under the Plan in respect of any Allowed amount thereof.

34

1.     **Class 1 – Priority Non-Tax Claims**

Classification: Class 1 consists of all Priority Non-Tax Claims against any of the Debtors.

Treatment: At the election of the Liquidating Debtors, the Holder of each Priority Non-Tax Claim against any of the Debtors shall receive, in full satisfaction, settlement, release, and extinguishment of such Priority Non-Tax Claim, a Cash payment from the Liquidating Debtors equal to the Allowed amount of such Claim (a) on or as soon as practicable after the later of (i) the Effective Date, or (ii) the date upon which the Bankruptcy Court enters a Final Order determining or allowing such Claim; or (b) as otherwise agreed by the Holders of such Claims and the Liquidating Debtors, as the case may be. Any Holder of a Priority Non-Tax Claim may agree to accept different treatment as to which the Liquidating Debtors and such Holder have agreed upon in writing.

Impairment/Voting: Class 1 is Unimpaired. Class 1 therefore is conclusively presumed to have accepted the Plan and Holders of Claims in Class 1 are not entitled to vote to accept or reject the Plan.

2.     **Class 2 – Miscellaneous Secured Claims**

Classification: Class 2 consists of all Miscellaneous Secured Claims (if any such Claims exist).

Treatment: On or as soon as practicable after the Effective Date, each Holder of an Allowed Miscellaneous Secured Claim shall, on account of such Claim, at the election of the Liquidating Debtors and in full satisfaction, settlement, release, and extinguishment of such Miscellaneous Secured Claim, either: (i) be paid by the Liquidating Debtors in Cash in full, (ii) have surrendered to such Holder, without representation or warranty, the collateral securing its Claim, (iii) notwithstanding any contractual provision or applicable law that entitles the Holder of such Miscellaneous Secured Claim to demand or receive accelerated payment of such Claim after the occurrence of a default (A) be paid by the Liquidating Debtors a cure of any such default that occurred prior to the Effective Date, other than a default of a kind specified in section 365(b)(2) of this title, (B) have reinstated the maturity of such Miscellaneous Secured Claim as such maturity existed before such default, (C) be compensated by the Liquidating Debtors for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law, and (D) otherwise not have altered the legal, equitable, or contractual rights to which such Miscellaneous Secured Claim entitles the Holder of such Claim, or (iv) have left unaltered the legal, equitable, and contractual rights to which such Claim entitles the Holder of such Claim. In the case of option (ii) or (iii), in the event that any such Miscellaneous Secured Claim is not completely satisfied by such distribution, any deficiency against the Liquidating Debtors will be treated as a General Unsecured Claim. Any Holder of an Miscellaneous Secured Claim may agree to accept different treatment as to which the Liquidating Debtors and such Holder have agreed upon in writing.

Impairment/Voting: Class 2 is Unimpaired. Class 2 is therefore conclusively presumed to have accepted the Plan, and Holders of Claims in Class 2 are not entitled to vote to

accept or reject the Plan.

3. **Class 3 – Senior Lender Claims**

Classification: Class 3 consists of the Senior Lender Claims against any of the Debtors.

Treatment: From and after the Effective Date, each Holder of an Allowed Senior Lender Claim against any of the Debtors shall receive, in full satisfaction, settlement, release, and extinguishment of such Senior Lender Claim, any and all rights, Claims and Liens in the Excluded Interests and the Remaining Claim referenced in the Beta Sale Order to which such Holder of an Allowed Senior Lender Claim is entitled pursuant to the terms and provisions of the Beta Sale Order. For purposes of the Plan, the value of the "Excluded Interests" shall be deemed to equal $35,000,000. The sum of $40,000,000 shall be deemed allowed and treated as the Remaining Claim referenced in the Beta Sale Order. In accordance with the terms and provisions of the Beta Sale Order, distributions on account of the Remaining Claim were assigned to the Estates solely for the benefit of Holders of Allowed General Unsecured Claims (specifically excluding Forest Oil). Notwithstanding anything otherwise set forth in this paragraph, the Holders of Allowed Senior Lender Claims shall be entitled to the value of any proceeds of the Excluded Interests pursuant to the terms and conditions of the Beta Sale Order. Unless otherwise provided by an order of the Bankruptcy Court, title to the Excluded Interests shall be vested in the Liquidating Debtors from and after the Effective Date, provided that the Liquidating Debtors shall have no obligations or responsibilities whatsoever with respect to the Excluded Interests except as may be agreed by the Liquidating Debtors, by and through the Plan Representative, and the Holders of Allowed Senior Lender Claims, which Holders shall be required to fund, compensate and reimburse, and to otherwise indemnify and hold harmless, the Liquidating Debtors for any costs, expenses, fees or other liabilities that may be incurred by the Liquidating Debtors at the direction of the Holders of Allowed Senior Lender Claims with respect to the Excluded Interests from and after the Effective Date, which in such case the Liquidating Debtors shall act reasonably and in good faith to support recovery of the Excluded Interests. Further, the Liquidating Debtors shall have the right, only upon the consent of all Holders of Allowed Senior Lender Claims, but after consultation with the Holders of Allowed Senior Lender Claims, to transfer title to the Excluded Interests, or some portion thereof, to the Holders of Allowed Senior Secured Claims at any time from and after the Effective Date without notice to Creditors or approval of the Bankruptcy Court, provided, however, that any transfer of title in the Excluded Interests shall not prejudice a Holder of an Allowed Senior Lender Claim's ability to collect proceeds of the Excluded Interests.

Impairment/Voting: Class 3 is Impaired. Holders of Class 3 are therefore entitled to vote to accept or reject the Plan.

4. **Class 4 – General Unsecured Claims Against PERL**

Classification: Class 4 consists of the General Unsecured Claims against PERL.

Treatment: On or as soon as practicable after the Effective Date or such other date as Net Distributable Assets of PERL become available for distribution, each Holder of an Allowed General Unsecured Claim against PERL shall receive, in full satisfaction, settlement,

release, and extinguishment of such General Unsecured Claim, a Pro Rata share (calculated as a percentage of Allowed General Unsecured Claims against PERL) of the Net Distributable Assets of PERL. Further, Holders of Allowed General Unsecured Claims against PERL shall have the benefit of any subordination rights or carve-outs assigned to such Holders by the Holders of the Senior Lender Claims under the Beta Sale Order, the Final DIP Order, the Plan, or any other order of the Bankruptcy Court.

Impairment/Voting: Class 4 is Impaired. Holders of Class 4 are therefore entitled to vote to accept or reject the Plan.

5. **Class 5 – General Unsecured Claims Against PEAH**

Classification: Class 5 consists of the General Unsecured Claims against PEAH.

Treatment: On or as soon as practicable after the Effective Date or such other date as Net Distributable Assets of PEAH become available for distribution, each Holder of an Allowed General Unsecured Claim against PEAH shall receive, in full satisfaction, settlement, release, and extinguishment of such General Unsecured Claim, a Pro Rata share (calculated as a percentage of Allowed General Unsecured Claims against PEAH) of the Net Distributable Assets of PEAH, if any. Further, Holders of Allowed General Unsecured Claims against PEAH shall have the benefit of any subordination rights or carve-outs assigned to such Holders by the Holders of the Senior Lender Claims under the Beta Sale Order, the Final DIP Order, the Plan, or any other order of the Bankruptcy Court.

Impairment/Voting: Class 5 is Impaired. Holders of Class 5 are therefore entitled to vote to accept or reject the Plan.

6. **Class 6 – General Unsecured Claims Against PEAO**

Classification: Class 6 consists of the General Unsecured Claims against PEAO.

Treatment: On or as soon as practicable after the Effective Date or such other date as Net Distributable Assets of PEAO become available for distribution, each Holder of an Allowed General Unsecured Claim against PEAO shall receive, in full satisfaction, settlement, release, and extinguishment of such General Unsecured Claim, a Pro Rata share (calculated as a percentage of Allowed General Unsecured Claims against PEAO) of the Net Distributable Assets of PEAO, if any. Further, Holders of Allowed General Unsecured Claims against PEAO shall have the benefit of any subordination rights or carve-outs assigned to such Holders by the Holders of the Senior Lender Claims under the Beta Sale Order, the Final DIP Order, the Plan, or any other order of the Bankruptcy Court.

Impairment/Voting: Class 6 is Impaired. Holders of Class 6 are therefore entitled to vote to accept or reject the Plan.

7. **Class 7 – General Unsecured Claims Against Petrocal, Carneros Acquisition, Carneros Energy and Gotland**

Classification: Class 7 consists of the General Unsecured Claims against Petrocal, Carneros Acquisition, Carneros Energy and Gotland.

