# Exhibit A

Page 1

1

2        IN THE UNITED STATES BANKRUPTCY COURT

3             FOR THE  DISTRICT OF DELAWARE

4     ---------------------------------

      In Re:                          )
5                                      ) Chapter 11

      PACIFIC ENERGY RESOURCES, LTD.,  )
6                                      ) No. 09-10785 (KJC)

      et al.,                         )
7                                      ) Jointly Administered
                                       )
8                    Debtors.          )

      ---------------------------------

9

10                   RULE 30(b)(6)

11          DEPOSITION OF GERRY A. TYWONIUK

12                New York, New York

13             Friday, September 24, 2010

14

15

16

17

18

19

20

21

22

23

24   Reported by:

     ANNETTE ARLEQUIN, CCR, RPR

25   JOB NO. 33434

Page 2

```
 1
 2
 3
 4
 5                   September 24, 2010
 6                   1:42 p.m.
 7
 8        RULE 30 (b)(6) deposition of PACIFIC
 9   ENERGY ALASKA OPERATING, LLC, through its
10   representative GERRY A. TYWONIUK, held at
11   the offices of Pillsbury Winthrop Shaw
12   Pittman LLP, 1540 Broadway, New York, New
13   York, before Annette Arlequin, a Certified
14   Court Reporter, a Registered Professional
15   Reporter and a Notary Public of the State
16   of New York.
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2   A P P E A R A N C E S:
 3
 4      ROSENTHAL, MONHAIT & GODDESS, P.A.
 5      Attorneys for Union Oil Company of California
 6         P.O. Box 1070
 7         Wilmington, Delaware 19899
 8      (Not Present)
 9            -and-
10      PILLSBURY WINTHROP SHAW PITTMAN LLP
11      Attorneys for Union Oil Company of California
12         1540 Broadway
13         New York, New York 10036
14      BY: DAVID A. CRICHLOW, ESQ.
15         david.crichlow@pillsbury.com
16         ROGER ELDER, ESQ.
17         roger.elder@pillsbury.com
18
19      PACHULSKI STANG ZIEHL JONES
20      Attorneys for Debtors
21         150 California Street, 15th Floor
22         San Francisco, California 94111
23      BY: JAMES K. T. HUNTER, ESQ.
24         jhunter@pszjlaw.com
25
```

Page 4

```
 1
 2   A P P E A R A N C E S (Cont'd):
 3
 4      BINGHAM McCUTCHEN LLP
 5      Attorneys for J. Aron
 6         399 Park Avenue
 7         New York, New York 10022-4689
 8      BY: SCOTT K. SEAMON, ESQ.
 9         scott.seamon@bingham.com
10
11      MORRISON FOERSTER LLP
12      Attorneys for State of Alaska
13         1290 Avenue of the Americas
14         New York, New York 10104-0050
15      BY: SAMANTHA MARTIN, ESQ.
16         smartin@mofo.com
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1
 2          IT IS HEREBY STIPULATED AND AGREED,
 3   by and between the attorneys for the
 4   respective parties herein, that filing
 5   and sealing be and the same are hereby
 6   waived
 7          IT IS FURTHER STIPULATED AND AGREED
 8   that all objections, except as to the form
 9   of the question, shall be reserved to the
10   time of the trial.
11          IT IS FURTHER STIPULATED AND AGREED
12   that the within deposition may be sworn to
13   and signed before any officer authorized to
14   administer an oath, with the same force and
15   effect as if signed and sworn to before the
16   Court.
17
18
19
20
21
22
23
24
25
```

Page 6

1          Tywoniuk
2  G E R R Y  A.  T Y W O N I U K, called as a
3      witness, having been duly sworn by a
4      Notary Public, was examined and testified
5      as follows:
6          *    *    *
7  EXAMINATION BY
8  MR. CRICHLOW:
9      Q.  Good afternoon, Mr. Tywoniuk.  My
10  name is David Crichlow.  We met before.  I
11  represent Union Oil Company of California and I
12  will be taking the deposition today on behalf of
13  Union Oil.
14          Can you please state your name and
15  address for the record?
16      A.  Gerald Alan Tywoniuk.  My address is
17  106 Avenue E, Redondo Beach, California, 90277.
18      Q.  And Mr. Tywoniuk, have you ever been
19  deposed before?
20      A.  I have not.
21      Q.  Let's just go through a few
22  deposition ground rules.  I'd like to keep this
23  short and simple.
24          If you don't understand a question
25  that I ask you, just please ask me to rephrase

Page 7

1          Tywoniuk
2  it and I'll be happy to.  I don't want you
3  trying to answer questions that you don't
4  understand.
5      A.  Okay.
6      Q.  If I ask you a question, I would just
7  ask that you give me the courtesy before
8  answering to let me complete the question, and I
9  will remind myself to give you the same courtesy
10  with respect to your answers and not interpose a
11  question while you're still answering.
12          Is that fair?
13      A.  Yes.
14      Q.  There are several lawyers that you
15  see around the table today and including your
16  own lawyer, and your lawyer and every lawyer
17  that's in the room today are entitled to object
18  to any question that I put before you.
19          However, if your lawyer does not
20  instruct you not to answer, I'm entitled to an
21  answer to my question.
22          Do you understand that?
23      A.  I do.
24      Q.  You will also have to answer
25  questions affirmatively, which in most instances

Page 8

1          Tywoniuk
2  you will naturally do, but with respect to
3  questions that require perhaps a yes or a no
4  answer, the court reporter is going to be able
5  to transcribe that but would have difficulty
6  transcribing a nod of the head or the colloquial
7  "uh-huh" or "uh-uh."  So I'm going to ask you
8  that you state answers that are "yes" or "no" so
9  that the court reporter can understand.
10          Is that fair?
11      A.  Yes.
12      Q.  And finally, if you answer my
13  question, unless you tell me otherwise, I will
14  assume you understood it.
15          You understand that?
16      A.  Yes, I do.
17      Q.  A couple of other things.
18          For shorthand I may be referring to
19  Pacific Energy Alaska Operating LLC during the
20  course of this deposition as PEAO.
21          Would you understand me as referring
22  to that if I call it PEAO?
23      A.  I will.
24      Q.  And at some point we may talk about
25  Joint Interest Billings that occurred between

Page 9

1          Tywoniuk
2  Union Oil Company and PEAO; and if I refer to
3  them as JIBs, will you understand that?
4      A.  I will.
5      Q.  You are appearing -- to your
6  understanding, you are appearing here pursuant
7  to a Notice of Deposition that was served on you
8  by my client Union Oil Company; is that correct?
9      A.  Yes, it is.
10          MR. CRICHLOW:  May I have that marked
11  as Tywoniuk Exhibit 1.
12          (Deposition Exhibit Tywoniuk 1,
13  Amended Notice of Deposition, marked for
14  identification, as of this date.)
15  BY MR. CRICHLOW:
16      Q.  Mr. Tywoniuk, I've had the court
17  reporter hand you what's been marked as Tywoniuk
18  Exhibit 1.  It is an Amended Notice of
19  Deposition.
20          The notice comes from Union Oil
21  Company of California and it is a notice to
22  PEAO, and it is a notice for what is called a
23  Rule 30(b)(6) deposition.
24          Have you seen this before?
25      A.  I have.

3

Page 10

Tywoniuk

1
2      Q.   And if you will look at the first
3   page of Tywoniuk-1, you will see that -- strike
4   that.
5          Are you aware that PEAO has
6   designated you to speak on behalf of the company
7   for the purposes of this deposition?
8      A.   Yes, I am.
9      Q.   And are you aware that you have been
10  designated as the person most knowledgeable with
11  respect to the categories, if you look at
12  Tywoniuk-1, beginning on the bottom of page 1,
13  Roman numeral one and going to the carryover
14  page on 2 to 3?
15     A.   Yes, I am that person.
16     Q.   And are you familiar with the topics
17  listed in Tywoniuk-1?
18     A.   Yes, I am.
19     Q.   What steps did you take to prepare
20  for this deposition?
21     A.   These documents were prepared so very
22  recently that I needed to undertake no special
23  preparation.  I've been intimately involved in
24  the case all the way through so...
25     Q.   Did you meet with or have discussions

Page 11

Tywoniuk

1
2   with anyone other than your attorney regarding
3   your testimony today?
4      A.   I did not.
5      Q.   And I assume that you did meet with
6   or have a discussion with your attorney prior to
7   your deposition today.
8          Would I be correct in assuming that?
9      A.   Briefly, yes.
10     Q.   Okay.  Was anyone else present when
11  you met with your attorney?
12     A.   The taxi driver.
13     Q.   Okay.  Did you review any documents
14  prior to this deposition?
15     A.   Like I just said, because these
16  documents were prepared so recently and I was
17  intimately involved in the preparation, I did
18  not need to do any special preparation.
19     Q.   Very good.
20         I'm going to try to go through some
21  brief background questions today and I note for
22  the record that you have just flown in from
23  London and accommodated me by appearing at this
24  deposition in my offices, and it will be my
25  intent to be as efficient during the deposition

Page 12

Tywoniuk

1
2   as I can, so I will try to get through the
3   background information pretty quickly.
4          And I'd like you to start with your
5   education since college.
6      A.   Since college?
7      Q.   Yes.  Will you start with college?
8      A.   I have a Bachelor of Commerce degree
9   from the University of Alberta, Canada and I am
10  a Canadian Chartered Accountant, and I've
11  undertaken various continuing education over the
12  years.
13     Q.   Can you please give me your
14  employment history over the last ten years?
15     A.   Sure.  I'll go in reverse order.
16         I continue to be acting CEO and CFO
17  of Pacific Energy Resources.  It's a part-time
18  responsibility at this point, but I'm in that
19  capacity.
20         I am concurrently the interim senior
21  vice president finance for CIBER, Inc.,
22  C-I-B-E-R, and have been so since May of this
23  year.
24         I joined Pacific Energy Resources at
25  the end of June of 2008 and was an employee

Page 13

Tywoniuk

1
2   through April of 2010, at which point I switched
3   to be an hourly consultant and officer,
4   continued as an officer.
5          Prior to June of 2008, I was acting
6   VP finance for Pecos, P-e-c-o-s, Inc. and its
7   subsidiaries between March of 2007 and April of
8   2008.
9          Prior to that date I was senior vice
10  president finance for a company with a very
11  similar name but unrelated, Pacific Energy
12  Partners, LP, and that was between December 2002
13  through November 2006, although I stayed on as
14  an employee after the company was sold until
15  March of 2007.
16         Prior to that position I was senior
17  vice president, chief financial officer of two
18  related public companies called MarkWest
19  Hydrocarbon, Inc. and MarkWest Energy Partners
20  LP.  I joined that group in April of 1997
21  through November of 2002.
22     Q.   That's fine.
23         And is it fair to say that based on
24  your current role as CEO and CFO of Pacific
25  Energy Resources, that you've spent a

Page 14

1           Tywoniuk
2   significant amount of time and have been heavily
3   involved in the Pacific Energy Resources
4   Limited, among others, bankruptcy proceeding?
5       A.   It is fair to say that.
6       Q.   And you mentioned that your current
7   position as CEO and CFO of Pacific Energy
8   Resources is essentially a part-time venture
9   now.
10          Can you just explain why it's part
11  time now?
12      A.   Just the nature of the case is such
13  that the work has diminished to that point.
14  There's one employee in Long Beach, there is a
15  part-time accountant and there's a part-time
16  myself.  That's the entirety of the remaining
17  staff.
18          MR. HUNTER:  By the way, can we refer
19      to Pacific Energy Resources Limited as PERL
20      from now on?
21          MR. CRICHLOW:  Yes, we can.
22      A.   So I spend as much time as needed
23  each week.
24      Q.   At PERL.
25          And if you mentioned this, because

Page 15

1           Tywoniuk
2   there were a lot of positions, forgive me if I'm
3   asking a question that you've already answered,
4   but do you have an official role with respect to
5   PEAO currently as opposed to PERL?
6       A.   I have the same titles at PEAO.  All
7   the subsidiaries of PERL.  We have uniforms, we
8   have officers, that few of us that there are
9   now.
10      Q.   And what are your roles and
11  responsibilities with respect to PEAO?
12      A.   Overseeing the entirety of the case
13  from the company's standpoint.
14      Q.   And when you say "entirety of the
15  case," just so the record is clear, you mean the
16  bankruptcy proceeding that's pending?
17      A.   I do mean that, yes.
18      Q.   Can you describe generally for me
19  your involvement, if any, in the formulation of
20  the current plan, the proposed plan before the
21  Bankruptcy Court to liquidate the debtors?
22      A.   I was the principal company
23  participant in the preparation of that plan
24  together with outside counsel.
25      Q.   Anybody else from the Pacific Energy

Page 16

1           Tywoniuk
2   side that would have been involved in
3   formulating the plan?
4       A.   Jennifer Kuritz is our remaining
5   full-time employee.  She is our treasurer.
6       Q.   And before that proposed plan was
7   submitted to the Bankruptcy Court for
8   confirmation, you know, over what period of time
9   did negotiation of the plan take place?
10      A.   It took place from sometime in the
11  spring through the date of its filing in the
12  summer.
13      Q.   And that would be the summer of 2010,
14  correct?
15      A.   Yes, 2010.
16      Q.   And when you say "sometime in the
17  spring," I'm just trying to make the record as
18  accurate as I can, you are talking about the
19  spring of 2010, correct?
20      A.   Yes, it is.  Yes.
21      Q.   What was your specific role in the
22  formulation of the current plan?
23      A.   Well, it's a very simple plan first
24  of all, so the structure came from counsel, but
25  it really is all -- the only option we have is

Page 17

1           Tywoniuk
2   the plan of liquidation.
3          In other words, the remaining cash,
4   settle any outstanding claims and make the
5   distribution, and wind up the entities so there
6   really is no alternative to that.  It's very --
7   it was a very simple formulation.
8       Q.   And, Mr. Tywoniuk, were you the
9   person from the company who was responsible for
10  approving each draft of the plan before it was
11  ultimately submitted?
12          MR. HUNTER:  Objection.  Assumes a
13      fact not in evidence.
14  BY MR. CRICHLOW:
15      Q.   You may answer the question.
16          THE WITNESS:  May I answer the
17      question?
18          MR. HUNTER:  You can answer it if you
19      understand it.
20      A.   The answer is yes, I reviewed every
21  draft.
22          MR. HUNTER:  And approved every
23      draft.
24      A.   And approved every draft.  I'm not
25  sure what approved means when we have a working

Page 18

1    Tywoniuk
2  team that's drafting it, but yes.
3        Q.   What role will you play in the
4  winding up of the debtors' companies?
5        A.   I'm the named plan representative,
6  which on a practical level means exactly the
7  same as I've been doing.
8        Q.   And what will those duties include
9  after -- assuming that the plan is confirmed,
10 what would those duties include after the plan
11 is confirmed?
12       A.   Settlement of the remaining claims.
13 As you know, the Unsecured Creditors Committee
14 is pursuing the preference actions so there will
15 be monies to be received pursuant to those debt
16 process and whatever support that process needs,
17 and ultimately payment of the monies that are
18 available to the pool of claims and the legal
19 wind-up of the corporations and LLCs.
20       Q.   I want to talk a little bit about the
21 legal wind-up of the corporations and
22 specifically focus your attention on the wind-up
23 of PEAO.
24       Do you know whether it is PEAO's
25 intent to have someone in place for three years

Page 19

1    Tywoniuk
2  after a plan is confirmed to wind up the affairs
3  of the company?
4        A.   I don't know specifically what the
5  legal requirements are to formally wind up the
6  corporation, but we will do that as soon as
7  practical after claims are settled and monies
8  are distributed. There's no reason to keep it
9  alive in other words.
10       Q.   Who would be responsible for
11 prosecuting and/or defending suits against PEAO
12 after the effective date of a confirmed plan?
13       A.   Well, from the company's perspective,
14 myself with counsel. I would be working under
15 the supervision of the board of supervisors.
16       Q.   And forgive me because this is a very
17 technical question and I do not mean to offer it
18 to trick you. We literally want to find out
19 what your understanding is.
20       If a suit should be commenced after
21 the estate's property is disposed of and the
22 bankruptcy cases are closed, what is your
23 understanding of the entity that would exist
24 that would defend that suit?
25       And again, I'm talking with respect

Page 20

1    Tywoniuk
2  to PEAO post exit from bankruptcy.
3        A.   I'd have to consult with counsel on
4  that question. It's a legal question.
5        Q.   You have no under -- you have no
6  understanding?
7        A.   I have no understanding.
8        Q.   That's fine.
9        And is it you that would be
10 responsible for settling and closing all the
11 affairs of PEAO after the effective date of the
12 plan?
13       A.   Myself together with my part-time
14 staff, yes.
15       Q.   Have you had any discussion with that
16 part-time staff about, you know, whether they
17 have to stay on after the confirmation of a
18 plan, and if so, for how long?
19       A.   It's informal. Our part-time
20 accountant would stay on to assist and our
21 treasurer may or may not be available depending
22 on what she does next with her career.
23       Q.   Are you committed to stay on until
24 the complete winding up of PEAO?
25       A.   I am, although it's hard to predict

Page 21

1    Tywoniuk
2  all the ultimate circumstances, but at a
3  professional level, yes.
4        Q.   I understand.
5        Now what property remains to be
6  liquidated or otherwise disposed of with respect
7  to PEAO?
8        A.   We have no properties.
9        Q.   Do you have, and again, as you know,
10 Mr. Tywoniuk, I have an understanding of this
11 bankruptcy proceeding and we both know that
12 there were certain PEAO properties abandoned
13 during the course of this bankruptcy.
14       Is that fair to say?
15       A.   Yes, it is.
16       Q.   What abandoned properties other than
17 the Trading Bay properties does PEAO intend to
18 liquidate or otherwise dispose of, if any?
19       A.   There were no other abandoned
20 properties beyond the Trading Bay properties.
21       Q.   If there were to be an offer to
22 purchase any of PEAO's abandoned assets, what is
23 your understanding of who would handle those
24 negotiations going forward?
25       A.   Well, as I've said, there really is

Page 22

1    Tywoniuk
2  just me plus a couple of others. That's the
3  situation, so it would be me, although I am
4  aware of no such offer.
5    Q.  You're anticipating future questions,
6  which is good.
7      MR. HUNTER:  Which is actually bad.
8      MR. CRICHLOW:  Well, it depends on
9  one's perspective I guess.
10 BY MR. CRICHLOW:
11   Q.  And again, this is a technical
12 question and I assure you and your counsel I
13 offer it for a better understanding and not to
14 trick you.
15     But at this point with respect to
16 PEAO's abandoned assets, do you have an
17 understanding of if there were a purchaser
18 willing to purchase those assets post
19 confirmation of the plan, who would a payment be
20 made to or what entity to your understanding?
21   A.  Well, I suppose -- I mean I
22 understand the theoretical nature of your
23 question, but given this notion of -- I don't
24 know.  I guess it would be either PEAO or its
25 parent.