Treatment: On the Effective Date, the Chapter 11 Cases of Petrocal, Carneros Acquisition, Carneros Energy and Gotland shall be deemed dismissed because such Debtors have no assets, and Holders of Allowed General Unsecured Claims against such Debtors, if any, shall receive no distributions or recoveries on account of such Claims.

Impairment/Voting: Class 7 is Impaired. Because Holders of Claims in Class 7 receive no recovery on account of such Claims under the Plan, they are conclusively presumed to reject the Plan.

8. **Class 8 – Intercompany Claims**

Classification: Class 8 consists of all Intercompany Claims against any of the Debtors.

Treatment: Holders of Intercompany Claims shall receive no distributions or recoveries on account of such Claims and such Claims shall be extinguished on the Effective Date. However, Holders of the Intercompany Claims shall benefit from the Inter-Estate Settlement under the Plan.

Impairment/Voting: Class 8 is Impaired. Because Holders of Claims in Class 8 are the proponents of the Plan, they have agreed to accept the Plan.

9. **Class 9 – Subordinated Debt Claims**

Classification: Class 9 consists of the Subordinated Debt Claims.

Treatment: Holders of Subordinated Debt Claims shall receive no distributions or recoveries on account of such Claims based upon the terms of the Forest Subordinated Note and the Beta Sale Order.

Impairment/Voting: Class 9 is Impaired. Because Holders of Claims in Class 9 receive no recovery on account of such Claims under the Plan, they are conclusively presumed to reject the Plan.

10. **Class 10 – Interests in the Debtors**

Classification: Class 10 consists of Interests in the Debtors.

Treatment: Holders of Interests in the Debtors shall receive no distributions or recoveries on account of such Interests and such Interests shall be extinguished on the Effective Date.

38

Impairment/Voting: Class 10 is Impaired. Because Holders of Interests in Class 10 receive no recovery on account of such Interests under the Plan, they are conclusively presumed to reject the Plan.

# X.

## ACCEPTANCE OR REJECTION OF PLAN

### A.    Identification of Unimpaired Classes

The following Classes are not Impaired (i.e., are Unimpaired) under the Plan:

1.    Class 1 – Priority Non-Tax Claims

2.    Class 2 – Miscellaneous Secured Claims

### B.    Identification of Impaired Classes

The following Classes of Claims and Interests are Impaired under the Plan.

1.    Class 3 – Senior Lender Claims

2.    Class 4 – General Unsecured Claims against PERL

3.    Class 5 – General Unsecured Claims against PEAH

4.    Class 6 – General Unsecured Claims against PEAO

5.    Class 7 – General Unsecured Claims against Petrocal, Carneros Acquisiton, Carneros Energy and Gotland

6.    Class 8– Intercompany Claims

7.    Class 9 – Subordinated Debt Claims

8.    Class 10 – Interests in the Debtors

### C.    Classes Permitted and Not Permitted to Vote

Classes 1 and 2 are Unimpaired. Holders of Claims or Interests in such Classes are conclusively presumed pursuant to section 1126(f) of the Bankruptcy Code to have accepted the Plan and therefore shall not be entitled to vote to accept or reject the Plan.

Classes 3 through 10 are Impaired. Holders of Claims and Interests in Classes 3 through 6 are permitted to vote to accept or reject the Plan. Class 8 is not permitted to vote as this is a Class made up of the Debtors, which are the proponents of the Plan and have agreed to accept the treatment under the Plan. Holders of Claims and Interests in Classes 7, 9 and 10 are conclusively presumed to reject the Plan.

An Impaired Class of Claims that votes shall have accepted the Plan if (a) the Holders (other than any Holder designated by the Bankruptcy Court based on their vote or its solicitation not being in good faith under Bankruptcy Code section 1126(e)) of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the Holders (other than any Holder designated under Bankruptcy Code section 1126(e)) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan. An Impaired Class of Interests that votes shall have accepted the Plan if the Holders (other than any Holder designated under section 1126(e)) of at least two-thirds in amount of the Allowed Interests actually voting in such Class have voted to accept the Plan.

## D.     Nonconsensual Confirmation

In the event any Class of Claims or Interests votes to reject the Plan, the Debtors intend to request that the Bankruptcy Court confirm the Plan notwithstanding such rejection pursuant to section 1129(b) of the Bankruptcy Code on the basis that the Plan is fair and equitable and does not discriminate unfairly as to the Holders of any Class of Claims or Interests.

## E.     Postpetition Interest

Nothing in the Plan or the Disclosure Statement will be deemed to entitle the Holder of a Claim to receive postpetition interest on account of such Claim.

## XI.

## MEANS FOR IMPLEMENTATION OF THE PLAN

## A.     Continued Corporate Existence and Vesting of Assets of Liquidating Debtors

The Liquidating Debtors will continue to exist on and after the Effective Date as separate corporate Entities, with all of the powers of corporations under the applicable non-bankruptcy law, and without prejudice to any right to alter or terminate their existence (whether by merger or otherwise), provided that the Liquidating Debtors' sole purpose from and after the Effective Date will be to make distributions to Creditors consistent with the Plan and to otherwise effectuate the Wind-Down. Except as otherwise provided in the Plan, on and after the Effective Date, all Distributable Assets and property of the Estates of PERL, PEAH and PEAO, including all Retained Rights of Action, the Unsecured Creditor Fund, the Alaska Fund, the Wind-Down Fund, and any property acquired by such Debtors under or in connection with the Plan will vest in the applicable Liquidating Debtors free and clear of all Claims, Liens, charges, other encumbrances and Interests. Notwithstanding the foregoing, any proceeds of Retained Rights of Action constituting Excluded Interests shall be paid to the Holders of Senior Lender Claims consistent with the Beta Sale Order and the Plan. Further, nothing in the Plan shall have any affect on any rights, Liens or Claims that any party may have against assets that were abandoned by the Estates by Final Order of the Bankruptcy Court.

## B.     Dismissal of Chapter 11 Cases of Petrocal, Carneros Acquisition, Carneros Energy and Gotland

Upon the Effective Date, the Chapter 11 Cases of Petrocal, Carneros Acquisition, Carneros Energy and Gotland shall be dismissed, and such Debtors shall be deemed dissolved

40

and wound up without any further action required by the Debtors or their shareholders or boards of directors.

## C.    No Substantive Consolidation

Nothing in the Plan is intended to substantively consolidate, nor shall have the effect of substantively consolidating, the Debtors or their Estates, and each Liquidating Debtor shall maintain its separate corporate existence and assets from and after the Effective Date. As set forth in Article VII.C above, the Debtors are not aware of any basis for substantive consolidation of the Estates.

## D.    Retained Rights of Action

Unless a Right of Action or objection to Claim is, in writing, expressly waived, relinquished, released, assigned, compromised, or settled in the Plan, or in a Final Order, all rights with respect to such Retained Right of Action or objections to Claims are expressly preserved for the benefit of, and fully vested in, the respective Liquidating Debtors. Notwithstanding the foregoing, any proceeds of Retained Rights of Action constituting Excluded Interests shall be paid to the Holders of Senior Lender Claims consistent with the Beta Sale Order and the Plan. For the avoidance of doubt, on the Effective Date, the Liquidating Debtors shall automatically succeed to any and all Avoidance Claims that had been investigated and/or pursued by the Committee prior to the Effective Date and standing to investigate, prosecute and/or compromise such Avoidance Claims shall automatically revert to the Liquidating Debtors. For the avoidance of doubt, on and after the Effective Date: (i) the captions in all pleadings filed in any Avoidance Claims shall be deemed automatically amended to reflect the Liquidating Debtors as plaintiff; (ii) any pleadings filed in any Avoidance Claims subsequent to the Effective Date shall reflect the Liquidating Debtors as plaintiff; (iii) Pepper Hamilton LLP shall act as counsel to the Liquidating Debtors with respect to the Avoidance Claims; and (iv) all amendments and authorizations contemplated in this paragraph shall take effect automatically and without the need for any further Order of the Court, authorization by the Clerk of Court, or filings of notices or requests in the Avoidance Claims.

With the exception of Retained Rights of Action constituting Excluded Interests, which the Liquidating Debtors shall act reasonably and in good faith to support recovery of such Excluded Interests to the extent set forth in the treatment of Class 3 under the Plan, the applicable Liquidating Debtors may pursue, or decline to pursue, the Retained Rights of Action and objections to Claims, as appropriate, in the business judgment of the Plan Representative and the Supervisory Board. The applicable Liquidating Debtors may settle, release, sell, assign, otherwise transfer, or compromise, Retained Rights of Action and/or objections to Claims without need for notice or order of the Bankruptcy Court.