Page 23

1    Tywoniuk
2    Q.  And upon exit from bankruptcy, what
3  is your understanding of what happens to PEAO's
4  46.8 percent joint interest with Union in the
5  TBU and the TBF?
6      And let me take a step back.  That's
7  Trading Bay Unit and Trading Bay Field.
8    A.  Can you repeat the question?
9    Q.  I'd be happy to.
10     And upon exit from bankruptcy, what
11 is your understanding of what happens to PEAO's
12 46.8 percent joint interest with Union in the
13 TBU and the TBF?
14   A.  Well, first of all, we abandoned the
15 properties for a reason.  I understand that
16 there's some notion in bankruptcy that somehow
17 they're abandoned to the pre-bankrupt entity.
18 I also understand that's kind of a nonsensical
19 concept in a corporate situation as opposed to a
20 personal situation.
21   Q.  Is it your understanding that PEAO no
22 longer has a 46.8 percent joint interest with
23 Union in the TBU and the TBF?
24   A.  On a practical level, yes.
25   Q.  And do you have an understanding of

Page 24

1    Tywoniuk
2  whether that 46.8 percent joint interest has
3  gone elsewhere as a matter of law or as a matter
4  of practicality?
5      MR. HUNTER:  I'm not going to object
6  that it calls for a conclusion of law
7  because I believe you're clear that you're
8  simply asking for his understanding,
9  correct?
10     MR. CRICHLOW:  And that is correct.
11     MR. HUNTER:  Okay.
12   A.  My understanding is that's a legal
13 question to be determined and that parties that
14 have an interest in that question will pursue
15 the answer, and PEAO has neither the money nor
16 the interest in pursuing any answer to that
17 question.
18   Q.  To now focus again on the Trading Bay
19 assets, in the time since abandonment of PEAO's
20 Trading Bay assets, has PEAO taken any steps to
21 sell or otherwise dispose of those assets?
22   A.  No.
23   Q.  What are PEAO's current plans for
24 disposition of the Trading Bay assets?
25   A.  No plans.  No interest, no plans.

Page 25

1    Tywoniuk
2    Q.  Have there been any post-abandonment
3  offers to purchase some or all of the Trading
4  Bay assets?
5    A.  No.
6    Q.  Does PEAO have any plans regarding
7  satisfaction of claims related to the Trading
8  Bay assets?
9    A.  The PEAO debtor-in-possession?
10   Q.  The PEAO debtor-in-possession.
11   A.  Can you repeat the question?
12   Q.  Sure.  We'll frame it more precisely.
13 You raised a very important point.  I had it in
14 my outline as pre-abandonment and
15 post-abandonment, but I like your distinction
16 better.
17     Does the PEAO debtor-in-possession
18 have any plans regarding satisfaction of claims
19 related to the Trading Bay assets?
20   A.  Well, the claims will need to be
21 settled.  Various parties have made claims.  We
22 have or will object to certain of those.  We
23 have and will reach settlements on certain of
24 those.  You've probably seen the settlement with
25 the State of Alaska, for example, recently

Page 26

1       Tywoniuk
2  filed. So that's just the normal course of
3  events in the case.
4       So is that answering your question?
5  Q. I think it does. I think you've
6  answered it, but I have a follow-up question as
7  you might suspect.
8       What would happen if you are unable
9  to settle all of the claims against PEAO
10 regarding the Trading Bay assets?
11 A. That's I guess a legal question that
12 I have not asked.
13 Q. And upon emergence, which I think now
14 I have a better understanding of but I think the
15 question is still valid, you know, upon
16 emergence, what are PEAO's plans regarding
17 satisfaction of claims related to the Trading
18 Bay assets?
19       MR. HUNTER: Objection. Vague.
20 BY MR. CRICHLOW:
21 Q. You may answer the question.
22 A. Well, as I understand it, the
23 post-confirmation entity will continue to work
24 through a resolution of claims and that's just
25 part of the process of determining the payout to

Page 27

1       Tywoniuk
2  each party. I mean our plan is to get to the
3  point of liquidating the corporations and the
4  LLCs.
5  Q. And to your understanding, who
6  currently owns the Trading Bay assets?
7  A. I do not know nor does the estate
8  have an interest in that question. We abandoned
9  the properties and that was not a matter for the
10 bankruptcy process, as I understand it, to
11 determine.
12 Q. So is it your testimony that once you
13 abandoned the properties, PEAO has no further
14 ownership interest in the Trading Bay assets?
15       MR. HUNTER: I'm sorry. Did you say
16 was it his understanding?
17       Could you please reread his question?
18       MR. CRICHLOW: I said was it his
19 testimony.
20       MR. HUNTER: Was it his test -- okay.
21 Then I would object. It calls for a legal
22 conclusion.
23       MR. CRICHLOW: Okay.
24 BY MR. CRICHLOW:
25 Q. I'm just asking if that was your

Page 28

1       Tywoniuk
2  testimony.
3  A. Can you repeat the question?
4  Q. Sure. I'll try it again. Don't
5  worry about it. And I'll rephrase it.
6       Is it your understanding that the
7  abandoned properties -- let me strike that.
8       Is it your understanding that once
9  PEAO abandoned the properties, PEAO has no
10 further ownership interest in the Trading Bay
11 assets?
12 A. Yes.
13 Q. Has PEAO taken any steps to deal with
14 claims for future environmental remediation
15 liability related to the Trading Bay assets?
16 A. Yes. We have recently reached
17 agreement with the State of Alaska.
18 Q. And can you describe the process of
19 reaching that settlement with the State of
20 Alaska?
21 A. My counsel and the state's counsel
22 were the primary negotiators on each party's
23 behalf, so I worked with my counsel to craft
24 that Settlement Agreement on our side.
25 Q. Other than what is in that agreement,

Page 29

1       Tywoniuk
2  which obviously speaks for itself, has the state
3  informed PEAO of what it must do or what the
4  state would like for it to do with respect to
5  future environmental remediation?
6  A. At one point they gave us a workup of
7  their cost estimate.
8  Q. Has that workup been submitted in any
9  pleading in the bankruptcy proceeding?
10 A. No, it has not.
11 Q. Any other related written
12 communications from the State of Alaska with
13 respect to future environmental remediation for
14 the Trading Bay assets?
15 A. Not to my knowledge.
16 Q. And can you tell me what PEAO's
17 current plans are to deal with the future
18 environmental liabilities?
19 A. None. We abandoned the properties.
20 As you know, that was based on a fact that there
21 was no resources to deal with the ongoing
22 losses, never mind the abandonment.
23 Q. And to your understanding, if there
24 is determined to be an environmental remediation
25 obligation at the Trading Bay -- for the Trading

Page 30

1   Tywoniuk
2   Bay assets, who would be responsible for that
3   remediation?
4       A.  It's because of the abandonments,
5   PEAO is no longer involved so we're not -- PEAO
6   nor myself have an interest in determining that
7   question.
8       Q.  I understand your testimony, but I
9   have a slightly different question.
10          Do you have an understanding of who
11  would be responsible?
12      A.  I do not.
13      Q.  Has PEAO set aside any reserves to
14  cover potential future environmental liabilities
15  or remediation costs?
16      A.  No.
17      Q.  I'm going to move on to some
18  discussions about the proposed plan itself.  I
19  think I'm right on time so far.
20          Mr. Tywoniuk, do you know the current
21  approximate value of the outstanding claims
22  against PEAO?
23      A.  I'd have to open up the plan document
24  to look at the range of estimates that we
25  provided to give you the exact figures, but I do

Page 31

1   Tywoniuk
2   know I was involved in the preparation.
3       Q.  And I asked in case you knew and as
4   you might suspect, we've got a copy of the plan
5   here.  You do not have to guess.
6           MR. CRICHLOW:  May we have that
7   marked as Tywoniuk-2.
8           (Deposition Exhibit Tywoniuk 2, First
9   Amended Chapter 11 Plan of Liquidation for
10  Pacific Energy Recourses Limited, marked
11  for identification, as of this date.)
12          THE WITNESS:  I mean the disclosure
13  statement, that's where the financial table
14  is.
15          MR. CRICHLOW:  We can mark that also.
16  May I have this marked as Tywoniuk-3.
17          (Deposition Exhibit Tywoniuk 3,
18  Disclosure Statement in Respect of First
19  Amended Chapter 11 Plan of Liquidation for
20  Pacific Energy Resources Limited, marked
21  for identification, as of this date.)
22      A.  Could you repeat your question,
23  please to make sure I'm answering the right one?
24      Q.  Sure.
25          I was asking you what the current

Page 32

1   Tywoniuk
2   approximate value of outstanding claims against
3   PEAO are.
4           MR. HUNTER:  And if you're referring
5   to a specific page of the document to help
6   you out, could you refer to the page?
7           MR. CRICHLOW:  That's a fair point,
8   and we have now handed the witness two
9   documents; Tywoniuk-2 and Tywoniuk-3.
10  BY MR. CRICHLOW:
11      Q.  If you could also just take a look at
12  because they are not Bates stamped.
13      A.  I'm looking at the Disclosure
14  Statement, which is document No. 3.
15      Q.  Thank you.
16      A.  Exhibit 3, page 1 of 2 which is near
17  the back obviously.  Four pages from the back.
18      Q.  Okay.
19          MR. HUNTER:  Based on that, what is
20  your estimate or...
21      A.  You used the word "value," I'll use
22  the word "amount" of the estimated claims, $105
23  million to $275 million, and I'm looking at the
24  two PEAO columns on page 1 of 2 of Exhibit 3.
25      Q.  Okay.  Do you know what classes of

Page 33

1   Tywoniuk
2   claims are currently asserted against PEAO and
3   the value of the claims in each class?
4       A.  Yes.  There is a priority tax claim
5   which is approximately $68,000 or something of
6   that small magnitude.
7           Other than that, there really isn't
8   anything significant in the other classes.
9           Let me just think about that for a
10  second.
11          (Document review.)
12      A.  In the senior lender claims class
13  there are the excluded interests that underlie
14  that, and then we're just left with the general
15  unsecured claims and those are the figures that
16  I just quoted.
17      Q.  We'll talk about Senior Lender and
18  excluded interest claims a little bit later, but
19  before we get there, does PEAO currently view
20  any of the claims against it as administrative
21  expenses?
22      A.  As you know, there's arguments before
23  the court on that front with respect to Union
24  and CIPL, and we've argued no, there are not.
25  We're all waiting for the judge's decision.

Page 34

1      Tywoniuk
2      Q.   But there have been asserted -- there
3   have been claims that have been asserted to be
4   administrative expenses; is that correct?
5      A.   That is correct.
6      Q.   Including claims by Union that --
7      A.   Yes.
8      Q.   -- that have been asserted to be --
9           MR. HUNTER:  You started answering it
10   before he finished his question, so just a
11   reminder.
12          THE WITNESS:  Okay.
13          MR. CRICHLOW:  Thank you.
14     A.   Pardon me.
15     Q.   That's fine.
16          Including claims by Union that are
17   asserted to be administrative expenses; is that
18   correct?
19     A.   Yes, Union has asserted
20   administrative claims.
21     Q.   And what are the value of those
22   claims that are asserted to be administrative
23   expenses?
24          MR. HUNTER:  Objection.  Vague as to
25   what you mean by "value."

Page 35

1      Tywoniuk
2   BY MR. CRICHLOW:
3      Q.   What are the amounts of those claims
4   that are asserted to be administrative claims?
5      A.   I'd have to look it up I guess, but
6   it's something like $18 million, but I'd have to
7   look it up to give you the exact figure.
8      Q.   And let's probably make this easy.
9           And you are aware that Union has
10   asserted claims of over $200 million, asserts to
11   have administrative claims?
12     A.   Including the abandonment, yes, I'm
13   aware of that.
14     Q.   Does PEAO have enough cash to pay
15   these claims in full if they were determined to
16   be administrative claims?
17     A.   No.
18     Q.   I'd like to draw your attention to
19   the Disclosure Statement.
20          Is that Tywoniuk-3?
21     A.   Yes.
22     Q.   Mr. Tywoniuk, you started answering
23   questions probably before I laid a foundation,
24   but you have seen this document before, have you
25   not?

Page 36

1      Tywoniuk
2      A.   Yes.
3      Q.   And you know it to be the Disclosure
4   Statement that was filed in the Pacific Energy
5   Resources Limited bankruptcy proceeding,
6   correct?
7      A.   Correct.
8      Q.   I'd like you to turn, if you will,
9   with me to page 4.
10          (Document review.)
11     Q.   There's a column under Section 1A on
12   page 4 that says -- underneath a heading that
13   says, "Unclassified Claims."
14          Do you see that?
15     A.   I do.
16     Q.   And the left-hand side of the column
17   it says, "Administrative Expenses" and the first
18   cell says, "Estimated Allowed Claims."
19          Do you see that?
20     A.   Yes.
21     Q.   Under "PEAO," it says, "$20,000."
22          Do you see that?
23     A.   Yes.
24     Q.   What does that mean to your
25   understanding?

Page 37

1      Tywoniuk
2      A.   That is the one -- it's either an
3   allowance or there's one small administrative
4   claim.
5      Q.   Do you know what the basis for that
6   estimation was?
7      A.   Yes.  It assumes, as the document
8   states elsewhere, that we prevail with respect
9   to Union's claim, administrative claim.
10     Q.   Do you recall whose claims are
11   represented in the estimate?
12     A.   The $20,000?
13     Q.   Yes.
14     A.   I believe it's just an allowance.
15          In other words, it was just a
16   placeholder for anything small that might be
17   outstanding.  We're not aware of anything that
18   needs to go in there in that category.  We have
19   no larger amount --
20     Q.   Okay.
21     A.   -- that would fall in that category,
22   putting aside the Union and CIPL disputed
23   administrative claims.
24     Q.   Now you testified earlier that if
25   Union were to prevail, that PEAO does not have

Page 38

1          Tywoniuk
2   enough cash resources to pay Union's
3   administrative claim in full.
4          Is that a fair recount of your
5   testimony?
6      A.   Yes.  And we speak to that in the
7   document as well.
8      Q.   And the plan assumes that not all
9   claims asserted as administrative priority will
10  be allowed as such, which you have acknowledged.
11         If PEAO's estimation of $20,000 turns
12  out to be low, do you know how much more than
13  the currently estimated amount PEAO could pay
14  out in administrative claims?
15     A.   Not precisely.  The table on page
16  2 -- sorry, page 1 of 2 in Exhibit 3 in the
17  Tywoniuk Exhibit 3 speaks to a range of cash
18  that's available for distribution between
19  $66,000 and $1,066,000.
20         And it also notes that there are
21  potential litigation recoveries in Trading Bay
22  segregated funds recoveries that would increase
23  those figures.
24     Q.   I want to take Union's claims,
25  Union's asserted administrative claims and break

Page 39

1          Tywoniuk
2   them up into two.
3          You are aware that Union has asserted
4   that it has an administrative claim for
5   outstanding JIB payments that total $21,714,293
6   and change.
7          Are you aware of that?
8      A.   Yes.  And I mentioned $18 million
9   before so that's the same concept, yes.
10     Q.   And combined with that there is also
11  an asserted administrative claim of $200 million
12  for environmental remediation asserted by Union.
13         You're aware of that as well.
14     A.   Yes, I am.
15     Q.   So taking those two claims
16  separately, I'd like to draw your attention to
17  my question, which is whether PEAO has enough to
18  pay Union's $21 million plus administrative JIB
19  claim if it were determined that Union were
20  entitled to an administrative claim on that
21  amount.
22     A.   The only circumstance where that
23  could be paid -- well, the answer is no.  It's
24  not expected that the potential litigation
25  recoveries would rise to that level, so the

Page 40

1          Tywoniuk
2   answer is no, no circumstance.
3      Q.   And again, forgive me because I need
4   to make my record, but I don't want to
5   anticipate your question so -- your answer, so
6   I'll give you an opportunity to testify to the
7   next question, which is that I assume that it
8   would be fair to state that PEAO would not be
9   able to pay, then, the $200 million claim that
10  has been asserted by Union as an administrative
11  claim.
12     A.   Correct.
13         MR. HUNTER:  It's not only fair, it's
14  logically compelled, but okay.
15         THE WITNESS:  Correct.
16  BY MR. HUNTER:
17     Q.   Does PEAO have any amounts of money
18  reserved against Union's administrative claims,
19  asserted administrative claims?
20     A.   The only monies PEAO have are the
21  ones that are referred to in Exhibit 3, so those
22  are the only monies it has.
23     Q.   Okay.  I want to move now to a
24  discussion about the treatment of certain
25  classes of creditors under the plan.

Page 41

1          Tywoniuk
2      A.   Okay.
3      Q.   I think, I'm pretty sure this will
4   involve the use of the plan exclusively.  Of
5   course if you disagree, you're free to look at
6   anything else that would refresh your
7   recollection.
8          And I want to start with a treatment
9   of class two creditors under the plan.
10     A.   Okay.
11     Q.   And do you recall what category of
12  creditors comprised Class 2?
13     A.   I'm looking at the Disclosure
14  Statement table.  It's a summary of what's in
15  the plan, so that's Exhibit 3, page 5,
16  "Miscellaneous Secured Claims."
17     Q.   And that is a defined term under the
18  plan; isn't that correct?
19     A.   I believe so.
20     Q.   Do you remember the definition of
21  miscellaneous secured claims?
22     A.   By memory, no.
23     Q.   Okay.  Well, can you turn with me to
24  page 13 of the plan, which is Tywoniuk-2.
25     A.   Yes.

Page 42

1                    Tywoniuk
2      Q.   Okay.  And paragraph 51 has a
3    definition of miscellaneous secured claim.
4          Do you see that?
5      A.   I do.
6      Q.   And the definition states, "Any
7    secured claim other than a senior lender claim."
8      A.   Yes.
9      Q.   And does that refresh your
10   recollection of what the definition for
11   miscellaneous secured claim means?
12     A.   Yes.
13     Q.   Does PEAO currently view any of the
14   claims against PEAO as miscellaneous secured
15   claims?
16     A.   No, it does not.
17     Q.   And if they do not, can you tell me
18   why not?
19         MR. HUNTER:  Objection.  Vague.
20   BY MR. CRICHLOW:
21     Q.   You can answer the question.
22     A.   The only party that has asserted such
23   a claim is Union and as you know, we're arguing
24   before the court about that.
25     Q.   Based on the assets that are

Page 43

1                    Tywoniuk
2    available to fund the plan of liquidation, what
3    is the maximum amount PEAO could pay to Class 2
4    creditors?
5      A.   I'd refer you back again to Exhibit 3
6    of the Disclosure Statement.  There are -- the
7    range we gave was $66,000 to $1,066,000, subject
8    to whatever increase there is from potential
9    litigation recoveries in Trading Bay segregated
10   funds.
11     Q.   You completed your answer, correct?
12     A.   I have.
13     Q.   Do you recall what the treatment of
14   Class 2 claims are under the plan?
15     A.   They would rank ahead of other
16   categories, but as I have stated, we are not
17   aware of any miscellaneous secured claims, Class
18   2 claims.
19     Q.   If you could turn with me in the plan
20   to page 23.
21     A.   Yes.
22     Q.   And you see at the top -- well, I'm
23   sorry.  Let's go one -- so I can make a clearer
24   record, if you can turn to page 22 of the plan,
25   which is Tywoniuk-2, you'll see at the bottom

Page 44

1                    Tywoniuk
2    there is a heading number two, "Class 2
3    Miscellaneous Secured Claims."
4          Do you see that?
5      A.   Yes.
6      Q.   And is it fair to say underneath that
7    heading there's a discussion about the
8    classification of the miscellaneous secured
9    claims and their treatment which carries over to
10   page 23 and 24?
11     A.   Yes, I see that.
12     Q.   Am I correct in stating if we turn to
13   page 23 at the top, therein begins under
14   subheading B, the discussion of the treatment of
15   that class?
16     A.   Yes.
17     Q.   And do you see after the term
18   "Treatment" it says, "On or as soon as
19   practicable after the effective date, each
20   holder of an allowed miscellaneous secured claim
21   shall on account of such claim at the election
22   of the liquidating debtors and in full
23   satisfaction, settlement, release and
24   extinguishment of such miscellaneous secured
25   claim, either:  (i) be paid by the liquidating

Page 45

1                    Tywoniuk
2    debtors in cash in full, (ii) have surrendered
3    to such holder without representation or
4    warranty the collateral securing its claim..."
5    and then it goes on to say "(iii) -- well,
6    those -- let's stop at those two issues.
7          Is it your understanding that this
8    accurately reflects the treatment that will be
9    given to the Class 2 claimants?
10     A.   Yes, it does.
11         I want to correct what I said earlier
12   as to if Union was successful in its
13   administrative claim, I do not know whether it
14   would fit in this category, in this secured
15   claim Category 2, Class 2 category.
16     Q.   And not to anticipate that, is that
17   because you -- strike that.
18         Why don't you know?
19     A.   I think that's a legal question.
20     Q.   Thank you.
21         Is Union considered a senior lender
22   as that term is defined under the plan?
23     A.   No.
24     Q.   And can you tell me why Union is not
25   determined to be a senior lender?