## E.    Corporate Governance

From and after the Effective Date, subject to the oversight of the Supervisory Board, each of the Liquidating Debtors shall be managed and administered through the Plan Representative, who shall be appointed as sole officer of each of the Liquidating Debtors, and shall have full authority to execute the provisions of the Plan. The initial Plan Representative shall be Gerald A. Tywoniuk. Any successor thereto shall be appointed by the Supervisory Board after the

41

Effective Date in accordance with applicable corporate governance documents, subject to the approval of the Bankruptcy Court. The terms of the initial Plan Representative's compensation shall be disclosed prior to the Confirmation Hearing.

The Supervisory Board shall be appointed as directors for each of the Liquidating Debtors pursuant to 8 Delaware Code §303, with supervisory authority over the Plan Representative. The Supervisory Board shall consist of no more than three (3) Persons and no less than one (1) Person selected by the Committee with the consent of the Debtors, which consent shall not be unreasonably withheld. In the event that a member of the Supervisory Board can no longer carry out its duties as a director (by reason of death, resignation or disability) (the "Director Vacancy"), the remaining members of the Supervisory Board may jointly appoint a successor, or in the event no such successor is appointed within 90 days, the Plan Representative may petition the Bankruptcy Court to appoint a successor. The members of the Supervisory Board shall not be compensated for their service for the Debtors, aside from reimbursement of reasonable expenses.

Notwithstanding anything to the contrary herein, to the extent of any dispute between the Plan Representative and the Supervisory Board, such dispute shall be resolved by the Bankruptcy Court. The Plan Representative may rely on counsel for the Liquidating Debtors in bringing any disputes before the Bankruptcy Court, and the Supervisory Board shall be authorized to employ and compensate counsel of its own choosing (payable out of the Liquidating Debtors' assets) in the event of such dispute.

## F.    **Wind-Down**

The Liquidating Debtors, through the Plan Representative, shall make distributions to Creditors consistent with the Plan and otherwise hold and liquidate all Distributable Assets and property of the Estates for the benefit of Creditors, in accordance with the provisions of the Plan. The Liquidating Debtors, the Plan Representative, and the Supervisory Board shall not be required to post a bond in favor of the United States.

The Liquidating Debtors, acting through the Plan Representative, shall have the power and authority to perform the following acts (together, the "Wind-Down"), in addition to any powers granted by law or conferred by any other provision of the Plan and orders of the Bankruptcy Court; provided, however, that enumeration of the following powers shall not be considered in any way to limit or control the power of the Liquidating Debtors or the Plan Representative, subject to the authority of the Supervisory Board, to act as specifically authorized by any other provision of the Plan or orders of the Bankruptcy Court, and to act in such manner as the Plan Representative may deem necessary, or desirable to discharge all obligations assumed by the Liquidating Debtors as provided herein, and to conserve and protect the Distributable Assets, or to confer on Creditors the benefits intended to be conferred upon them by the Plan; including without limitation and by example only:

1.    Determine Tax issues or liabilities in accordance with section of the Bankruptcy Code 505;

2.    Resolve any objections to the allowance or priority of Claims, Administrative Expenses or Interests;

42

3. Resolve any dispute as to the treatment necessary to reinstate a Claim, Administrative Expense or Interest pursuant to the Plan;

4. Distribute Cash in the Estates to Creditors consistent with the terms of the Plan;

5. Perfect and secure the Liquidating Debtors' right, title and interest to property of the Estates;

6. Recover and, to the extent possible, sell and convert the property of the Estates to Cash, and distribute the net proceeds consistent with the terms of the Plan;

7. Manage and protect property of the Estates and distribute the net proceeds consistent with the terms of the Plan;

8. Wind-up the affairs of the Liquidating Debtors' subsidiaries and affiliates, including Petrocal, Carneros Acquisition, Carneros Energy and Gotland to the extent necessary;

9. Purchase or continue insurance to protect the Liquidating Debtors, the Plan Representative, and property of the Estates;

10. Deposit Estate funds, draw checks and make disbursements thereof consistent with the terms of the Plan;

11. Employ, retain and compensate, and discharge and dismiss, without further order of the Bankruptcy Court, Professional Persons as the Plan Representative may deem necessary or desirable to assist in fulfilling the purposes of the Plan, including the continued retention and payment of Professional Persons in connection with any ongoing litigation or other matter pursued or conducted by the Debtors or the Committee whether on an hourly, flat fee or contingency basis, including any litigation related to any Avoidance Claims or Excluded Interests provided that the retention of Professional Persons by the Liquidating Debtors shall be subject to the consent of the Supervisory Board (except for Professional Persons retained solely for the purpose of pursuing Excluded Interests);

12. Commence or prosecute in the name of the Liquidating Debtors (or any of them), any lawsuit or other legal or equitable action (except to the extent released pursuant to the terms of the Plan), including, without limitation, filing objections to or estimation of Claims, and prosecuting Retained Rights of Action, in any court of competent jurisdiction, which are necessary to carry out the terms and conditions of the Plan;

13. Settle, compromise or adjust, pursuant to the standards of Bankruptcy Rule 9019 (which standards, but not a requirement for Bankruptcy Court approval, shall be deemed to apply to all post-Effective Date settlements), any disputes or controversies in favor of, or against, any Liquidating Debtor;

43

14.     Incur and pay all Plan Expenses and any reasonable costs and expenses incident to the performance of the duties of the Liquidating Debtors and the Plan Representative under the Plan, including without limitation, reasonable rent for office space and storage, office supplies, travel and expense reimbursement, insurance, and other obligations;

15.     Prepare and file tax returns, as mandated by applicable local, state, federal and foreign law;

16.     Seek entry of a final decree at the appropriate time; and

17.     Take such other action as the Plan Representative may determine to be necessary or desirable to carry out the purpose of the Plan.

## G.    Funding for the Plan

The Liquidating Debtors' obligations under the Plan and the fees and expenses of the Liquidating Debtors will be funded out of existing Cash in the Estates. Any unused Cash of the Liquidating Debtors set aside to fund Plan Expenses and the Wind-Down shall be distributed to the Holders of Allowed General Unsecured Claims against the Liquidating Debtors in accordance with the Plan. Any additional Cash proceeds that may be realized by the Liquidating Debtors from and after the Effective Date shall be distributed to the Holders of Allowed General Unsecured Claims in accordance with the Plan.

## H.    Inter-Estate Settlement

Upon the Effective Date, pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, each Debtor and their successors and assigns hereby waive, release and discharge each other and all of their respective successors from any and all Intercompany Claims and Rights of Action amongst and between any or all of the Debtors, which waiver, release and discharge shall be effective as a bar to all actions, causes of action, suits, Claims, Liens, or demands of any kind with respect to any Intercompany Claim or Right of Action amongst or between any or all of the Debtors.

In consideration of the foregoing waiver and release of Claims amongst the Estates and the funding of the Allowed Administrative Expense Claims, Priority Tax Claims and Priority Non-Tax Claims of the Estates, the Unsecured Creditor Fund shall be distributed to the Holders of Allowed General Unsecured Claims against PERL, the Alaska Fund, if any, shall be distributed to the Holders of Allowed General Unsecured Claims against PEAO, and the Wind-Down Fund, if any, shall be distributed to the Estate of PERL after all Allowed Administrative Expense Claims, Priority Tax Claims and Priority Non-Tax Claims of the other Debtors have been satisfied. No distribution out of the Unsecured Creditor Fund or the Wind-Down Fund shall be made to, or for the benefit of, the Debtors other than PERL, except as set forth above.

## I.    Corporate Action/Dissolution

On the Effective Date, the matters under the Plan involving or requiring corporate action of the Debtors, including but not limited to, actions requiring a vote or other approval of the

44

board of directors or shareholders or execution of all documentation incident to the Plan, shall be deemed to have been authorized by the Confirmation Order and to have occurred and be in effect from and after the Effective Date without any further action by the Bankruptcy Court or the officers and directors of the Debtors. On the Effective Date, all officers and directors of the Debtors shall be deemed removed from such positions and the Debtors' charters shall be deemed amended to prohibit (1) the issuance of nonvoting equity securities, or (2) the existence of securities possessing an inappropriate distribution of voting power, all as more specifically required and described in section 1123(a)(6) of the Bankruptcy Code.

Upon entry of a final decree, the Liquidating Debtors shall be deemed dissolved and wound up without any further action required by the Liquidating Debtors and the Debtors' shareholders or boards of directors.