Page 46

Tywoniuk

1  
2       MR. HUNTER:  Determined to be or
3  defined as?
4       MR. CRICHLOW:  Defined as a senior
5  lender.
6       A.   A senior lender, in all the
7  definitions through, it has to do with the
8  definitions in the beta sales order, so that was
9  referring to parties other than Union.
10      Q.   To your understanding, Union has a
11 secured claim; is that correct?
12      MR. HUNTER:  Objection.  Vague.
13      THE WITNESS:  Do I still answer?
14      MR. HUNTER:  Yes.  Unless I instruct
15 you not to answer, you can answer.
16      A.   Can you repeat the question, please?
17      Q.   Sure.
18           To your understanding, Union does
19 have a secured claim; is that correct?
20      MR. HUNTER:  Objection.
21      A.   I don't know.  That's a legal
22 question.
23      Q.   Have you ever known?
24      A.   Have I ever known?
25      Q.   Yes.

Page 47

Tywoniuk

1  
2       A.   I don't recall whether I have ever
3  known.
4       Q.   Have the debtors reserved any amounts
5  to pay Union's claim if it is determined to be a
6  secured claim?
7       A.   The debtors, my understanding is that
8  we would follow the waterfall and the amount of
9  money that PEAO has would go down that
10 waterfall, so if Union was higher in the chain,
11 then those monies would be available to Union.
12      Q.   And would Union be paid in full?
13      A.   No, it would not.
14      Q.   What types of claims exist as
15 unsecured claims against PEAO?
16           I think they're Class 6 claims.  And
17 again, to help you out.  I've cheated.  I've got
18 all the notes.  It's on page 27 of the plan.
19      MR. HUNTER:  We do not regard that as
20 cheating.  We regard that as simply
21 assisting and we appreciate it.
22      A.   I mean there's different categories
23 of parties as we think about it from a business
24 standpoint.
25      Q.   Okay.

Page 48

Tywoniuk

1  
2       A.   And that's more just the way we
3  tallied the numbers.
4           Vendors in the State of Alaska, my
5  understanding is if Union is unsuccessful with
6  respect to its administrative claim, then those
7  amounts would also be part of that class as
8  would its prepetition JIBs, and then there would
9  be an argument over the abandonment claim as to
10 how that fits in given that the State of Alaska
11 has filed and we just agreed on the same nature
12 of claim.
13      Q.   Okay.  Do you know what the
14 anticipated total amount of the unsecured claims
15 against PEAO are?
16      MR. HUNTER:  Asserted or allowed?
17 Just asserted?
18      MR. CRICHLOW:  Asserted.
19      A.   The estimate that we gave, which is a
20 little different than the assertion, is this
21 range in Exhibit 3 again, 105 to $275 million.
22      Q.   And in that range of 105 -- let me
23 make sure I got it right.
24           105 to $275 million, are you
25 including the Union asserted claims?

Page 49

Tywoniuk

1  
2       A.   We are, subject to dealing with the
3  fact that both the state and the Union have
4  claims with respect to the decommissioning
5  estimate, so we in effect removed the double
6  counting of two claims on one matter.
7       Q.   And again, how much do the debtors
8  anticipate having on hand to pay the Class 6
9  claimants?
10      A.   Again, the same figures as shown
11 on -- in Exhibit 3, $66,000 to $1,066,000 plus
12 whatever is in the unknown category shown in the
13 table.
14      Q.   Stay on page 23 for a second.  I just
15 got to go back there.
16      MR. HUNTER:  By the way, can we agree
17 that when you refer to page 23, it's not
18 the 23rd page of the exhibit, but it is the
19 page that is numbered 23 at the bottom; is
20 that correct?
21      MR. CRICHLOW:  That is correct.
22 BY MR. CRICHLOW:
23      Q.   And I'm sorry.  It actually wasn't
24 page 23.
25           I would like to turn your attention

Page 50

Tywoniuk

1
2    to page 27 of the Tywoniuk-2.
3        A.    Okay.
4        Q.    We were actually just there a second
5    ago. I wasn't ready to leave it yet. We were
6    talking about Class 6 general unsecured claims
7    against PEAO.
8            And am I correct that on page 27 of
9    the plan we have a description of the
10    classification of the claims as well as the
11    treatment of the claims in that class; is that
12    correct?
13        A.    Yes.
14        Q.    And I'd like to draw your attention
15    here to the treatment provision which is 6 sub B
16    and it says, "Treatment," after which it states,
17    "On or as soon as practicable after the
18    effective date and such other date as the net
19    distributable assets of PEAO become available
20    for distribution, each holder of an allowed
21    general unsecured claim against PEAO shall
22    receive in full satisfaction, settlement,
23    release and extinguishment of such general
24    unsecured claim, a pro rata share..." and then
25    in parens "...calculated as a percentage of

Page 51

Tywoniuk

1
2    allowed, general unsecured claims against PEAO
3    of the net --
4            MR. HUNTER: I'm sorry. Close the
5    paren --
6            MR. CRICHLOW: Close paren.
7            MR. HUNTER: -- since you opened the
8    paren.
9            MR. CRICHLOW: Yeah.
10   BY MR. CRICHLOW:
11       Q.    "...of the net distributable assets
12   of PEAO, if any."
13           And you see those words that I've
14   just read?
15       A.    Yes, I do.
16       Q.    I'd like to draw your attention to
17   where it says "...in full satisfaction,
18   settlement, release and extinguishment of such
19   general unsecured claims."
20           Do you have an understanding of what
21   that language means for PEAO?
22       A.    From a layman's perspective, yes.
23       Q.    Okay. And tell me what you
24   understand that means and what you're attempting
25   to convey with that language in the "Treatment"

Page 52

Tywoniuk

1
2    section of the Class 6 general unsecured claims?
3        A.    Once we pay out the remaining cash,
4    there's no further claim against the entity.
5        Q.    So those claims will be discharged?
6        A.    They would be settled and released
7    and extinguished.
8        Q.    Fair enough.
9            To your understanding, would the
10   declarations still be liable for paying those
11   claims?
12       A.    The unpaid portion, the debtor would
13   not be responsible after paying out whatever
14   cash it has.
15       Q.    And where -- after it says "...in
16   full satisfaction, settlement, release,
17   extinguishment of such general unsecured
18   claim..." it followed by saying "...a pro rata
19   share..." I'm omitting the parenthetical now
20   "...of the net distributable assets of PEAO, if
21   any."
22           And to your understanding does that
23   mean that it is possible that there may not be a
24   pro rata share distributed?
25       A.    Yes.

Page 53

Tywoniuk

1
2        Q.    And is it your understanding if there
3    is no payment made to the general unsecured
4    claims, that upon exit from bankruptcy that PEAO
5    will no longer be liable for paying the unpaid
6    portion of those claims?
7        A.    Correct.
8        Q.    Mr. Tywoniuk, how have the debtors
9    classified Union's claims for purposes of voting
10   on the plan?
11       A.    Class 6.
12       Q.    And what was the basis for that
13   classification?
14       A.    That we would prevail with respect to
15   the administrative claims that Union has
16   asserted.
17       Q.    Okay.
18           MR. CRICHLOW: We've been going just
19   about an hour. Do you want to just take a
20   break?
21           I'm going to move to a different area
22   and I think we're about halfway through
23   so...
24           MR. HUNTER: Okay.
25           (Recess is taken.)

Page 54

1              Tywoniuk
2       (Deposition Exhibit Tywoniuk 4, Draft
3    copy of Chapter 11 Plan of Liquidation for
4    Pacific Energy Resources Limited, et al.,
5    marked for identification, as of this
6    date.)
7  BY MR. CRICHLOW:
8     Q.   Mr. Tywoniuk, I'm handing you what
9  has been marked as Tywoniuk Exhibit 4.  It has
10 on its title a core caption "Pacific Energy
11 Resources Limited" and has a heading "Chapter 11
12 Plan of Liquidation for Pacific Energy Resources
13 Limited, et al."
14       Have you seen this document before?
15    A.   How does this differ from Exhibit 2?
16    Q.   I would have to ask you after --
17    A.   This is one of the drafts?
18    Q.   That's what I was going to ask you.
19       Is this one of the drafts --
20    A.   Apparently.
21    Q.   -- of what was -- let me just
22 complete the question so we get it clear -- of
23 what was been marked as Tywoniuk Exhibit 2?
24    A.   If you're telling me it's a draft,
25 since it came from you, then I would accept that

Page 55

1              Tywoniuk
2  as a draft.
3       MR. HUNTER:  Just so the record is
4    clear, I believe we sent you a number of
5    drafts and there's no way, I don't believe,
6    that this witness is going to be able to
7    just without seeing to what it was
8    attached, to give him the email to date
9    this or put it in chronological, and I
10   assume you don't really expect him to look
11   at this closely enough to make a shot at
12   that.
13       MR. CRICHLOW:  We won't need to do
14   that.
15 BY MR. CRICHLOW:
16    Q.   What I can do is make a
17 representation that of the documents that we got
18 from your lawyers and based on the fact that
19 this is certainly not the Chapter 11 Plan of
20 Liquidation that was filed because what was
21 filed is titled the First Amended Chapter 11
22 Plan of Liquidation for Pacific Energy
23 Resources, or at least that's the file plan
24 that's before the court, I think we can
25 represent to you that this is an earlier version

Page 56

1              Tywoniuk
2  of the current plan that is before the court.
3       There may be another document I hand
4  you shortly where it was attached to an email
5  and we can better determine that it is in fact a
6  draft.
7       I want to draw your attention --
8  well, let's start at the beginning.
9       You testified earlier that you were
10 heavily involved in the plan of liquidation
11 negotiation process and in fact you saw drafts
12 from time to time; is that correct?
13    A.   Yes.
14    Q.   And you commented on drafts from time
15 to time; is that correct?
16    A.   Yes.
17    Q.   Your lawyers commented on drafts from
18 time to time; is that fair?
19    A.   Yes.
20    Q.   And other lawyers interested -- that
21 represented interested parties in this case made
22 comments from time to time on various drafts of
23 the plan; is that fair?
24    A.   Yes, it is.
25    Q.   If you could turn to Tywoniuk

Page 57

1              Tywoniuk
2  Exhibit 4, which appears to be a draft, an
3  earlier draft of the First Amended Chapter 11
4  Plan of Liquidation.
5       On what states it to be page 21, we
6  have a description of the Class 3 senior lender
7  claims.
8     A.   I see that.
9     Q.   Okay.  And again I want to draw --
10 well, strike that.
11       The Class 3 senior lender claims
12 before that heading on page -- after that
13 heading on page 21, as with other classes that
14 we've discussed earlier, there is a description
15 at this point, you know, a proposed description
16 of the classification of the class and then a
17 proposed description of the treatment of the
18 class; is that correct?
19    A.   Yes.
20    Q.   And I want to focus your attention on
21 treatment of the Class 3 senior lender claims as
22 the language appeared in this draft.
23       After "Treatment," in this draft it
24 says, "From and after the effective date, each
25 holder of an allowed senior lender claim against

Page 58

1          Tywoniuk
2  any of the debtors shall receive in full
3  satisfaction, settlement, release,
4  extinguishment and discharge of such senior
5  lender claim, any and all rights, claims and
6  liens to which such holder of an allowed senior
7  lender claim is entitled pursuant to the terms
8  and provisions of the beta sale order or any
9  other order of the Bankruptcy Court in the
10 Chapter 11 cases."
11         Do you see that?
12     A.   Yes.
13     Q.   Do you recall whether this treatment
14 language changed in the plan that was ultimately
15 submitted to the court?
16     A.   I think by virtue of the fact you're
17 asking about it that it did, and I think I know
18 which word was deleted.
19     Q.   And please, I don't want you to
20 assume anything and I'm sure your lawyer will
21 tell you not to assume to anything.
22         If you need to refer to -- I can give
23 you some help because we can move to the file
24 plan. It's not my intention to have you
25 guessing. I believe it's on page 24. Is it?

Page 59

1          Tywoniuk
2  Yes, page 24.
3          And the plan that's currently before
4  the court, Tywoniuk Exhibit 2, is what I'm
5  referring to. On page 24 you will see the
6  current description of Class 3 senior lender
7  claims.
8          Do you see that?
9      A.   I do.
10     Q.   And am I correct this is the
11 classification and the treatment that has been
12 proposed to the court for confirmation?
13     A.   Correct.
14     Q.   And if we look under "Treatment," it
15 is fair to say that if nothing else, the
16 description has, has expanded significantly. It
17 is now, you know, the better part of a page and
18 a carryover on page 24 to 25, whereas in an
19 initial draft it was six lines long; is that
20 correct?
21     A.   Yes.
22     Q.   Also I'd like to draw your attention
23 to the Tywoniuk-2 to the plan that's currently
24 pending before the court for confirmation, and
25 about four lines up from the bottom there is

Page 60

1          Tywoniuk
2  language that says, "Notwithstanding anything
3  otherwise set forth in this paragraph, the
4  holders of allowed senior lender claims shall be
5  entitled to the value of any proceeds of the
6  excluded interest pursuant to the terms and
7  conditions of the beta sale order."
8          Do you see that language?
9      A.   I do.
10     Q.   Okay. And is it fair to say that
11 there was no reference of excluded interests in
12 the earlier draft that I showed you, which is
13 Tywoniuk-4?
14     A.   Not in this particular section.
15     Q.   It's fair to say there was no mention
16 of excluded interests in the "Treatment" section
17 of the Class 3 senior lender claims in the draft
18 that is Tywoniuk-4; is that correct?
19     A.   Yes, it is.
20     Q.   Do you know why this language was
21 changed to include that excluded interests?
22         MR. HUNTER: To the extent that
23     revealing that would require you to reveal
24     the content of any privileged
25     attorney-client privilege, you should not

Page 61

1          Tywoniuk
2  reveal that. So if you can answer that
3  question without revealing any privileged
4  communication, you can answer.
5      A.   As you know, the beta sales order
6  spoke to the excluded interests and that was
7  with those monies being determined to be the
8  senior lenders, it was added to this document
9  just for full clarity. It was not necessary
10 because it already exists in a court order, so
11 it's just a clarification, just a reminder of
12 what already exists.
13     Q.   And am I correct in stating that the
14 language that I just read beginning with
15 "Notwithstanding" and ending with the words "the
16 beta sale order," that that was language that
17 PEAO's lenders asked to be included?
18         MR. HUNTER: You've read a couple of
19     things. I'm not sure which --
20         MR. CRICHLOW: Okay.
21         MR. HUNTER: You may have read
22     "Notwithstanding" with respect to both
23     versions, so I'm just not sure if the
24     record is completely clear.
25         MR. CRICHLOW: And it will not

Page 62

Tywoniuk

1
2    benefit me if it's not clear, so let's go
3    back and make it clear.
4    BY MR. CRICHLOW:
5        Q.    I'm referring to Tywoniuk-2 now and
6    on page 24, and this is the plan that is
7    currently before the court for confirmation.
8    And I read to you some language that I believe
9    that is clear in the record that we acknowledge
10   was not present in the earlier draft of
11   Tywoniuk-4, that stated, "Notwithstanding
12   anything otherwise set forth in this paragraph,
13   the holders of allowed senior lender claims
14   shall be entitled to the value of any proceeds
15   of the excluded interests pursuant to the terms
16   and conditions of the beta sale order."
17       With respect to that language that
18   was added, am I correct in stating that it was
19   PEAO's DIP lenders that required that that
20   language be added?
21       A.    PEAO did not have a DIP loan.
22       Q.    I apologize. Let me rephrase that.
23       Was it the debtors' lenders that
24   required that that language be added?
25       A.    It was the debtors' lenders that

Page 63

Tywoniuk

1
2    asked to be added because it didn't change any
3    plans or, as I said, it was part of the court
4    order. It didn't change any substance. We did
5    agree to add it.
6        Q.    Now excluded interests in the plan is
7    a defined term also; is that correct?
8        A.    Yes.
9        Q.    Okay. I'd like for you to turn for
10   me to the definition of excluded interests.
11           MR. HUNTER: Page 10?
12           MR. CRICHLOW: Um-hmm.
13       A.    I see it.
14       Q.    And have you taken a second to read
15   what the definition of excluded interests means
16   under the plan?
17       A.    Yes, I have.
18       Q.    And are you familiar with this --
19       A.    Yes, I am.
20       Q.    -- generally?
21       Do any of the excluded interests in
22   your view relate to PEAO's interest in Trading
23   Bay?
24       A.    Your question is probably too general
25   for me to answer.

Page 64

Tywoniuk

1
2        Q.    And can you explain why the question
3    is too general for you to answer?
4        A.    Well, it, for example, says in
5    romanette two, "Proceeds from sale of crude
6    oil...from Trading Bay that are the subject of
7    the adversary proceeding."
8        So it says what it says with respect
9    to Trading Bay.
10       Q.    Okay.
11       A.    It does not include what PEAO owned,
12   the working interest that it owned prior to
13   abandonment.
14       Q.    Now the definition of excluded
15   interests begins with a statement that says, "It
16   means all of the right, title and interest of
17   Rise Energy, Silverpoint and any of their
18   predecessors or affiliates or any of the
19   debtors' estates..." and then it starts to give
20   a laundry list, which includes, as you pointed
21   out, "Any proceeds from the sale of crude oil or
22   other petroleum products produced from the oil
23   fields commonly known as Trading Bay Unit."
24       And it is fair to say that --
25           MR. HUNTER: I think just for

Page 65

Tywoniuk

1
2    clarity, "...known as Trading Bay Unit and
3    Trading Bay Field."
4    BY MR. CRICHLOW:
5        Q.    "...Trading Bay Unit and Trading Bay
6    Field."
7        And you noted in your testimony a
8    minute ago that that is the subject of
9    litigation among Union and others with respect
10   to Union's asserted lien rights and such
11   proceeds.
12       Is that fair to say?
13       A.    Yes, it is.
14       Q.    Okay. Is there any reason why Union
15   was not included in the excluded interests
16   opening statement when it says, "All of the
17   right, title and interests of Rise Energy,
18   Silverpoint"? Is there any reason specifically
19   that the debtors chose not to include Union?
20           MR. HUNTER: Again, to the extent
21       that answering his question requires you to
22       reveal any confidential attorney-client
23       communication, you should not reveal that
24       but you may answer it excluding only that
25       information.