## J.      Interests in Affiliates and Subsidiaries

As of the Effective Date, except as expressly provided in the Plan or by separate order of the Bankruptcy Court, the Liquidating Debtors shall retain any stock or interests they may hold in their subsidiaries or affiliates (other than the Debtors) and retain any rights to which such stock or interests may be entitled under applicable law with respect to such shares or other interests. After the Effective Date, any Liquidating Debtor may sell, transfer, assign or otherwise dispose of such shares or interests as permitted by applicable law.

## K.      Payment of Plan Expenses

The Liquidating Debtors may pay all reasonable Plan Expenses without further notice to Creditors or Holders of Interests or approval of the Bankruptcy Court; provided, however, that an accounting of the Plan Expenses, including the fees and expenses of professionals, shall be provided to the Supervisory Board for review in a form acceptable to the Supervisory Board.

## L.      Dissolution of the Official Committee

As of the Effective Date, the Committee shall be dissolved, provided however, that notwithstanding such dissolution, the Committee's professionals may seek payment of any unpaid Administrative Expenses pursuant to the Plan.

## XII.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

## A.      Rejection of Executory Contracts and Unexpired Leases

Except for any executory contracts or unexpired leases:  (i) that previously were assumed or rejected by an order of the Bankruptcy Court, pursuant to section 365 of the Bankruptcy Code; (ii) as to which a motion for approval of the assumption or rejection of such contract or lease has been filed and served prior to Confirmation; (iii) that constitute contracts of insurance in favor of, or that benefit, the Debtors or the Estates; or (iv) that were previously sold, conveyed or otherwise assigned pursuant to the Beta Sale Order, each executory contract and unexpired lease entered into by the Debtors prior to the Petition Date that has not previously expired or terminated pursuant to it own terms shall be deemed rejected pursuant to section 365 of the

45

Bankruptcy Code as of the Effective Date. The Confirmation Order shall constitute an Order of the Bankruptcy Court approving such rejections, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date.

## B. Bar Date for Rejection Damages

If the rejection of an executory contract or unexpired lease pursuant to the Plan or otherwise gives rise to a Claim by the other party or parties to such contract or lease, such Claim shall be forever barred and shall not be enforceable against the Debtors, the Liquidating Debtors or their Estates unless a proof of Claim is Filed and served on the Debtors and their counsel within 30 days after the earlier of (a) Confirmation or (b) service of a notice that the executory contract or unexpired lease has been rejected. All such Claims for which proofs of Claim are required to be Filed, if Allowed, will be, and will be treated as, General Unsecured Claims, subject to the provisions of the Plan.

## XIII.

## LITIGATION, OBJECTIONS TO CLAIMS, AND DETERMINATION OF TAXES

## A. Litigation; Objections to Claims; Objection Deadline

Except as may be expressly provided otherwise in the Plan, the Liquidating Debtors shall be responsible for pursuing Retained Rights of Action, any objection to the allowance of any Claim, and the determination of Tax issues and liabilities.

As of the Effective Date, the Liquidating Debtors shall have exclusive authority to file objections, settle, compromise, withdraw or litigate to judgment objections to Claims. Unless another date is established by the Bankruptcy Court (which may so act without notice or hearing) or is established by other provisions of the Plan, any objection to a Claim shall be filed with the Bankruptcy Court and served on the Person holding such Claim within ninety (90) days after the Effective Date (the "Objection Deadline"), provided that the Liquidating Debtors may seek extension(s) thereof subject to Bankruptcy Court approval.

In addition to any other available remedies or procedures with respect to Tax issues or liabilities, the Liquidating Debtors, at any time, may utilize (and receive the benefits of) section 505 of the Bankruptcy Code with respect to: (1) any Tax issue or liability relating to an act or event occurring prior to the Effective Date; or (2) any Tax liability arising prior to the Effective Date. If the Liquidating Debtors utilize section 505(b) of the Bankruptcy Code: (1) the Bankruptcy Court shall determine the amount of the subject Tax liability in the event that the appropriate governmental entity timely determines a Tax to be due in excess of the amount indicated on the subject return; and (2) if the prerequisites are met for obtaining a discharge of Tax liability in accordance with section 505(b) of the Bankruptcy Code, the Liquidating Debtors shall be entitled to such discharge which shall apply to any and all Taxes relating to the period covered by such return.

## B.     Temporary or Permanent Resolution of Disputed Claims

The Liquidating Debtors may request, at any time prior to the Effective Date or on and after the Effective Date, that the Bankruptcy Court estimate any contingent or unliquidated Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, irrespective of whether any party has previously objected to such Disputed Claim. The Bankruptcy Court will retain jurisdiction to estimate any contingent or unliquidated Disputed Claim at any time during litigation concerning any objection to the Disputed Claim. If the Bankruptcy Court estimates any contingent or unliquidated Disputed Claim, that estimated amount would constitute either the Allowed amount of such Disputed Claim or a maximum limitation on such Disputed Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Disputed Claim, the Liquidating Debtors may elect to pursue any supplemental proceedings to object to any ultimate payment on account of such Disputed Claim. In addition, the Liquidating Debtors may resolve or adjudicate any Disputed Claim in the manner in which the amount of such Claim, Interest or Administrative Expense and the rights of the Holder of such Claim, Interest or Administrative Expense would have been resolved or adjudicated if the Chapter 11 Cases had not been commenced. All of the aforementioned objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.

## C.     Setoffs

The Liquidating Debtors may, pursuant to sections 553 or 558 of the Bankruptcy Code or applicable nonbankruptcy law, set off against any Allowed Claim, Interest or Administrative Expense (before any distribution is made on account of such Claim, Interest or Administrative Expense), the Retained Rights of Action of any nature that the Liquidating Debtors may hold against the Holder of such Allowed Claim, Interest or Administrative Expense. Neither the failure to set off nor the allowance of any Claim, Interest or Administrative Expense hereunder will constitute a waiver or release by the Liquidating Debtors of any such Retained Rights of Action that the Liquidating Debtors may have against such Holder.

## D.     Preservation of Retained Rights of Action

In accordance with section 1123(b) of the Bankruptcy Code, the Liquidating Debtors, and their successors, any assigns hereunder and future assigns will retain and may exclusively enforce any Retained Rights of Action, subject to the oversight of the Supervisory Board, and the Confirmation Order shall be deemed a res judicata determination of such rights to retain and exclusively enforce such Retained Rights of Action. Absent such express waiver or release, the Liquidating Debtors or their successors or assigns may pursue Retained Rights of Action, as appropriate, in accordance with the best interests of the Liquidating Debtors (or their successors or future assigns) and subject to the oversight of the Supervisory Board. The Retained Rights of Action may be asserted or prosecuted before or after solicitation of votes on the Plan or before or after the Effective Date.

Absent an express waiver or release set forth in the Plan, nothing in the Plan shall (or is intended to) prevent, estop or be deemed to preclude the Liquidating Debtors from utilizing, pursuing, prosecuting or otherwise acting upon all or any of their Retained Rights of Action and,

therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to such Retained Rights of Action upon or after Confirmation or Consummation.

## XIV.

## INJUNCTION AND EXCULPATION PROVISIONS

### A.    Injunctions

#### 1.    Generally

Unless otherwise provided in the Plan or the Confirmation Order, all injunctions and stays provided for in the Chapter 11 Cases pursuant to sections 105 and 362 of the Bankruptcy Code or otherwise in effect on the Confirmation Date, shall remain in full force and effect until the Effective Date. From and after the Effective Date, all Persons are permanently enjoined from, and restrained against, commencing or continuing in any court any suit, action or other proceeding, or otherwise asserting any claim or interest, (a) seeking to hold (i) the Debtors, Liquidating Debtors or the Estates, or (ii) the property of the Liquidating Debtors or the Estates, liable for any Claim, obligation, right, interest, debt or liability that has been released pursuant to the Plan.