17

Page 66

Tywoniuk

2  THE WITNESS: Okay.
3  A.  It's pretty simple.  The excluded
4  interests actually was originally defined in the
5  beta sales order and the concept, putting aside
6  kind of the mechanical structure, but the
7  concept was that the secured lenders by virtue
8  of the agreement with the debtor were entitled
9  to certain remaining outstanding monies from
10 PEAO's Alaska business, and those collections
11 were going to be made after the rest of their
12 interest was extinguished.
13      In other words, they did their credit
14 bid for beta, they're entitled to these various
15 proceeds, the balance of their debt is cancelled
16 so that whole concept does not involve Union.
17      Q.  Am I correct in stating, though, that
18 those rights with respect to the proceeds from
19 the sale of crude oil relating to Trading Bay
20 Unit and Trading Bay Field that you just
21 described are subject to a first lien assertion
22 by Union Oil Company?
23      A.  Yes.
24      Q.  And to your knowledge, does Union
25 have a lien in PEAO's Trading Bay interests?

Page 67

Tywoniuk

2      MR. HUNTER: Objection.  Calls for a
3  legal conclusion.
4  BY MR. CRICHLOW:
5      Q.  I asked for your understanding.
6      MR. HUNTER: Actually you said "to
7  your knowledge."
8      MR. CRICHLOW: Okay.
9      MR. HUNTER: But if you meant the
10 same thing, that's fine, then you can
11 answer it.
12      A.  Can you repeat the question?  I lost
13 my train of thought there.
14      Q.  I'd be happy to.  You have a
15 difficult job.
16      To your understanding, does Union
17 have a lien in PEAO's Trading Bay interest?
18      A.  A lien in Trading Bay's interest.
19 Well, there's this adversary proceeding with
20 respect to these proceeds, so there's obviously
21 some disagreement on the operation of and the
22 priority of Union's lien assertion.
23      Q.  No, that is correct and that deals
24 with the priority, and I'm not trying to be
25 tricky here.

Page 68

Tywoniuk

2  I just want to know if you have an
3  understanding of whether they have a lien, not
4  whether that lien is prior to anyone else's;
5  whether they have a lien in PEAO's Trading Bay
6  interest.
7      A.  My understanding is they have a lien.
8  There is a dispute as to the priority.
9      Q.  Okay.  One of the excluded interests
10 is certain Alaska tax credits to which PEAO
11 asserts it is entitled; is that correct?
12      A.  The answer is yes under romanette 4.
13      Q.  Can you please describe for me the
14 basis for PEAO's assertion of the tax credits?
15 Of its entitlement to the tax credits from the
16 State of Alaska.
17      A.  There is a Law in Alaska that
18 provides for the generation of production tax
19 credits based on, in our case, qualifying
20 capital expenditures and also based on net
21 operating losses as defined.
22      Q.  And to your understanding, what
23 generally is a qualified capital expenditure?
24      A.  In our case it's pretty simple.  It's
25 anything that we would have capitalized for

Page 69

Tywoniuk

2  facility upgrades, for example, drilling, not
3  that there was any during this time period, but
4  kind of the accounting convention for capital
5  expenditures was I think actually the State of
6  Alaska uses the IRS definition, but it's very
7  similar to the accounting definition.
8      Q.  Do you know whether the tax credits
9  to which PEAO believes it's entitled based on,
10 you know, in addition to qualified capital
11 expenditures carry forward annual losses?
12      A.  Yes.  They're based on annual net
13 operating losses as defined.  It's not really a
14 carryover concept, but yes.
15      Q.  And how does a company qualify for
16 those net operating losses?
17      A.  The company makes an application to
18 the Alaska Department of Revenue.
19      Q.  And the tax credits for which you
20 believe the debtors are entitled, what periods,
21 what period or periods of time do those tax
22 credits cover?
23      A.  The application the company made
24 began with the date the company acquired the
25 assets in Alaska, so that was the end of

18

Page 70

1          Tywoniuk
2   August 2007 through the date of abandonment in
3   2009.
4       Q.   And you've actually claimed a tax
5   credit with the State of Alaska for 2009.  Let
6   me not say you, but the debtors have actually
7   claimed a tax credit for 2009; is that correct?
8       A.   The answer is yes, and those have
9   also been dealt with in the settlement with the
10  State of Alaska over their claim.
11          MR. CRICHLOW:  Can we have that
12      marked as Tywoniuk-5.
13          (Deposition Exhibit Tywoniuk 5,
14      Stipulation Resolving Claims of the State
15      of Alaska Against the Debtors, marked for
16      identification, as of this date.)
17  BY MR. CRICHLOW:
18      Q.   Now Mr. Tywoniuk, when you said that
19  those have -- that the tax credits have also
20  been dealt with in the settlement with the State
21  of Alaska over their claim, I've handed you a
22  document that's been marked by the court
23  reporter as Tywoniuk-5.  It's entitled
24  "Stipulation Resolving Claims of the State of
25  Alaska Against the Debtors."  It has a court

Page 71

1          Tywoniuk
2   caption on it that says, "In Re:  Pacific Energy
3   Resources Limited" and the document, first part
4   of the document, the stipulation itself, it
5   appears to be 11 pages.
6          Is this the settlement to which you
7   just referred?
8       A.   Yes.
9       Q.   And if we turn to page 4 where some
10  of the whereas clauses continue on, at the very
11  bottom there is a whereas clause that says, "The
12  debtors assert that PEAO has credits due from
13  Alaska in the amount of $2,869,468.16 for
14  overpayment of royalty due to a change in
15  royalty rate relating to the Trading Bay
16  interest..." deleting parens "...and in the
17  amount of $5,666,807 related to production tax
18  credits."
19          And the text continues, but for my
20  purposes my question is, is the $5,666,807 the
21  claim for the tax credits related to Trading
22  Bay?
23      A.   Yes, it is, with one important fact
24  is it's been reduced by the amount of unpaid
25  JIBs to Union.

Page 72

1          Tywoniuk
2       Q.   And how much was that amount?
3       A.   I don't recall offhand.
4       Q.   Do you recall whether the actual tax
5   credit claim for 2009 was $5,680,016?
6       A.   This figure here is the sum of 2007
7   from the end of August through early September,
8   2009.  I don't recall the specific amount of the
9   2009 period in isolation.
10      Q.   Do you know how the figures were
11  calculated?
12      A.   Yes.
13      Q.   And please tell me how the figures
14  were calculated.
15      A.   They were calculated in two pieces.
16          One was the qualifying capital
17  expenditures for that time period times the
18  applicable tax credit rate.
19          And secondly, the amount of operating
20  losses for the Union-operated properties,
21  Pacific's share, as well as the properties we
22  operated ourself, and for both those categories
23  of tax credits, the amounts were reduced by
24  unpaid JIBs.
25      Q.   And am I correct that in making the

Page 73

1          Tywoniuk
2   representations to the State of Alaska with
3   respect to the tax credits to which the debtors
4   felt they were entitled, that the debtors had to
5   make an assumption about whether or not Union
6   would succeed on its claims against the unpaid
7   JIBs?
8       A.   Can you repeat the question?
9       Q.   Sure.  I'll see if I can make it
10  better.
11          I asked with respect to making the
12  claims to the State of Alaska with respect to
13  the tax credits to which the debtors believe
14  they are entitled, that the debtors had to make
15  an assumption in reaching that number about
16  whether or not Union would succeed on its claims
17  against the unpaid JIBs.
18      A.   We assumed that Union would not be
19  paid for the unpaid JIBs and therefore we would
20  not be entitled to tax credit on that portion.
21          And I will just to be absolutely
22  clear, when we filed the tax credit forms, we
23  initially, we did not make the adjustment for
24  unpaid JIBs, but based on a subsequent inquiry
25  from the state's Department of Natural -- of

Page 74

1    Tywoniuk
2    Revenue, we said yes, that logically makes
3    sense, here's the amended number.  We did not
4    refile the signed return, so to speak, we just
5    were waiting for all the balance of their other
6    queries to be answered.
7        Q.   And when you made your application to
8    the State of New York, did you prepare -- I'm
9    sorry, the State of Alaska, did you prepare any,
10   you know, financial spreadsheets to demonstrate
11   your calculus of the amounts requested?
12       A.   Yes.  I or my staff did, yes.
13       Q.   Okay.
14           (Deposition Exhibit Tywoniuk 6,
15       "Alaska Oil and Gas Production Tax,
16       Qualified Capital Expenditures Credit",
17       marked for identification, as of this
18       date.)
19   BY MR. CRICHLOW:
20       Q.   Mr. Tywoniuk, I've handed you a
21   spreadsheet that has been marked as Tywoniuk
22   Exhibit 6.  It's a one-page document.  It says
23   in the top left-hand corner, "Alaska Oil and Gas
24   Production Tax Credits."
25           Have you seen this document before?

Page 75

1    Tywoniuk
2        A.   Yes, I have.
3        Q.   What is it?
4        A.   It's our calculation to adjust for
5    the unpaid JIBs.
6        Q.   And was this calculation submitted in
7    conjunction with your application for tax
8    credits to the State of Alaska?
9        A.   Subsequent to the initial
10   application, but as part of the process, yes.
11       Q.   And can you walk me through what this
12   particular spreadsheet is designed to convey to
13   the state?
14       A.   It's designed to account for the
15   unpaid JIBs that reduced the amount of our
16   original application to amounts that we actually
17   paid or paid with respect to the Trading Bay
18   properties.
19       Q.   And to the far left toward the bottom
20   of the list of items under the heading that says
21   "Qualified Capital Expenditures Credit" there is
22   a subject line that says, "Revised Credit."
23           Do you see that?
24       A.   Yes.
25       Q.   And then to the right there is, in

Page 76

1    Tywoniuk
2    2009 you have an "Operated" cell "Non-Operated"
3    and then "Total."
4        A.   Yes.
5        Q.   In the middle of that "Revised
6    Credit" cell under "Non-Operated," there's a
7    figure that says $690,107.
8            What is that figure?
9        A.   That is the figure that is determined
10   based on the fact that only a portion of the
11   JIBs were paid in 2009.
12       Q.   Okay.  And then there is a footnote
13   above it that says, "1."
14           And my question is, because I just
15   simply don't know the answer to this, is that
16   footnote relating to that figure or is the
17   footnote relating to the 60.08 percent that is
18   above it?
19       A.   Oh, actually the 60.8 percent is used
20   to determine the revised credit amounts and the
21   footnote could be clear it's referring to the
22   $12 million of segregated proceeds from oil
23   sales in the post-petition period.
24           So if Union wins, which is the
25   assumption on this page for this calculation,

Page 77

1    Tywoniuk
2    and we just gave the range, and takes those
3    proceeds as if we paid $12 million worth of JIBs
4    and that would be the high figure.
5            If Union loses it all, then there are
6    obviously still unpaid JIBs and the percentage
7    goes down.
8        Q.   Right.
9        A.   So we just gave the range.
10       Q.   All right.  And which range did you
11   give to the State of Alaska in requesting the
12   credit?  Was it the range where it assumes Union
13   wins the adversary action or was it the range
14   that if Union loses all, the 16.68 percent?
15       A.   We gave the range of 60 percent down
16   to 16 percent.
17       Q.   Okay.  So the range from 60 all the
18   way down is what you provided to the --
19       A.   Correct.
20       Q.   And with respect to that $5,666,807
21   in the Alaska settlement, that is a solid
22   number, does that represent a range or is that
23   picking one of the two ranges?
24       A.   That's picking the 60 percent.
25       Q.   And that would be the assumption that

Page 78

1                    Tywoniuk
2   Union wins the adversary action in Bankruptcy
3   Court, correct?
4       A.   Correct.
5       Q.   So with respect to the tax
6   application that you made to Alaska, at least
7   for the moment you are making the assumption
8   that Union would win the adversary proceeding.
9       A.   Yes. Knowing at the time this was
10  prepared, which it's got the May 21st, 2010 date
11  on it, at that point we were expecting that the
12  judge would rule before the state finished their
13  work so we would have that answer and adjust
14  accordingly between ourselves and the state.
15      Q.   And I just want to make one point of
16  clarification.
17           The amount in the settlement, the
18  $5,666,807, does that definitely cover 2007
19  through 2009 or is that the figure just for
20  2009?
21      A.   It should be the cumulative figure.
22      Q.   Do you know for certain?
23      A.   Not without looking at my file.
24      Q.   Okay.
25      A.   The concept was it included all

Page 79

1                    Tywoniuk
2   periods.
3       Q.   With respect to the Alaska
4   settlement, I think you testified earlier that
5   that was negotiated primarily between your
6   counsel and counsel for the State of Alaska.
7            Did you have any involvement in the
8   negotiations of that settlement?
9       A.   Yes. I mean our team consisted of my
10  counsel and myself on that, on our side of the
11  table, yes.
12      Q.   Do you know who prepared this
13  document that is Tywoniuk-5?
14      A.   The law firm of Pachulski Stang, and
15  it was Max Litvak and perhaps one of his
16  associates.
17      Q.   And who from the State of Alaska was
18  involved in the negotiation of this settlement?
19      A.   We worked through their counsel at
20  the Morrison & Foerster firm, Lorenzo Marinuzzi,
21  and whoever he had involved.
22      Q.   Very well. I want to return back to
23  the excluded interests. Did I say that right?
24  Yes, the excluded interests as defined in the
25  plan that's currently before the court for

Page 80

1                    Tywoniuk
2   confirmation.
3       A.   Okay.
4       Q.   And we are on page 10 of Tywoniuk-2.
5       A.   I see it.
6       Q.   Now am I correct that certain Trading
7   Bay related insurance premium refunds and
8   business interruption insurance proceeds are
9   also classified as excluded interests?
10      A.   Yes.
11      Q.   What is the total amount of returned
12  Trading Bay related insurance premiums?
13      A.   Total return to date?
14      Q.   Yes.
15      A.   None.
16           Having said that, we have in round
17  numbers 4 or $500,000 of refunds of insurance
18  premiums. When the properties were abandoned,
19  the policies were terminated at that point.
20           There is ongoing dialogue with the
21  insurance carriers with respect to the business
22  interruption insurance, so nothing has been paid
23  on that front and all of this is subject to the
24  motion before the court on October the 12th as
25  well.

Page 81

1                    Tywoniuk
2       Q.   And for the record, what motion is
3   that so that we're clear on the motion before
4   the court?
5       A.   It's the motion to authorize PEAO to
6   begin to make payments under this excluded
7   interests provision, whether it be insurance
8   premium refunds or these other categories that
9   are listed on page 10 of Tywoniuk Exhibit 2.
10      Q.   And to whom would those payments be
11  made if you are successful in getting that
12  motion granted?
13      A.   They would be made to Rise and
14  Silverpoint.
15      Q.   Is it your intention to make any of
16  those payments to Union Oil Company?
17      A.   No.
18      Q.   And why do you not believe that you
19  have any obligation to make such payments out of
20  the insurance, the insurance refunds and the
21  other assets that you described to Union?
22           MR. HUNTER: Again, to the extent
23      that answering that would require you to
24      disclose any privileged attorney-client
25      communications, you should not do that.

Page 82

1      Tywoniuk
2          Respond to the question insofar as
3      you can do so without disclosing any such
4      communications.
5          A.   The answer is simple.  Union has no
6      right to any of those monies, nor has Union
7      argued that they have any right to those monies.
8          Q.   What is the basis for the debtors'
9      request for business interruption insurance
10     coverage?
11         A.   The claim, insurance claim?
12         Q.   Yes.
13         A.   The fact that the Mount Redoubt
14     Volcano disrupted the production beginning early
15     April 2009.
16         Q.   And is that related to PEAO's working
17     interest in Trading Bay?
18         A.   As well as the properties that we
19     operated, yes.
20         Q.   And you mentioned that you are still
21     having dialogue with the insurers about those
22     claims.
23             What is the current status of the
24     debtors' request for coverage?
25         A.   The parties, meaning --

Page 83

1      Tywoniuk
2          MR. HUNTER:  By the way, does this
3      need to be confidential specifically?
4              I know we have a specific general
5      confidentiality regarding the documents.  I
6      just don't know whether this is
7      particularly sensitive so...  If it is
8      particularly sensitive --
9              THE WITNESS:  This question is fine.
10             MR. HUNTER:  Okay.  That's fine.
11         A.   The debtor and the insurance carriers
12     or their representatives have had a series of
13     correspondence.  You know, number one, turning
14     in the claim, and then number two, arguing about
15     how the claim fits or does not fit within the
16     policy.
17         Q.   Has the insurer issued any
18     preliminary assessment of whether it will cover
19     the claim?
20         A.   They've issued a denial letter.
21         Q.   What was the basis for denial of
22     coverage?
23         A.   Their reading of the policy.
24         Q.   Are you able to describe it any more
25     specifically sitting here today?

Page 84

1      Tywoniuk
2          A.   I mean it's really a legal reading of
3      the contract and arguing about what the policy
4      says.  We believe we have coverage.  They have
5      denied to date.
6          Q.   And discussions are --
7          A.   You know, it's just -- we've sent a
8      letter with more argument as recently as this
9      month, September of 2010.
10         Q.   So you're not abandoning your claim.
11         A.   No.
12         Q.   What is the value of the debtors'
13     claim?
14             MR. HUNTER:  Objection.  Vague.
15             Do you mean the amount.
16     BY MR. CRICHLOW:
17         Q.   What amount have you claimed?
18         A.   The amount is $32 million.
19         Q.   Based on your discussions, do you
20     have a view of the chances that the debtors will
21     receive some coverage from the insurers?
22             MR. HUNTER:  If you have your own
23     view separate and apart from any
24     confidential communications you've had with
25     counsel, you can communicate that.

Page 85

1      Tywoniuk
2              But if your only assessment would be
3      to reveal the confidential communication or
4      if it would be confidential and we need to
5      do that even if it's not privileged, please
6      indicate.
7          A.   The answer is we believe we have
8      coverage.
9          Q.   And --
10         A.   And we have taken the effort to
11     review as recently as this current month.
12         Q.   And it's fair to say that you're
13     taking those efforts because you believe that at
14     some point you will receive coverage.
15         A.   Yes.
16         Q.   Thank you.
17             Last item.  Earlier in this
18     bankruptcy proceeding, as we have talked about
19     earlier, the debtors abandoned the PEAO assets,
20     Trading Bay Field and Trading Bay Unit; is that
21     correct?
22         A.   Can you repeat the question?
23         Q.   Sure.
24         A.   My London time is catching up with
25     me.

Page 86

1          Tywoniuk
2    Q.   Not to worry.
3         Earlier in this bankruptcy
4    proceeding, as we have talked about earlier, the
5    debtors abandoned the PEAO assets, paren, the
6    Trading Bay Field and the Trading Bay Unit; is
7    that correct?
8    A.   Yes.
9    Q.   And prior to that abandonment, the
10   debtors actually tried to sell those assets; is
11   that correct?
12   A.   Yes.
13   Q.   And there were bids on those assets;
14   am I correct?
15   A.   There was a bid.
16   Q.   Were there any bidder deposits on any
17   of the Trading Bay properties?
18   A.   No, there was not.
19   Q.   Okay.
20        MR. CRICHLOW:  Just give me one
21   second and I think we may be done.
22        We can take a little break.
23        (Recess is taken.)
24        MR. CRICHLOW:  Mr. Tywoniuk, I am
25   done.  I have no further questions.