#### 2.    Injunction Related to Rights of Action and Terminated Claims, Administrative Expenses or Interests

*Except as provided in the Plan or in the Confirmation Order, as of the Confirmation Date, all Entities that have held, currently hold or may hold a Claim, Administrative Expense, Interest or other debt or liability that is stayed, Impaired or terminated pursuant to the terms of the Plan are permanently enjoined from taking any of the following actions either (x) against the Debtors, the Liquidating Debtors, the Estates or property of the Liquidating Debtors or the Estates on account of all or such portion of any such Claims, Administrative Expenses, Interests, debts or liabilities that are stayed, Impaired or terminated or (y) against any Person with respect to any Right of Action or any objection to a Claim, Administrative Expense or Interest, which Right of Action or objection, under the Plan, is waived, released or exclusively retained by any of the Debtors: (a) commencing or continuing, in any manner or in any place, any action or other proceeding; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (c) creating, perfecting or enforcing any lien or encumbrance; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due; and (e) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan. To avoid any doubt, except as otherwise expressly noted in the Plan, nothing in the Plan or herein shall be construed or is intended to affect, enjoin, modify, release or waive any claims, rights, and actions that a third party may have against a person other than the Debtors, the Liquidating Debtors or the Estates. Further, nothing in the Plan shall have any affect on any rights, Liens or Claims that any party may have against assets that were abandoned by the Estates by Final Order of the Bankruptcy Court.*

48

**B.** **Exculpation**

As of and subject to the occurrence of the Effective Date, for good and valuable consideration, including the consideration provided under the Plan, each of the Debtors and their Representatives, the Liquidating Debtors, the Plan Representative, the members of the Committee (acting in such capacity), and the Committee's Representatives shall neither have nor incur any liability to any Person or Entity for any act taken or omitted to be taken, in connection with, or related to, the formulation, preparation, dissemination, implementation, administration, Confirmation or Consummation of the Plan or any contract, instrument, waiver, release or other agreement or document created or entered into, in connection with the Plan, or any other act taken or omitted to be taken in connection with the Chapter 11 Cases; provided, however, that the foregoing provisions of this subsection shall have no effect on the liability of any Person or Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct.

## XV.

## PENSION PLANS, OTHER RETIREE BENEFITS AND LABOR CONTRACTS

The Debtors are not obligated pursuant to section 1129(a)(13) of the Bankruptcy Code to pay any "retiree benefits" (as that term is defined in section 1114(a) of the Bankruptcy Code).

## XVI.

## NO REGULATED RATE CHANGE WITHOUT GOVERNMENT APPROVAL

The Debtors do not charge any rates for purposes of section 1129(a)(6) that are regulated by any governmental regulatory commission with jurisdiction under applicable non-bankruptcy law.

## XVII.

## EXEMPTION FROM CERTAIN TRANSFER TAXES

Pursuant to section 1146(c) of the Bankruptcy Code, any transfers by the Debtors or the Liquidating Debtors pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax or other similar Tax or governmental assessment.

## XVIII.

## REQUIREMENTS FOR CONFIRMATION

**A.** **Acceptances Necessary to Confirm Plan**

At the Confirmation Hearing, the Bankruptcy Court must determine, among other things, whether the Plan has been accepted by each Impaired Class. Under section 1126 of the Bankruptcy Code, an Impaired Class of Claims is deemed to have accepted a plan if a plan has been accepted by creditors of that class that hold at least two-thirds in dollar amount and more

49

than one-half in number of the allowed claims of such class held by creditors that have accepted or rejected the plan. Similarly, an Impaired Class of Interests is deemed to have accepted a plan if the plan has been accepted by holders of such interests that hold at least two-thirds in amount of the allowed equity interests of such class held by holders of such interests that have accepted or rejected the plan.

Voting rights are set forth as follows:

| Class | Status | Voting Rights |
|---|---|---|
| Class 1—Priority Non-Tax Claim | Unimpaired | Deemed to have accepted the Plan and not entitled to vote |
| Class 2—Miscellaneous Secured Claims | Unimpaired | Deemed to have accepted the Plan and not entitled to vote |
| Class 3—Senior Lender Claims | Impaired | Entitled to vote |
| Class 4—General Unsecured Claims against PERL | Impaired | Entitled to vote |
| Class 5—General Unsecured Claims against PEAH | Impaired | Entitled to vote |
| Class 6—General Unsecured Claims against PEAO | Impaired | Entitled to vote |
| Class 7—General Unsecured Claims against Petrocal, Carneros Acquisition, Carneros Energy and Gotland | Impaired | Deemed to have rejected the Plan and not entitled to vote |
| Class 8—Intercompany Claims | Impaired | Support the Plan |
| Class 9—Subordinated Debt Claims | Impaired | Deemed to have rejected the Plan and not entitled to vote |
| Class 10—Interests in the Debtors | Impaired | Deemed to have rejected the Plan and not entitled to vote |

## B.    Best Interest of Creditors Test

Confirmation requires, among other things, that each Holder of a Claim in an Impaired Class and each Holder of an Interest either: (a) accepts the Plan; or (b) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. This requirement is commonly referred to as the "best interests test."

### a.    Chapter 7

To determine the value that the Holders of Impaired Claims and Interests would receive if the Debtors were liquidated, the Bankruptcy Court must determine the dollar amount that would

50

be generated from the liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation case. Section 704 of the Bankruptcy Code requires a chapter 7 trustee to collect and reduce to money the property of the estate as expeditiously as is compatible with the best interests of parties in interest.

Here, the Cash available in chapter 7 cases for satisfaction of Allowed Claims would consist of the proceeds resulting from the liquidation of the Debtors' Estates, augmented by the Cash, if any, held by the Debtors at the time of the commencement of the chapter 7 case(s). Any such Cash amount would then be reduced by the amount of any Claims secured by such assets such as the Senior Lender Claims or other Miscellaneous Secured Claims, the costs and expenses of the liquidation of any remaining assets, including the costs of prosecution of any pending litigation and Avoidance Claims, and such additional Administrative Claims, and other Priority Claims, that may result from the use of chapter 7 for the purposes of liquidation.

The costs of liquidation under chapter 7 would include fees payable to trustee(s) in bankruptcy, as well as those that might be payable to his or her attorneys, and to other professionals that such trustee(s) may engage, plus any unpaid expenses incurred by the Debtors during the Chapter 11 Cases that would be allowed as a priority in the chapter 7 cases, such as compensation for attorneys, accountants or other Professional Persons, and costs and expenses of the Debtors and the Committee. Such Administrative Expenses from the chapter 7 and 11 cases would have to be paid in Cash in full from the liquidation proceeds before the balance of those proceeds could be made available to pay prepetition Claims.

### b.     Liquidation Alternative

Pursuant to Bankruptcy Code section 1129(a)(7), if an Impaired Class does not accept the Plan unanimously, the Debtors must demonstrate, and the Bankruptcy Court must determine that with respect to such Class, each Holder of a Claim will receive property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date of the Plan.

As reflected on Exhibit 4 annexed hereto and set forth below, the Plan satisfies this standard. The Plan provides greater recovery to the Holders of Allowed Claims than such Holders would receive under a liquidation under chapter 7 primarily because the Plan incorporates an inter-estate settlement that resolves significant claims amongst the Debtors' estates and avoids a layer of administrative expense associated with the appointment of a chapter 7 trustee, while increasing the efficiency of administering the Debtors' assets for the benefit of Creditors. The Plan also avoids the costs and delay that would be associated with the education of the trustee and his/her Professional Persons regarding the background of the Chapter 11 Cases and the Debtors' business.

Moreover, in a chapter 7 case, the chapter 7 trustee also would be entitled to seek a sliding scale commission based upon the funds distributed by such trustee, even though the Debtors have already accumulated much of the funds and have already incurred many of the expenses associated with generating those funds. Accordingly, the Debtors believe that there is a reasonable likelihood that Creditors would "pay again" for the funds accumulated by the

51

Debtors, since the chapter 7 trustee would be entitled to receive a commission in some amount for all funds distributed, including possibly substantial funds handed over to the chapter 7 trustee by the Debtors. It is also anticipated that a chapter 7 liquidation would result in delay in distributions to Creditors. Among other things, a chapter 7 case would trigger a new bar date for filing Claims that would be more than 90 days following conversion of the case to chapter 7. Fed. R. Bankr. P. 3002(c). Hence, a chapter 7 liquidation would not only delay distributions, but raise the prospect of additional Claims that were not asserted in the Chapter 11 Cases. Based on the foregoing, the Plan provides an opportunity to bring the greatest return to Creditors.

## C.    Feasibility of Plan

Section 1129(a)(11) of the Bankruptcy Code requires, as a condition to confirmation, that the Bankruptcy Court find that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed under the Plan. This requirement is called "feasibility."

The Plan is feasible because the Debtors have sufficient Cash on hand, as set forth in Exhibit 3, to satisfy all of the Debtors' projected obligations under the Plan.

## D.    Classification

In accordance with section 1122 of the Bankruptcy Code, the Plan provides for the classification of Claims. Section 1122(a) permits a plan to place a claim or equity interest in a particular class only if the claim or equity interest is substantially similar to the other claims or interests in that class. The Debtors believe that the classification of Claims and Interests under the Plan is appropriate and consistent with applicable law.