Page 87

1          Tywoniuk
2        MR. HUNTER:  Unless anyone else has
3    any other questions, I would propose a
4    stipulation that the original can be
5    released so that I can make it available
6    for the witness to review.
7        And, Dave, I don't know if you're
8    going to have this expedited or not.
9        MR. CRICHLOW:  We are going to have
10   it expedited and we can get the original
11   released to you if you give the court
12   reporter a card.
13       MR. HUNTER:  I've already given her
14   my card.
15       (Continued on next page to include
16   jurat.)
17
18
19
20
21
22
23
24
25

Page 88

1
2        MR. CRICHLOW:  Okay.
3        (Time noted:  3:31 p.m.)
4
5    _____
6         GERRY A. TYWONIUK
7
8
9    Subscribed and sworn to before me
10   this    day of        2006
11
12   _____
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 89

1
2         C E R T I F I C A T E
3
4    STATE OF NEW YORK      )
5                   ) ss.:
6    COUNTY OF WESTCHESTER  )
7
8        I, ANNETTE ARLEQUIN, a Notary Public
9    within and for the State of New York, do
10   hereby certify:
11       That GERRY A. TYWONIUK, the witness
12   whose deposition is hereinbefore set forth,
13   was duly sworn by me and that such
14   deposition is a true record of the
15   testimony given by such witness.
16       I further certify that I am not
17   related to any of the parties to this
18   action by blood or marriage; and that I am
19   in no way interested in the outcome of this
20   matter.
21       IN WITNESS WHEREOF, I have hereunto
22   set my hand this 27th day of September, 2010.
23
24   ------------------------------
25       ANNETTE ARLEQUIN, CCR, RPR

23

Page 90

1
2        I N D E X
3    Witness            Page
4    GERRY A. TYWONIUK
5    MR. CRICHLOW            6
6
7    I N D E X   O F   E X H I B I T S
8    Description          Page
9
     Deposition Exhibit Tywoniuk 1, Amended      9
10   Notice of Deposition
11
     Deposition Exhibit Tywoniuk 2, First    31
12   Amended Chapter 11 Plan of Liquidation
     for Pacific Energy Recourses Limited
13
14   Deposition Exhibit Tywoniuk 3,      31
     Disclosure Statement in Respect of
15   First Amended Chapter 11 Plan of
     Liquidation for Pacific Energy
16   Resources Limited
17
     Deposition Exhibit Tywoniuk 4, Draft    54
18   copy of Chapter 11 Plan of Liquidation
     for Pacific Energy Resources Limited,
19   et al.
20
     Deposition Exhibit Tywoniuk 5,      70
21   Stipulation Resolving Claims of the
     State of Alaska Against the Debtors
22
23   Deposition Exhibit Tywoniuk 6, "Alaska    74
     Oil and Gas Production Tax, Qualified
24   Capital Expenditures Credit"
25

Page 91

1
2        ERRATA SHEET FOR THE TRANSCRIPT OF:
3    CASE NAME:  IN RE:  PACIFIC ENERGY
4    DATE:        SEPTEMBER 24, 2010
5    DEPONENT:  GERRY A. TYWONIUK
6    Pg.  Ln.  Now Reads  Should Read  Reason
7    __  __  _____  _____  _____
8    __  __  _____  _____  _____
9    __  __  _____  _____  _____
10   __  __  _____  _____  _____
11   __  __  _____  _____  _____
12   __  __  _____  _____  _____
13   __  __  _____  _____  _____
14   __  __  _____  _____  _____
15   __  __  _____  _____  _____
16   __  __  _____  _____  _____
17
18                _____
19            GERRY A. TYWONIUK
20   SUBSCRIBED AND SWORN BEFORE ME
21   THIS____DAY OF_____ 2010.
22
23   _____
24   (Notary Public)
25   MY COMMISSION EXPIRES:_____

**A**

abandoned (15)
21:12,16,19,22 22:16
23:14,17 27:8,13
28:7,9 29:19 80:18
85:19 86:5
abandoning (1)
84:10
abandonment (7)
24:19 29:22 35:12
48:9 64:13 70:2
86:9
abandonments (1)
30:4
able (4)
8:4 40:9 55:6 83:24
absolutely (1)
73:21
accept (1)
54:25
accommodated (1)
11:23
account (2)
44:21 75:14
accountant (3)
12:10 14:15 20:20
accounting (2)
69:4,7
accurate (1)
16:18
accurately (1)
45:8
acknowledge (1)
62:9
acknowledged (1)
38:10
acquired (1)
69:24
acting (2)
12:16 13:5
action (3)
77:13 78:2 89:18
actions (1)
18:14
actual (1)
72:4
add (1)
63:5
added (5)
61:8 62:18,20,24 63:2
addition (1)
69:10
address (2)
6:15,16
adjust (2)
75:4 78:13

adjustment (1)
73:23
administer (1)
5:14
Administered (1)
1:7
administrative (26)
33:20 34:4,17,20,22
35:4,11,16 36:17
37:3,9,23 38:3,9,14
38:25 39:4,11,18,20
40:10,18,19 45:13
48:6 53:15
adversary (5)
64:7 67:19 77:13 78:2
78:8
affairs (2)
19:2 20:11
affiliates (1)
64:18
affirmatively (1)
7:25
afternoon (1)
6:9
ago (2)
50:5 65:8
agree (2)
49:16 63:5
agreed (4)
5:2,7,11 48:11
agreement (4)
28:17,24,25 66:8
ahead (1)
43:15
al (4)
1:6 54:4,13 90:19
Alan (1)
6:16
Alaska (36)
2:9 4:12 8:19 25:25
28:17,20 29:12 48:4
48:10 66:10 68:10
68:16,17 69:6,18,25
70:5,10,15,21,25
71:13 73:2,12 74:9
74:15,23 75:8 77:11
77:21 78:6 79:3,6
79:17 90:21,23
Alberta (1)
12:9
alive (1)
19:9
allowance (2)
37:3,14
allowed (10)
36:18 38:10 44:20

48:16 50:20 51:2
57:25 58:6 60:4
62:13
alternative (1)
17:6
amended (10)
9:13,18 31:9,19 55:21
57:3 74:3 90:9,12
90:15
Americas (1)
4:13
amount (20)
14:2 32:22 37:19
38:13 39:21 43:3
47:8 48:14 71:13,17
71:24 72:2,8,19
75:15 78:17 80:11
84:15,17,18
amounts (8)
35:3 40:17 47:4 48:7
72:23 74:11 75:16
76:20
and/or (1)
19:11
Annette (4)
1:24 2:13 89:8,25
April (4)
13:2,7,20 82:15
area (1)
53:21
argued (2)
33:24 82:7
arguing (3)
42:23 83:14 84:3
argument (2)
48:9 84:8
arguments (1)
33:22
Arlequin (4)
1:24 2:13 89:8,25
Aron (1)
4:5
aside (3)
30:13 37:22 66:5
asked (6)
26:12 31:3 61:17 63:2
67:5 73:11
asking (5)
15:3 24:8 27:25 31:25
58:17
assert (1)
71:12
asserted (23)
33:2 34:2,3,8,17,19
34:22 35:4,10 38:9
38:25 39:3,11,12
40:10,19 42:22

apologize (1)
62:22
Apparently (1)
54:20
appeared (1)
57:22
appearing (3)
9:5,6 11:23
appears (2)
57:2 71:5
applicable (1)
72:18
application (7)
69:17,23 74:7 75:7,10
75:16 78:6
appreciate (1)
47:21
approved (3)
17:22,24,25
approving (1)
17:10
approximate (2)
30:21 32:2
approximately (1)
33:5
assume (6)
8:14 11:5 40:7 55:10
58:20,21
assumed (1)
73:18
assumes (4)
17:12 37:7 38:8 77:12
assuming (2)
11:8 18:9
assumption (5)
73:5,15 76:25 77:25
78:7
assure (1)
22:12
attached (2)
55:8 56:4
attempting (1)
51:24
attention (9)
18:22 35:18 39:16
49:25 50:14 51:16
56:7 57:20 59:22
attorney (3)
11:2,6,11
attorneys (6)
3:5,11,20 4:5,12 5:3
attorney-client (3)
60:25 65:22 81:24
August (2)
70:2 72:7
authorize (1)
81:5

48:16,17,18,25
53:16 65:10
assertion (4)
48:20 66:21 67:22
68:14
asserts (2)
35:10 68:11
assessment (2)
83:18 85:2
assets (28)
21:22 22:16,18 24:19
24:20,21,24 25:4,8
25:19 26:10,18 27:6
27:14 28:11,15
29:14 30:2 42:25
50:19 51:11 52:20
69:25 81:21 85:19
86:5,10,13
assist (1)
20:20
assisting (1)
47:21
associates (1)
79:16

**authorized (1)**
5:13
**available (7)**
18:18 20:21 38:18
43:2 47:11 50:19
87:5
**Avenue (3)**
4:6,13 6:17
**aware (10)**
10:5,9 22:4 35:9,13
37:17 39:3,7,13
43:17

**B**

**b (4)**
2:8 44:14 50:15 90:7
**Bachelor (1)**
12:8
**back (7)**
23:6 32:17,17 43:5
49:15 62:3 79:22
**background (2)**
11:21 12:3
**bad (1)**
22:7
**balance (2)**
66:15 74:5
**bankruptcy (20)**
1:2 14:4 15:16,21
16:7 19:22 20:2
21:11,13 23:2,10,16
27:10 29:9 36:5
53:4 58:9 78:2
85:18 86:3
**based (12)**
13:23 29:20 32:19
42:25 55:18 68:19
68:20 69:9,12 73:24
76:10 84:19
**basis (5)**
37:5 53:12 68:14 82:8
83:21
**Bates (1)**
32:12
**Bay (45)**
21:17,20 23:7,7 24:18
24:20,24 25:4,8,19
26:10,18 27:6,14
28:10,15 29:14,25
30:2 38:21 43:9
63:23 64:6,9,23
65:2,3,5,5 66:19,20
66:25 67:17 68:5
71:15,22 75:17 80:7
80:12 82:17 85:20
85:20 86:6,6,17

**Bay's (1)**
67:18
**Beach (2)**
6:17 14:14
**began (1)**
69:24
**beginning (4)**
10:12 56:8 61:14
82:14
**begins (2)**
44:13 64:15
**behalf (3)**
6:12 10:6 28:23
**believe (13)**
24:7 37:14 41:19 55:4
55:5 58:25 62:8
69:20 73:13 81:18
84:4 85:7,13
**believes (1)**
69:9
**benefit (1)**
62:2
**beta (8)**
46:8 58:8 60:7 61:5
61:16 62:16 66:5,14
**better (6)**
22:13 25:16 26:14
56:5 59:17 73:10
**beyond (1)**
21:20
**bid (2)**
66:14 86:15
**bidder (1)**
86:16
**bids (1)**
86:13
**Billings (1)**
8:25
**BINGHAM (1)**
4:4
**bit (2)**
18:20 33:18
**blood (1)**
89:18
**board (1)**
19:15
**bottom (6)**
10:12 43:25 49:19
59:25 71:11 75:19
**Box (1)**
3:6
**break (3)**
38:25 53:20 86:22
**brief (1)**
11:21
**Briefly (1)**

11:9
**Broadway (2)**
2:12 3:12
**business (5)**
47:23 66:10 80:8,21
82:9

**C**

**C (4)**
3:2 4:2 89:2,2
**calculated (4)**
50:25 72:11,14,15
**calculation (3)**
75:4,6 76:25
**calculus (1)**
74:11
**California (7)**
3:5,11,21,22 6:11,17
9:21
**call (1)**
8:22
**called (3)**
6:2 9:22 13:18
**calls (3)**
24:6 27:21 67:2
**Canada (1)**
12:9
**Canadian (1)**
12:10
**cancelled (1)**
66:15
**capacity (1)**
12:19
**capital (8)**
68:20,23 69:4,10
72:16 74:16 75:21
90:24
**capitalized (1)**
68:25
**caption (2)**
54:10 71:2
**card (2)**
87:12,14
**career (1)**
20:22
**carriers (2)**
80:21 83:11
**carries (1)**
44:9
**carry (1)**
69:11
**carryover (3)**
10:13 59:18 69:14
**case (10)**
10:24 14:12 15:12,15
26:3 31:3 56:21

68:19,24 91:3
**cases (2)**
19:22 58:10
**cash (7)**
17:3 35:14 38:2,17
45:2 52:3,14
**catching (1)**
85:24
**categories (5)**
10:11 43:16 47:22
72:22 81:8
**category (7)**
37:18,21 41:11 45:14
45:15,15 49:12
**CCR (2)**
1:24 89:25
**cell (3)**
36:18 76:2,6
**CEO (3)**
12:16 13:24 14:7
**certain (8)**
21:12 25:22,23 40:24
66:9 68:10 78:22
80:6
**certainly (1)**
55:19
**Certified (1)**
2:13
**certify (2)**
89:10,16
**CFO (3)**
12:16 13:24 14:7
**chain (1)**
47:10
**chances (1)**
84:20
**change (4)**
39:6 63:2,4 71:14
**changed (2)**
58:14 60:21
**Chapter (12)**
1:5 31:9,19 54:3,11
55:19,21 57:3 58:10
90:12,15,18
**Chartered (1)**
12:10
**cheated (1)**
47:17
**cheating (1)**
47:20
**chief (1)**
13:17
**chose (1)**
65:19
**chronological (1)**
55:9

**CIBER (1)**
12:21
**CIPL (2)**
33:24 37:22
**circumstance (2)**
39:22 40:2
**circumstances (1)**
21:2
**claim (47)**
33:4 37:4,9,9 38:3
39:4,11,19,20 40:9
40:11 42:3,7,7,11
42:23 44:20,21,25
45:4,13,15 46:11,19
47:5,6 48:6,9,12
50:21,24 52:4,18
57:25 58:5,7 70:10
70:21 71:21 72:5
82:11,11 83:14,15
83:19 84:10,13
**claimants (2)**
45:9 49:9
**claimed (3)**
70:4,7 84:17
**claims (86)**
17:4 18:12,18 19:7
25:7,18,20,21 26:9
26:17,24 28:14
30:21 32:2,22 33:2
33:3,12,15,18,20
34:3,6,16,20,22
35:3,4,10,11,15,16
36:13,18 37:10,23
38:9,14,24,25 39:15
40:18,19 41:16,21
42:14,15 43:14,17
43:18 44:3,9 47:14
47:15,16 48:14,25
49:4,6 50:6,10,11
51:2,19 52:2,5,11
53:4,6,9,15 57:7,11
57:21 58:5 59:7
60:4,17 62:13 70:14
70:24 73:6,12,16
82:22 90:21
**clarification (2)**
61:11 78:16
**clarity (2)**
61:9 65:2
**class (25)**
33:3,12 41:9,12 43:3
43:14,17 44:2,15
45:9,15 47:16 48:7
49:8 50:6,11 52:2
53:11 57:6,11,16,18
57:21 59:6 60:17

classes (4)
32:25 33:8 40:25
57:13
classification (5)
44:8 50:10 53:13
57:16 59:11
classified (2)
53:9 80:9
clause (1)
71:11
clauses (1)
71:10
clear (11)
15:15 24:7 54:22 55:4
61:24 62:2,3,9
73:22 76:21 81:3
clearer (1)
43:23
client (1)
9:8
Close (2)
51:4,6
closed (1)
19:22
closely (1)
55:11
closing (1)
20:10
collateral (1)
45:4
collections (1)
66:10
college (3)
12:5,6,7
colloquial (1)
8:6
column (2)
36:11,16
columns (1)
32:24
combined (1)
39:10
comes (1)
9:20
commenced (1)
19:20
commented (2)
56:14,17
comments (1)
56:22
Commerce (1)
12:8
COMMISSION (1)
91:25
committed (1)
20:23

Committee (1)
18:13
commonly (1)
64:23
communicate (1)
84:25
communication (3)
61:4 65:23 85:3
communications (4)
29:12 81:25 82:4
84:24
companies (2)
13:18 18:4
company (18)
3:5,11 6:11 9:2,8,21
10:6 13:10,14 15:22
17:9 19:3 66:22
69:15,17,23,24
81:16
company's (2)
15:13 19:13
compelled (1)
40:14
complete (3)
7:8 20:24 54:22
completed (1)
43:11
completely (1)
61:24
comprised (1)
41:12
concept (7)
23:19 39:9 66:5,7,16
69:14 78:25
conclusion (3)
24:6 27:22 67:3
concurrently (1)
12:20
conditions (2)
60:7 62:16
confidential (5)
65:22 83:3 84:24 85:3
85:4
confidentiality (1)
83:5
confirmation (7)
16:8 20:17 22:19
59:12,24 62:7 80:2
confirmed (4)
18:9,11 19:2,12
conjunction (1)
75:7
considered (1)
45:21
consisted (1)
79:9

consult (1)
20:3
consultant (1)
13:3
content (1)
60:24
continue (3)
12:16 26:23 71:10
continued (2)
13:4 87:15
continues (1)
71:19
continuing (1)
12:11
contract (1)
84:3
Cont'd (1)
4:2
convention (1)
69:4
convey (2)
51:25 75:12
copy (3)
31:4 54:3 90:18
core (1)
54:10
corner (1)
74:23
corporate (1)
23:19
corporation (1)
19:6
corporations (3)
18:19,21 27:3
correct (47)
9:8 11:8 16:14,19
24:9,10 34:4,5,18
36:6,7 40:12,15
41:18 43:11 44:12
45:11 46:11,19
49:20,21 50:8,12
53:7 56:12,15 57:18
59:10,13,20 60:18
61:13 62:18 63:7
66:17 67:23 68:11
70:7 72:25 77:19
78:3,4 80:6 85:21
86:7,11,14
correspondence (1)
83:13
cost (1)
29:7
costs (1)
30:15
counsel (13)
15:24 16:24 19:14

20:3 22:12 28:21,21
28:23 79:6,6,10,19
84:25
counting (1)
49:6
COUNTY (1)
89:6
couple (3)
8:17 22:2 61:18
course (4)
8:20 21:13 26:2 41:5
court (27)
1:2 2:14 5:16 8:4,9
9:16 15:21 16:7
33:23 42:24 55:24
56:2 58:9,15 59:4
59:12,24 61:10 62:7
63:3 70:22,25 78:3
79:25 80:24 81:4
87:11
courtesy (2)
7:7,9
cover (3)
30:14 69:22 83:18
coverage (7)
82:10,24 83:22 84:4
84:21 85:8,14
craft (1)
28:23
credit (14)
66:13 70:5,7 72:5,18
73:20,22 74:16
75:21,22 76:6,20
77:12 90:24
creditors (5)
18:13 40:25 41:9,12
43:4
credits (16)
68:10,14,15,19 69:8
69:19,22 70:19
71:12,18,21 72:23
73:3,13 74:24 75:8
Crichlow (48)
3:14 6:8,10 9:10,15
14:21 17:14 22:8,10
24:10 26:20 27:18
27:23,24 31:6,15
32:7,10 34:13 35:2
42:20 46:4 48:18
49:21,22 51:6,9,10
53:18 54:7 55:13,15
61:20,25 62:4 63:12
65:4 67:4,8 70:11
70:17 74:19 84:16
86:20,24 87:9 88:2
90:5

crude (3)
64:5,21 66:19
cumulative (1)
78:21
current (12)
13:24 14:6 15:20
16:22 24:23 29:17
30:20 31:25 56:2
59:6 82:23 85:11
currently (10)
15:5 27:6 33:2,19
38:13 42:13 59:3,23
62:7 79:25
C-I-B-E-R (1)
12:22