## E.    Confirmation of Plan Without Necessary Acceptances; Cramdown

A COURT MAY CONFIRM A PLAN, EVEN IF IT IS NOT ACCEPTED BY ALL IMPAIRED CLASSES, IF THE PLAN HAS BEEN ACCEPTED BY AT LEAST ONE IMPAIRED CLASS OF CLAIMS, AND THE PLAN MEETS THE "CRAMDOWN" REQUIREMENTS SET FORTH IN SECTION 1129(b) OF THE BANKRUPTCY CODE. SECTION 1129(b) OF THE BANKRUPTCY CODE REQUIRES THAT THE BANKRUPTCY COURT FIND THAT A PLAN IS "FAIR AND EQUITABLE," AND DOES NOT "DISCRIMINATE UNFAIRLY" WITH RESPECT TO EACH NON-ACCEPTING IMPAIRED CLASS OF CLAIMS OR INTERESTS. IN THE EVENT THAT ANY IMPAIRED CLASS REJECTS THE PLAN, IN ACCORDANCE WITH SECTION 1129(a)(8) OF THE BANKRUPTCY CODE, AND AT LEAST ONE IMPAIRED CLASS HAS VOTED TO ACCEPT THE PLAN, THE DEBTORS INTEND TO REQUEST THAT THE BANKRUPTCY COURT CONFIRM THE PLAN IN ACCORDANCE WITH THE "CRAMDOWN" PROVISION OF SECTION 1129(b) OF THE BANKRUPTCY CODE, OR MODIFY THE PLAN IN ACCORDANCE WITH THE TERMS THEREOF.

The Plan provides for the possibility of invoking the "cramdown" provisions as defined in section 1129(a) of the Bankruptcy Code. Under this provision, the Bankruptcy Court has the authority to confirm the Plan even though a Class of Claims that is Impaired does not vote to

52

accept the Plan, if another Class of Claims, which is also Impaired, votes to accept the Plan. This provision takes into account the possibility that one large claimant or several claimants may arbitrarily vote not to accept the Plan and that those arbitrary votes could be detrimental to other Creditors. In this instance the Bankruptcy Court, notwithstanding the negative vote of an Impaired Class, in the interest of being "fair and equitable," may confirm the Plan if another Impaired Class has accepted the Plan. Such determination, if necessary, would be addressed at the Confirmation Hearing.

### a. No Unfair Discrimination

The Debtors believe that under the Plan: (i) all Impaired Classes of Claims and Interests are treated in a manner that is consistent with the treatment of other Classes of Claims and Interests with which their legal rights are intertwined, if any; and (ii) no Class of Claims or Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims or Allowed Interests in such Class. The Debtors believe that the Plan does not discriminate unfairly as to any Impaired Class.

### b. Fair and Equitable Test

With respect to a dissenting class of Claims and Interests, the "fair and equitable" standard requires that the Plan provide that either the Claims or Interests in each Class received everything to which they are legally entitled or that Classes junior in priority to the Class receive nothing. The strict requirement of the allocation of full value to dissenting classes before junior classes can receive distribution is known as the "absolute priority rule."

The Bankruptcy Code establishes different "fair and equitable" tests for holders of secured claims, unsecured claims and interests as follows:

(i)    Secured Claims

Either: (i) each holder of a secured claim (x) retains the lien securing its secured claim and receives on account of its allowed secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, or (y) realizes the "indubitable equivalent" of its allowed secured claim; or (ii) the property securing the claim is sold free and clear of liens, with such liens attaching to the proceeds, and the liens against such proceeds are treated in accordance with clause (i).

(ii)    Unsecured Claims

Either: (i) each holder of an unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed claim; or (ii) the holders of claims and interests that are junior to the claims or the non-accepting class do not receive any property under the plan on account of such claims and interests.

68773-002\DOCS_SF:73639.1

      (iii)    <u>Equity Interests</u>

Either: (i) such holder of an interest receives or retains property of a value equal to the greater of any fixed liquidation preference or fixed redemption price to which such holder is entitled, or the value of the interest; or (ii) the holder of any interests junior to the interests in the impair class will not receive or retain any property under the plan.

The cramdown provisions of the Bankruptcy Code are complex and this summary is not intended to be a complete statement of the law in this area.

## XIX.

## EFFECT OF CONFIRMATION

### A.    <u>Binding Effect of Confirmation</u>

Confirmation will bind the Debtors, all Holders of Claims, Administrative Expenses, or Interests and other parties in interest to the provisions of the Plan whether or not the Claim, Administrative Expense, or Interest of such Holder is Impaired under the Plan and whether or not the Holder of such Claim, Administrative Expense, or Interest has accepted the Plan.

### B.    <u>Good Faith</u>

Confirmation of the Plan shall constitute a finding that: (i) the Plan has been proposed in good faith and in compliance with applicable provisions of the Bankruptcy Code; and (ii) all Persons' solicitations of acceptances or rejections of the Plan and the offer, issuance, sale, or purchase of a security offered or sold under the Plan have been in good faith and in compliance with applicable provisions of the Bankruptcy Code.

### C.    <u>No Limitations on Effect of Confirmation</u>

Nothing contained in the Plan will limit the effect of Confirmation as described in section 1141 of the Bankruptcy Code.

## XX.

## RISK FACTORS

The principal risk associated with the Plan is that there are various Administrative Claims asserted by Union against PEAO, that are material, but remain unresolved. Union's Administrative Claims in particular exceed $200 million. These Claims have been fully briefed and litigated, and are currently under submission with the Bankruptcy Court. Although the Debtors strongly believe that Union should not be entitled to any Allowed Administrative Claims against PEAO, there is no certainty that the Bankruptcy Court will agree.

PEAO's estate does not have sufficient funds available to satisfy a substantial administrative claim in favor of Union. Hence, there is a risk that the Plan is not feasible, and cannot be confirmed, as to PEAO to the extent that a material portion of Union's administrative claim is allowed.

68773-002\DOCS_SF:73639.1

There is also risk that the Plan may not be confirmed by the Bankruptcy Court, either because the requisite votes in favor of the Plan are not received or the Bankruptcy Court decides not to confirm the Plan on some other basis.

Finally, there are risks that the recoveries by Creditors projected hereby will not be realized, primarily as a result of Allowed Claims exceeding current estimates. Such a result could materially and adversely impact Creditor distributions under the Plan. Specifically, there is a risk that the Court could agree with Forest Oil that its claims should not be subordinated, in whole or in part. The Plan could be amended and confirmed under such circumstances without effectuating a subordination of Forest Oil, but there would be a material negative impact on recoveries by holders of Allowed General Unsecured Claims, particularly as to Claims asserted against PERL.

## XXI.

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion is a summary of certain U.S. federal income tax consequences of the Plan to the Debtors and to Holders of Claims and Interests. This discussion is based on the Internal Revenue Code, Treasury Regulations promulgated and proposed thereunder, judicial decisions and published administrative rules and pronouncements of the Internal Revenue Service ("IRS") as in effect on the date hereof. Due to the complexity of certain aspects of the Plan, the lack of applicable legal precedent, the possibility of changes in the law, the differences in the nature of the Claims (including Claims within the same Class) and Interests, the Holder's status and method of accounting (including Holders within the same Class) and the potential for disputes as to legal and factual matters with the IRS, the tax consequences described herein are subject to significant uncertainties. No legal opinions have been requested from counsel with respect to any of the tax aspects of the Plan and no rulings have been or will be requested from the IRS with respect to the any of the issues discussed below. Further, legislative, judicial or administrative changes may occur, perhaps with retroactive effect, which could affect the accuracy of the statements and conclusions set forth below as well as the tax consequences to the Debtors and the Holders of Claims and Interests.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or the Holders of Claims or Interests in light of their personal circumstances, nor does the discussion deal with tax issues with respect to taxpayers subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, brokers and dealers in securities, insurance companies, financial institutions, tax-exempt organizations, small business investment companies, regulated investment companies and foreign taxpayers). This discussion does not address the tax consequences to Holders of Claims who did not acquire such Claims at the issue price on original issue. No aspect of foreign, state, local or estate and gift taxation is addressed.

THE FOLLOWING SUMMARY IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE PERSONAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR INTEREST. EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT WITH SUCH HOLDER'S TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL, FOREIGN AND OTHER TAX CONSEQUENCES

APPLICABLE UNDER THE PLAN.