─────────────
            D
─────────────

D (2)
90:2,7
date (21)
9:14 13:9 16:11 19:12
20:11 31:11,21
44:19 50:18,18 54:6
55:8 57:24 69:24
70:2,16 74:18 78:10
80:13 84:5 91:4
Dave (1)
87:7
David (2)
3:14 6:10
david.crichlow@pil...
3:15
day (3)
88:10 89:22 91:21
deal (3)
28:13 29:17,21
dealing (1)
49:2
deals (1)
67:23
dealt (2)
70:9,20
debt (2)
18:15 66:15
debtor (3)
52:12 66:8 83:11
debtors (32)
1:8 3:20 15:21 18:4
44:22 45:2 47:4,7
49:7 53:8 58:2
62:23,25 64:19
65:19 69:20 70:6,15
70:25 71:12 73:3,4
73:13,14 82:8,24
84:12,20 85:19 86:5
86:10 90:21

**debtor-in-possessio...**
25:9,10,17
**December (1)**
13:12
**decision (1)**
33:25
**declarations (1)**
52:10
**decommissioning (1)**
49:4
**defend (1)**
19:24
**defending (1)**
19:11
**defined (9)**
41:17 45:22 46:3,4
  63:7 66:4 68:21
  69:13 79:24
**definitely (1)**
78:18
**definition (9)**
41:20 42:3,6,10 63:10
  63:15 64:14 69:6,7
**definitions (2)**
46:7,8
**degree (1)**
12:8
**Delaware (2)**
1:3 3:7
**deleted (1)**
58:18
**deleting (1)**
71:16
**demonstrate (1)**
74:10
**denial (2)**
83:20,21
**denied (1)**
84:5
**Department (2)**
69:18 73:25
**depending (1)**
20:21
**depends (1)**
22:8
**DEPONENT (1)**
91:5
**deposed (1)**
6:19
**deposition (31)**
1:11 2:8 5:12 6:12,22
  8:20 9:7,12,13,19
  9:23 10:7,20 11:7
  11:14,24,25 31:8,17
  54:2 70:13 74:14
  89:12,14 90:9,10,11

90:14,17,20,23
**deposits (1)**
86:16
**describe (4)**
15:18 28:18 68:13
  83:24
**described (2)**
66:21 81:21
**description (8)**
50:9 57:6,14,15,17
  59:6,16 90:8
**designated (2)**
10:6,10
**designed (2)**
75:12,14
**determine (3)**
27:11 56:5 76:20
**determined (9)**
24:13 29:24 35:15
  39:19 45:25 46:2
  47:5 61:7 76:9
**determining (2)**
26:25 30:6
**dialogue (2)**
80:20 82:21
**differ (1)**
54:15
**different (4)**
30:9 47:22 48:20
  53:21
**difficult (1)**
67:15
**difficulty (1)**
8:5
**diminished (1)**
14:13
**DIP (2)**
62:19,21
**disagree (1)**
41:5
**disagreement (1)**
67:21
**discharge (1)**
58:4
**discharged (1)**
52:5
**disclose (1)**
81:24
**disclosing (1)**
82:3
**disclosure (8)**
31:12,18 32:13 35:19
  36:3 41:13 43:6
  90:14
**discussed (1)**
57:14

**discussion (5)**
11:6 20:15 40:24 44:7
  44:14
**discussions (4)**
10:25 30:18 84:6,19
**dispose (2)**
21:18 24:21
**disposed (2)**
19:21 21:6
**disposition (1)**
24:24
**dispute (1)**
68:8
**disputed (1)**
37:22
**disrupted (1)**
82:14
**distinction (1)**
25:15
**distributable (3)**
50:19 51:11 52:20
**distributed (2)**
19:8 52:24
**distribution (3)**
17:5 38:18 50:20
**DISTRICT (1)**
1:3
**document (17)**
30:23 32:5,14 33:11
  35:24 36:10 37:7
  38:7 54:14 56:3
  61:8 70:22 71:3,4
  74:22,25 79:13
**documents (6)**
10:21 11:13,16 32:9
  55:17 83:5
**doing (1)**
18:7
**double (1)**
49:5
**draft (17)**
17:10,21,23,24 54:2
  54:24 55:2 56:6
  57:2,3,22,23 59:19
  60:12,17 62:10
  90:17
**drafting (1)**
18:2
**drafts (7)**
54:17,19 55:5 56:11
  56:14,17,22
**draw (7)**
35:18 39:16 50:14
  51:16 56:7 57:9
  59:22
**drilling (1)**

69:2
**driver (1)**
11:12
**due (2)**
71:12,14
**duly (2)**
6:3 89:13
**duties (2)**
18:8,10

_____ **E** _____
**E (11)**
3:2,2 4:2,2 6:2,17
  89:2,2 90:2,7,7
**earlier (13)**
37:24 45:11 55:25
  56:9 57:3,14 60:12
  62:10 79:4 85:17,19
  86:3,4
**early (2)**
72:7 82:14
**easy (1)**
35:8
**education (2)**
12:5,11
**effect (2)**
5:15 49:5
**effective (5)**
19:12 20:11 44:19
  50:18 57:24
**efficient (1)**
11:25
**effort (1)**
85:10
**efforts (1)**
85:13
**either (3)**
22:24 37:2 44:25
**ELDER (1)**
3:16
**election (1)**
44:21
**else's (1)**
68:4
**email (2)**
55:8 56:4
**emergence (2)**
26:13,16
**employee (4)**
12:25 13:14 14:14
  16:5
**employment (1)**
12:14
**Energy (26)**
1:5 2:9 8:19 12:17,24
  13:11,19,25 14:3,7

14:19 15:25 31:10
  31:20 36:4 54:4,10
  54:12 55:22 64:17
  65:17 71:2 90:12,15
  90:18 91:3
**entirety (3)**
14:16 15:12,14
**entities (1)**
17:5
**entitled (15)**
7:17,20 39:20 58:7
  60:5 62:14 66:8,14
  68:11 69:9,20 70:23
  73:4,14,20
**entitlement (1)**
68:15
**entity (5)**
19:23 22:20 23:17
  26:23 52:4
**environmental (7)**
28:14 29:5,13,18,24
  30:14 39:12
**ERRATA (1)**
91:2
**ESQ (5)**
3:14,16,23 4:8,15
**essentially (1)**
14:8
**estate (1)**
27:7
**estates (1)**
64:19
**estate's (1)**
19:21
**estimate (5)**
29:7 32:20 37:11
  48:19 49:5
**estimated (3)**
32:22 36:18 38:13
**estimates (1)**
30:24
**estimation (2)**
37:6 38:11
**et (4)**
1:6 54:4,13 90:19
**events (1)**
26:3
**evidence (1)**
17:13
**exact (2)**
30:25 35:7
**exactly (1)**
18:6
**EXAMINATION (1)**
6:7
**examined (1)**

6:4
**example (3)**
25:25 64:4 69:2
**excluded (20)**
33:13,18 60:6,11,16
60:21 61:6 62:15
63:6,10,15,21 64:14
65:15 66:3 68:9
79:23,24 80:9 81:6
**excluding (1)**
65:24
**exclusively (1)**
41:4
**exhibit (31)**
9:11,12,18 31:8,17
32:16,24 38:16,17
40:21 41:15 43:5
48:21 49:11,18 54:2
54:9,15,23 57:2
59:4 70:13 74:14,22
81:9 90:9,11,14,17
90:20,23
**exist (2)**
19:23 47:14
**exists (2)**
61:10,12
**exit (4)**
20:2 23:2,10 53:4
**expanded (1)**
59:16
**expect (1)**
55:10
**expected (1)**
39:24
**expecting (1)**
78:11
**expedited (2)**
87:8,10
**expenditure (1)**
68:23
**expenditures (7)**
68:20 69:5,11 72:17
74:16 75:21 90:24
**expenses (5)**
33:21 34:4,17,23
36:17
**EXPIRES (1)**
91:25
**explain (2)**
14:10 64:2
**extent (3)**
60:22 65:20 81:22
**extinguished (2)**
52:7 66:12
**extinguishment (5)**
44:24 50:23 51:18

52:17 58:4

_____ **F** _____
**F (2)**
89:2 90:7
**facility (1)**
69:2
**fact (10)**
17:13 29:20 49:3
55:18 56:5,11 58:16
71:23 76:10 82:13
**fair (19)**
7:12 8:10 13:23 14:5
21:14 32:7 38:4
40:8,13 44:6 52:8
56:18,23 59:15
60:10,15 64:24
65:12 85:12
**fall (1)**
37:21
**familiar (2)**
10:16 63:18
**far (2)**
30:19 75:19
**felt (1)**
73:4
**Field (6)**
23:7 65:3,6 66:20
85:20 86:6
**fields (1)**
64:23
**figure (9)**
35:7 72:6 76:7,8,9,16
77:4 78:19,21
**figures (6)**
30:25 33:15 38:23
49:10 72:10,13
**file (3)**
55:23 58:23 78:23
**filed (6)**
26:2 36:4 48:11 55:20
55:21 73:22
**filing (2)**
5:4 16:11
**finally (1)**
8:12
**finance (3)**
12:21 13:6,10
**financial (3)**
13:17 31:13 74:10
**find (1)**
19:18
**fine (6)**
13:22 20:8 34:15
67:10 83:9,10
**finished (2)**

34:10 78:12
**firm (2)**
79:14,20
**first (12)**
10:2 16:23 23:14 31:8
31:18 36:17 55:21
57:3 66:21 71:3
90:11,15
**fit (2)**
45:14 83:15
**fits (2)**
48:10 83:15
**Floor (1)**
3:21
**flown (1)**
11:22
**focus (3)**
18:22 24:18 57:20
**Foerster (2)**
4:11 79:20
**follow (1)**
47:8
**followed (1)**
52:18
**follows (1)**
6:5
**follow-up (1)**
26:6
**footnote (4)**
76:12,16,17,21
**force (1)**
5:14
**forgive (3)**
15:2 19:16 40:3
**form (1)**
5:8
**formally (1)**
19:5
**forms (1)**
73:22
**formulating (1)**
16:3
**formulation (3)**
15:19 16:22 17:7
**forth (3)**
60:3 62:12 89:12
**forward (2)**
21:24 69:11
**foundation (1)**
35:23
**four (2)**
32:17 59:25
**frame (1)**
25:12
**Francisco (1)**
3:22

**free (1)**
41:5
**Friday (1)**
1:13
**front (2)**
33:23 80:23
**full (10)**
35:15 38:3 44:22 45:2
47:12 50:22 51:17
52:16 58:2 61:9
**full-time (1)**
16:5
**fund (1)**
43:2
**funds (2)**
38:22 43:10
**further (7)**
5:7,11 27:13 28:10
52:4 86:25 89:16
**future (6)**
22:5 28:14 29:5,13,17
30:14

_____ **G** _____
**G (1)**
6:2
**Gas (3)**
74:15,23 90:23
**general (12)**
33:14 50:6,21,23 51:2
51:19 52:2,17 53:3
63:24 64:3 83:4
**generally (3)**
15:18 63:20 68:23
**generation (1)**
68:18
**Gerald (1)**
6:16
**GERRY (7)**
1:11 2:10 88:6 89:11
90:4 91:5,19
**getting (1)**
81:11
**give (12)**
7:7,9 12:13 30:25
35:7 40:6 55:8
58:22 64:19 77:11
86:20 87:11
**given (5)**
22:23 45:9 48:10
87:13 89:15
**go (8)**
6:21 11:20 12:15
37:18 43:23 47:9
49:15 62:2
**GODDESS (1)**

3:4
**goes (2)**
45:5 77:7
**going (14)**
8:4,7 10:13 11:20
21:24 24:5 30:17
53:18,21 54:18 55:6
66:11 87:8,9
**good (3)**
6:9 11:19 22:6
**granted (1)**
81:12
**ground (1)**
6:22
**group (1)**
13:20
**guess (5)**
22:9,24 26:11 31:5
35:5
**guessing (1)**
58:25

_____ **H** _____
**H (1)**
90:7
**halfway (1)**
53:22
**hand (4)**
9:17 49:8 56:3 89:22
**handed (3)**
32:8 70:21 74:20
**handing (1)**
54:8
**handle (1)**
21:23
**happen (1)**
26:8
**happens (2)**
23:3,11
**happy (3)**
7:2 23:9 67:14
**hard (1)**
20:25
**head (1)**
8:6
**heading (7)**
36:12 44:2,7 54:11
57:12,13 75:20
**heavily (2)**
14:2 56:10
**held (1)**
2:10
**help (3)**
32:5 47:17 58:23
**hereinbefore (1)**
89:12

hereunto (1)
89:21
high (1)
77:4
higher (1)
47:10
history (1)
12:14
holder (5)
44:20 45:3 50:20
57:25 58:6
holders (2)
60:4 62:13
hour (1)
53:19
hourly (1)
13:3
HUNTER (45)
3:23 14:18 17:12,18
17:22 22:7 24:5,11
26:19 27:15,20 32:4
32:19 34:9,24 40:13
40:16 42:19 46:2,12
46:14,20 47:19
48:16 49:16 51:4,7
53:24 55:3 60:22
61:18,21 63:11
64:25 65:20 67:2,6
67:9 81:22 83:2,10
84:14,22 87:2,13
Hydrocarbon (1)
13:19

                    I
identification (6)
9:14 31:11,21 54:5
70:16 74:17
ii (1)
45:2
iii (1)
45:5
important (2)
25:13 71:23
include (7)
18:8,10 60:21 64:11
65:19 78:18 87:15
included (3)
61:17 65:15 78:25
includes (1)
64:20
including (5)
7:15 34:6,16 35:12
48:25
increase (2)
38:22 43:8
indicate (1)

85:6
informal (1)
20:19
information (2)
12:3 65:25
informed (1)
29:3
initial (2)
59:19 75:9
initially (1)
73:23
inquiry (1)
73:24
insofar (1)
82:2
instances (1)
7:25
instruct (2)
7:20 46:14
insurance (12)
80:7,8,12,17,21,22
81:7,20,20 82:9,11
83:11
insurer (1)
83:17
insurers (2)
82:21 84:21
intend (1)
21:17
intent (2)
11:25 18:25
intention (2)
58:24 81:15
interest (23)
8:25 23:4,12,22 24:2
24:14,16,25 27:8,14
28:10 30:6 33:18
60:6 63:22 64:12,16
66:12 67:17,18 68:6
71:16 82:17
interested (3)
56:20,21 89:19
interests (20)
33:13 60:11,16,21
61:6 62:15 63:6,10
63:15,21 64:15
65:15,17 66:4,25
68:9 79:23,24 80:9
81:7
interim (1)
12:20
interpose (1)
7:10
interruption (3)
80:8,22 82:9
intimately (2)

10:23 11:17
involve (2)
41:4 66:16
involved (9)
10:23 11:17 14:3 16:2
30:5 31:2 56:10
79:18,21
involvement (2)
15:19 79:7
IRS (1)
69:6
isolation (1)
72:9
issued (2)
83:17,20
issues (1)
45:6
item (1)
85:17
items (1)
75:20

                    J
J (1)
4:5
JAMES (1)
3:23
Jennifer (1)
16:4
jhunter@pszjlaw.c...
3:24
JIB (2)
39:5,18
JIBs (13)
9:3 48:8 71:25 72:24
73:7,17,19,24 75:5
75:15 76:11 77:3,6
job (2)
1:25 67:15
joined (2)
12:24 13:20
joint (5)
8:25 23:4,12,22 24:2
Jointly (1)
1:7
JONES (1)
3:19
judge (1)
78:12
judge's (1)
33:25
June (2)
12:25 13:5
jurat (1)
87:16

                    K
K (3)
3:23 4:8 6:2
keep (2)
6:22 19:8
kind (3)
23:18 66:6 69:4
KJC (1)
1:6
knew (1)
31:3
know (41)
16:8 18:13,24 19:4
20:16 21:9,11 22:24
26:15 27:7 29:20
30:20 31:2 32:25
33:22 36:3 37:5
38:12 42:23 45:13
45:18 46:21 48:13
57:15 58:17 59:17
60:20 61:5 68:2
69:8,10 72:10 74:10
76:15 78:22 79:12
83:4,6,13 84:7 87:7
Knowing (1)
78:9
knowledge (3)
29:15 66:24 67:7
knowledgeable (1)
10:10
known (5)
46:23,24 47:3 64:23
65:2
Kuritz (1)
16:4

                    L
laid (1)
35:23
language (13)
51:21,25 57:22 58:14
60:2,8,20 61:14,16
62:8,17,20,24
larger (1)
37:19
laundry (1)
64:20
law (4)
24:3,6 68:17 79:14
lawyer (5)
7:16,16,16,19 58:20
lawyers (4)
7:14 55:18 56:17,20
layman's (1)
51:22
leave (1)

50:5
left (2)
33:14 75:19
left-hand (2)
36:16 74:23
legal (11)
18:18,21 19:5 20:4
24:12 26:11 27:21
45:19 46:21 67:3
84:2
lender (17)
33:12,17 42:7 45:21
45:25 46:5,6 57:6
57:11,21,25 58:5,7
59:6 60:4,17 62:13
lenders (6)
61:8,17 62:19,23,25
66:7
letter (2)
83:20 84:8
let's (6)
6:21 35:8 43:23 45:6
56:8 62:2
level (4)
18:6 21:3 23:24 39:25
liabilities (2)
29:18 30:14
liability (1)
28:15
liable (2)
52:10 53:5
lien (10)
65:10 66:21,25 67:17
67:18,22 68:3,4,5,7
liens (1)
58:6
Limited (12)
14:4,19 31:10,20 36:5
54:4,11,13 71:3
90:12,16,18
line (1)
75:22
lines (2)
59:19,25
liquidate (2)
15:21 21:18
liquidated (1)
21:6
liquidating (3)
27:3 44:22,25
liquidation (13)
17:2 31:9,19 43:2
54:3,12 55:20,22
56:10 57:4 90:12,15
90:18
list (2)

64:20 75:20
listed (2)
10:17 81:9
literally (1)
19:18
litigation (4)
38:21 39:24 43:9 65:9
little (4)
18:20 33:18 48:20
86:22
Litvak (1)
79:15
LLC (2)
2:9 8:19
LLCs (2)
18:19 27:4
LLP (4)
2:12 3:10 4:4,11
Ln (1)
91:6
loan (1)
62:21
logically (2)
40:14 74:2
London (2)
11:23 85:24
long (3)
14:14 20:18 59:19
longer (3)
23:22 30:5 53:5
look (9)
10:2,11 30:24 32:11
35:5,7 41:5 55:10
59:14
looking (4)
32:13,23 41:13 78:23
Lorenzo (1)
79:20
loses (2)
77:5,14
losses (6)
29:22 68:21 69:11,13
69:16 72:20
lost (1)
67:12
lot (1)
15:2
low (1)
38:12
LP (2)
13:12,20