## A.     Consequences to the Debtors

The United States federal income tax consequences of the distributions contemplated by the Plan to the Holders of Claims that are United States Persons will depend upon a number of factors. For purposes of the following discussion, a "United States Person" is any person or entity (1) who is a citizen or resident of the United States, (2) that is a corporation or partnership created or organized in or under the laws of the United States or any state thereof, (3) that is an estate, the income of which is subject to United States federal income taxation regardless of its source or (4) that is a trust (a) the administration over which a United States person can exercise primary supervision and all of the substantial decisions of which one or more United States persons have the authority to control; or (b) that has elected to continue to be treated as a United States Person for United States federal income tax purposes. In the case of a partnership, the tax treatment of its partners will depend on the status of the partner and the activities of the partnership. United States Persons who are partners in a partnership should consult their tax advisors. A "Non-United States Person" is any person or entity that is not a United States Person. For purposes of the following discussion and unless otherwise noted below, the term "Holder" shall mean a Holder of a Claim that is a United States Person.

The United States federal income tax consequences to Holders and the character and amount of income, gain or loss recognized as a consequence of the Plan and the distributions provided for thereby will depend upon, among other things, (1) the manner in which a Holder acquired a Claim; (2) the length of time the Claim has been held; (3) whether the Claim was acquired at a discount; (4) whether the Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (5) whether the Holder has previously included in income accrued but unpaid interest with respect to the Claim; (6) the method of tax accounting of the Holder; and (7) whether the Claim is an installment obligation for United States federal income tax purposes. Certain Holders of Claims (such as foreign persons, S corporations, regulated investment companies, insurance companies, financial institutions, small business investment companies, broker-dealers and tax-exempt organizations) may be subject to special rules not addressed in this summary of United States federal income tax consequences. There also may be state, local, and/or foreign income or other tax considerations or United States federal estate and gift tax considerations applicable to Holders of Claims, which are not addressed herein. EACH HOLDER OF A CLAIM OR INTEREST AFFECTED BY THE PLAN IS STRONGLY URGED TO CONSULT ITS TAX ADVISOR WITH RESPECT TO DISTRIBUTIONS RECEIVED UNDER THE PLAN.

### 1.     Holders of Claims.

A Holder who received Cash (or potentially other consideration with respect to any Holders of Class 1 through 6 Claims) in satisfaction of its Claims may recognize ordinary income or loss to the extent that any portion of such consideration is characterized as accrued interest. A Holder who did not previously include in income accrued but unpaid interest attributable to its Claim, and who receives a distribution on account of its Claim pursuant to the Plan, will be treated as having received interest income to the extent that any consideration received is characterized for United States federal income tax purposes as interest, regardless of

56

whether such Holder realizes an overall gain or loss as a result of surrendering its Claim. A Holder who previously included in its income accrued but unpaid interest attributable to its Claim should recognize an ordinary loss to the extent that such accrued but unpaid interest is not satisfied, regardless of whether such Holder realizes an overall gain or loss as a result of the distribution it may receive under the Plan on account of its Claim.

### 2. **Non-United States Persons.**

A Holder of a Claim that is a Non-United States Person generally will not be subject to United States federal income tax with respect to property (including money) received in exchange for such Claim pursuant to the Plan, unless (i) such Holder is engaged in a trade or business in the United States to which income, gain or loss from the exchange is "effective connected" for United States federal income tax purposes, or (ii) if such Holder is an individual, such Holder is present in the United States for 183 days or more during the taxable year of the exchange and certain other requirements are met.

### 3. **Importance of Obtaining Professional Tax Assistance.**

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIM HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, CLAIM HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## XXII.

## ALTERNATIVES TO PLAN

The Debtors believe that if the Plan is not confirmed, or is not confirmable, the alternatives to the Plan include: (a) conversion of the Chapter 11 Cases to chapter 7; (b) dismissal of the Debtors' cases; or (c) an alternative plan of reorganization.

### A. **Liquidation Under Chapter 7**

If no plan can be confirmed, the Debtors' Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the Debtors' assets for distribution to Creditors in accordance with the priorities established by the Bankruptcy Code. For the reasons previously discussed above, the Debtors believe that Confirmation of the Plan will provide Creditors with a recovery that is expected to be substantially more than could be achieved in a liquidation under chapter 7 of the Bankruptcy Code.

**B.** **Dismissal**

Dismissal of the Chapter 11 Cases would result in each individual creditor having to protect its own rights through legal action. The Debtors possibly would be left with certain unencumbered assets but would have no direction as to how to use those assets. The Debtors believe that dismissal of the Chapter 11 Cases (except as to Petrocal, Carneros Acquisition, Carneros Energy and Gotland) would result in a disparate recovery by creditors that would not be beneficial to the whole.

**C.** **Alternative Plan**

The Debtors believe that any alternative plan would not result in as favorable of treatment of Claims and Interests as proposed under the Debtors' Plan.

**D.** **No Res Judicata Effect**

Notwithstanding anything to the contrary in the Plan, or in this Disclosure Statement, the provisions of this Disclosure Statement, and the Plan, which permits the Liquidating Debtors to enter into settlements and compromises of any potential litigation, shall not have and are not intended to have any res judicata effect with respect to any prepetition Claims and causes of action that are not otherwise treated under the Plan, and shall not be deemed a bar to asserting such Claims and causes of action.

58

# XXIII.

## CONCLUSION

The Debtors believe that the Plan is in the best interest of Creditors and urge Creditors to vote to accept the Plan.

August 27, 2010

/s/

Gerald A. Tywoniuk
Acting Chief Executive Officer and Chief Financial Officer of
the Debtors and Debtors in Possession

PACHULSKI STANG ZIEHL & JONES LLP
Ira D. Kharasch (CA Bar No. 109084)
James E. O'Neill (DE Bar No. 4042)
Maxim B. Litvak (CA Bar No. 215852)
Scotta E. McFarland (DE Bar No. 4184)
919 North Market Street, Seventeenth Floor
Post Office Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

Counsel to Debtors and Debtors in Possession

**Exhibit 1**

**Plan**

# Filed Separately

**Exhibit 2**

**Disclosure Statement Order**

# Filed Separately

# **Exhibit 3**

## **Chapter 11 Plan Projections**

**Pacific Energy Resources Ltd., et al**
**Chapter 11 Plan Projections**

**Cash Disbursement Analysis**

| | PERL High Case | PERL Low Case | PEAO High Case | PEAO Low Case | PEAH |
|---|---|---|---|---|---|
| Estimated Cash Balance as of Anticipated Effective Date (Oct. 15, 2010) | $ 3,961,107 | $ 3,961,107 | $ 461,741 | $ 461,741 | $ |
| **Other Sources of Cash** | | | | | |
| Unsecured Creditors Fund | 1,400,000 | 1,400,000 | - | - | |
| Potential Litigation Recoveries ( a ) | unknown | unknown | unknown | unknown | unknown |
| Trading Bay Segregated Funds ( b ) | - | - | 1,000,000 | unknown | |
| **Total Estimated Sources of Cash** | 1,400,000 | 1,400,000 | 1,000,000 | unknown | - |
| **Total Estimated Cash Available for Distribution** | $ 5,361,107 | $ 5,361,107 | $ 1,461,741 | $ 461,741 | $ |
| **Estimated Cash Distributions** | | | | | |
| Success and Transaction Fees ( c ) | $ 1,000,000 | $ 1,000,000 | $ - | $ - | $ - |
| Post-Petition Accrued but Unpaid Professional Fees as of Oct. 15, 2010 ( d ) | 222,393 | 222,393 | - | - | |
| Accrued but Unpaid Administrative Claims Other than Professional Fees | 367,980 | 367,980 | 20,000 | 20,000 | - |
| Priority Tax Claims | 310,000 | 310,000 | 375,447 | 375,447 | - |
| Sub-Total | 1,900,373 | 1,900,373 | 395,447 | 395,447 | - |
| **Professional and other Administrative Costs from and after Oct. 15, 2010** | | | | | |
| Professional Fees | 420,000 | 420,000 | - | - | - |
| Employee Costs | 324,175 | 324,175 | - | - | - |
| General and Administrative Expenses | 88,692 | 88,692 | - | - | - |
| Contingency | 240,000 | 240,000 | - | - | - |
| Sub-Total | 1,072,867 | 1,072,867 | - | - | - |
| **Total Estimated Cash Distribution to Success Fees, Admin. Claims, Priority Claims, and Wind Down** | $ 2,973,240 | $ 2,973,240 | $ 395,447 | $ 395,447 | $ - |
| **Remaining Cash for Distribution to Unsecured Claims** | $ 2,387,867 | $ 2,387,867 | $ 1,066,294 | $ 66,294 | $ - |
| **Estimated Unsecured Claims ( e )** | $ 13,528,001 | $ 27,349,076 | $ 105,303,827 | $ 275,363,827 | $ 21,000,000 |
| **Recovery Percentage** | 17.7% | 8.7% | 1.0% | 0.0% | 0.0% |

**Footnotes:**

( a ) Litigation recoveries are speculative. No value assigned. Litigation
will be pursued on a contingency basis at no cost to estate.