**M**

magnitude (1)
33:6
making (3)

72:25 73:11 78:7
March (2)
13:7,15
Marinuzzi (1)
79:20
mark (1)
31:15
marked (15)
9:10,13,17 31:7,10,16
31:20 54:5,9,23
70:12,15,22 74:17
74:21
MarkWest (2)
13:18,19
marriage (1)
89:18
MARTIN (1)
4:15
matter (5)
24:3,3 27:9 49:6
89:20
Max (1)
79:15
maximum (1)
43:3
McCUTCHEN (1)
4:4
mean (13)
15:15,17 19:17 22:21
27:2 31:12 34:25
36:24 47:22 52:23
79:9 84:2,15
meaning (1)
82:25
means (7)
17:25 18:6 42:11
51:21,24 63:15
64:16
meant (1)
67:9
mechanical (1)
66:6
meet (2)
10:25 11:5
memory (1)
41:22
mention (1)
60:15
mentioned (4)
14:6,25 39:8 82:20
met (2)
6:10 11:11
middle (1)
76:5
million (13)
32:23,23 35:6,10 39:8

39:11,18 40:9 48:21
48:24 76:22 77:3
84:18
mind (1)
29:22
minute (1)
65:8
miscellaneous (10)
41:16,21 42:3,11,14
43:17 44:3,8,20,24
moment (1)
78:7
money (3)
24:15 40:17 47:9
MONHAIT (1)
3:4
monies (10)
18:15,17 19:7 40:20
40:22 47:11 61:7
66:9 82:6,7
month (2)
84:9 85:11
Morrison (2)
4:11 79:20
motion (5)
80:24 81:2,3,5,12
Mount (1)
82:13
move (4)
30:17 40:23 53:21
58:23

**N**

N (5)
3:2 4:2 6:2 90:2,7
name (4)
6:10,14 13:11 91:3
named (1)
18:5
Natural (1)
73:25
naturally (1)
8:2
nature (3)
14:12 22:22 48:11
near (1)
32:16
necessary (1)
61:9
need (7)
11:18 25:20 40:3
55:13 58:22 83:3
85:4
needed (2)
10:22 14:22
needs (2)

18:16 37:18
negotiated (1)
79:5
negotiation (3)
16:9 56:11 79:18
negotiations (2)
21:24 79:8
negotiators (1)
28:22
neither (1)
24:15
net (7)
50:18 51:3,11 52:20
68:20 69:12,16
never (1)
29:22
New (14)
1:12,12 2:12,12,16
3:13,13 4:7,7,14,14
74:8 89:4,9
nod (1)
8:6
nonsensical (1)
23:18
Non-Operated (2)
76:2,6
normal (1)
26:2
Notary (4)
2:15 6:4 89:8 91:24
note (1)
11:21
noted (2)
65:7 88:3
notes (2)
38:20 47:18
notice (7)
9:7,13,18,20,21,22
90:10
notion (2)
22:23 23:16
Notwithstanding (4)
60:2 61:15,22 62:11
November (2)
13:13,21
number (7)
44:2 55:4 73:15 74:3
77:22 83:13,14
numbered (1)
49:19
numbers (2)
48:3 80:17
numeral (1)
10:13

**O**

O (2)
6:2 90:7
oath (1)
5:14
object (4)
7:17 24:5 25:22 27:21
Objection (8)
17:12 26:19 34:24
42:19 46:12,20 67:2
84:14
objections (1)
5:8
obligation (2)
29:25 81:19
obviously (4)
29:2 32:17 67:20 77:6
occurred (1)
8:25
October (1)
80:24
offer (4)
19:17 21:21 22:4,13
offers (1)
25:3
offhand (1)
72:3
officer (4)
5:13 13:3,4,17
officers (1)
15:8
offices (2)
2:11 11:24
official (1)
15:4
Oh (1)
76:19
oil (17)
3:5,11 6:11,13 9:2,8
9:20 64:6,21,22
66:19,22 74:15,23
76:22 81:16 90:23
okay (39)
7:5 11:10,13 24:11
27:20,23 32:18,25
34:12 37:20 40:14
40:23 41:2,10,23
42:2 47:25 48:13
50:3 51:23 53:17,24
57:9 60:10 61:20
63:9 64:10 65:14
66:2 67:8 68:9
74:13 76:12 77:17
78:24 80:3 83:10
86:19 88:2
omitting (1)
52:19

**once (3)**
27:12 28:8 52:3
**ones (1)**
40:21
**one's (1)**
22:9
**one-page (1)**
74:22
**ongoing (2)**
29:21 80:20
**open (1)**
30:23
**opened (1)**
51:7
**opening (1)**
65:16
**operated (3)**
72:22 76:2 82:19
**operating (6)**
2:9 8:19 68:21 69:13
69:16 72:19
**operation (1)**
67:21
**opportunity (1)**
40:6
**opposed (2)**
15:5 23:19
**option (1)**
16:25
**order (11)**
12:15 46:8 58:8,9
60:7 61:5,10,16
62:16 63:4 66:5
**original (3)**
75:16 87:4,10
**originally (1)**
66:4
**ourself (1)**
72:22
**outcome (1)**
89:19
**outline (1)**
25:14
**outside (1)**
15:24
**outstanding (6)**
17:4 30:21 32:2 37:17
39:5 66:9
**overpayment (1)**
71:14
**Overseeing (1)**
15:12
**owned (2)**
64:11,12
**ownership (2)**
27:14 28:10

**owns (1)**
27:6

**_____ P _____**

**P (4)**
3:2,2 4:2,2
**Pachulski (2)**
3:19 79:14
**Pacific (23)**
1:5 2:8 8:19 12:17,24
13:11,24 14:3,7,19
15:25 31:10,20 36:4
54:4,10,12 55:22
71:2 90:12,15,18
91:3
**Pacific's (1)**
72:21
**page (42)**
10:3,12,14 32:5,6,16
32:24 36:9,12 38:15
38:16 41:15,24
43:20,24 44:10,13
47:18 49:14,17,18
49:19,24 50:2,8
57:5,12,13 58:25
59:2,5,17,18 62:6
63:11 71:9 76:25
80:4 81:9 87:15
90:3,8
**pages (2)**
32:17 71:5
**paid (9)**
39:23 44:25 47:12
73:19 75:17,17
76:11 77:3 80:22
**paragraph (3)**
42:2 60:3 62:12
**Pardon (1)**
34:14
**paren (4)**
51:5,6,8 86:5
**parens (2)**
50:25 71:16
**parent (1)**
22:25
**parenthetical (1)**
52:19
**Park (1)**
4:6
**part (7)**
14:10 26:25 48:7
59:17 63:3 71:3
75:10
**participant (1)**
15:23
**particular (2)**

60:14 75:12
**particularly (2)**
83:7,8
**parties (8)**
5:4 24:13 25:21 46:9
47:23 56:21 82:25
89:17
**Partners (2)**
13:12,19
**party (2)**
27:2 42:22
**party's (1)**
28:22
**part-time (7)**
12:17 14:8,15,15
20:13,16,19
**pay (9)**
35:14 38:2,13 39:18
40:9 43:3 47:5 49:8
52:3
**paying (3)**
52:10,13 53:5
**payment (3)**
18:17 22:19 53:3
**payments (5)**
39:5 81:6,10,16,19
**payout (1)**
26:25
**PEAO (68)**
8:20,22 9:2,22 10:5
15:5,6,11 18:23
19:11 20:2,11,24
21:7,12,17 22:24
23:21 24:15,20 25:6
25:9,10,17 26:9
27:13 28:9,9,13
29:3 30:5,5,13,22
32:3,24 33:2,19
35:14 36:21 37:25
38:13 39:17 40:8,17
40:20 42:13,14 43:3
47:9,15 48:15 50:7
50:19,21 51:2,12,21
52:20 53:4 62:21
64:11 68:10 69:9
71:12 81:5 85:19
86:5
**PEAO's (19)**
18:24 21:22 22:16
23:3,11 24:19,23
26:16 29:16 38:11
61:17 62:19 63:22
66:10,25 67:17 68:5
68:14 82:16
**Pecos (1)**
13:6

**pending (2)**
15:16 59:24
**percent (10)**
23:4,12,22 24:2 76:17
76:19 77:14,15,16
77:24
**percentage (2)**
50:25 77:6
**period (6)**
16:8 69:3,21 72:9,17
76:23
**periods (3)**
69:20,21 79:2
**PERL (4)**
14:19,24 15:5,7
**person (3)**
10:10,15 17:9
**personal (1)**
23:20
**perspective (3)**
19:13 22:9 51:22
**petroleum (1)**
64:22
**Pg (1)**
91:6
**picking (2)**
77:23,24
**pieces (1)**
72:15
**Pillsbury (2)**
2:11 3:10
**Pittman (2)**
2:12 3:10
**place (3)**
16:9,10 18:25
**placeholder (1)**
37:16
**plan (59)**
15:20,20,23 16:3,6,9
16:22,23 17:2,10
18:5,9,10 19:2,12
20:12,18 22:19 27:2
30:18,23 31:4,9,19
38:8 40:25 41:4,9
41:15,18,24 43:2,14
43:19,24 45:22
47:18 50:9 53:10
54:3,12 55:19,22,23
56:2,10,23 57:4
58:14,24 59:3,23
62:6 63:6,16 79:25
90:12,15,18
**plans (8)**
24:23,25,25 25:6,18
26:16 29:17 63:3
**play (1)**

18:3
**pleading (1)**
29:9
**please (10)**
6:14,25 12:13 27:17
31:23 46:16 58:19
68:13 72:13 85:5
**plus (3)**
22:2 39:18 49:11
**point (14)**
8:24 12:18 13:2 14:13
22:15 25:13 27:3
29:6 32:7 57:15
78:11,15 80:19
85:14
**pointed (1)**
64:20
**policies (1)**
80:19
**policy (3)**
83:16,23 84:3
**pool (1)**
18:18
**portion (4)**
52:12 53:6 73:20
76:10
**position (2)**
13:16 14:7
**positions (1)**
15:2
**possible (1)**
52:23
**post (2)**
20:2 22:18
**post-abandonment ...**
25:2,15
**post-confirmation (1)**
26:23
**post-petition (1)**
76:23
**potential (4)**
30:14 38:21 39:24
43:8
**practicable (2)**
44:19 50:17
**practical (3)**
18:6 19:7 23:24
**practicality (1)**
24:4
**precisely (2)**
25:12 38:15
**predecessors (1)**
64:18
**predict (1)**
20:25
**preference (1)**

18:14
preliminary (1)
83:18
premium (2)
80:7 81:8
premiums (2)
80:12,18
preparation (5)
10:23 11:17,18 15:23
31:2
prepare (3)
10:19 74:8,9
prepared (4)
10:21 11:16 78:10
79:12
prepetition (1)
48:8
present (3)
3:8 11:10 62:10
president (3)
12:21 13:10,17
pretty (4)
12:3 41:3 66:3 68:24
prevail (3)
37:8,25 53:14
pre-abandonment (1)
25:14
pre-bankrupt (1)
23:17
primarily (1)
79:5
primary (1)
28:22
principal (1)
15:22
prior (8)
11:6,14 13:5,9,16
64:12 68:4 86:9
priority (5)
33:4 38:9 67:22,24
68:8
privilege (1)
60:25
privileged (4)
60:24 61:3 81:24 85:5
pro (3)
50:24 52:18,24
probably (4)
25:24 35:8,23 63:24
proceeding (10)
14:4 15:16 21:11 29:9
36:5 64:7 67:19
78:8 85:18 86:4
proceeds (11)
60:5 62:14 64:5,21
65:11 66:15,18

67:20 76:22 77:3
80:8
process (7)
18:16,16 26:25 27:10
28:18 56:11 75:10
produced (1)
64:22
production (6)
68:18 71:17 74:15,24
82:14 90:23
products (1)
64:22
professional (2)
2:14 21:3
properties (18)
21:8,12,16,17,20,20
23:15 27:9,13 28:7
28:9 29:19 72:20,21
75:18 80:18 82:18
86:17
property (2)
19:21 21:5
propose (1)
87:3
proposed (6)
15:20 16:6 30:18
57:15,17 59:12
prosecuting (1)
19:11
provided (2)
30:25 77:18
provides (1)
68:18
provision (2)
50:15 81:7
provisions (1)
58:8
public (5)
2:15 6:4 13:18 89:8
91:24
purchase (3)
21:22 22:18 25:3
purchaser (1)
22:17
purposes (3)
10:7 53:9 71:20
pursuant (5)
9:6 18:15 58:7 60:6
62:15
pursue (1)
24:14
pursuing (2)
18:14 24:16
ranges (1)
77:23
put (2)
7:18 55:9
putting (2)

37:22 66:5
P-e-c-o-s (1)
13:6
P.A (1)
3:4
p.m (2)
2:6 88:3
P.O (1)
3:6

**Q**

qualified (5)
68:23 69:10 74:16
75:21 90:23
qualify (1)
69:15
qualifying (2)
68:19 72:16
queries (1)
74:6
question (52)
5:9 6:24 7:6,8,11,18
7:21 8:13 15:3
17:15,17 19:17 20:4
20:4 22:12,23 23:8
24:13,14,17 25:11
26:4,6,11,15,21
27:8,17 28:3 30:7,9
31:22 34:10 39:17
40:5,7 42:21 45:19
46:16,22 54:22 61:3
63:24 64:2 65:21
67:12 71:20 73:8
76:14 82:2 83:9
85:22
questions (8)
7:3,25 8:3 11:21 22:5
35:23 86:25 87:3
quickly (1)
12:3
quoted (1)
33:16

**R**

R (5)
3:2 4:2 6:2,2 89:2
raised (1)
25:13
range (13)
30:24 38:17 43:7
48:21,22 77:2,9,10
77:12,13,15,17,22
ranges (1)
77:23
rank (1)
43:15

rata (3)
50:24 52:18,24
rate (2)
71:15 72:18
reach (1)
25:23
reached (1)
28:16
reaching (2)
28:19 73:15
read (7)
51:14 61:14,18,21
62:8 63:14 91:6
reading (2)
83:23 84:2
Reads (1)
91:6
ready (1)
50:5
really (7)
16:25 17:6 21:25 33:7
55:10 69:13 84:2
reason (5)
19:8 23:15 65:14,18
91:6
recall (8)
37:10 41:11 43:13
47:2 58:13 72:3,4,8
receive (4)
50:22 58:2 84:21
85:14
received (1)
18:15
Recess (2)
53:25 86:23
recollection (2)
41:7 42:10
record (11)
6:15 11:22 15:15
16:17 40:4 43:24
55:3 61:24 62:9
81:2 89:14
recount (1)
38:4
Recourses (2)
31:10 90:12
recoveries (4)
38:21,22 39:25 43:9
Redondo (1)
6:17
Redoubt (1)
82:13
reduced (3)
71:24 72:23 75:15
refer (6)
9:2 14:18 32:6 43:5

49:17 58:22
reference (1)
60:11
referred (2)
40:21 71:7
referring (7)
8:18,21 32:4 46:9
59:5 62:5 76:21
refile (1)
74:4
reflects (1)
45:8
refresh (2)
41:6 42:9
refunds (4)
80:7,17 81:8,20
regard (2)
47:19,20
regarding (6)
11:2 25:6,18 26:10,16
83:5
Registered (1)
2:14
relate (1)
63:22
related (12)
13:18 25:7,19 26:17
28:15 29:11 71:17
71:21 80:7,12 82:16
89:17
relating (4)
66:19 71:15 76:16,17
release (5)
44:23 50:23 51:18
52:16 58:3
released (3)
52:6 87:5,11
remaining (6)
14:16 16:4 17:3 18:12
52:3 66:9
remains (1)
21:5
remediation (7)
28:14 29:5,13,24 30:3
30:15 39:12
remember (1)
41:20
remind (1)
7:9
reminder (2)
34:11 61:11
removed (1)
49:5
repeat (8)
23:8 25:11 28:3 31:22
46:16 67:12 73:8

85:22
**rephrase (3)**
6:25 28:5 62:22
**Reported (1)**
1:24
**reporter (7)**
2:14,15 8:4,9 9:17
70:23 87:12
**represent (3)**
6:11 55:25 77:22
**representation (2)**
45:3 55:17
**representations (1)**
73:2
**representative (2)**
2:10 18:5
**representatives (1)**
83:12
**represented (2)**
37:11 56:21
**request (2)**
82:9,24
**requested (1)**
74:11
**requesting (1)**
77:11
**require (3)**
8:3 60:23 81:23
**required (2)**
62:19,24
**requirements (1)**
19:5
**requires (1)**
65:21
**reread (1)**
27:17
**reserved (3)**
5:9 40:18 47:4
**reserves (1)**
30:13
**resolution (1)**
26:24
**Resolving (3)**
70:14,24 90:21
**resources (18)**
1:5 12:17,24 13:25
14:3,8,19 29:21
31:20 36:5 38:2
54:4,11,12 55:23
71:3 90:16,18
**respect (31)**
7:10 8:2 10:11 15:4
15:11 19:25 21:6
22:15 29:4,13 31:18
33:23 37:8 48:6
49:4 53:14 61:22

62:17 64:8 65:9
66:18 67:20 73:3,11
73:12 75:17 77:20
78:5 79:3 80:21
90:14
**respective (1)**
5:4
**Respond (1)**
82:2
**responsibilities (1)**
15:11
**responsibility (1)**
12:18
**responsible (6)**
17:9 19:10 20:10 30:2
30:11 52:13
**rest (1)**
66:11
**return (3)**
74:4 79:22 80:13
**returned (1)**
80:11
**reveal (5)**
60:23 61:2 65:22,23
85:3
**revealing (2)**
60:23 61:3
**Revenue (2)**
69:18 74:2
**reverse (1)**
12:15
**review (5)**
11:13 33:11 36:10
85:11 87:6
**reviewed (1)**
17:20
**revised (3)**
75:22 76:5,20
**right (11)**
30:19 31:23 48:23
64:16 65:17 75:25
77:8,10 79:23 82:6
82:7
**rights (3)**
58:5 65:10 66:18
**rise (4)**
39:25 64:17 65:17
81:13
**ROGER (1)**
3:16
**roger.elder@pillsb...**
3:17
**role (4)**
13:24 15:4 16:21 18:3
**roles (1)**
15:10

**Roman (1)**
10:13
**romanette (2)**
64:5 68:12
**room (1)**
7:17
**ROSENTHAL (1)**
3:4
**round (1)**
80:16
**royalty (2)**
71:14,15
**RPR (2)**
1:24 89:25
**rule (4)**
1:10 2:8 9:23 78:12
**rules (1)**
6:22

**S**

**S (3)**
3:2 4:2 90:7
**sale (7)**
58:8 60:7 61:16 62:16
64:5,21 66:19
**sales (4)**
46:8 61:5 66:5 76:23
**SAMANTHA (1)**
4:15
**San (1)**
3:22
**satisfaction (8)**
25:7,18 26:17 44:23
50:22 51:17 52:16
58:3
**saw (1)**
56:11
**saying (1)**
52:18
**says (24)**
36:12,13,17,18,21
44:18 50:16 51:17
52:15 57:24 60:2
64:4,8,8,15 65:16
71:2,11 74:22 75:20
75:22 76:7,13 84:4
**SCOTT (1)**
4:8
**scott.seamon@bing...**
4:9
**sealing (1)**
5:5
**SEAMON (1)**
4:8
**second (5)**
33:10 49:14 50:4