( b ) Segregated funds total $12,334,228 as of July 31, 2010 pending outcome of adversary proceeding.
Potential recovery of $1,600,000 from pending adversary proceeding, for illustrative purposes only.

( c ) Success fee to Zolfo Cooper at effectiveness of Plan.

( d ) Reduced by retainers held by Debtors' counsel in the amount of $385,497.

( e ) Preliminary estimate, low and high recovery scenarios shown. PERL High Case includes claims asserted by Marathon Oil Company on account of fuel gas in the amount of $2,820,287 plus
an estimated contingency of $1,000,000 for PERL's allocated share of costs related to decommissioning expenses associated with the Spurr Platform actually incurred and paid by Marathon.
PERL Low Case increases Marathon's decommissioning claims to $11,060,000 and adds a claim asserted by CIPL on account of transportation services in Alaska in the amount of
$3,761,084. PEAO High Case assumes $40,000,000 in claims in favor of the State of Alaska and $56,743,935 in claims in favor of Union Oil Company. PEAO Low Case assumes
$200,000,000 in claims in favor of either the State or Union in connection with Alaska decommissioning costs (in lieu of the $40,000,000 above), plus increases the Spurr Platform
claim from $1,000,000 to $11,060,000 in favor of Marathon.

# Pacific Energy Resources Ltd., et al
## Chapter 11 Plan Projections

**Summary of Professional Fees and Other Administrative Expenses from and after October 15, 2010**

|  | PERL | PEAO | PEAH |
|---|---|---|---|
| Professional Fees | $ 420,000 | $ - | $ - |
| Employee Costs | 324,175 | - | - |
| General and Administrative Expenses | 88,692 | - | - |
| Contingency | 240,000 | - | - |
| **Total Estimated Professional Fees and Other Administrative Expenses** | $ 1,072,867 | $ - | $ - |

**Breakdown of Professional Fees and other Administrative Expenses from and after October 15, 2010**

|  | PERL | PEAO | PEAH |
|---|---|---|---|
| **Professional Fees** |  |  |  |
| Pachulski | $ 350,000 | $ - | $ - |
| Rutan | 35,000 | - | - |
| Schully | 10,000 | - | - |
| Windes (tax professional) | 25,000 | - | - |
| Total Estate Professional Fees | $ 420,000 | $ - | $ - |
| **Employee Costs** |  |  |  |
| Employee Cost | $ 259,145 | $ - | $ - |
| General and Administrative Expense | 55,030 | - | - |
| Supervisory Board Expense | 10,000 |  |  |
| Total Employee Costs | $ 324,175 | $ - | $ - |
| **General and Administrative Expenses** |  |  |  |
| Insurance | $ 20,000 | $ - | $ - |
| US Trustee Fees | 33,451 | - | - |
| Other Expenses | 35,241 | - | - |
| Total Insurance, US Trustee Fees and Other Expenses | $ 88,692 | $ - | $ - |
| **Contingency** |  |  |  |
| Contingency | $ 240,000 | $ - | $ - |
| Total Contingency | $ 240,000 | $ - | $ - |
| **Total** | $ 1,072,867 | $ - | $ - |

**Note**

Assumes completion of liquidation within one year of plan effectiveness.

**Exhibit 4**

**Liquidation Analysis**

# Pacific Energy Resources Ltd., et al
## Chapter 7 Liquidation Analysis

**Cash Disbursement Analysis**

| | PERL High Case | PERL Low Case | PEAO High Case | PEAO Low Case | PEAH High Case | PEAH Low Case |
|---|---|---|---|---|---|---|
| Estimated Cash Balance as of Anticipated Effective Date (Oct. 15, 2010) | $ 3,961,107 | $ 3,961,107 | $ 461,741 | $ 461,741 | $ - | $ - |
| **Other Sources of Cash** | | | | | | |
| Unsecured Creditors Fund | 1,400,000 | 1,400,000 | | | | |
| Potential Litigation Recoveries ( a ) | unknown | unknown | unknown | unknown | unknown | unknown |
| Recoveries for Intercompany Claims | 116,508 | - | - | - | 86,581 | |
| Trading Bay Segregated Funds ( b ) | - | - | 1,000,000 | unknown | - | |
| **Total Estimated Sources of Cash** | 1,516,508 | 1,400,000 | 1,000,000 | unknown | 86,581 | - |
| **Total Estimated Cash Available for Distribution** | $ 5,477,615 | $ 5,361,107 | $ 1,461,741 | $ 461,741 | $ 86,581 | $ - |
| **Estimated Liquidation Distributions ( c )** | | | | | | |
| Success and Transaction Fees ( d ) | $ 750,000 | $ 750,000 | $ 150,000 | $ 150,000 | $ 100,000 | 100,000 |
| Post-Petition Accrued but Unpaid Professional Fees as of Oct. 15, 2010 ( e ) | 166,795 | 166,795 | 33,441 | 33,441 | 22,294 | 22,294 |
| Accrued but Unpaid Administrative Claims Other than Professional Fees | 367,980 | 367,980 | 20,000 | 20,000 | - | - |
| Priority Tax Claims | 310,000 | 310,000 | 375,447 | 375,447 | | |
| Sub-Total | 1,594,775 | 1,594,775 | 578,888 | 578,888 | 122,294 | 122,294 |
| **Professional and other Administrative Costs from and after Oct. 15, 2010** | | | | | | |
| Professional Fees ( f ) | 466,500 | 466,500 | 93,300 | 93,300 | 62,200 | 62,200 |
| Employee Costs ( g ) | 182,974 | 182,974 | 36,095 | 36,095 | 24,063 | 24,063 |
| General and Administrative Expenses | 66,518 | 66,518 | 13,304 | 13,304 | 8,869 | 8,869 |
| Ch. 7 Trustee Fees | 164,328 | 160,833 | 43,852 | 13,852 | 2,597 | - |
| Contingency ( h ) | 292,500 | 292,500 | 58,500 | 58,500 | 39,000 | 39,000 |
| Sub-Total | 1,172,821 | 1,169,325 | 245,051 | 215,051 | 136,730 | 134,132 |
| **Total Estimated Cash Distribution to Success Fees, Admin. Claims, Priority Claims, and Wind Down** | $ 2,767,595 | $ 2,764,100 | $ 873,939 | $ 793,939 | $ 259,024 | $ 256,426 |
| **Remaining Cash for Distribution to Unsecured Claims** | $ 2,710,020 | $ 2,597,007 | $ 637,802 | $ - | $ - | $ - |
| **Unsecured Claims ( i )** | | | | | | |
| Estimated Unsecured Claims ( j ) | $ 16,233,601 | $ 32,818,891 | $ 126,364,592 | $ 330,436,592 | $ 21,000,000 | 21,000,000 |
| Intercompany Amounts Owed ( k ) | - | - | 59,034,716 | 59,034,716 | - | |
| **Total Unsecured Claims** | $ 16,233,601 | $ 32,818,891 | $ 185,399,308 | $ 389,471,308 | $ 21,000,000 | $ 21,000,000 |
| **Recovery Percentage** | 16.7% | 7.9% | 0.3% | 0.0% | 0.0% | 0.0% |

**Footnotes:**
( a ) Litigation recoveries are speculative. No value assigned.
    Litigation will be pursued on a contingency basis at no cost to estate.
( b ) Segregated funds total $12,334,228 as of July 31, 2010 pending outcome of adversary proceeding.
    Potential recovery from pending adversary proceeding, for illustrative purposes only.
( c ) Allocation of expenses between PERL 75%, PEAO 15%, and PEAH 10%.
( d ) Success fee due to Zolfo Cooper at effectiveness of Plan.
( e ) Reduced by retainers held by Debtors' counsel in the amount of $385,497.
( f ) Increased by $200,000 in the aggregate compared to Ch. 11 Plan Projections given need for new professionals.
( g ) Reduced by 25% compared to Ch. 11 Plan Projections given presence of Ch. 7 Trustee.
( h ) Contingency increased by $150,000.
( i ) Claims increased by 20% (except as to PEAH) compared to Ch. 11 Plan Projections given Debtor's familiarity with allowed claims and creation of new bar date.
( j ) Preliminary estimate, low and high recovery scenarios shown.
( k ) Estimates from amended Schedules, reduced by 50% given potential objections to intercompany claims.