63:14 86:21
**secondly (1)**
72:19
**section (4)**
36:11 52:2 60:14,16
**secured (16)**
41:16,21 42:3,7,11,14
43:17 44:3,8,20,24
45:14 46:11,19 47:6
66:7
**securing (1)**
45:4
**see (21)**
7:15 10:3 36:14,19,22
42:4 43:22,25 44:4
44:11,17 51:13 57:8
58:11 59:5,8 60:8
63:13 73:9 75:23
80:5
**seeing (1)**
55:7
**seen (5)**
9:24 25:24 35:24
54:14 74:25
**segregated (3)**
38:22 43:9 76:22
**sell (2)**
24:21 86:10
**senior (21)**
12:20 13:9,16 33:12
33:17 42:7 45:21,25
46:4,6 57:6,11,21
57:25 58:4,6 59:6
60:4,17 61:8 62:13
**sense (1)**
74:3
**sensitive (2)**
83:7,8
**sent (2)**
55:4 84:7
**separate (1)**
84:23
**separately (1)**
39:16
**September (6)**
1:13 2:5 72:7 84:9
89:22 91:4
**series (1)**
83:12
**served (1)**
9:7
**set (5)**
30:13 60:3 62:12
89:12,22
**settle (2)**
17:4 26:9

**settled (3)**
19:7 25:21 52:6
**settlement (17)**
18:12 25:24 28:19,24
44:23 50:22 51:18
52:16 58:3 70:9,20
71:6 77:21 78:17
79:4,8,18
**settlements (1)**
25:23
**settling (1)**
20:10
**share (4)**
50:24 52:19,24 72:21
**Shaw (2)**
2:11 3:10
**SHEET (1)**
91:2
**short (1)**
6:23
**shorthand (1)**
8:18
**shortly (1)**
56:4
**shot (1)**
55:11
**showed (1)**
60:12
**shown (2)**
49:10,12
**side (4)**
16:2 28:24 36:16
79:10
**signed (3)**
5:13,15 74:4
**significant (2)**
14:2 33:8
**significantly (1)**
59:16
**Silverpoint (3)**
64:17 65:18 81:14
**similar (2)**
13:11 69:7
**simple (6)**
6:23 16:23 17:7 66:3
68:24 82:5
**simply (3)**
24:8 47:20 76:15
**sitting (1)**
83:25
**situation (3)**
22:3 23:19,20
**six (1)**
59:19
**slightly (1)**
30:9

**small (3)**
33:6 37:3,16
**smartin@mofo.co...**
4:16
**sold (1)**
13:14
**solid (1)**
77:21
**soon (3)**
19:6 44:18 50:17
**sorry (6)**
27:15 38:16 43:23
49:23 51:4 74:9
**speak (3)**
10:6 38:6 74:4
**speaks (2)**
29:2 38:17
**special (2)**
10:22 11:18
**specific (4)**
16:21 32:5 72:8 83:4
**specifically (5)**
18:22 19:4 65:18 83:3
83:25
**spend (1)**
14:22
**spent (1)**
13:25
**spoke (1)**
61:6
**spreadsheet (2)**
74:21 75:12
**spreadsheets (1)**
74:10
**spring (3)**
16:11,17,19
**ss (1)**
89:5
**staff (4)**
14:17 20:14,16 74:12
**stamped (1)**
32:12
**standpoint (2)**
15:13 47:24
**Stang (2)**
3:19 79:14
**start (4)**
12:4,7 41:8 56:8
**started (2)**
34:9 35:22
**starts (1)**
64:19
**state (35)**
2:15 4:12 6:14 8:8
25:25 28:17,19 29:2
29:4,12 40:8 48:4

48:10 49:3 68:16
69:5 70:5,10,14,20
70:24 73:2,12 74:8
74:9 75:8,13 77:11
78:12,14 79:6,17
89:4,9 90:21
**stated (2)**
43:16 62:11
**statement (10)**
31:13,18 32:14 35:19
36:4 41:14 43:6
64:15 65:16 90:14
**states (5)**
1:2 37:8 42:6 50:16
57:5
**state's (2)**
28:21 73:25
**stating (4)**
44:12 61:13 62:18
66:17
**status (1)**
82:23
**stay (4)**
20:17,20,23 49:14
**stayed (1)**
13:13
**step (1)**
23:6
**steps (3)**
10:19 24:20 28:13
**STIPULATED (3)**
5:2,7,11
**stipulation (5)**
70:14,24 71:4 87:4
90:21
**stop (1)**
45:6
**Street (1)**
3:21
**strike (4)**
10:3 28:7 45:17 57:10
**structure (2)**
16:24 66:6
**sub (1)**
50:15
**subheading (1)**
44:14
**subject (7)**
43:7 49:2 64:6 65:8
66:21 75:22 80:23
**submitted (5)**
16:7 17:11 29:8 58:15
75:6
**Subscribed (2)**
88:9 91:20
**subsequent (2)**

73:24 75:9
**subsidiaries (2)**
13:7 15:7
**substance (1)**
63:4
**succeed (2)**
73:6,16
**successful (2)**
45:12 81:11
**suit (2)**
19:20,24
**suits (1)**
19:11
**sum (1)**
72:6
**summary (1)**
41:14
**summer (2)**
16:12,13
**supervision (1)**
19:15
**supervisors (1)**
19:15
**support (1)**
18:16
**suppose (1)**
22:21
**sure (14)**
12:15 17:25 25:12
28:4 31:23,24 41:3
46:17 48:23 58:20
61:19,23 73:9 85:23
**surrendered (1)**
45:2
**suspect (2)**
26:7 31:4
**switched (1)**
13:2
**sworn (6)**
5:12,15 6:3 88:9
89:13 91:20

——————
**T**

**T (5)**
3:23 6:2 89:2,2 90:7
**table (6)**
7:15 31:13 38:15
41:14 49:13 79:11
**take (7)**
10:19 16:9 23:6 32:11
38:24 53:19 86:22
**taken (6)**
24:20 28:13 53:25
63:14 85:10 86:23
**takes (1)**
77:2

**talk (3)**
8:24 18:20 33:17
**talked (2)**
85:18 86:4
**talking (3)**
16:18 19:25 50:6
**tallied (1)**
48:3
**tax (25)**
33:4 68:10,14,15,18
69:8,19,21 70:4,7
70:19 71:17,21 72:4
72:18,23 73:3,13,20
73:22 74:15,24 75:7
78:5 90:23
**taxi (1)**
11:12
**TBF (3)**
23:5,13,23
**TBU (3)**
23:5,13,23
**team (2)**
18:2 79:9
**technical (2)**
19:17 22:11
**tell (7)**
8:13 29:16 42:17
45:24 51:23 58:21
72:13
**telling (1)**
54:24
**ten (1)**
12:14
**term (4)**
41:17 44:17 45:22
63:7
**terminated (1)**
80:19
**terms (3)**
58:7 60:6 62:15
**test (1)**
27:20
**testified (4)**
6:4 37:24 56:9 79:4
**testify (1)**
40:6
**testimony (8)**
11:3 27:12,19 28:2
30:8 38:5 65:7
89:15
**text (1)**
71:19
**Thank (4)**
32:15 34:13 45:20
85:16
**theoretical (1)**

22:22
**thing (1)**
67:10
**things (2)**
8:17 61:19
**think (18)**
26:5,5,13,14 30:19
33:9 41:3 45:19
47:16,23 53:22
55:24 58:16,17
64:25 69:5 79:4
86:21
**thought (1)**
67:13
**three (1)**
18:25
**time (21)**
5:10 14:2,11,22 16:8
24:19 30:19 56:12
56:12,14,15,18,18
56:22,22 69:3,21
72:17 78:9 85:24
88:3
**times (1)**
72:17
**title (3)**
54:10 64:16 65:17
**titled (1)**
55:21
**titles (1)**
15:6
**today (7)**
6:12 7:15,17 11:3,7
11:21 83:25
**top (3)**
43:22 44:13 74:23
**topics (1)**
10:16
**total (5)**
39:5 48:14 76:3 80:11
80:13
**Trading (46)**
21:17,20 23:7,7 24:18
24:20,24 25:3,7,19
26:10,17 27:6,14
28:10,15 29:14,25
29:25 38:21 43:9
63:22 64:6,9,23
65:2,3,5,5 66:19,20
66:25 67:17,18 68:5
71:15,21 75:17 80:6
80:12 82:17 85:20
85:20 86:6,6,17
**train (1)**
67:13
**transcribe (1)**

8:5
transcribing (1)
8:6
TRANSCRIPT (1)
91:2
treasurer (2)
16:5 20:21
treatment (18)
40:24 41:8 43:13 44:9
44:14,18 45:8 50:11
50:15,16 51:25
57:17,21,23 58:13
59:11,14 60:16
trial (1)
5:10
trick (2)
19:18 22:14
tricky (1)
67:25
tried (1)
86:10
true (1)
89:14
try (3)
11:20 12:2 28:4
trying (3)
7:3 16:17 67:24
turn (9)
36:8 41:23 43:19,24
44:12 49:25 56:25
63:9 71:9
turning (1)
83:13
turns (1)
38:11
two (13)
13:17 32:8,24 39:2,15
41:9 44:2 45:6 49:6
64:5 72:15 77:23
83:14
types (1)
47:14
Tywoniuk (123)
1:11 2:10 6:1,9,16,18
7:1 8:1 9:1,11,12,16
9:17 10:1 11:1 12:1
13:1 14:1 15:1 16:1
17:1,8 18:1 19:1
20:1 21:1,10 22:1
23:1 24:1 25:1 26:1
27:1 28:1 29:1 30:1
30:20 31:1,8,17
32:1 33:1 34:1 35:1
35:22 36:1 37:1
38:1,17 39:1 40:1
41:1 42:1 43:1 44:1

45:1 46:1 47:1 48:1
49:1 50:1 51:1 52:1
53:1,8 54:1,2,8,9,23
55:1 56:1,25 57:1
58:1 59:1,4 60:1
61:1 62:1 63:1 64:1
65:1 66:1 67:1 68:1
69:1 70:1,13,18
71:1 72:1 73:1 74:1
74:14,20,21 75:1
76:1 77:1 78:1 79:1
80:1 81:1,9 82:1
83:1 84:1 85:1 86:1
86:24 87:1 88:6
89:11 90:4,9,11,14
90:17,20,23 91:5,19
Tywoniuk-1 (3)
10:3,12,17
Tywoniuk-2 (8)
31:7 32:9 41:24 43:25
50:2 59:23 62:5
80:4
Tywoniuk-3 (3)
31:16 32:9 35:20
Tywoniuk-4 (3)
60:13,18 62:11
Tywoniuk-5 (3)
70:12,23 79:13

**U**

U (1)
6:2
uh-huh (1)
8:7
uh-uh (1)
8:7
ultimate (1)
21:2
ultimately (3)
17:11 18:17 58:14
Um-hmm (1)
63:12
unable (1)
26:8
Unclassified (1)
36:13
underlie (1)
33:13
underneath (2)
36:12 44:6
understand (16)
6:24 7:4,22 8:9,15,21
9:3 17:19 21:4
22:22 23:15,18
26:22 27:10 30:8
51:24

understanding (38)
9:6 19:19,23 20:6,7
21:10,23 22:13,17
22:20 23:3,11,21,25
24:8,12 26:14 27:5
27:16 28:6,8 29:23
30:10 36:25 45:7
46:10,18 47:7 48:5
51:20 52:9,22 53:2
67:5,16 68:3,7,22
understood (1)
8:14
undertake (1)
10:22
undertaken (1)
12:11
uniforms (1)
15:7
Union (56)
3:5,11 6:11,13 9:2,8
9:20 23:4,12,23
33:23 34:6,16,19
35:9 37:22,25 39:3
39:12,19 40:10
42:23 45:12,21,24
46:9,10,18 47:10,11
47:12 48:5,25 49:3
53:15 65:9,14,19
66:16,22,24 67:16
71:25 73:5,16,18
76:24 77:5,12,14
78:2,8 81:16,21
82:5,6
Union's (10)
37:9 38:2,24,25 39:18
40:18 47:5 53:9
65:10 67:22
Union-operated (1)
72:20
Unit (7)
23:7 64:23 65:2,5
66:20 85:20 86:6
UNITED (1)
1:2
University (1)
12:9
unknown (1)
49:12
unpaid (11)
52:12 53:5 71:24
72:24 73:6,17,19,24
75:5,15 77:6
unrelated (1)
13:11
unsecured (12)
18:13 33:15 47:15

48:14 50:6,21,24
51:2,19 52:2,17
53:3
unsuccessful (1)
48:5
upgrades (1)
69:2
use (2)
32:21 41:4
uses (1)
69:6

**V**

Vague (5)
26:19 34:24 42:19
46:12 84:14
valid (1)
26:15
value (9)
30:21 32:2,21 33:3
34:21,25 60:5 62:14
84:12
various (4)
12:11 25:21 56:22
66:14
Vendors (1)
48:4
venture (1)
14:8
version (1)
55:25
versions (1)
61:23
vice (3)
12:21 13:9,17
view (5)
33:19 42:13 63:22
84:20,23
virtue (2)
58:16 66:7
Volcano (1)
82:14
voting (1)
53:9
VP (1)
13:6

**W**

W (1)
6:2
waiting (2)
33:25 74:5
waived (1)
5:6
walk (1)
75:11

want (16)
7:2 18:20 19:18 38:24
40:4,23 41:8 45:11
53:19 56:7 57:9,20
58:19 68:2 78:15
79:22
warranty (1)
45:4
wasn't (2)
49:23 50:5
waterfall (2)
47:8,10
way (8)
10:24 14:18 48:2
49:16 55:5 77:18
83:2 89:19
week (1)
14:23
WESTCHESTER (1)
89:6
We'll (2)
25:12 33:17
we're (7)
30:5 33:14,25 37:17
42:23 53:22 81:3
we've (5)
31:4 33:24 53:18
57:14 84:7
WHEREOF (1)
89:21
willing (1)
22:18
Wilmington (1)
3:7
win (1)
78:8
wind (3)
17:5 19:2,5
winding (2)
18:4 20:24
wind-up (3)
18:19,21,22
wins (3)
76:24 77:13 78:2
Winthrop (2)
2:11 3:10
witness (15)
6:3 17:16 31:12 32:8
34:12 40:15 46:13
55:6 66:2 83:9 87:6
89:11,15,21 90:3
word (3)
32:21,22 58:18
words (6)
17:3 19:9 37:15 51:13
61:15 66:13

**work (3)**
14:13 26:23 78:13
**worked (2)**
28:23 79:19
**working (4)**
17:25 19:14 64:12
82:16
**workup (2)**
29:6,8
**worry (2)**
28:5 86:2
**worth (1)**
77:3
**written (1)**
29:11

———— **X** ————
**X (3)**
90:2,7,7

———— **Y** ————
**Y (2)**
6:2,2
**Yeah (1)**
51:9
**year (1)**
12:23
**years (3)**
12:12,14 18:25
**York (14)**
1:12,12 2:12,13,16
3:13,13 4:7,7,14,14
74:8 89:4,9

———— **Z** ————
**ZIEHL (1)**
3:19

———— **$** ————
**$1 (1)**
49:11
**$1,066,000 (2)**
38:19 43:7
**$105 (1)**
32:22
**$12 (2)**
76:22 77:3
**$18 (2)**
35:6 39:8
**$2,869,468.16 (1)**
71:13
**$20,000 (3)**
36:21 37:12 38:11
**$200 (3)**
35:10 39:11 40:9
**$21 (1)**

39:18
**$21,714,293 (1)**
39:5
**$275 (3)**
32:23 48:21,24
**$32 (1)**
84:18
**$5,666,807 (4)**
71:17,20 77:20 78:18
**$5,680,016 (1)**
72:5
**$500,000 (1)**
80:17
**$66,000 (3)**
38:19 43:7 49:11
**$68,000 (1)**
33:5
**$690,107 (1)**
76:7

———— **0** ————
**066,000 (1)**
49:11
**09-10785 (1)**
1:6

———— **1** ————
**1 (9)**
9:11,12,18 10:12
32:16,24 38:16
76:13 90:9
**1A (1)**
36:11
**1:42 (1)**
2:6
**10 (3)**
63:11 80:4 81:9
**10022-4689 (1)**
4:7
**10036 (1)**
3:13
**10104-0050 (1)**
4:14
**105 (3)**
48:21,22,24
**106 (1)**
6:17
**1070 (1)**
3:6
**11 (13)**
1:5 31:9,19 54:3,11
55:19,21 57:3 58:10
71:5 90:12,15,18
**12th (1)**
80:24
**1290 (1)**

4:13
**13 (1)**
41:24
**15th (1)**
3:21
**150 (1)**
3:21
**1540 (2)**
2:12 3:12
**16 (1)**
77:16
**16.68 (1)**
77:14
**19899 (1)**
3:7
**1997 (1)**
13:20

———— **2** ————
**2 (19)**
10:14 31:8 32:16,24
38:16,16 41:12 43:3
43:14,18 44:2 45:9
45:15,15 54:15,23
59:4 81:9 90:11
**2002 (2)**
13:12,21
**2006 (2)**
13:13 88:10
**2007 (5)**
13:7,15 70:2 72:6
78:18
**2008 (3)**
12:25 13:5,8
**2009 (11)**
70:3,5,7 72:5,8,9 76:2
76:11 78:19,20
82:15
**2010 (11)**
1:13 2:5 13:2 16:13
16:15,19 78:10 84:9
89:22 91:4,21
**21 (2)**
57:5,13
**21st (1)**
78:10
**22 (1)**
43:24
**23 (7)**
43:20 44:10,13 49:14
49:17,19,24
**23rd (1)**
49:18
**24 (9)**
1:13 2:5 44:10 58:25
59:2,5,18 62:6 91:4

**25 (1)**
59:18
**27 (3)**
47:18 50:2,8
**27th (1)**
89:22

———— **3** ————
**3 (18)**
10:14 31:17 32:14,16
32:24 38:16,17
40:21 41:15 43:5
48:21 49:11 57:6,11
57:21 59:6 60:17
90:14
**3:31 (1)**
88:3
**30 (1)**
2:8
**30(b)(6) (2)**
1:10 9:23
**31 (2)**
90:11,14
**33434 (1)**
1:25
**399 (1)**
4:6

———— **4** ————
**4 (9)**
36:9,12 54:2,9 57:2
68:12 71:9 80:17
90:17
**46.8 (4)**
23:4,12,22 24:2

———— **5** ————
**5 (3)**
41:15 70:13 90:20
**51 (1)**
42:2
**54 (1)**
90:17

———— **6** ————
**6 (11)**
2:8 47:16 49:8 50:6
50:15 52:2 53:11
74:14,22 90:5,23
**60 (3)**
77:15,17,24
**60.08 (1)**
76:17
**60.8 (1)**
76:19

———— **7** ————
**70 (1)**
90:20
**74 (1)**
90:23

———— **9** ————
**9 (1)**
90:9
**90277 (1)**
6:17
**94111 (1)**
3:22